# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

MARY T. THOMAS, NEA RICHARD, JEREMY RUTLEDGE, TRENA WALKER, DR. BRENDA WILIAMS, and THE FAMILY UNIT, INC.,

        Plaintiffs,

        v.

MARCI ANDINO, in her official capacity as Executive Director of the South Carolina State Election Commission; JOHN WELLS, in his official capacity as Chair of the South Carolina State Election Commission; CLIFFORD J. EDLER and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission; and HENRY D. McMASTER, in his official capacity as Governor of South Carolina,

        Defendants.

Case No.: _____

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## **INTRODUCTION**

1.     On March 15, 2020, when State health officials reported just 28 confirmed cases of COVID-19 in South Carolina,[1] the Election Commission affirmed its mission "to ensure every eligible citizen has the opportunity to . . . participate in fair and impartial elections, and have the assurance that their votes will count."[2] These are laudable goals, crucial to safeguarding the

---

[1] See Press Release, DHEC Announces Additional Nine Cases of 2019 Novel Coronavirus in South Carolina, scdhec.gov (Mar. 15, 2020), https://www.scdhec.gov/news-releases/dhec-announces-additional-nine-cases-2019-novel-coronavirus-south-carolina.

[2] See Coronavirus (COVID-19) Updates, Securing South Carolina Elections, SCvotes.org (Mar. 15, 2020), https://www.scvotes.org/securing-south-carolina-elections.

fundamental right to vote of all South Carolina electors.  But weeks into a deadly pandemic that

now afflicts thousands of South Carolinians, prompting Governor McMaster to order all

residents to remain at "home or work," it is now clear that two requirements of the election laws

will deprive thousands of the chance to participate in scheduled South Carolina elections by

putting voters like the individual Plaintiffs in this lawsuit to the Hobson's choice of risking their

community's and their own health to vote or not voting at all.

2.      Plaintiffs bring this action to prevent the needless deprivation of their fundamental

right to vote.

3.      First, Plaintiffs challenge the requirement setting forth exclusive categories of

"[p]ersons qualified to vote by absentee ballot," in South Carolina (the "Excuse Requirement").

S.C. Code Ann. § 7-15-320.  A voter who does not qualify under any of the listed categories has

to vote in person on Election Day, or not at all.  Defendants have maintained that none of the

listed absentee "excuses" apply to the thousands of voters like Plaintiff Rev. Jeremy Rutledge

who has preexisting conditions that make exposure to COVID-19 extremely dangerous or

deadly, but would surely vote in person at his polling site but for the ongoing COVID-19

pandemic.  Defendants have also refused to provide an absentee "excuse" for voters like Plaintiff

Trena Walker who reasonably fears that voting in person may result in her contracting or

unintentionally contributing to the spread of COVID-19.  In so doing, Defendants have forced

South Carolina voters to make an untenable decision between risking their health and the health

of their families or giving up their right to vote.  Plaintiffs seek relief enjoining the Excuse

Requirement insofar as it unreasonably burdens their fundamental right to vote while following

South Carolina's directive to remain at "home or work," or while practicing recommended

physical distancing to protect their and their community's health from community transmission

of the novel coronavirus.

4.    Second, Plaintiffs challenge the constitutionality of South Carolina's witness signature requirement on absentee ballots, codified at S.C. Code Ann. § 7-15-220 (the "Witness Requirement," and collectively with the Excuse Requirement, the "Challenged Requirements"). State law requires all mail-in ballots be signed by a third-party witness in addition to the voter, otherwise an absentee ballot goes uncounted.  In the current environment, this poses an unreasonable obstacle to many South Carolina voters, like Plaintiff Mary Thomas, who lives alone and cannot risk contact with third parties while the threat of contagion continues—whether to vote in person or to obtain a witness signature.  The Witness Requirement also violates Sections 3(b) and 201 of the Voting Rights Act, which categorically prohibit the use of "any test or device" including "any requirement that a person as a prerequisite for voting . . . prove his qualifications by the voucher of registered voters or members of any other class."

5.    The Witness Requirement threatens to disenfranchise thousands of voters like Ms. Thomas: almost 30% of the State's residents (about 560,000) live by themselves, and well over 200,000 South Carolinians over 65 years of age—one of the groups most vulnerable to COVID-19—live alone.[3]

6.    And the Challenged Requirements' impact will also fall more heavily on African-American voters in South Carolina, who both live alone in larger percentages than the population as a whole and who are being afflicted by COVID-19 at stunningly disproportionate rates and currently comprise over 56% of the State's virus-related deaths despite making up just 27% of its

_____

[3] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: Selected Social Characteristics of the United States: South Carolina (2018), https://data.census.gov/cedsci/table?q=south%20carolina%20single%20person%20households&g=0400000US45&hidePreview=false&tid=ACSDP1Y2018.DP02&vintage=2018&layer=VT_2018_040_00_PY_D1&cid=DP02_0001E (last visited Apr. 21, 2020).

3

total population.  South Carolina's history of voting-related discrimination against African Americans, as well as continuing discrimination in areas such as education, employment, and healthcare, interacts with the Challenged Requirements to hinder their ability to participate effectively in the political process in violation of Section 2 of the Voting Rights Act.

7.    COVID-19 is an unprecedented public health emergency.  The current crisis has yet to reach its "peak,"[4] and will still pose a public health risk in June.[5]  Models project that infections will rebound in the fall, even if the current outbreak subsides before then.[6]  In this context, the two challenged requirements will each, separately and jointly, unduly burden the right to vote of South Carolina voters.  This is certainly true for South Carolina's statewide primaries in June, and will foreseeably remain true for the November general election as well.

8.    Neither of the requirements' undeniable burdens on voters are justified.  South Carolina already allows voters to vote absentee if they cannot vote in person "because of injury or illness."  S.C. Code Ann. § 7-15-310.  But current interpretation of state law by Andino and the SEC does not recognize that voters  who choose to stay home to mitigate the spread of COVID-19 are *all* unable to vote in person because of an illness, *whether or not they have knowingly contracted the disease*.  The State could remedy the unconstitutional disenfranchisement that the qualification requirement will cause by allowing voters to vote

---

[4] *See* Institute for Health Metrics and Evaluation, COVID-19 projections assuming full social distancing through May 2020: South Carolina, https://covid19.healthdata.org/united-states-of-america/south-carolina (last visited Apr. 21, 2020).

[5] *Id.*

[6] *See Dr. Fauci anticipates coronavirus outbreak in the fall*, COUNTON2 NEWS (Mar. 31, 2020) ("Fauci said he anticipates coronavirus will be cyclical and return in the fall because of its degree of transmissibility."), https://www.counton2.com/news/national-news/dr-fauci-anticipates-coronavirus-outbreak-in-the-fall/.

absentee for that reason, as public officials in Alabama, Arkansas, Delaware, Indiana, Massachusetts, New Hampshire, New York, and West Virginia have already done during the current crisis.

9.     And while election integrity is a critical interest, the witness signature rule does very little if anything—nor is it properly tailored—to serve this interest in light of the many other provisions of South Carolina law that safeguard absentee voting and penalize those who abuse the process.  Indeed, the fact that South Carolina is one of only 11 states that require an individual submitting an absentee ballot to have another adult witness and sign their ballot envelope further underscores the requirement's lack of necessity.  Regardless, whatever additional marginal benefit the witness rule may offer, such benefit is greatly outweighed by the risk of disenfranchisement.

10.     Plaintiffs therefore ask that the Court enjoin South Carolina's limitations on qualifications to vote by means of an absentee ballot and its absentee witness rule and declare them unconstitutional for the duration of the 2020 election calendar.

## **PARTIES**

11.     Plaintiff Nea Richard is a 22-year-old African-American student at Claflin University, a historically Black university in Orangeburg, South Carolina.  She is a U.S. citizen, and is a lawfully registered voter in her hometown of Cross Hill, South Carolina.  Though her school has transitioned to online instruction, Ms. Richard continues to reside in Orangeburg.  While in school, Ms. Richard has travelled two hours to Cross Hill for each election so that she can vote in person and serve as a poll worker.  She intends to vote in person and serve as a poll worker again in Cross Hill for the 2020 state primary and general elections.  From Ms. Richard's experience as a poll worker, she is familiar with the many forms of close contact that poll

workers and voters are forced to make at polling sites, like sharing pens and touching voting

machine screens. If the Challenged Requirements are not eliminated, Ms. Richard reasonably

fears that the Challenged Requirements will significantly increase congestion at her precinct,

make it nearly impossible to properly clean the precinct, and will needlessly contribute to the

spread of COVID-19 and potentially her own infection. The elimination of the Challenged

Requirements will protect Ms. Richard and other people in the precinct by meaningfully

reducing the number of in-person voters and lowering the concomitant increased risk of

transmission caused by excessive congestion due to the lack of alternatives to in-person voting

for most voters.

12.    Plaintiff the Reverend Jeremy Rutledge is a 49-year-old senior pastor of the

Circular Congregational Church, located in Charleston. He is white. He resides in Mt. Pleasant,

South Carolina. He is a U.S. citizen, has never lost his right to vote by reason of a felony

conviction or court order, and is a registered voter in South Carolina. Rutledge is at risk of

severe complications from the novel coronavirus and COVID-19 because he lives with systemic

scleroderma, a chronic, autoimmune disorder that affects the skin and internal organs.

Rutledge's condition has caused him to suffer from interstitial lung disease, which in the past has

caused severe scarring (fibrosis) of his lungs. For years, Rutledge has treated his medical

conditions with immunosuppressant medication. These drugs help Rutledge maintain a

relatively healthy, active life by preventing his immune system from dangerously causing his

lung tissue to thicken, but also make Rutledge particularly vulnerable to respiratory ailments like

COVID-19 and pneumonia. As a result, Rutledge has strictly self-quarantined himself at home

with his wife and son since at least mid-March and does not anticipate that he will feel safe

outside his home until a vaccine or cure for the novel coronavirus and COVID-19 have been

developed or found.  In the likely event that public officials ease social distancing restrictions

before a vaccine or cure are available, Rutledge anticipates that his family will find another place

to live so that his wife and son return to work and school while he remains self-quarantined in

their family home.  Rutledge has routinely voted in person on Election Day until the COVID-19

pandemic and does not consider himself physically disabled.  Under Defendants' interpretation

of the Excuse Requirement, he therefore does not qualify to vote absentee.  He must therefore

either vote in person or forego his right to vote in South Carolina elections.  In the event that his

wife and son return to work and school and he remains self-quarantined by himself in their

family home, Rutledge will have no way to obtain a witness's signature on an absentee ballot

without putting himself in grave danger of severe illness.

13.     Plaintiff Mary Thomas is an 86-year-old retiree who lives alone at her residence in

Charleston, South Carolina.  She is a U.S. citizen, has never lost her right to vote by reason of a

felony conviction or court order, and is a registered South Carolina voter.  She is African

American.  Before retiring, Ms. Thomas worked as a licensed public nurse (LPN) and as a

clinical pastoral chaplain.  Ms. Thomas is at risk of severe complications from the novel

coronavirus and COVID-19 because of her age and preexisting medical conditions, including

hypertension and gout.  She is partially blind.  She has voted absentee in South Carolina for over

twenty years, either by reason of being physically disabled or because she is over 65 years of

age.  Ms. Thomas has been quarantining herself since approximately mid-March and has cut off

all in-person contact with others unless absolutely necessary—*e.g.*, because of a health

emergency.  She intends to vote absentee again in this year's elections, including the June

primary and November general, in part, to avoid the documented risk that COVID-19 poses to

her health and life.  Ms. Thomas understands that a witness signature is needed to vote absentee

in South Carolina.  However, because she lives alone and is currently adhering to a strict self-quarantine, she has no way to obtain a witness's signature on her absentee ballot without gravely endangering her health.

14.     Plaintiff Trena Walker is a 53-year-old, single caregiver to three children under 12 who lives in the Mixson development in North Charleston, South Carolina.  She is African American and a U.S. citizen.  She is a lawfully registered South Carolina voter.  She is presently unemployed; in the past, she has worked as a nursery teacher for preschoolers and as a teacher's assistant for the Charleston County School District.  Ms. Walker is legally blind.  She does not live with any person considered legally competent to sign legal documents in South Carolina. Ms. Walker intends to vote in the June primary and November general elections.  She usually votes in person, but is fearful of doing so again in forthcoming elections because her medical history of breast cancer and emphysema put her at high risk of grave complications from COVID-19.  For that reason, Ms. Walker has followed social distancing and quarantine recommendations to the best of her ability, and does not leave her home except when necessary to purchase food for her and her children.  Ms. Walker also closely follows public health officials' specific recommendations to African Americans and is particularly reluctant to leave her home because of the disproportionately harmful effects that COVID-19 has already had on Black people.  Ms. Walker expects she will not feel safe leaving her home until a vaccine against the virus is developed or a cure is identified.  She is fearful that leaving her home will only become more dangerous in the event that public officials ease social distancing restrictions before a vaccine or cure are available.  Ms. Walker does not qualify to vote absentee under any of the state law "excuses" as interpreted by Andino and the SEC. If the Challenged Requirements were eliminated, Ms. Walker would vote by absentee ballot to reduce the chances of contracting

8

COVID-19.

15.    Dr. Brenda Williams, MD, is the 68-year-old Founder and Executive Director of the Family Unit, Inc. Dr. Williams is African American and lives in Sumter County, South Carolina with her husband.  She is a U.S. citizen and is a lawfully registered voter in Sumter County.  Dr. Williams intends to vote in the 2020 state primary and general elections.  She recently learned that she has contracted COVID-19.  She is self-quarantining.  Her infection will prevent her from assisting or witnessing the absentee ballots for many of the Family Unit, Inc.'s members and constituents who have no one else to assist them with or witness their absentee ballots.  As a registered voter over age 65, Dr. Williams qualifies for an absentee ballot.  Because of her diagnosis and the need to self-quarantine, however, the Witness Requirement acts as a stumbling block for her and may result in the denial or abridgment of her right to vote amid the COVID-19 pandemic.  Even after her symptoms subside, Dr. Williams is reasonably fearful that, if she appears in-person to vote or acts to assist others in complying with the Challenged Requirements in the 2020 elections, she may unintentionally and unknowingly infect others.

16.    Plaintiff the Family Unit, Inc. is a 501(c)(3) nonpartisan, charitable nonprofit organization with the mission of empowering and serving the needs of the low-income community of Sumter County, South Carolina.  The Family Unit is led by Plaintiff Dr. Brenda C. Williams.  The Family Unit's constituents and members are mostly African Americans and/or low-income people with a high school education or less.  As part of its mission, the Family Unit educates and registers voters, including people who are pretrial detainees; helps eligible voters to understand and perform absentee voting; restores abandoned homes and donates them to working-poor families to live in; helps people find employment; volunteers with elderly people; and advocates for improved school facilities for children in the Sumter County area. In recent

years, the Family Unit's members and constituents have had their absentee ballots rejected

because of the Witness Requirement.  The difficulties experienced by the Family Unit's

members and constituents in attempting to vote absentee under the Challenged Requirements

have been magnified substantially by the COVID-19 pandemic.

17.    As a direct result of the Challenged Requirements, the Family Unit has been

forced to divert its extremely limited resources and time away from its core activities to

investigate, respond to, mitigate, and address the concerns of its members and constituents

impacted or disenfranchised by the Challenged Requirements as interpreted by Andino and the

SEC and Defendants' inadequate efforts to protect voters from COVID-19 ahead of the 2020

elections.  For example, after learning about the impact of the Challenged Requirements on its

members and constituents, Dr. Williams began an investigation that included requesting

information from county election officials, interviewing affected voters, and reviewing

information about the impact of the Challenged Requirements.  Based on data provided by

election officials, every year, the ballots of hundreds of voters in each county are rejected

because of the Witness Requirement.  In absence of the Challenged Requirements, the Family

Unit would not have had to engage in these activities.

18.    Defendant Marci Andino is the Executive Director of the South Carolina Election

Commission and is sued in her official capacity.  The Executive Director is the Chief

Administrative Officer for the State Election Commission and is required by law to supervise the

County Boards of Voter Registration and Elections.  S.C. Code Ann. § 7-3-20.  In this role, she is

tasked with ensuring that the County Boards comply with state and federal law in conducting

elections and voter registration.  *Id.* § 7-3-20(C).

19.    Defendant John Wells is the Chair of the South Carolina Election Commission

and is sued in his official capacity.  Defendants Clifford J. Edler and Scott Moseley are members

of the South Carolina Election Commission and are sued in their official capacities.  The

Executive Director serves at the pleasure of the South Carolina Election Commission.  S.C. Code

Ann. § 7-3-20(A).  The mission of the South Carolina Election Commission is "to ensure every

eligible citizen has the opportunity to register to vote and participate in fair and impartial

elections with the assurance that every vote will count."[7]

20.     Defendant Henry D. McMaster is the Governor of South Carolina.  As Governor,

the South Carolina Constitution vests in him the "supreme executive authority" of the State.  S.C.

Const. Art. IV, § 1.  He has statutory power to proclaim an emergency in the State and may

"cope with such threats and danger" as it presents pursuant to his authority to "order and direct

any person or group of persons to do any act which in his opinion, endanger life, limb or

property."  S.C. Code Ann. § 1-3-430.  He has "full power by use of all appropriate available

means to enforce such order or proclamation."  *Id.*

## JURISDICTION AND VENUE

21.     This action arises under the First and Fourteenth Amendments to the U.S.

Constitution and the Voting Rights Act, and is brought under 42 U.S.C. §§ 1983 and 1988 and

52 U.S.C. §§ 10301, 10302(b) and 10501 to seek injunctive and declaratory relief for violations

of constitutional rights under color of state law.  This Court therefore has subject matter

jurisdiction under 28 U.S.C. §§ 1331 and 1343.

22.     This Court has personal jurisdiction over Defendants, who are sued in their

official capacities as state officials.  The violations complained of concern their conduct in such

---

[7] *See* About the SEC, Mission Statement, https://www.scvotes.org/about-sec (last visited Apr. 21, 2020).

capacities.

23.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

24.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants reside in this judicial district, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claims occurred there.

## STATEMENT OF FACTS

### I.    Transmission of COVID-19 and Public Health Guidelines

25.     Our nation faces a public health emergency caused by the exponential spread of COVID-19, the respiratory disease caused by the novel coronavirus SARS-CoV-2.  According to the CDC, this coronavirus spreads aggressively and asymptomatic people can spread it.[8]  All age groups have contracted the disease.[9]

26.     The United States is the current epicenter of the global COVID-19 pandemic.  As of early April, the United States led the world in the total number of COVID-19 cases, surpassing previous leaders China and Italy.  While statistical models have improved to estimate fewer U.S. deaths than initially anticipated, leading models still project as many as 60,000 people in the United States may die from COVID-19 in the pandemic—assuming "full social distancing" measures are followed through May 2020.[10]

---

[8] Ctrs. for Disease Control & Prevention, *How Coronavirus Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 21, 2020).

[9] Robert Verity, PhD. et al., Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis, Lancet Infec Dis (March 30, 2020), 6.

[10] IHME, *COVID-19 projections assuming full social distancing through May 2020 (as of April 13, 2020)*, https://covid19.healthdata.org/united-states-of-america; *see also* Bill Chapel, *Fauci Says U.S. Coronavirus Deaths May Be 'More Like 60,000'; Antibody Tests on Way*, S.C. PUBLIC RADIO (Apr. 9,

27.     The World Health Organization (WHO) estimates that approximately 20% of those who are infected by SARS-CoV-2 require hospitalization.[11]  COVID-19 can severely damage lung tissue, cause a permanent loss of respiratory capacity, and also damage tissues in the kidney, heart, and liver.[12]  The surge of COVID-19 cases causes mounting strains on healthcare systems, including critical shortages of doctors, nurses, hospital beds, medical equipment, and personal protective equipment (PPE).

28.     Estimates from early March put the fatality rate for people infected with COVID-19 at approximately ten times higher than even a severe flu season, including in countries with advanced healthcare systems.[13]

29.     People of all ages have contracted COVID-19 and died from it, but the illness poses special risks for the elderly and those with certain preexisting medical conditions. Preliminary reports based on WHO data show a 3.6% mortality rate for individuals between 60-69 years old, an 8% mortality rate for those 70-79 years old, and a 14.8% mortality rate for those who are 80 years old or older.[14]  COVID-19 also poses greater risks for people with preexisting heart and respiratory conditions, individuals with compromised immune systems, and those with

---

2020), https://www.southcarolinapublicradio.org/post/fauci-says-us-coronavirus-deaths-may-be-more-60000-antibody-tests-way.

[11] World Health Organization, Q&A on Coronaviruses (COVID-19), "Should I Worry About COVID-19?," https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited Apr. 21, 2020).

[12] Ctrs. for Disease Control & Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited Apr. 21, 2020).

[13] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020, 12:49 PM), https://www.wsj.com/articles/coronavirus-vs-flu-which-virus-is-deadlier-11583856879; *see also Castillo v. Barr*, No. 20-00605, 2020 WL 1502864, at *2 (C.D. Cal. Mar. 27, 2020) ("COVID-19 is highly contagious and has a mortality rate ten times higher than influenza.").

[14] Ctrs. for Disease Control & Prevention, *supra* note 12.

many other conditions.[15]

30.    The effects of the pandemic on social life will last well into the summer of 2020, if not much longer.  Even into the summer months, experts have indicated that COVID-19 "will face less immunity and thus transmit more readily even outside of the winter season," and that season changes are "unlikely to stop transmission."[16]  Further, even those who develop an immune response to the virus after an infection are not necessarily safe from reinfection, as we do not yet have sufficient data about how long immunity to the virus will last.[17]  Dr. Anthony Fauci, head of the National Institute of Allergy and Infectious Diseases, recently said that he "can't guarantee" in-person voting will be safe in November, because of a potential resurgence of COVID-19 in the fall.[18]

31.    With no known effective treatment, and vaccines months (or more) away, public health officials have been left to urge the public to practice 'social distancing,' frequent (and thorough) hand washing, and avoidance of close contact with others.[19]  The CDC has issued guidance informing individuals to avoid public gatherings until at least May 15, 2020.

---

[15] Ctrs. for Disease Control & Prevention, *Groups at Higher Risk of Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 21, 2020).

[16] Marc Lipsitch, DPhil, Professor of Epidemiology and Director, Center for Communicable Disease Dynamics, Harvard T.H. Chan School of Public Health, *Seasonality of SARS-CoV-2: Will COVID-19 go away on its own in warmer weather?,* https://ccdd.hsph.harvard.edu/will-covid-19-go-away-on-its-own-in-warmer-weather/.

[17] Apoorva Mandavilli and Katie Thomas, *Will an Antibody Test Allow Us to Go Back to School or Work?*, N.Y. TIMES (Apr. 10, 2020), https://www.nytimes.com/2020/04/10/health/coronavirus-antibody-test.html.

[18] Jason Silverstein, *Fauci says he "can't guarantee" in-person voting in November will be safe,* CBS NEWS (Apr. 13, 2020), https://www.cbsnews.com/news/coronavirus-fauci-says-he-cant-guarantee-in-person-voting-in-november-will-be-safe/?ftag=CNM-00-10aac3a.

[19] Johns Hopkins University, *Coronavirus, Social Distancing and Self-Quarantine*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-

32.    The majority of American voters still vote in person, at a polling place, on Election Day.[20]  To some—such as homeless, visually impaired, limited English proficient or illiterate voters who need accessible voting machines and personal assistance—meaningful opportunities to physically vote in person early or on Election Day are critical.  For this reason, the CDC has issued specific guidelines concerning voting during the COVID-19 pandemic. Among other things, it recommends that states "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations" including "mail-in methods of voting if allowed in the jurisdiction."[21]

33.    These are essential recommendations given the relatively minimal risks of voting in person during the pandemic versus voting by mail.  There is no evidence that SARS-CoV-2 can be spread through the mail, and the U.S. Postal Service has further changed their policies to "eliminate the requirement that customers sign our Mobile Delivery Devices for delivery" and now require the customer "to step back a safe distance or close the screen door/door so that they may leave the item in the mail receptacle or appropriate location by the customer door."[22]

34.    In contrast, the risks of interpersonal interaction while voting are already evident.

---

distancing-and-self-quarantine (last visited Apr. 21, 2020); Declaration of Dr. Jonathan Louis Golob at ¶ 8, ECF No. 5, *Dawson v. Asher*, 2:20-cv-00409-JLRMAT (W.D. Wash. Mar. 16, 2020).

[20] *See, e.g.*, Jordan Misra, *Behind the 2018 U.S. Midterm Election Turnout*, Census.gov (Apr. 23, 2019) (showing 60% of voters who cast ballot in 2018 did so "in person on Election Day"), https://www.census.gov/library/stories/2019/04/behind-2018-united-states-midterm-election-turnout.html.

[21] Ctrs. for Disease Control & Prevention, *Recommendations for Election Polling Locations: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated March 27, 2020).

[22] United States Postal Service. *USPS Statement on Coronavirus* (April 2, 2020), https://about.usps.com/newsroom/statements/usps-statement-on-coronavirus.htm (citing guidance from World Health Organization, CDC, and Surgeon General).

During Florida's recent primary, two Broward County poll workers tested positive for COVID-19, one of whom was handling driver's license as part of the identification verification process.[23] And on April 13, Chicago officials reported that a poll worker for the city's March 17 election died of COVID-19, prompting officials to send letters notifying voters, poll workers, field investigators, and cartage companies who were present at the same polling site.[24]

35.    Elections held on April 7 in Wisconsin saw multi-hour waits and lines stretching blocks upon blocks in places like Milwaukee and Green Bay, in part, because government officials there were unable to create a viable vote-by-mail process for all voters.  These crowded lines are ideal places for person-to-person contagion, and led Wisconsin health officials to anticipate that the large numbers of in-person voting on April 7 would result in "an increase in the number of cases in Wisconsin [and] more deaths."[25]  By April 21, health officials in Milwaukee had identified at least 19 individuals who either voted in-person or worked at a polling location on election day and now test positive COVID-19.[26]  At a minimum, health officials believe that seven of those new cases are directly linked to in-person voting in

---

[23] Anthony Man, *Two Broward poll workers, including one who handled voters' driver licenses, test positive for coronavirus*, S. FLA. SUN SENTINEL (Mar. 26, 2020), https://www.sun-sentinel.com/coronavirus/fl-ne-browardelections-poll-workers-coronavirus-20200326-wmgy775dvjc5jis2oagxlpmule-story.html.

[24] *See* Mary Ann Ahern, *Poll Worker at Chicago Voting Site Dies of Coronavirus, Election Officials Say*, NBC CHICAGO (Apr. 13, 2020), https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/.

[25] Devi Shastri, *In-person voting was likely a 'disaster' for Wisconsin's efforts to flatten coronavirus curve, national experts say*, MILWAUKEE J. SENTINEL (Apr. 8, 2020) (quoting Wisconsin Department of Health Services Secretary Andrea Palm), https://www.jsonline.com/story/news/politics/elections/2020/04/08/coronavirus-wisconsin-election-likely-hurt-effort-flatten-curve/2961718001/.

[26] Kendall Karson, *19 new cases of coronavirus in Wisconsin linked to election activities: State health officials*, ABC NEWS (Apr. 21, 2020), https://abcnews.go.com/Politics/cases-coronavirus-wisconsin-linked-election-activities-state-health/story?id=70264956.

Wisconsin, including six voters and one poll worker.[27]

## II.    COVID-19 in South Carolina

36.    The COVID-19 pandemic has deeply affected the Palmetto State.  As of April 17, 2020, the State had confirmed over 4,000 cases,[28] with public health officials warning that thousands more have likely gone uncounted or untested.[29]  Over 100 South Carolinians have died from the disease.[30]

37.    Models used by health officials predict that the State has not yet seen the worst of the pandemic, which will reach its "peak" in early May and at that point demand the most of South Carolina's health resources.[31]  These models project a sustained outbreak in South Carolina will continue into the summer, if not longer.[32]

38.    As has been the case nationally, South Carolinians of all ages have tested positive for COVID-19.  As of April 14, the youngest person to test positive in South Carolina was 2 months old; the oldest was 101.[33]

---

[27] Alex Seitz-Wald, *7 Wisconsin coronavirus infections linked to election day, health official says*, NBC NEWS (Apr. 21, 2020), https://www.nbcnews.com/politics/2020-election/7-wisconsin-virus-cases-linked-person-voting-n1188606.

[28] Emily Bohatch, *SC coronavirus cases top 4,000, state health officials say*, THE STATE (Apr. 17, 2020) (citing Officials with the S.C. Department of Health and Environmental Control) https://www.thestate.com/news/coronavirus/article242084471.html.

[29] *See id.* (citing state officials stating that "86% of COVID-19 cases in the state have not been identified or tested," meaning, South Carolina "likely has more than 29,000 cases.").

[30] *Id.*

[31] *See* Institute for Health Metrics and Evaluation, COVID-19 projections assuming full social distancing through May 2020: South Carolina, https://covid19.healthdata.org/united-states-of-america/south-carolina (last visited Apr. 21, 2020).

[32] *Id.*

[33] *See* DHEC, *SC Demographic Data (COVID-19)*, https://www.scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/sc-demographic-data-covid-19 (last visited Apr. 21, 2020); *see also* Laurel Mallory, *Breaking down COVID-19 cases, deaths in SC by age, sex, race*,

17

39.    In response, the South Carolina Department of Health and Environmental Control ("DHEC") has urged social distancing by "staying home as much as possible, staying at least 6 feet away from other people while in public, and avoiding gatherings with many people present."[34]  According to DHEC, "[t]hese are the best ways to protect yourself and our communities from the spread of COVID-19."

40.    To combat viral spread, Governor McMaster has also taken a series of increasingly aggressive steps since early March, including by issuing various executive orders. These orders have had the incremental effect of closing down most "non-essential" businesses and requiring residents of the State to essentially shelter in place.[35]

41.    On March 13, Governor McMaster issued Executive Order No. 2020-08, declaring a State of Emergency for South Carolina.[36]  On the same day, President Donald Trump proclaimed a National Emergency concerning COVID-19.[37]

42.    On March 15, Governor McMaster issued Executive Order No. 2020-09, directing the closure of all public schools in South Carolina beginning Monday, March 16 through

---

WISNEWS (Apr. 16, 2020), https://www.wistv.com/2020/04/15/breaking-down-covid-cases-deaths-sc-by-age-sex-race/.

[34] DHEC, *Protect Yourself & Those Around You (COVID-19)*, https://www.scdhec.gov/protect-yourself-those-around-you-covid-19 (last visited Apr. 21, 2020).

[35] S.C. Exec. Order No. 2020-07 (Mar. 11, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-11%20FILED%20Executive%20Order%20No.%202020-07%20-%20Suspending%20Transportation%20Regulations%20Due%20to%20NC%20Emergency%20%20Coronavirus%20(002).pdf.

[36] *Id.*

[37] Proclamation No. 9994, 85 Fed. Reg. 15337 (2020),  https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

Tuesday, March 31, 2020.[38]

43.    Executive Order No. 2020-09 also postponed or rescheduled all elections scheduled to be held in the state on or before May 1, 2020.[39]  It delegated responsibility to the State Election Commission ("SEC") to ensure that candidate filing period(s) continued and that individuals could continue to register to vote.  Town, city, and county referendums and elections planned for March 19, March 24, March 31, April 7, April 14, and April 28 were all postponed accordingly.[40]

44.    On March 27, President Trump approved a major disaster declaration for South Carolina, which made federal emergency aid available for recovery efforts due to the COVID-19 pandemic.[41]

45.    On March 28, Governor McMaster issued Executive Order No. 2020-15, declaring a "new, separate, and distinct" state of emergency based on his determination that COVID-19 posed an "actual, ongoing and evolving public health threat" to the State of South

---

[38] S.C. Exec. Order No. 2020-09 §2 (Mar. 15, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-15%20FILED%20Executive%20Order%20No.%202020-09-%20Closing%20Schools%20Cancelling%20Elections%20Other%20Provisions%20Due%20to%20COVID-19.pdf.

[39] S.C. Exec. Order No. 2020-09 §3 (Mar. 15, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-15%20FILED%20Executive%20Order%20No.%202020-09-%20Closing%20Schools%20Cancelling%20Elections%20Other%20Provisions%20Due%20to%20COVID-19.pdf.

[40] South Carolina Election Commission, *March & April Elections Postponed Due to Coronavirus* (Mar. 15, 2020), https://www.scvotes.org/march-april-elections-postponed-due-coronavirus.

[41] *See* FEMA, *President Donald J. Trump Approves Major Disaster Declaration for South Carolina* (Mar. 27, 2020), https://www.fema.gov/news-release/2020/03/27/president-donald-j-trump-approves-major-disaster-declaration-south-carolina.

Carolina.[42]

46.    On March 31, Governor McMaster issued Executive Order No. 2020-17, directing "non-essential" businesses to close to non-employees and the public.  That order was followed by Executive Order No. 2020-18 on April 3, which expanded the definition of "non-essential" businesses that should be closed to non-employees and the public to include retail stores.[43]

47.    On Monday, April 6, Governor McMaster issued Executive Order No. 2020-21, a mandatory statewide "Home or Work" order requiring "[a]ll South Carolinians [to] remain at home or work unless visiting family, exercising, or obtaining goods or services."[44]  The order instructs residents of the State to "limit social interaction, practice 'social distancing' . . . and take every possible precaution to avoid potential exposure to" viral infection.  It directs individuals in South Carolina to "take reasonable steps to maintain six (6) feet of separation from any other person."[45]  It orders residents to limit movement outside the home except for the

---

[42] S.C. Exec. Order No. 2020-15 (Mar. 28, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-28%20eFILED%20Executive%20Order%20No.%202020-15%20-%20State%20of%20Emergency%20Due%20to%20COVID-19%20Pandemic.pdf.

[43] S.C. Exec. Order No. 2020-18 §1(B) (Apr. 3, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-03%20eFILED%20Executive%20Order%20No.%202020-18%20-%20Closure%20of%20Additional%20Non-Essential%20Businesses.pdf.

[44] S.C. Exec. Order No. 2020-21 at 6, (Apr. 6, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-06%20eFILED%20Executive%20Order%20No.%202020-21%20-%20Stay%20at%20Home%20or%20Work%20Order.pdf; see also Office of Gov. McMaster, Governor McMaster Issues "Home or Work" Order, SC.Gov (Apr. 7, 2020), https://governor.sc.gov/news/2020-04/governor-mcmaster-issues-home-or-work-order.

[45] S.C. Exec. Order No. 2020-21 (Apr. 6, 2020) https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-06%20eFILED%20Executive%20Order%20No.%202020-21%20-%20Stay%20at%20Home%20or%20Work%20Order.pdf.

purposes of visiting essential businesses, engaging in essential activities, or conducting critical

infrastructure operations.

48.    In issuing the "Home or Work" order, Governor McMaster explained that he took

the steps, in part, because "[t]oo many people are not complying with [our] requests for social

distancing."[46]  Additionally, he clarified that, while not named as such, his April 6 order is a

"stay-at-home order."[47]

49.    The April 6 "Home or Work" order expressly exempts gatherings of government

officials, employees, or personnel needed to perform "essential government functions," but

directs state and local governments to "utilize any available technology or reasonable

procedures" to "accommodate public participation via virtual or other remote or alternate means"

in those functions "to the extent possible."[48]

50.    This Court has taken similar steps in light of the pandemic, including closing the

Clerk's Office public counters until further notice.[49]  On April 14, this District Court continued

"[a]ll civil and criminal jury selections, jury trials, and roster meetings scheduled to commence

through July 5, 2020."[50]

51.    On April 16, Governor McMaster sent a letter to the leadership of the State's

General Assembly to inform them of his view that the legislature should avoid returning for

---

[46] Joseph Bustos & Maayan Schechter, *Gov. McMaster toughens SC coronavirus stance, ordering state to work or 'stay home'*, THE STATE (Apr. 6, 2020), https://www.thestate.com/news/coronavirus/article241807571.html.

[47] *Id.* ("Asked on Monday why not call his new executive order a 'stay-at-home' mandate, the governor said: 'This is a stay-at-home order.  You call it what you like, but it says, 'stay at home.'").

[48] *Id.*

[49] *In re: District Clerk's Office Operations*, Misc. No. 20-mc-00122, Doc. No. 1 (D.S.C. Mar. 31, 2020).

[50] *In re: Court Operations Response to COVID-19*, Misc. No. 20-mc-00139, Doc. No. 1 (D.S.C. Apr. 14, 2020).

session any time before May 14, which "could place the health and safety of [its] members at an elevated risk for exposure to the virus."  A true and accurate copy of Governor McMaster's letter is attached hereto as Exhibit 1.  Governor McMaster explained that he "believe[d] – and hope[d] – that by late June that risk will have diminished to the extent that businesses and activities in our state may be safely resumed and conducted using personal safety precautions."

52.    On April 20, Governor McMaster issued Executive Order No. 2020-28, which, in relevant part, modified and amended his April 6 "Home or Work" order to ease restrictions on public beach use and on certain retail businesses including furniture, clothing, jewelry, and department stores.[51]  These and other listed businesses were authorized to re-open for business to the public as of 5:00 p.m. on April 20, provided they strictly follow social distancing measures.[52]

### III.    COVID-19's Impact on African-American South Carolinians in Light of Ongoing and Historical Discrimination

53.    Nationally, the COVID-19 pandemic has had a particularly devastating effect on African-American communities.  An analysis by the Associated Press—one of the first attempts to examine the racial disparities of COVID-19 cases and deaths nationwide—found that, in areas where the demographic data has been publicly shared by government officials, African Americans have made up 42% of people who have died from COVID-19, despite accounting for roughly only 21% of the total population in these areas.[53]  And a CDC report published April 8,

---

[51] S.C. Exec. Order No. 2020-28 (Apr. 20, 2020).

[52] Gov. Henry McMaster (@henrymcmaster), TWITTER (Apr. 20, 2020, 5:15 PM), https://twitter.com/henrymcmaster/status/1252345270588698627.

[53] Kat Stafford et al., *Outcry over racial data grows as virus slams black Americans*, ASSOCIATED PRESS (Apr. 8, 2020), https://apnews.com/71d952faad4a2a5d14441534f7230c7c?fbclid=IwAR1plunY_qfeA2KrSUPA1TuJobAwQh53a_Qlkf5dw0dWjz-iz85GA1FOt4.

2020, which included data from 1,482 patients hospitalized across 14 states, found that African-American patients made up 33% of those for whom race or ethnicity information was available, despite representing only 18% of the states' populations.  This "suggest[ed] that black populations might be disproportionately affected by COVID-19."[54]

54.     Courtney Cogburn, an associate professor at the Columbia University School of Social Work, noted that "[t]here are patterns at this intersection of race and socioeconomic status that make it very clear this is just not a story about poverty."  That is, racial disparities in serious illness and death due to COVID-19 are inextricably linked to a long history and ongoing patterns of racial discrimination against African Americans:

> A history of systemic racism and inequity in access to health care and economic opportunity has made many African Americans far more vulnerable to the virus. Black adults suffer from higher rates of obesity, diabetes and asthma, which make them more susceptible, and also are more likely to be uninsured.  They also often report that medical professionals take their ailments less seriously when they seek treatment.[55]

55.     These trends were in view relatively early in South Carolina, which as of early April already "reported a ratio of Black residents to white residents who ha[d] tested positive for the virus that well exceeds the general population ratio."[56]  In South Carolina, there is well-documented and alarming racially disparate patterns of serious illness and mortality due to

---

[54] CDC Morbidity and Mortality Weekly Report, Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019—COVID-NET, 14 States, March 1-30, 2020 (Apr. 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6915e3-H.pdf.

[55] Kat Stafford et al., *Outcry over racial data grows as virus slams black Americans*, ASSOCIATED PRESS (Apr. 8, 2020), https://apnews.com/71d952faad4a2a5d14441534f7230c7c?fbclid=IwAR1plunY_qfeA2KrSU-PA1TuJobAwQh53a_Qlkf5dw0dWjz-iz85GA1FOt4.

[56] *See* John Eligon et al., *Black Americans Face Alarming Rates of Coronavirus Infection in Some States*, N.Y. TIMES (Apr. 7, 2020).

COVID-19.  As of April 16, African Americans in South Carolina represented 41% of reported

COVID-19 cases and a staggering 57% of related deaths[57] despite making up just 27% of the

State's population.[58]  Based on these numbers, African-American South Carolinians have been

twice as likely to contract COVID-19 than white South Carolinians, and five times more likely to

die from it.

56.    South Carolina has long experienced patterns of racial discrimination in health

and socioeconomic life patterns that render African-American South Carolinians at greater risk

of severe health complications from COVID-19.  For example, because of longstanding racial

biases in medical care,[59] African Americans with symptoms like cough and fever are less likely

than other patients to be given one of the scarce COVID-19 tests.[60] Persistent structural

inequalities mean that African Americans have less access to healthcare, health insurance, or

emergency medical help.  DHEC has recognized that African Americans are "disproportionately

affected by [lack] of access to care,"[61] and that "[u]nderlying medical conditions such as

diabetes, heart disease, hypertension, obesity, and asthma might make it more likely that African

---

[57] DHEC, *SC Demographic Data (COVID-19)*, https://scdhec.gov/sc-demographic-data-covid-19 (last visited Apr. 21, 2020).

[58] U.S. Census Bureau, *QuickFacts South Carolina*, https://www.census.gov/quickfacts/SC (last visited Apr. 21, 2020).

[59] *See, e.g.*, Michael O. Schroeder, *Racial Bias in Medicine Leads to Worse Care for Minorities*, U.S. NEWS (Feb. 11, 2016), https://health.usnews.com/health-news/patient-advice/articles/2016-02-11/racial-bias-in-medicine-leads-to-worse-care-for-minorities.

[60] *See* Rubix Life Sciences, Health Data in the COVID-19 Crisis: How Racial Equity is Widening for Patients to Gain Access to Treatment (Mar. 20, 2020), https://rubixls.com/wp-content/uploads/2020/04/COVID-19-Minority-Health-Access-7-1.pdf; *see also* Blake Farmer, *The Coronavirus Doesn't Discriminate, But U.S. Health Care Showing Familiar Biases*, NPR (Apr. 2, 2020), https://www.npr.org/sections/health-shots/2020/04/02/825730141/the-coronavirus-doesnt-discriminate-but-u-s-health-care-showing-familiar-biases.

[61] SouthCarolinaETV, *Governor's Update on Coronavirus (COVID-19) | April 16, 2020*, YOUTUBE (Apr. 16, 2020), https://www.youtube.com/watch?v=Vv64tAZI_dY.

Americans are admitted to the ICU or die from the disease."[62]  Many of these underlying

conditions, like asthma, result from the past and present policies that both relegate African

Americans to particular neighborhoods and that disproportionately allocate landfills, factories,

and other environmental risks to these Black neighborhoods.[63]  Racial discrimination in South

Carolina has also resulted in socioeconomic inequalities that disadvantage African Americans,

like higher rates of unemployment, disability, poverty, and inadequate health insurance than

white people.  These factors also make it more likely that African-American voters in South

Carolina are forced to work outside the home even during the current pandemic and are therefore

more exposed to COVID-19.  For example, in South Carolina, the ACS shows that 24.5% of

African Americans and just 15.2% of whites over age 16 work in "blue collar" service

occupations.  And 39.9% of white people versus only 23.1% of African Americans in South

Carolina hold management or professional occupations—*i.e.*, "white collar" jobs that are much

more likely to allow employees to continue to work safely at home.  Dr. Jason Cummings, a

sociology professor at the University of South Carolina, recently highlighted these concerns in

noting: "[p]oor people, and people of color, are more likely to be exposed to other people.  The

idea of social distancing is really a privilege for those who have money and resources[.]"[64]

---

[62] Tonya Brown, *More African Americans are dying from COVID-19 than other races in South Carolina*, 15 NEWS (Apr. 9, 2020) (quoting DHEC statement), https://wpde.com/news/coronavirus/more-african-americans-dying-from-covid-19-in-south-carolina.

[63] *See, e.g.*, Ihab Mikati et al., *Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status*, 108 Am J. Pub. Health 480 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5844406/; Diane Alexander & Janet Currie, *Is it who you are or where you live? Residential segregation and racial gaps in childhood asthma*, 55 J. Health Econ. 186 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6112984/.

[64] Fleming Smith et al., *Long-term inequities put SC minorities at higher risk for coronavirus exposure and death*, THE POST & COURIER (Apr. 15, 2020) (quoting Dr. Jason Cummings),

IV.    **The COVID-19 Crisis and 2020 Elections in South Carolina**

57.    Dozens of elections are still scheduled to take place in South Carolina between May and the end of the calendar year, including major statewide elections on June 9 and November 3.[65]

58.    On March 30, 2020, Defendant Marci Andino, acting in her capacity as Executive Director of the South Carolina Election Commission, wrote various elected officials, including Defendant Governor Henry McMaster.  A true and accurate copy of Director Andino's letter is attached hereto as Exhibit 2 (hereinafter "SEC Letter").  The SEC Letter expressed the Commission's "concern[] about the safe conduct of the June Primaries, November General Election and all other elections scheduled for 2020."  Ex. 2 at 1.

59.    The SEC Letter stated the "main issue" in its view: "is that our elections, as currently prescribed by law, require large numbers of people to congregate in one place— something that everyone is currently being asked not to do by public safety and health officials." *Id.*  It added: "a large percentage of the state's poll managers fall into high risk categories, which would likely lead to a deficit in the number of managers needed to staff polling places."  *Id.* at 1-2.  Also, there will likely be a shortage of polling locations, as polling locations that have been used in the past have stated they will not allow their facilities to be used for voting.  For example, two fire stations in Murrells Inlet have already declined to allow their facility to be

https://www.postandcourier.com/health/covid19/long-term-inequities-put-sc-minorities-at-higher-risk-for-coronavirus-exposure-and-death/article_9d557788-799d-11ea-a89e-a7d97f6247a1.html.

[65] *See* SCvotes, 2020 Election Calendar 1/1/2020 – 12/31/2020, https://www.scvotes.org/sites/default/files/2020-04-08%20Schedule%20of%20Elections.pdf.

used for the June primary.[66]

60.    The SEC Letter recommended various "changes to our election process" that the SEC explained it understood were advisable "[i]n order to safely and securely conduct elections during and following the coronavirus pandemic." *Id.* at 2. At the top of the SEC Letter's listed options was the suggestion that South Carolina should "[a]llow no excuse absentee voting." *Id.* The SEC Letter described adopting "no-excuse absentee voting" as a "relatively simple change." *Id.* at 4. The SEC Letter also recommended "[r]emov[ing] the witness requirement on ballot return envelopes." *Id.*

61.    To date, Defendants have neither adopted nor implemented either recommendation.

V.    **South Carolina's Absentee Voting Process**

62.    South Carolina law sets out specific categories of qualified electors who may vote by mail ballot, known generally as "absentee voting." S.C. Code Ann. § 7-15-320. Section 7-15-320 of the South Carolina Code lists 15 such categories. These include various categories of people absent from the jurisdiction in which they could vote in person on Election Day, including students, service members on active duty, overseas citizens, and people away from their county of residence on vacation. *Id.* § 7-15-320(A).

63.    The election laws also set out several categories of qualified electors who may vote absentee "whether or not they are absent from their county of residence on election day."

---

[66] Charles Swenson, *Polls workers ready to bow out of primary*, COASTAL OBSERVER: POLITICS (Apr. 17, 2020), https://coastalobserver.com/polls-workers-ready-to-bow-out-of-primary/, ("We are extremely hesitant just because having several hundred to thousands of people come through on department property would not only put us at a risk for potential exposure, but for them to come into contact with us," Murrells Inlet-Garden City Fire Chief J.R. Haney said. "We're the ones that are transporting several people a day with symptoms.").

*Id.* § 7-15-320(B).  This list includes "physically disabled persons."  *Id.*  Physically disabled

persons are any "who, because of injury or illness, cannot be present in person at his voting place

on election day."  *Id.* § 7-15-310.

64.    Individuals may request an absentee ballot in person, by visiting their county

registration office, or by sending in a mail request, among other methods.  S.C. Code Ann. § 7-

15-330.  A voter may request the application anytime during the calendar year in which the

election in which they intend to vote absentee is being held.  When applying, individuals must

sign the application including a "reason for request" of an absentee ballot, among other

information.  *Id.* § 7-15-340.  Applicants must also affirm an oath stating: "I do swear or affirm

that I am a qualified elector, that I am entitled to vote in this election, and that I will not vote

again in this election.  The information above is true in all respects, and I hereby apply for an

absentee ballot for the reason indicated above."  *Id.*

65.    Fraudulently applying for an absentee ballot is a misdemeanor subject to "not less

than one hundred dollars nor more than five hundred dollars or imprison[ment] not more than

one year, or both."  *Id.*; *see also* S.C. Code Ann. § 7-25-20.

66.    When a registrar receives an absentee ballot application and verifies that the

individual properly competed the application and that they are a registered voter in the

jurisdiction, the registrar mails to the individual the following items:

   a. One of each ballot to be used in the election;

   b. Printed instructions as to the marking, folding, and return of each ballot;

   c. An envelope marked "Ballot Herein" in which all completed ballots must be

       placed;

   d. A return-addressed envelope for use to return the "Ballot Herein" envelope

28

and all ballots to the board of voter registration and elections, imprinted with

an "oath of absentee ballot applicant."  The oath informs, among other things,

that the applicant is qualified to vote in the election, has not already voted, and

that the applicant received no assistance in voting that they would not have

been entitled to receive had they voted in person.

67.    Under S.C. Code Ann. § 7-15-220, an individual voting by absentee ballot must

return their ballot in the envelope on which the oath is imprinted, which shall be "signed and

witnessed."  Spaces for a third-party witness to sign the oath and provide their address are

imprinted directly underneath blank lines to be filled in with the voter's signature and date.

68.    Once a voter receives their absentee ballot, the voter "must mark each ballot on

which he wishes to vote," place each in the single envelope marked "Ballot Herein," and then

place that envelope in the provided return-addressed envelope.  S.C. Code Ann. § 7-15-385.  The

return-addressed envelope must then be sent to the board of voter registration and elections by

mail, personal delivery, or by authorizing another person to return it as set forth in the law.  *Id.*

69.    The absentee ballot counting process is scheduled, by law, to begin at 9:00 a.m.

on Election Day.  *See* S.C. Code Ann. § 7-15-420.  At that time, election managers must

commence examining all return-addressed envelopes that have been received by the county

board of voter registration and elections and make sure that each oath has been properly signed

and witnessed, and that it includes the witness's address.

70.    A ballot determined not to be properly signed and witnessed by a third party, or

one that does not include the witness's signature and address, cannot be counted as a vote in the

election.  *See* S.C. Code Ann. § 7-15-420.

71.    South Carolina law does not afford the voter notice or the opportunity to cure a

ballot that is not counted because of a defective witness signature.

## VI.     The Challenged Requirements Unduly and Unreasonably Burdens the Voting Rights of South Carolinians.

### A.     The Excuse Requirement deprives many South Carolina voters, including Plaintiffs, of their fundamental right to vote.

72.     Historically, most voters in South Carolina vote in person and on Election Day.[67]
For most voters, that means physically appearing at a designated polling place where they must not only be in close contact with other voters, observers, poll workers, but also repeatedly touch equipment and material such as voting machines, paper ballots, and shared writing instruments. At present, public health officials consider all of these activities as risking exposure to and/or transmission of COVID-19. They are therefore strongly disfavored and/or proscribed by various government orders.

73.     Meaningful opportunities to vote in person are still necessary to many South Carolina voters, including those who lack access to reliable mail service or need the kinds of accommodations for persons with disabilities and personal assistance for people with limited literacy that are only available at in-person sites. To prevent viral spread at needed in-person sites, the CDC instructs that South Carolina encourage as many voters as possible "to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations."[68]

---

[67] *See, e.g.*, U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2018 Comprehensive Report* 30 (2018) (72,806 absentee ballots of over 1.7 million ballots cast in South Carolina in 2018 midterm elections; 217,857 voted "in-person early"), https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf; U.S. Election Assistance Comm'n, *The Election Admin. and Voting Survey 2016 Comprehensive Report* 24 (2016) (497,436 absentee ballots of over 2 million total ballots cast in South Carolina in 2016 election), https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf.

[68] Ctrs. for Disease Control & Prevention, *supra* note 21.

74.     Even if the ongoing COVID-19 outbreak subsides, members of vulnerable or "high-risk" populations who would otherwise vote in person on Election Day will reasonably opt and/or be required to continue practicing "social distancing" for the foreseeable future.  Some like Plaintiff Rev. Rutledge who risk grave medical complications from COVID-19 will reasonably decide to self-quarantine until a vaccine for the illness is the developed or a cure is identified.

75.     Because South Carolina is an "excuse required" absentee voting state, eligible voters must fall under one of several enumerated categories of persons who are "qualified" to vote by absentee ballot.  Relevant here, "physically disabled persons" and "persons sixty-five years of age or older" are qualified, and "must be permitted to vote by absentee ballot in all elections . . . ."  S.C. Code Ann. § 7-15-320.  Older South Carolinians at high risk of complications from COVID-19 are thus able to request an absentee ballot only if they are older than 65.

76.     As Defendant Andino explained in the SEC Letter, none of the 18 categories that qualify a voter to vote absentee "include self-isolating due to a pandemic." Ex. 2, at 2. Thus, at present, it is Defendants' position that no provision of the South Carolina laws affords *all* eligible voters—including many who are at high risk of complications from COVID-19—the opportunity to vote absentee by mail-in ballot, even as mandatory orders currently instruct all South Carolinians to remain at "home or work," and to rigidly adhere to social distancing practices at all times.

77.     As currently construed, the Excuse Requirement severely burdens the fundamental right of all eligible voters practicing self-quarantining and social distancing to participate in elections in South Carolina.  In particular, it egregiously burdens the right to vote

31

of persons with pre-existing medical conditions who commonly vote in person and are not considered "physically disabled," by placing them at "high-risk" of severe illness from COVID-19 (*e.g.*, by being immunocompromised).

78.    The Excuse Requirement will therefore likely prevent tens of thousands of South Carolinians who might otherwise vote in scheduled elections from participating in those contests, as anyone not covered by an enumerated absentee "excuse" will have to choose between exposing themselves and others to the risk of illness from coronavirus and COVID-19 to vote in person or foregoing their right to vote.

79.    The Excuse Requirement is also particularly burdensome for African Americans in South Carolina.  African Americans in South Carolina continue to bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.  It is precisely because of these patterns that African Americans in South Carolina face particularly severe health risks from COVID-19 exposure arising from being forced to vote in-person rather than by mail.  In these circumstances, the Excuse Requirement interacts with these conditions to deny African Americans in South Carolina an equal opportunity to participate in the political process.

80.    The Excuse Requirement is plainly unreasonable.  Because South Carolina already affords an excuse to eligible voters who "because of injury or illness, cannot be present in person at [a] voting place on election day[,]" S.C. Code Ann. § 7-15-310, Defendants could reasonably interpret the statute to include people who are self-isolating or who are subject to the Governor's "Home or Work" order to be eligible to vote absentee "because of injury or illness" under the Excuse Requirement.

81.     Voters staying at home to follow social distancing measures prescribed by the Governor and other government and public health officials are *all* unable to vote in person "because of an illness"—namely, the novel coronavirus and COVID-19.  And the listed absentee ballot qualifications do not expressly require that a voter must personally contract an illness like COVID-19 in order to qualify for an absentee ballot.  Rather, the election laws instruct that the absentee ballot provisions "shall be liberally construed . . . to effectuate their purposes."  S.C. Code Ann. § 7-15-20.

82.     Several of the remaining minority of states that require an excuse to vote by mail have interpreted their disability or illness basis for absentee eligibility in precisely this fashion during the ongoing crisis.

83.     For example, West Virginia now permits all registered voters to vote absentee in forthcoming elections due to "Illness, injury or other medical reason which keeps me confined," defining "medical condition" as "any threat to a person's health posed by an epidemic, pandemic, outbreak, disease, virus, or other emergency, which creates potential harm to the public interest, peace, health, safety, or welfare of citizens or voters."  W. Va. Code R. §§ 153-53-2–153-53-3.[69]  The State construes "confined" as being "restricted to a specific location for reasons beyond that person's control, including a recommendation by state or federal authorities for the person to self-quarantine, avoid public places or close contact with other persons."  W. Va. Code R. § 153-53-2.  Per issued rules, the State's action "cannot violate or alter clear statutory requirements" but rather, simply construes existing state law "in favor of enfranchisement, not disenfranchisement."  W. Va. Code R. § 153-53-1.

_____

[69] W. Va. Sec'y of State Mac Warner, Admin. Law Div., Notice Of An Emergency Rule (Mar. 20, 2020), http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=53039&Format=PDF.

84.    Similarly, Alabama has allowed "any qualified voter who determines it is impossible or unreasonable to vote at their voting place" as a result of COVID-19 to vote by mail in primary runoff elections being held in July by reason that "a physical illness or infirmity [] prevents [the voter's] attendance at the polls."[70]  And, because of COVID-19, Arkansas determined that Ark. Code Ann. §§ 7-5-402, which only allows absentee voting for people who are "absent or unable to attend an election due to illness or physical disability," should be read "so that all eligible qualified electors currently entitled to vote in the March 31, 2020 election may request the appropriate absentee ballots from their county of residence."[71]

85.    Virginia, Delaware and Massachusetts have likewise clarified that all registered voters in their respective states can use existing reasons related to illness and physical disability to vote by mail in the Upcoming Elections.[72]  And New Hampshire has interpreted its "physical

---

[70] Ala. Leg. Servs. Agency, Absentee Voting During State of Emergency, 17-11-3(e) (Mar. 18, 2020), https://www.sos.alabama.gov/sites/default/files/SOS%20Emergency%20Rule%20820-2-3-.06-.01ER.pdf; *see also* Press Release, Alabama Secretary of State, 100 Days Left to Apply for Absentee Ballot for the Primary Runoff Election (Mar. 31, 2020), https://www.sos.alabama.gov/newsroom/100-days-left-apply-absentee-ballot-primary-runoff-election; *see also* Ala. Code § 17-11-3(a)(2).

[71] Governor of Arkansas, Exec. Order No. 20-08, (Mar. 20, 2020), https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-08._.pdf

[72] *See Absentee Voting*, Va. Dep't of Elections, https://www.elections.virginia.gov/casting-a-ballot/absentee-voting/ (last visited April 5, 2020) (Virginia Department of Elections statement clarifying that "[v]oters may choose reason '2A My disability or illness'" to vote absentee in upcoming elections due to COVID-19); Governor of Delaware, Exec. Dep't, *Sixth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat* (Mar. 24, 2020), https://governor.delaware.gov/wp-content/uploads/sites/24/2020/03/Sixth-Modification-to-State-of-Emergency-03242020.pdf (Delaware executive order providing that for upcoming primary and special elections "the qualification of 'sick or physically disabled' [in Delaware vote-by-mail provisions] shall apply to and include any such voter who is asymptomatic of COVID-19 . . . and who herself or himself freely chooses to use such qualification to vote by absentee ballot.); An Act Granting Authority to Postpone 2020 Municipal Elections in the Commonwealth and Increase Voting Option in Response to the Declaration of Emergency to Respond to COVID-19, ch. 45 (2020), https://malegislature.gov/Laws/SessionLaws/Acts/2020/Chapter45 (new Massachusetts law clarifying that "any person taking precaution related to COVID-19 in response to a declared state of emergency or from guidance from a medical professional, local or state health official, or any civil authority shall be

disability" provision to "appl[y] equally to voters who are experiencing symptoms of COVID-19 . . . and those who are self-quarantining as a preventative measure."[73]

**B.    South Carolina's Witness Requirement will deny large numbers of eligible voters the right to vote yet provides only marginal benefits to the State.**

86.    As noted, election officials currently have no discretion on whether or not to count an unwitnessed absentee ballot—they must reject the ballot and are not required to give notice to the voter or opportunity to cure.  S.C. Code Ann. § 7-15-420.

87.    Yet in the current pandemic, individuals living alone have no safe means to have an individual witness and sign their ballot envelope.  Under the Governor's current "Home or Work" order, individuals are required to shelter in place.  Even if people do leave their homes, the state directs them to maintain at least six feet of distance from others with whom they do not live.  These orders also reflect the consensus of doctors and public health officials.  Indeed, a recent study found that COVID-19 bearing droplets could travel as far as 23 to 27 feet.[74]

88.    Older South Carolinians and those with certain preexisting medical conditions face even graver risks by interacting with another individual to obtain a witness signature.  But because COVID-19 can afflict individuals of any age and those without preexisting conditions and can spread aggressively through asymptomatic people, any individual living alone faces a real risk of endangering themselves or others by seeking someone to witness their ballot.

---

deemed to be unable by reason of physical disability to cast their vote in person," which is one of the reasons set forth in the state constitution that permits a Massachusetts voter to vote by mail).

[73] Memorandum from the Sec'y of State and Att'y General to New Hampshire Election Officials re: Elections Operations During the State of Emergency 2 (Apr. 10, 2020), https://www.governor.nh.gov/news-media/press-2020/documents/20200410-absentee-voting.pdf.

[74] Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19*, JAMA Insights (Mar. 26, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763852.

89.     Nor will the impact of enforcing the witness requirement in an environment in which COVID-19 is still being transmitted be light.  Instead, it will likely prevent thousands of eligible South Carolinians from casting ballots.

90.     At present, South Carolina has over 3.3 million registered voters.[75]  Over 620,000 South Carolinians voted in the June 2018 Democratic and Republican primaries.  And in the November 2016 general election, over 2.1 million South Carolinians cast ballots.

91.     Yet according to 2018 American Community Survey (ACS) statistics from the Census Bureau, 29% of South Carolinians age 18 and older live alone.[76]  Assuming similar numbers in the 2020 November general election, over 550,000 South Carolinians will face the choice of either risking their health by voting in person or finding a witness for their absentee ballots, or not voting at all.[77] Like Plaintiffs, many of them will be forced not to vote in order to protect their health and their community.

92.     This burden on the right to vote will fall more heavily upon certain groups—older people, persons with disabilities, and African Americans in South Carolina, among others.  For instance, about 39.8% of all South Carolinians living alone are age 65 and older.[78]  24.7% of South Carolinians age 65 and older live alone, compared to approximately 11% of the general

---

[75] *South Carolina Voter Registration Demographics*, https://www.scvotes.org/cgi-bin/scsec/96vr?countykey=ALL&D1=None (last visited Apr. 21, 2020).

[76] U.S. Census Bureau, *supra* note 3, https://data.census.gov/cedsci/table?q=south%20carolina%20single%20person%20households&g=0400000US45&hidePreview=false&tid=ACSDP1Y2018.DP02&vintage=2018&layer=VT_2018_040_00_PY_D1&cid=DP02_0001E.

[77]   *Id*.

[78]   *Id*.

population.[79]  33.2% of South Carolinians 18 and older with a disability live alone and 33.8% of

South Carolinians 65 and older with a disability live alone.  Of all African American households,

33.2% are people who live alone.  Of all white households, 28.2% are people who live alone.

And 14.8% of all African American households in South Carolina are headed by women who

live alone with their children under 18 (*i.e.*, people who are not legally competent witnesses)

versus just 3.9% of similar white households.

93.    As noted above, older individuals already face higher rates of infection and death

from COVID-19, further magnifying its impact.  And the CDC has found that "some people with

disabilities might be at a higher risk of infection or severe illness because of their underlying

medical conditions."[80]

94.    Evidence has also revealed stark racial disparities in the impact of COVID-19 that

will result in disparate burdens on minority voters.  These figures mirror developing trends in

other states, such as Maryland and North Carolina, which have both released data showing that

African Americans face higher rates of both infection and death from COVID-19 than the

population as a whole.[81]

---

[79] U.S. Census Bureau, *2010-2018 American Community Survey 1-Year Estimates: ACS Demographic and Housing Estimates: South Carolina* (2018), https://data.census.gov/cedsci/table?q=south%20carolina%20demographics&g=0400000US45&tid=ACSDP1Y2018.DP05 (last visited Apr. 21, 2020).

[80] Ctrs. for Disease Control & Prevention, *People with Disabilities*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last updated Apr. 7, 2020).

[81] N. Carolina Dep't Health & Human Servs., *COVID-19 North Carolina Dashboard*, https://www.ncdhhs.gov/divisions/public-health/covid19/covid-19-nc-case-count#by-race/ethnicity (last updated Apr. 21, 2020); Fenit Nirappil et al., *Record set for single-day covid-19 deaths in D.C., Maryland and Virginia at 53; black residents hit hardest*, WASH. POST (Apr. 9, 2020), https://www.washingtonpost.com/local/covid-19-deaths-hit-new-high-in-dc-maryland-and-virginia-at-53-Black-residents-hit-hardest/2020/04/09/cc85cd14-77b3-11ea-b6ff-597f170df8f8_story.html.

95.     The Witness Requirement will therefore likely prevent tens of thousands of South Carolinians who might otherwise cast absentee ballots from doing so this year, with a disproportionate impact falling on older voters, voters with disability, and African-American voters.

96.     The witness requirement is particularly burdensome for African Americans in South Carolina, who are more likely to live alone and thus will be more likely to risk exposure to COVID-19 in the course of obtaining a witness signature.  African Americans in South Carolina continue to bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.  It is precisely because of these patterns that African Americans in South Carolina face particularly severe health risks from COVID-19 exposure.  In these circumstances, the witness requirement interacts with these conditions to deny African Americans in South Carolina an equal opportunity to participate in the political process.

97.     Protecting election integrity and preventing improper use of absentee ballots certainly are valid governmental interests, but maintaining the Witness Requirement during the current pandemic fails to serve or protect those interests.  As Defendant Andino wrote in the SEC Letter urging changes to the elections process in light of the ongoing pandemic: "the witness signature offers no benefit to election officials as they have no ability to verify the witness signature." Ex. 2, at 3.  In fact, South Carolina already exempts voters in the military or living abroad from the Witness Requirement.  S.C. Code Ann. § 7-15-380(B).

98.     And to the extent the Witness Requirement did serve these or any other governmental interests, it would be substantially outweighed by its massive burden on South Carolina voters, particularly as compared to other procedures that serve the same interests.

99.     The Witness Requirement is not South Carolina's sole method of policing the integrity of absentee ballots—far from it.  Indeed, only 10 other states even contain a similar requirement, yet absentee balloting systems in the remaining 40 are not undermined by fraud.[82]

100.     Meanwhile, South Carolina has several other vehicles to both confirm the legitimacy of the absentee ballot cast and disincentivize fraudulent use of absentee ballots.

101.     For one, the board of voter registration and elections assigns each absentee ballot application a specific serial number, which is then memorialized in a "record book."  S.C. Code Ann. § 7-15-330.  The record book is updated to reflect:

    a.   the applicant's name, home address, and absentee mailing address (if different), the date on which the form is requested, and the date on which it is issued, *id.*;

    b.   the date on which the ballot(s), printed instructions, envelope marked "Ballot Herein," return-addressed envelope are requested by written application and the date they are issued to the elector, S.C. Code Ann. § 7-15-370;

    c.   the date on which the return-addressed envelope and enclosed ballot(s) are received by the board, S.C. Code Ann. § 7-15-385.

102.     Only return-addressed envelopes that are received and recorded in the record book by these procedures are securely stored "in a locked box within the office of the board of voter registration and elections."  S.C. Code Ann. § 7-15-385.  By law, absentee ballots "remain in the custody of the county board of voter registration and elections until" they are transferred "for the

---

[82] *Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options*, Nat'l Conf. of State Legislatures (Apr. 14, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx (select tab titled "Processing, Verifying, and Counting Absentee Ballots" and scroll down to the chart "Verifying Authenticity of Absentee/Mailed Ballots.")

purpose of tabulation and reporting . . . ."  S.C. Code Ann. § 7-15-410.

103.    Any elector or qualified watcher may challenge the absentee vote of any person whom they suspect is not a qualified voter.  S.C. Code Ann. § 7-13-810.  *Id.* § 7-13-830, and § 7-15-420.

104.    Most directly, of course, voters themselves must attest under penalty of perjury their identity, residence, and that they will not double vote when they request their absentee ballot.  S.C. Code Ann. § 7-15-340.  They must so attest again when they sign their ballot envelope.  *Id.* § 7-15-380.

105.    Any person who fraudulently attests to the absentee ballot application by voting more than once in the same election is guilty of a misdemeanor and subject to a fine of up to $500 or imprisonment for up to a year.  S.C. Code Ann. §§ 7-15-340, 7-25-20.  They are separately guilty of the offense of "voting more than once at elections" and may be fined at the discretion of the court or imprisoned as long as three years.  *Id.* § 7-25-110.

106.    Other provisions of law establish similar penalties for "impersonating a voter." *Id.* § 7-25-120.  And for "swearing falsely at elections or taking oath in another's name."  *Id.* § 7-25-150.

107.    In light of these attestation and verification requirements and criminal penalties associated with misusing absentee ballots, the additional step of requiring a witness signature adds no meaningful protection against fraud.  Indeed, while instances of fraud are exceedingly rare, an individual determined to break these laws and risk the penalties can just as easily forge the signature of another individual as they can falsely attest when they sign their own name. Indeed, the Witness Requirement has little if any practical utility for election integrity because South Carolina law does not require witnesses to identify themselves by printing their name or

providing any other information.  Indeed, the Witness Requirement has little if any practical

utility for election integrity because South Carolina law does not require witnesses to identify

themselves by legibly printing their name or providing any information than an address.  S.C.

Code Ann. § 7-15-380.

108.    As Defendant Andino explained: "Removing the requirement for a witness

signature would remove a barrier many voters would likely encounter while in self-isolation."

Ex. 2, at 3.  The burden on the voting rights of the many thousands of South Carolinians who

will be prevented from either casting their ballots safely or having them counted by retaining the

Witness Requirement far outweighs any upside of the requirement, if any.

**CLAIM FOR RELIEF**

**COUNT ONE**

**Violation of the Fundamental Right to Vote**
**42 U.S.C. § 1983, First and Fourteenth Amendments to the U.S. Constitution**

109.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this

Complaint and the paragraphs in the counts below as though fully set forth herein.

110.    Eligible individuals have a fundamental right to vote under the First and

Fourteenth Amendments of the U.S. Constitution.  Under the First and Fourteenth Amendments,

a court considering a challenge to a state election law must carefully balance the character and

magnitude of the injury to the rights that the plaintiff seeks to vindicate against the justifications

put forward for the burdens imposed by the rule.  *See Burdick v. Takushi*, 504 U.S. 428, 434

(1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

111.    In light of the COVID-19 pandemic, South Carolina's Excuse Requirement,

Witness Requirement, and their enforcement severely and unreasonably burden the fundamental

right to vote of South Carolina voters.  These requirements will likely prevent thousands of

eligible voters from casting ballots that are then counted, with particularly heavy burdens on older South Carolinians, voters with disabilities, and African American voters.

112.    Therefore, Defendants, acting under color of state law, have and will continue to deprive Plaintiffs of rights secured to them by the First and Fourteenth Amendments to the U.S. Constitution—namely, the fundamental right to vote—and protected by 42 U.S.C. § 1983 by enforcing the Challenged Requirements.

## COUNT TWO

### Violations of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301

113.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the Count below as though fully set forth herein.

114.    Section 2 of the Voting Rights Act provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a).

115.    The "essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *League of Women Voters of N. Carolina v. North Carolina* ("*LWV*"), 769 F.3d 224, 238–39 (4th Cir. 2014) (internal quotation marks and citation omitted).  "[A] Section 2 vote-denial claim consists of two elements:

> First, the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

Second, that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*LWV*, 769 F.3d at 240 (internal quotation marks and citations omitted).

116.    As it has been interpreted by Defendants, the Excuse Requirement, if not enjoined, will materially burden the right to vote, and will have an adverse and disparate impact on African-American voters in South Carolina.  Black voters in South Carolina are more likely to work in jobs that expose them to COVID-19, less likely to have insurance or financial resources, and more likely to suffer from severe health complications and/or to die from COVID-19 than white voters.  Black voters are therefore significantly more burdened by the effects of the Excuse Requirement.

117.    Likewise, the Witness Requirement, if not enjoined, will materially burden the right to vote, and will have an adverse and disparate impact on African-American voters in South Carolina.  Black voters in South Carolina are more likely to work in jobs that expose them to COVID-19, less likely to have insurance or financial resources, more likely to live alone, and more likely to suffer from severe health complications and/or to die from COVID-19 than white voters.  Black voters are therefore significantly more burdened by the effects of the Witness Requirement.

118.    The disparate burden resulting from the Challenged Requirements is directly linked to social and historical conditions.  South Carolina has a long history of voting-related discrimination, including the recent use of witness requirements, property qualifications, and photo ID laws.  From 1965 to 2013, South Carolina was covered by the preclearance provisions of the Voting Rights Act.  Since 2000, the U.S. Department of Justice has objected to eleven

proposed voting changes in South Carolina due to those changes' potentially racially discriminatory purpose or effect.

119.    African Americans in South Carolina continue to suffer from discrimination in other areas such as education, employment, and health, which hinders their ability to participate effectively in the political process.  According to the ACS, in South Carolina, 11.6% of African Americans and 8.3% of white people lack health insurance; 38.6% of African Americans and 33.1% of white people over age 65 have a disability; 14.2% of African Americans and 11.6% of white people age 18 to 64 have a disability; 16.1% of African-American and only 8.7% of white people lack a high school degree; 8% of Black and 4.1% of white people over age 16 are unemployed; 21.1% of African-American and 6.4% of white households in general lived below the poverty line; 17% of African Americans over 65 versus 7.1% of whites over 65 also live in poverty; 13.6% African-American and only 3.5% of white households lack a vehicle; 84.7% of African-American and 92% of white households have a computer or "smart phone"; even among those people with computers, 28.3% of African-American and just 14.9% of white households lack broadband internet; 24.2% of African-American and 6.5% of white households use SNAP/food stamps; and African-American median family income ($42,910) is nearly half that of white families ($76,382).  In particular, as discussed above at ¶¶ 53-56, these discriminatory patterns render African-American voters more vulnerable to COVID-19, such that the Challenged Requirements are particularly burdensome for them as a group relative to other voters.  In addition, voting is racially polarized in South Carolina and African Americans do not hold elected office in portion to their population, resulting in state elected officials who are less responsive to the health, voting, and other concerns of African-American voters amid the COVID-19 crisis.

120.    Under the totality of the circumstances, the Challenged Requirements interact with these social and historical conditions to abridge and deny African Americans in South Carolina the right to vote.  As a result of the Challenged Requirements, African Americans in South Carolina will have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

## COUNT THREE

### Violations of Sections 3 and 201 of the Voting Rights Act, 52 U.S.C. §§ 10302, 10501

121.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

122.    Section 201 of the Voting Rights Act categorically prohibits the use of "any test or device" as a "prerequisite for voting or registration for voting," stating that "[n]o citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State."  52 U.S.C. § 10501(a).  Section 201 defines the phrase "test or device" as including "any requirement that a person as a prerequisite for voting . . . prove his qualifications by the voucher of registered voters or members of any other class."  52 U.S.C. § 10501(b)(4).

123.    Section 201 is a "potent weapon" and it applies to "any official with control over any aspect of the election . . . ."  *United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 120-21 (1978).  For that reason, the U.S. Department of Justice has employed the Voting Rights Act to block literacy and witness requirements in the absentee voting or voter registration process.[83]

---

[83] Letter from Bill Lann Lee, Acting Assist. Att'y Gen., U.S. Dep't of Just., Civ. Rights Div., to Hon. Robert A. Butterworth, Att'y Gen., State of Florida (Aug. 14, 1998), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/FL-1030.pdf;

124.    "All literacy tests and similar voting qualifications were abolished" by the Voting

Rights Act because, "[a]lthough such tests may have been facially neutral, they were easily

manipulated to keep blacks from voting."  *N.W. Austin Mun. Util. Dist. No. One v. Holder*, 557

U.S. 193, 198 (2009).  This *per se* ban on tests and devices "bars certain types of voting tests and

devices altogether" and removes the burden of demonstrating the discriminatory application of a

test or device.  *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 338 n.6 (2000).

125.    The Witness Requirement is a prohibited "test or device" insofar as it is a

"requirement that a person as a prerequisite for voting . . . prove his qualifications by the voucher

of registered voters or members of any other class." 52 U.S.C. § 10501(b). An absentee "ballot

may not be counted unless the oath is properly signed and witnessed . . . ."  S.C. Code Ann. § 7-

15-420.  Under the plain text of the Voting Rights Act, this is *per se* prohibited as an illegal test

or device.

126.    The South Carolina Supreme Court has previously concluded that the Witness

Requirement is justified because it has "as its purpose the assurance of the authenticity of the

absentee vote . . . ."  *Gregory v. S.C. Democratic Exec. Comm.*, 247 S.E.2d 439, 444 (S.C. 1978).

127.    That justification cannot overcome the plain text of the Voting Rights

Act.  Indeed, other "supporting witness" requirements outlawed by the Voting Rights Act were

likewise justified as necessary to authenticate a voter's identity.  *See, e.g.*, *United States v. Ward*,

349 F.2d 795, 799 (5th Cir. 1965).  In any event, even if the interest in authenticating a voter's

identity could, in some circumstances, justify certain kinds of limited witness requirements, it

---

Letter from Jerris Leonard, Assist. Att'y Gen., U.S. Dep't of Just., Civ. Rights Div., to Hon. MacDonald
Gallion, Att'y Gen., State of Alabama (Mar. 13, 1970),
https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1100.pdf.

cannot justify the Witness Requirement where, as described above at ¶¶ 97-108, South Carolina law already includes other, more reliable means of confirming a voter's identity.

128.    In light of the COVID-19 pandemic, South Carolina's Witness Requirement requires thousands of voters, including Plaintiffs, to either comply with a *per se* illegal "test or device" or have their vote discarded in violation of the Voting Rights Act.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.    Declare that South Carolina's enforcement and interpretation of the Excuse Requirement (as stated in S.C. Code Ann. § 7-15-320 and § 7-15-310) while the risk of COVID-19 transmission in South Carolina remains violates the fundamental right to vote under First and Fourteenth Amendments to the U.S. Constitution and the Voting Rights Act;

B.    Declare that South Carolina's enforcement of the Witness Requirement (as stated in S.C. Code Ann. § 7-15-220) while the risk of COVID-19 transmission in South Carolina remains violates the fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution and the Voting Rights Act.

C.    Issue a preliminary and permanent injunction that orders relief including:

1.    Prohibiting Defendants from enforcing the Excuse Requirement (as stated in S.C. Code Ann. § 7-15-320 and § 7-15-310) to prevent any eligible voter, regardless of age and physical condition, to request, receive, and have counted, an absentee ballot, at least while emergency orders concerning COVID-19 are in place and/or while public health officials continue to recommend social distancing practices due to risk of community transmission of COVID-19;

2.     Prohibiting Defendants from enforcing the Witness Requirement (as stated in S.C. Code Ann. § 7-15-220) for all voters, at least while emergency orders concerning COVID-19 are in place and/or while public health officials continue to recommend social distancing practices due to risk of community transmission of COVID-19;

3.     Ordering Defendants to issue guidance instructing city and county election officials to count otherwise validly cast absentee ballots that are missing a witness signature for South Carolina's primary and general elections in 2020; and

4.     Ordering Defendants to modify election materials, including absentee ballots, to reflect the elimination of the Excuse and Witness Requirements, and conduct a public information campaign informing South Carolina voters about the elimination of the Excuse and Witness Requirements, in coordination with city and county officials before and during the absentee balloting period, and ordering Defendants to issue guidance instructing city and county election officials to issue absentee ballots to all eligible voters and to count otherwise validly cast absentee ballots that are missing a witness signature;

D.     Award Plaintiffs attorneys' fees in this action;

E.     Award Plaintiffs their costs of suit; and

F.     Grant such other and further relief as this Court deems just and proper in the circumstances.

48

Dated: April 22, 2020                    Respectfully submitted,


Adriel I. Cepeda Derieux*                */s/ Susan K. Dunn*
Dale E. Ho*                              Susan K. Dunn (Fed. Bar #647)
Sophia Lin Lakin*                        American Civil Liberties Union
Davin M. Rosborough*                     of South Carolina
Theresa J. Lee*                          Charleston, SC 29413-0998
Brian Hauss*                             Tel.: (843) 282-7953
American Civil Liberties Union Foundation  Fax: (843) 720-1428
125 Broad Street, 18th Floor             sdunn@aclusc.org
New York, NY 10004
Tel.: (212) 549-2500
acepedaderieux@aclu.org                  *Attorneys for Plaintiffs*
dho@aclu.org


Deuel Ross*
NAACP Legal Defense &
    Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel.: (212) 965-2200
dross@naacpldf.org


*Motion for admission *Pro Hac Vice*
forthcoming