UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Mary T. Thomas, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>Marci Andino, *et al.*,<br><br>        Defendants. | No.: 3:20-cv-01552-JMC<br><br><br>**State Election Commission Defendants' Opposition to Motion for Preliminary Injunction** |

Defendants Marci Andino, John Wells, Clifford J. Elder, and Scott Moseley ("Election Defendants"), all of whom have been sued in their official capacities with the State Election Commission, submit this Opposition to the Plaintiffs' Motion for a Preliminary Injunction.

## **Introduction**

COVID-19 is serious. So is the rule of law. The urgency of the moment is no reason to cast aside South Carolina statutes by misapplying well-established legal principles about the extraordinary nature of injunctive relief.

The Plaintiffs ask this Court to upend South Carolina's rules of absentee voting after that process is already underway because, they claim, the rules are too burdensome in light of COVID-19. *First*, the Plaintiffs ask the Court to enjoin the application of S.C. Code § 7-15-320, which provides which voters are qualified to vote by absentee ballot ("Qualification Requirement"), so that every voter in South Carolina may vote by absentee ballot if she so desires. *Second*, they demand the Court enjoin application of the requirement in S.C. Code §§ 7-15-220 and 7-15-420 that a witness attest to an absentee voter's oath that she has complied with the laws governing absentee voting ("Witness Requirement").

The Plaintiffs' request for this drastic relief suffers from multiple flaws. In the first place, they ignore the United State Supreme Court's level of scrutiny for absentee voting, never mentioning *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969). In that case, the Supreme Court refused to apply the heightened scrutiny to a challenge to absentee-voting rules that the Plaintiffs ask this Court to apply.

In the second, the crux of their argument about how in-person voting and having to see other people to witness an absentee ballot is unsafe—Governor McMaster's "home or work" order—no longer carries much (if any) weight. The Governor lifted that order on May 4, more than a month before the June 9 primary. *See* Office of the Governor, Exec. Order 2020-31 (Election Defs.' Ex. 1).

In the third, the Plaintiffs overstate the burden of complying with the Qualification and Witness Requirements. A careful review of their declarations shows that most, if not all, of the individual Plaintiffs can cast valid absentee ballots while safely self-quarantining.

In the fourth, they discount South Carolina's substantial interests. The State has an interest in protection of its carefully, legislatively drawn balance of making voting easier for people who might otherwise struggle with in-person voting while avoiding voter fraud. And the State and its citizens have an undeniable interest in election integrity. The Qualification and Witness Requirements promote these interests.

And in the fifth, the Plaintiffs miscalculate the equities and the public interest. Even without an injunction, they can all vote (all by absentee ballot).

2

Speaking of voting, it is already underway for the primaries. Changing the rules now risks confusing voters. Plus, changing the rules now amounts to a judicial rewriting of a statute—taking the Court beyond its constitutional rule.

<u>**Background**</u>

*COVID-19 and South Carolina*

Like the rest of the county, COVID-19 is affecting South Carolina. Governor McMaster issued his first executive order related to COVID-19 on March 11, suspending certain transportation regulations. *See* Office of the Governor, Exec. Order 2020-07. In reliance on the authority granted to him under the South Carolina Code of Laws and Article IV of the Constitution of South Carolina, two days later, he declared a state of emergency based on the public-health emergency posed by COVID-19. *See* Office of the Governor, Exec. Order 2020-08. (Additional declarations of emergency were made on March 28, *see* Office of the Governor, Exec. Order 2020-15, April 12, *see* Office of the Governor, Exec. Order 2020-23, and April 27, *see* Office of the Governor, Exec. Order 2020-29.) Two days after the first emergency was declared, the Governor closed public schools. *See* Office of the Governor, Exec. Order 2020-09. Over the next week, other executive orders followed, including ones that limited the size of gatherings, addressed the functioning of government, and instituted social distancing. *See* Office of the Governor, Exec. Order 2020-10; Office of the Governor, Exec. Order 2020-11; Office of the Governor, Exec. Order 2020-12. All nonessential businesses were closed effective April 6. *See* Office of the Governor, Exec. Order 2020-18.

Also on April 6, Governor McMaster issued his "home or work" executive order. That order instructed South Carolinians to stay at home or limit their travel to work or obtaining essential services. *See* Office of the Governor, Exec. Order 2020-21. The "home or work" order was lifted on May 4. *See* Office of the Governor, Exec. Order 2020-31.

As of May 11, the South Carolina Department of Health and Environmental Control ("DHEC") reported 7,653 COVID-19 cases and 331 COVID-19 deaths in South Carolina. *See* S.C. Dep't of Health and Envtl. Control, *SC Testing Data & Projections (COVID-19)*, https://www.scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/sc-testing-data-projections-covid-19 (last visited May 11, 2020).

### The South Carolina Election Law

The General Assembly is charged with "provid[ing] for the administration of elections and for absentee voting." S.C. Const. art. II, § 10. It has done so in the South Carolina Election Law. *See* S.C. Code § 7-1-10 *et seq.*

The General Assembly has given the Election Defendants the authority to implement and oversee elections in South Carolina. *Id.* § § 7-15-10(d). The Commission consists of five members, appointed by the Governor. *Id.* § 7-3-10(a). The Commission acts independently of any political campaign. *Id.* § 7-3-10(e). The Commission, in turn, elects an executive director, who "shall be the chief administrative officer for the State Election Commission." *Id.* § 7-3-20(A). The executive director is responsible for myriad statutorily defined duties, including, but not limited to, supervising the conduct of the county boards of elections and voter

4

registration ("County Boards"); maintaining a complete master list of qualified voters by county and precinct; and furnishing each County Board with a master list of all registered voters in the county at least ten days prior to each election. *Id.* § 7-3-20(B). She also serves as the chief state election official for implementing and coordinating the State's responsibilities under the National Voter Registration Act of 1993 and for the Uniformed and Overseas Citizens Absentee Voting Act. *Id.* § 7-3-20(C).

Anyone who is a citizen of South Carolina and the United States is (subject to exceptions for mental incapacity, imprisonment, or a felony conviction) eligible to vote if he is at least eighteen years old, is not disabled from voting under the State constitution, and lives in the county and polling precinct where he offers to vote. *Id.* § 7-5-120. A person must register to vote. *Id.* § 7-5-110.

Registered voters can vote either in person on election day, *id.* § 7-13-710 *et seq.*, or by absentee ballot, *id.* § 7-15-10 *et seq.* Any registered voter may vote in person. *Id.* § 7-13-710(A). But only certain voters qualify to vote by absentee ballot. *Id.* § 7-15-320. Under this statute, certain voters are *qualified* to vote by absentee ballot, as opposed to being exempt or excused from voting in person.

### *Absentee Voting in South Carolina*

Section 7-15-320 allows numerous voters to qualify to vote by absentee ballot:

> (A) Qualified electors in any of the following categories must be permitted to vote by absentee ballot in all elections when they are absent from their county of residence on election day during the hours the polls are open, to an extent that it prevents them from voting in person:
> (1) students, their spouses, and dependents residing with them;

(2) persons serving with the American Red Cross or with the United Service Organizations (USO) who are attached to and serving with the Armed Forces of the United States, their spouses, and dependents residing with them;

(3) governmental employees, their spouses, and dependents residing with them;

(4) persons on vacation (who by virtue of vacation plans will be absent from their county of residence on election day); or

(5) overseas citizens.

(B) Qualified electors in any of the following categories must be permitted to vote by absentee ballot in all elections, whether or not they are absent from their county of residence on election day:

(1) physically disabled persons;

(2) persons whose employment obligations require that they be at their place of employment during the hours that the polls are open and present written certification of that obligation to the county board of voter registration and elections;

(3) certified poll watchers, poll managers, county board of voter registration and elections members and staff, county and state election commission members and staff working on election day;

(4) persons attending sick or physically disabled persons;

(5) persons admitted to hospitals as emergency patients on the day of an election or within a four-day period before the election;

(6) persons with a death or funeral in the family within a three-day period before the election;

(7) persons who will be serving as jurors in a state or federal court on election day;

(8) persons sixty-five years of age or older;

(9) persons confined to a jail or pretrial facility pending disposition of arrest or trial; or

(10) members of the Armed Forces and Merchant Marines of the United States, their spouses, and dependents residing with them.

*Id.* § 7-15-320.

A voter seeking to vote by absentee ballot must submit an absentee ballot application request to the County Board. *Id.* § 7-15-330. When submitting this application, a voter must swear that he is a qualified elector, entitled to vote in that election, and will not vote again in that election. *Id.* § 7-15-340. Violating that oath is a criminal offense. *Id.* The County Board then provides the voter with an absentee ballot, along with instructions, a return-addressed envelope, and any additional necessary information. *Id.* § 7-15-370.

On the absentee ballot return-addressed envelope, the voter must make this oath:

> I hereby swear (or affirm) that I am duly qualified to vote at this election according to the Constitution of the State of South Carolina, that I have not voted during this election, that the ballot or ballots contained in this envelope is my ballot and that I have received no assistance in voting my ballot that I would not have been entitled to receive had I voted in person at my voting precinct."

*Id.* § 7-15-380. This oath must be "witnessed by someone designated by the voter." *Id.* The statute does not limit who this witness may be. If the ballot return-address envelope is not witnessed or there is no witness address, the ballot cannot be counted.

Absentee ballots are then returned to the County Board, which keeps a record of the returned absentee ballots and stores them in a locked box in its office. *Id.* § 7-15-385. Votes are then counted on election day. *Id.* § 7-15-420. An absentee ballot that is not properly signed and witnessed may not be counted. *Id.*

*South Carolina's 2020 elections*

Statewide Democratic and Republican primaries are scheduled for June 9, with runoffs slated for June 23 (if necessary). Absentee voting is currently well underway. County Boards have already received significantly more absentee ballot applications from voters than in previous years for statewide primaries. As of May 7, County Boards had already received over 75,900 requests for absentee ballots for the June 9 primaries. (By comparison, approximately 60,000 total absentee ballots were issued to voters in the 2018 statewide primary.) Over 34,400 voter absentee applications have been returned. More than 21,300 ballots have been issued to voters and more than 2,950 ballots have been returned to the County Boards. *See* Decl. of Marci Andino ¶ 4 (Election Defs.' Ex. 2).

## Legal Standard

When plaintiffs seek a preliminary injunction, they must satisfy each of four elements: "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013). A preliminary injunction is "an extraordinary remedy," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and even more extraordinary when the injunction sought is a mandatory one (which changes the status quo), *see Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980) (the power to issue a mandatory preliminary injunction "should be exercised sparingly").

## Argument

### I.    The Plaintiffs are not likely to succeed on the merits.

"[V]oting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). No one disputes that. But "the right to vote in any manner" is not "absolute." *Id.* States may regulate elections. *See, e.g.*, U.S. Const. art. I, § 4. Indeed, such regulation is necessary to ensure that elections are fair and orderly. *Burdick*, 504 U.S. at 433.

### A.    Heightened scrutiny does not apply to the Plaintiffs' claims.

Analyzing election regulations is not a one-size-fits-all task. Rather, a court typically "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). In other words, "the rigorousness of [the judicial] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* When a restriction is "severe," it must be "narrowly drawn to advance a state interest of compelling importance." *Id.* On the other hand, when it is a "reasonable, nondiscriminatory" restriction, "the State's important regulatory interests are generally sufficient to justify" it. *Id.*

The Plaintiffs insist that the Qualification and Witness Requirements warrant heightened scrutiny. But they do so without acknowledging that the United

State Supreme Court has refused to examine absentee-voting provisions with such an exacting eye when the plaintiffs had other options for exercising their right to voe.[1] In *McDonald v. Board of Election Commissioners of Chicago*, the Court reviewed a challenge by unsentenced inmates in Cook County, who, although qualified voters, could not go to their polling places because they were incarcerated. Yet they could not obtain absentee ballots because they did not fall into one of the four categories of voters eligible to vote by absentee ballot under Illinois law. The Supreme Court expressly rejected the inmates' invitation to apply heightened scrutiny for two reasons. *First*, the state's "absentee provisions are not drawn on the basis of wealth or race." 394 U.S. at 807. *Second*, the state's absentee rules did not "impact [the inmates'] ability to exercise the fundamental right to vote," but rather only their "right to receive absentee ballots." *Id.* These same things are true of the Qualification and Witness Requirements: Neither is based on wealth or race, as all South Carolina voters must comply with them, and both Requirements relate to the right to receive (or submit) an absentee ballot. Although *McDonald* predates *Anderson* and *Burdick*, the Supreme Court in *Burdick* cited *McDonald* approvingly in discussing the standard of review, so it is still good law that binds this Court to apply a lower level of scrutiny to the Qualification Requirement and Witness Requirement. *See Burdick*, 504 U.S. at 434.

---

[1] Nor do the cases the Plaintiffs cite on the level of scrutiny consider *McDonald*, *see* Mem., ECF No. 7-1 at 27–28, though that is presumably because, unlike this case, those cases did involve absentee voting (making those cases of little value here).

One important part of *McDonald* also bears mentioning: "[T]here [was] nothing in the record to show that appellants are in fact absolutely prohibited from voting by the State." *McDonald*, 394 U.S. at 809 n.7. The same is true here. The Plaintiffs can still exercise their right to vote, making *O'Brien v. Skinner*, 414 U.S. 524 (1974), (on which the Plaintiffs rely, *see* Mem., ECF No. 7-1 at 40) irrelevant. In that case, New York inmates could not vote in any manner. That is not the situation here.

**B.    A cornerstone of the Plaintiffs' argument has been removed.**

At least seven times in the memorandum, the Plaintiffs invoke Governor McMaster's "home or work" order to argue that forcing people to choose to vote or risk their health is unreasonable when the State's chief executive has instructed South Carolinians to stay at home unless they are going to work, visiting family, or obtaining essential services. This executive order, they say, demonstrates the gravity of the situation.

But Governor McMaster lifted that order as of May 4. *See* Office of the Governor, Exec. Order 2020-31. This means that although South Carolinians should still abide by social-distancing protocols, the Governor has determined is now safe for them to resume certain other activities. The Plaintiffs have therefore lost the lead argument on both of the provisions they challenge. *See* Mem., ECF No. 7-1 at 29, 36.

**C.    The Plaintiffs are not likely to succeed on the Qualification Requirement.**

As an initial matter, one thing needs to be clear: The Constitution does not require a state to allow anyone to vote by absentee ballot. *See Griffin v. Roupas*, 385

F.3d 1128, 1131 (7th Cir. 2004). States are free to choose what, if any, absentee voting to allow. *See id.*

One additional preliminary matter: The Plaintiffs challenge section 7-15-320 generally. *See* Mem., ECF No. 7-1 at 47 (asking the Court to enjoin section 7-15-320 so that "any eligible voter, regardless of age or physical condition" to vote by absentee ballot in the June 9 primary). Their arguments focus solely on the supposed burden on voters because of COVID-19. *See* Mem. 29–32. Thus, the Election Defendants likewise focus only on that issue.

### 1.    **The Plaintiffs have overstated any burden.**

It is worth noting at the outset the many voters already covered by the plain language of the statute. Among the people at heightened risk with COVID-19 include those who are 65 years of age and older, live in a nursing home or long-term care facility, are immunocompromised, or who have conditions like asthma, severe obesity, chronic lung disease, diabetes, serious heart conditions, kidney disease requiring dialysis, and liver disease. *See* Ctrs. for Disease Control & Prevention, Groups at Higher Risk for Severe Illness (Apr. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Assuming that someone living in a long-term care facility is either over 65 or has some serious health condition (a safe assumption), all of these people can already vote by absentee ballot. *See* S.C. Code §§ 7-15-320(B)(1) ("physically disabled persons"); 7-15-320(B)(8) ("persons sixty-five years of age or older"). Thus, South Carolina's absentee-voting rules already protect the vast majority of those most at risk due to COVID-19, meaning that the Plaintiffs need no relief from this

Court to protect the "two distinct groups [that] are at particularly severe risk." Mem., ECF No. 7-1 at 31.

Turn now to the individual Plaintiffs who address the Qualification Requirement specifically. Jeremy Rutledge alleges that, despite having systemic scleroderma, a chronic autoimmune disorder that affects his skin and organs, he does not consider himself physically disabled. *See* Decl. of Jeremy Rutledge ¶¶ 5–6, ECF No. 7-20. His belief does not matter. The law says what it says. The plain language of the statute controls, and his chronic illnesses mean Rutledge is qualified to vote by absentee ballot. Neither the Election Defendants nor South Carolina courts have ever strictly read "cannot" in section 7-15-310(4) to require a voter literally be unable to appear in person to qualify as "physically disabled."

The same is true of Trena M. Walker. Her emphysema and immunocompromised condition qualifies her to vote by absentee ballot. *See* Decl. of Trena M. Walker ¶ 7, ECF No. 7-21. Her belief that she is not physically disabled is also irrelevant.

As for Mary Thomas, the Plaintiffs claim she has "no reason to vote absentee" other than self-quarantining, Mem., ECF No. 7-1 at 31, but she qualifies to vote by absentee ballot because she is over sixty-five years old, *see* S.C. Code § 7-15-320(B)(8); Decl. of Mary T. Thomas ¶ 8, ECF No. 7-18. The Qualification Requirement therefore does not impact her.

In addition to these Plaintiffs for whom the Qualification Requirement is no burden at all, that requirement is a not an unreasonable burden for others. Nea Richard, for instance, wants to be a poll worker (which allows her to vote by

absentee ballot, *see* S.C. Code § 7-15-320(B)(3)) and says more in-person voting will be a danger to her health and take more time than usual. *See* Decl. of Nea Richard ¶¶ 6, 9, 10, ECF No. 7-19. Unless a court were to mandate that the State hold the primary and general election exclusively by mail, people will have to serve as poll workers, and voters will have the right to vote in person. Some delays because of the extra precautions are inevitable, but they constitute no reason to rewrite the statute.

Some evidence the Plaintiffs offer on the Qualification Requirement is inadmissible. For instance, the only way Brenda Murphy could know about the voter described in Paragraph 12 of her Declaration is not willing to vote in person is if that voter told Murphy so. *See* Decl. of Brenda C. Murphy ¶ 12, ECF No. 7-17. Yet, that is hearsay that the Court cannot consider. *See* Fed. R. Evid. 802.

Finally, on the suggestion that in-person voting is *per se* unsafe, that is false. The Election Defendants have been and will continue to be providing special COVID-19 training to poll managers on social distancing and sanitation, so that check-in stations are properly spaced, voters leave six feet between themselves in line, voting equipment is cleaned between voters. The Election Defendants have also ordered personal protective equipment (like masks and gloves), cleaning supplies, sneeze guards for check-in stations, and cotton swabs for voters to use instead of fingers. Decl. of Marci Andino ¶ 3. Voting may take longer because of these precautions, but it can take place safely, employing the social distancing guidelines recommended by the CDC and DHEC. *See* Ctrs. for Disease Control &

Prevention, How to Protect Yourself and Others, (Apr. 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

Ultimately, "even assuming that the burden [of the Qualification Requirement] may not be justified as to a few voters, that conclusion is by no means sufficient to establish [the Plaintiffs'] right to the relief they seek in this litigation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 199–200 (2008) (internal footnote omitted). The Supreme Court has refused to allow election-case plaintiffs to strike down provisions that—like the Qualification Requirement—burden at most a few voters. That is particularly so in a case like this, when the Qualification Requirement does not severely burden any individual Plaintiff.

### 2.    The State has a compelling interest.

The Plaintiffs insist the State does not have "a discernable interest in compelling citizens to vote in person in the midst of a dangerous pandemic." Mem., ECF No. 7-1 at 33. That is a strawman.[2]

The correct question is whether the State has an interest in enforcing the Election Law that is on the books. Of course the State does. *See United States v. Dickson*, 40 U.S. 141, 162 (1841) (Story, J.) ("ours is a government of laws, and not of men").

South Carolina law generally requires in-person voting. *See* S.C. Code § 7-13-710 *et seq*. Certain voters are qualified to vote by absentee ballot if they chose to do so.

---

[2] Note that neither the Election Defendants nor even the Governor could give every South Carolina voter the option to vote by mail-in absentee ballot but are merely refusing to do so. *See* S.C. Const. art. I, § 7 ("The power to suspend the laws shall be exercised only by the General Assembly or by its authority in particular cases expressly provided for by it.").

*See id.* § 7-15-320. These voters are not exempt or excused from voting in-person, but rather they can be qualified to vote by absentee ballot, if they would rather vote that way than in person.

Like many policy choices, absentee voting has benefits and drawbacks. On one side of the proverbial ledger, it makes voting easier for certain individuals who might find going to their polling place challenging. *See McDonald*, 394 U.S. at 807 (noting that absentee-voting rules "are designed to make voting more available to some groups who cannot easily get to the polls"). On the other side, it heightens the risk of voting fraud.[3] *See Griffin*, 385 F.3d at 1130–31 (collecting sources on voting fraud and absentee voting). To balance these competing interests, South Carolina has determined to give some voters—but not all—the right to qualify to vote by absentee ballot.

The Plaintiffs implicitly admit that not all voters qualify under state law to vote by absentee ballot, claiming that the Defendants rejected an interpretation of state law to allow everyone to qualify. *See* Mem., ECF No. 7-1 at 33–34. They have rejected the Plaintiffs' interpretation for good reason: it is not a plausible one because it does not comport with the plain meaning of the statutory definition of "physically disabled persons."

---

[3] Though they do not raise election integrity here, the Plaintiffs do so in the context of the Witness Requirement, and they challenge voter fraud as a legitimate basis for the State's interest. Presumably, they would take the same view here. In any event, there is conflicting scholarship on this subject, and it is for legislatures, not courts, to weigh that evidence and enact appropriate legislation.

i.    **The Plaintiffs' interpretation is inconsistent with the language of the statute.**

The starting point for interpreting what a "physically disabled person" under section 7-15-310(4) must be the General Assembly's intent. *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) (calling this intent the "cardinal rule of statutory construction"). And to determine legislative intent, this Court looks first to the words that the General Assembly used. *Smith v. Tiffany*, 419 S.C. 548, 555, 799 S.E.2d 479, 483 (2017) ("It is axiomatic that statutory interpretation begins (and often ends) with the text of the statute in question."). Those words must be read in context such that all parts of the statute are given effect and work harmoniously together. *CFRE, LLC v. Greenville Cty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011).

The Election Law defines a "physically disabled person" as someone "who, because of injury or illness, cannot be present in person at his voting place on election day." S.C. Code § 7-15-310(4). The Plaintiffs are correct that COVID-19 is an illness. *See* Mem., ECF No. 7-1 at 34.

But it does not follow that every South Carolina voter is statutorily defined as "physically disabled" because COVID-19 is an illness. For one, that conclusion belies the common use of the words in section 7-15-310(4). *See Olds v. City of Goose Creek*, 424 S.C. 240, 249, 818 S.E.2d 5, 10 (2018) ("In construing a statute, its words must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's operation."). A simple example shows how. If someone says, "I am not going because of the flu," the listener would understand that that person has the flu. In other words, he is sick. On the other

17

hand, to convey that this person did not want to go somewhere because of fear of the flu, that person would say, "I am not going because I don't want to catch the flu."

For another, their argument wrongly reads "because of . . . illness" in isolation. *See Senate by & through Leatherman v. McMaster*, 425 S.C. 315, 322, 821 S.E.2d 908, 912 (2018) ("We . . . should not concentrate on isolated phrases within the statute."). In addition to a "physically disabled person" being qualified to vote by absentee ballot, a voter "attending sick or physically disabled persons" may also vote by absentee ballot. S.C. Code § 7-15-320(B)(4). These are two distinct qualifications for being able to vote absentee. The only way to harmonize these provisions and to give meaning to both is to interpret a "physically disabled person" as a person with an illness and to interpret a person "attending" the physically disabled person as someone giving care to a person with an illness. After all a person with only the fear of contracting an illness does not need a caregiver. Plus, if the Plaintiffs' view of "physically disabled" were correct, the sick person's illness would already qualify the care giver to vote by absentee ballot, so section 7-15-320(B)(4) would be superfluous. *See Senate by & through Leatherman*, 425 S.C. at 322, 821 S.E.2d at 912 ("we must read the statute so that no word, clause, sentence, provision or part shall be rendered surplusage, or superfluous" (internal quotation mark omitted)).

To be sure, section 7-15-310(4) must "be liberally construed in order to effectuate" its purpose. S.C. Code § 7-15-20. That is why, for example, the SEC has never strictly read "cannot" in section 7-15-310(4) to require a voter to be literally unable to appear in person to qualify as "physically disabled." Nevertheless,

liberally construing the statute is not a license to ignore the words themselves or the context in which they appear. *See Gregory v. S.C. Democratic Exec. Comm.*, 247 S.E.2d 439, 444 (S.C. 1978) (although "our absentee voting statutes should be given a liberal construction, we cannot extend statutes to accommodate errors if such interpretation would be contrary to clear mandatory language by the Legislature"). The words here require a voter to have an illness to qualify to vote by absentee ballot, not simply have the fear of contracting an illness.

### ii. The Plaintiffs' interpretation does not align with the history of the statute.

If the language of the statutes leaves any doubt, the history of these provisions removes it. *See In re Hosp. Pricing Litig., King v. AnMed Health*, 377 S.C. 48, 54, 659 S.E.2d 131, 134 (2008) ("The history of the period in which the statute was passed may be considered in interpreting the statute.").

The General Assembly established in 1972 the right to vote by absentee ballot if a voter was "physically unable to present himself" at the polls. 1972 S.C. Acts No. 1574, § 2 ("Any qualified elector who will be physically unable to present himself at his precinct on election day shall be permitted to vote by absentee ballot."). When five Richland County voters sought to use this provision to vote by absentee ballot when they would be out of town on election day, the Attorney General sought a declaration from this Court on whether this statute "extends the right of absentee voting only to those qualified electors who are unable to present themselves at their voting precinct by reason of illness, injury or other physical infirmity." *State ex rel. McLeod v. Ellisor*, 259 S.C. 364, 368, 192 S.E.2d 188, 188–89 (1972) (per curiam).

19

In examining the language of Act 1574, this Court recognized that the "ordinary signification of the words 'physically unable' is bodily incapacity or physical infirmity." *Id.* at 368–69, 192 S.E.2d at 189. The Court looked to the dictionary for definitions for "unable" and "physically" and concluded that "[t]o interpret these words to mean something other than inability by reason of illness, injury or other bodily infirmity is to place a strained and unnatural construction on them in violation of the South Carolina rule that the words are to be taken in their ordinary and literal meaning." *Id.* at 369, 192 S.E.2d at 189. The Court bolstered its conclusion by comparing the language of Act 1574 with other provisions on absentee voting, as interpreting Act 1574 to mean any voter who was absent on election day regardless of illness or injury would implicitly repeal the other absentee provisions s (something, of course, the law disfavors). *See id.* at 369–70, 192 S.E.2d at 189–90.

Less than three years later, the General Assembly amended the provisions for absentee voting. In Act 301 of 1975, the General Assembly defined a "physically disabled person" as "a person who, because of injury or illness, cannot be present in person at his voting place on Election Day." 1975 S.C. Acts No. 301, § 1 (codified at S.C. Code § 23-441(4) (1962)). The General Assembly allowed these physically disabled people to vote by absentee ballot, whether or not they would be absent from their county of residence on election day. *Id.* (codified at S.C. Code § 23-442(5) (1962)). This provisions have not substantively changed since 1975. *See* 2015 S.C. Acts No. 79, § 4; 2014 S.C. Acts No. 289, § 6;[4] 2000 S.C. Acts No. 392, § 10; 1997 S.C.

---

[4] This act restructured the subsections of 7-15-320 and moved "physically disabled persons" to its current location in section 7-15-320(B)(1).

Acts No. 25, § 1; 1996 S.C. Acts No. 434, § 19; 1994 S.C. Acts No. 365, § 3; 1989 S.C. Acts No. 193, § 2; 1984 S.C. Acts No. 266, § 7; 1982 S.C. Acts No. 280, § 1.[5]

When Act 301 is considered in light of *Ellisor*, it is apparent that the General Assembly was codifying the South Carolina Supreme Court's holding. *See State v. McKnight*, 352 S.C. 635, 648, 576 S.E.2d 168, 175 (2003) ("There is a presumption that the legislature has knowledge of previous legislation as well as judicial decisions construing that legislation when later statutes are enacted on related subjects."). The General Assembly used the same words ("injury" and "illness") to define "physically disabled person" that the South Carolina Supreme Court used in analyzing Act 1574. And the General Assembly gave the same people (those unable to vote in person because of injury or illness) the right to vote by absentee ballot that had it under the Court's interpretation of Act 1574.

> **D.    The Plaintiffs are not likely to succeed on the Witness Requirement.**
>
> **1.    The Plaintiffs again have overstated any burden.**

The Plaintiffs portray the Witness Requirement as a grave threat to their health. Having to have their absentee ballots witnessed, they insist, gives them an "impossible choice[]" of voting or their health. Mem., ECF No. 7-1 at 39.

Before getting to any specifics, a general observation about the witness requirement is necessary: Anyone can be a witness for an absentee ballot—the statute imposes no limitations. *See* S.C. Code §§ 7-15-220; 7-15-380(A). Thus, South Carolina's witness requirement is far less burdensome than other witness

---

[5] This act moved these provisions to their current code sections of 7-15-310 and 7-15-320.

requirements, such as Oklahoma's, which requires an absentee ballot be notarized and was just struck down by that state's supreme court. *See* Okla. Stat. tit. 26, § 14-108(A); *League of Women Voters v. Ziriax*, --- P.3d ---, 2020 WL 2111348 (Okla. May 4, 2020).

In fact, South Carolina's requirement is less stringent than it used to be. As originally enacted, South Carolina (like Oklahoma) required the oath of a voter casting an absentee ballot had to be notarized. *See* 1953 S.C. Acts No. 48 (codified at S.C. Code 23-449.5 (1962)). The General Assembly has removed the notarization requirement.

Given the broad availability of potential witnesses for a South Carolina absentee ballot, the Plaintiffs have overstated the burden of getting a witness to sign their absentee ballots. For example, Mary Thomas says she has "cut off all *unnecessary* in-person contact with others." Decl. of Mary T. Thomas ¶ 6, ECF No. 7-18 (emphasis added). She has some in-person contact (none of whom she claims is ineligible to be a witness), and that person could witness her absentee ballot when seeing Thomas for another reason.

Similarly, Rutledge lives with his wife. *See* Decl. of Jeremy Rutledge ¶ 8, ECF No. 7-20. His wife can witness his ballot. And although Dr. Williams has (or had) COVID-19, making it "dangerous" to interact with her husband, Mem., ECF No. 7-1 at 38, her husband could use his own pen and watch from a different room to witness her ballot. As for Walker, the Plaintiffs point to no law prohibiting an eleven year old from being a witness, and the SEC has never issued any guidance saying he could not be. *See* Decl. of Trena M. Walker ¶ 2, ECF No. 7-21.

As with the Qualification Requirement, some of the evidence the Plaintiffs offer on the Witness Requirement is inadmissible. For example, Dr. Williams, for instance claims that she would have witnessed "many" absentee ballots for voters "who have no one else to" witness their ballots, but she offers nothing to corroborate that any of these nameless people have no other witness options, nothing about who told her this, or why no one else from the Family Unit can perform these duties. *See* Decl. of Brenda C. Williams, M.D. ¶ 8; Fed. R. Evid. 602; Fed. R. Evid. 802.

More generally, a neighbor, friend, or delivery driver (if a voter is perfectly self-quarantining, someone still has to be delivering food) could witness an absentee ballot through a door. This requirement has existed since the 1950s and in its current form since the 1980s, *see* 1982 S.C. Acts No. 280, § 1; 1953 S.C. Acts No. 48, and it is clearly marked on absentee ballots, *see* Decl. of Marci Andino ¶ 7. Even if having an absentee ballot witnessed takes a little more effort because of COVID-19 (which will be the case for only a limited number of voters), the witness requirement can still be satisfied with reasonable efforts. *See AnMed Health v. S.C. Dep't of Employment & Workforce*, 404 S.C. 224, 229, 743 S.E.2d 854, 857 (Ct. App. 2013) ("What is 'reasonable' will vary according to the circumstances of each case . . . ."); *see also Burdick*, 504 U.S. at 441 (upholding "reasonable" burdens). Ultimately, the Witness Requirement "is a generally applicable, nondiscriminatory voting regulation, and [Supreme Court] precedents refute the view that individual impacts are relevant to determining the severity of the burden it imposes." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring).

The Plaintiffs try to bolster their burden argument with statistics of how the Witness Requirement impacts African-Americans differently than other groups. *See* Mem., ECF No. 7-1 at 37–39. They cite, however, no case law holding that such statistics are relevant to the analysis of the severity of a burden. Indeed, *Crawford*—a case also dealt with "a neutral, nondiscriminatory regulation of voting procedure"—rejects this idea. *Crawford*, 553 U.S. at 203 (controlling opinion).

## 2.    The State again has a compelling interest.

"A State indisputably has a compelling interest in preserving the integrity of its election process. Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (citation omitted).

The Witness Requirement furthers this goal. It provides "assurance of the authenticity of the absentee vote." *Gregory*, 247 S.E.2d at 444.

Not so, say the Plaintiffs. They insist that the witness requirement provides, at best, minimal benefits in protecting the integrity of an election. Overseas voters, they point out, do not have a witness requirement, and Congress removed the federal requirement.[6] *See* Mem., ECF No. 7-1 at 40–41.

---

[6] On the elimination of this requirement by Congress, the Plaintiffs point only to a committee report to explain congressional thinking. Courts have said time and again such reports shed little light on the thinking of members, who are, after all, elected by the people and have the authority to pass legislation. *See, e.g.*, *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 783 n.* (2018) (Thomas, J., concurring in part and concurring in the judgment) (quoting an exchange on the Senate floor observing that staff, not members, drafted a committee report).

These arguments wrongly ask the Court to evaluate legislative decisions. Of course, "[i]t is not the function of a court to determine whether the public policy that finds expression in legislation . . . is ill or well conceived." *Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 42 (1933).

Eleven states in addition to South Carolina also require a witness signature. *See* National Conf. of State Legislatures, *Verification of Absentee Ballots*, https://www.ncsl.org/research/elections-and-campaigns/verification-of-absentee-ballots.aspx (last visited May 4, 2020). The legislatures of these states have made a policy determination that a witness signature helps protect the integrity of an election. That is a reasonable conclusion, particularly given the requirement of witness signatures on other legal documents. *See, e.g.*, S.C. Code §§ 30-7-20 (liens on real property); 47-9-370 (branding of livestock).

Look at how South Carolina's witness signature requirement works. A voter casting an absentee ballot must swear that she is qualified to vote in the election, has not double voted, and received no improper assistance. *See* S.C. Code § 7-15-380(A). That signature must be witnessed by someone who signs the return-addressed envelope and puts his address. *See id.*

This witness requirement serves multiple purposes. In the first place, it can deter fraud. Even if someone intent on committing fraud might be willing to forge the witness signature requirement, the requirement may deter others. In the second, in the case of a challenged ballot, it allows election officials to investigate whether the ballot is valid by contacting the witness. (The Plaintiffs' insinuation

that a witness cannot be identified because he does not have to print his name is therefore false.)

None of the cases the Plaintiffs cite helps their cause because none involves a witness requirement on an absentee ballot. In *Libertarian Party of Virginia v. Judd*, 718 F.3d 308 (4th Cir. 2013), the court addressed the witness requirement for a candidate's petition to get on the ballot, and the witness under that statute had to be the candidate or a Virginia resident—restrictions that do not apply to South Carolina's absentee ballots. The Ohio statute in *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016), concerned absentee ballots and identifying voters, not protecting the integrity of an election, as Ohio did not raise that as a defense at trial.[7] And *One Wisconsin Institute, Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016), dealt with the length of time in which in-person early voting was allowed.

### 3.     The Witness Requirement is valid under the Voting Rights Act.

The Plaintiffs' last attack on the Witness Requirement is based on the Voting Rights Act. *See* Mem., ECF No. 7-1 at 42–44. Under federal law, no citizen may be denied the right to vote "because of his failure to comply with any test or device," including being required to "prove his qualifications by the voucher of registered voters or members of any other class." 52 U.S.C. §§ 10501(a), (b)(4).

---

[7] Given that Ohio did not raise this defense at trial, *see* 837 F.3d at 633 (discussing what evidence was offered at trial) it is unclear why the Sixth Circuit made voter fraud the central focus of the State's interest. Even on appeal, the State did not focus on voter fraud as its interest. *See* Br. of Husted and State of Ohio 28–33, *Northeast Ohio Coalition for the Homeless v. Husted*, No. 16-3603 (6th Cir. July 1, 2016).

Before getting to any analysis, it is worth noting what is missing from the Plaintiffs' argument: any case holding that a witness requirement violates this statute. Thus, the Plaintiffs ask this Court to break new legal ground.

In so asking, the Plaintiffs ignore the plain language of § 10501. A "test or device" includes a requirement that a voter "prove his qualifications by the voucher of registered voters or members of any other class." 52 U.S.C. § 10501(b)(4). South Carolina law does not require that the witness be another registered voter or the member of any particular class. *See* S.C. Code § 7-15-380. Therefore, it is not an illegal "test or device."

Moreover, the Plaintiffs' reading of § 10501 would undermine election integrity or force states to abandon absentee voting (or at least restrict it significantly). Absentee voting raises particular challenges that in-person voting does not. To address these challenges, states have adopted various generally applicable provisions to avoid potential fraud in absentee voting. Protecting against that fraud is valid state interest. And it is one that has nothing to do with the purpose of § 10501, which was to prevent states from using things like literacy tests, good moral character tests, or vouchers from other votes to disenfranchise voters. *See Ely v. Klahr*, 403 U.S. 108, 118 & n.2 (1971) (discussing the ban on "tests and devices"); *cf. Ne. Ohio Coal. for the Homeless*, 837 F.3d at 629 ("The address-and-birth-date requirements simply do not fall within the meaning of 'test or device,' as used in the statute.").

**II.    The Plaintiffs do not face an irreparable harm without an injunction.**

The Plaintiffs' argument on irreparable harm is simple: Without an injunction, because of COVID-19, their right to be vote will be lost. *See* Mem., ECF No. 7-1 at 44–45. Not so, for at least three reasons.

*First*, the Plaintiffs can vote. With the steps the Election Defendants are taking and by following guidance from the CDC and DHEC about social distancing and hand washing, people can safely vote in person. Framing the choice as either voting or death misstates the situation (particularly in light the "home or work" order being lifted).

*Second*, the Plaintiffs do not face any severe burden under the absentee-voting rules. Thomas, Rutledge, Williams, Richard, and Walker are all qualified to vote by absentee ballot. Getting a signature on those absentee ballots is not as challenging as they portray it.

*Third*, the Plaintiffs claim, without any evidentiary support, members of the Family Unit will suffer without an injunction. *See* Decl. of Brenda C. Williams, M.D. ¶¶ 3–4, ECF No. 7-22. These unsupported assertions carry little weight, especially in light of the overstatements of the burdens that the individual Plaintiffs face. As for the Family Unit as an entity, that it has to divert resources now to COVID-19 is no reason to issue an injunction. *See* Decl. of Brenda C. Williams, M.D. ¶ 5, ECF No. 7-22. Many other organizations have also diverted resources because of COVID-19.

**III.    The equities and the public interest counsel against an injunction.**

Taking these factors together as the Plaintiffs did, at least four considerations counsel against an injunction.

The first is practical. The Plaintiffs can exercise their right to vote. As explained already, *see supra* Parts I.C.1. and I.D.1, the Plaintiffs have overstated any burden that exists.

The second is logistical. Absentee voting is underway. Voters have already obtained absentee ballots that require a witness signature. Decl. of Marci Andino ¶ 4. Absentee ballots have already been returned to the County Boards. *Id.* Changing the rules in the middle of the election threatens to confuse voters. As the Supreme Court has cautioned, courts must be wary of changes to procedures "just weeks before an election." *Purcell*, 549 U.S. at 4. Those changes, "especially conflicting orders" (which is possible here because there is a case in the South Carolina Supreme Court about section 7-15-310 and another case in federal court), can "result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4–5.

The third is precedential. Plaintiffs should be encouraged to act diligently n bringing claims. Laches is one way the law promotes that diligence. Here, Governor McMaster declared the first state of emergency in mid-March, yet the Complaint was not filed until April 22, and then the motion for the preliminary injunction, with its forty-page memorandum and twenty-two additional ECF attachments, was not filed until April 28. Under South Carolina Election Law, voters can request an absentee ballot any time in the calendar year of an election. *See* S.C. Code § 7-15-330. Put another way, the Plaintiffs took more than a month after the public-health emergency was declared to claim the injunction was necessary, and then demanded that the Defendants respond in less than a week and the Court rule as quickly as

29

possible—hardly a reasonable position. When timing is so tight, plaintiffs should be expected to act more quickly in asserting their claims. Failing to do so, as these Plaintiffs have, puts courts and election agencies and officials in an untenable position. That is why courts have refused to grant relief when plaintiffs delay, even in election cases. *See, e.g.*, *Simkins v. Gressette*, 631 F.2d 287, 296 (4th Cir. 1980) (holding that the plaintiffs' delay in bringing a suit until the eve of an election as a sufficient basis to deny their claims); *Smith v. S.C. Election Comm'n*, 874 F. Supp. 2d 483, 498 (D.S.C. 2012) (three-judge court) (holding that a delay of forty days in filing a complaint was sufficient for laches to apply). This is particularly true when, as here, statutes have been in effect for decades before they are challenged.

The fourth is constitutional. The role of courts in our constitutional republic is to interpret the law. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803). It is not to rewrite the law. *See Puerto Rico v. Franklin California Tax-Free Tr.*, 136 S. Ct. 1938, 1949 (2016). The language of the Qualification Requirement and Witness Requirement is plain, and the Court is bound to apply those provisions as the General Assembly adopted them. *See id.* at 1946 ("The plain text of the [statute] begins and ends our analysis."); *Hodges*, 341 S.C. at 85, 533 S.E.2d at 581 (calling legislative intent the "cardinal rule of statutory construction" and the words of the statute as the best evidence of that intent); *see also* S.C. Const. art. II, § 10 (giving the General Assembly the responsibility to "provide for the administration of elections and for absentee voting"). As a three-judge panel once said in a challenge to election law, "[t]he public has an interest in ensuring that the State's general election is conducted pursuant to state law." *Smith v. S.C. State Election Comm'n*,

901 F. Supp. 2d 639, 649 (D.S.C. 2012) (three-judge court). At its essence, the Plaintiffs' request is for the Court to rewrite the South Carolina Election Law because of the seriousness of COVID-19. To do so would violate the Constitution and fall into the trap of which Justice Holmes warned in *Northern Securities Co. v. United States*: "Great cases, like hard cases, make bad law" because legal principles give way to the urgency of the moment. 193 U.S. 197, 364 (1904) (Holmes, J., dissenting).

Nothing the Plaintiffs say on this point overcomes these considerations. For one, much of their argument here assumes they are right on the merits. *See* Mem., ECF No. 7-1 at 45–46. As discussed already, they are not. For another they point to the public interest in protecting public health. *See* Mem., ECF No. 7-1 at 46. But that argument is based on the Governor's "home or work" order, which has been lifted, and the CDC social distancing guidance, which the Election Defendants are working diligently to implement on Election Day. And for a third, the Plaintiffs say that absentee voting is protected in other ways. But they do not mention that the other lawsuit pending in this Court regarding the 2020 elections seeks to undo multiple of these protections for absentee voting on which the Plaintiffs rely here. *See* Compl., *Middleton v. Andino*, No. 3:20-cv-1730-JMC (D.S.C. May 1, 2020), ECF No. 1.

## Conclusion

The motion for a preliminary injunction should be denied.

Respectfully Submitted,


<u>s/ Wm. Grayson Lambert</u>

M. Elizabeth Crum
Fed. ID No. 372
Wm. Grayson Lambert
Fed. ID No. 11761
BURR & FORMAN LLP
Post Office Box 11390
Columbia, SC 29211
(803) 799-9800

Robert Bolchoz
ROBERT BOLCHOZ LLC
P.O. Box 6989
Columbia, SC 29260
(803) 790-7474

Karl Smith Bowers, Jr.
BOWERS LAW OFFICE
P.O. Box 50549
Columbia, SC 29250
(803) 753-1099

Harrison D. Brant
STATE ELECTION COMMISSION
1122 Lady Street, Suite 500
Columbia, SC 29201
(803) 734-9063

*Counsel for Defendants Marci Andino,
John Wells, Clifford J. Elder, and
Scott Moseley*