IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| MARY T. THOMAS, *et al.,* | ) | Case No. 3:20-cv-01552-JMC |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **AMICUS MEMORANDUM OF** |
| MARCI ANDINO, *et al.,* | ) | **ATTORNEY GENERAL** |
| | ) | **ALAN WILSON** |
| Defendants. | ) | |
| | ) | |

Attorney General Alan Wilson submits the following memorandum as Amicus Curiae. We note for the Court's benefit that we have also submitted a memorandum in the case pending in the Original Jurisdiction of the South Carolina Supreme Court, *Bailey et al. v. South Carolina Election Commission and Andino*, Appellate Case No. 2020-00642. That case involved interpretation of § 7-15-310 et seq. relative to absentee voting in the wake of the current pandemic.

The public health emergency, which currently grips South Carolina, is unquestionably unprecedented in this State's history. The upcoming primary and general elections also loom large in the wake of a worldwide pandemic. But the present crisis – as extraordinary as it is – should not be used as justification for setting aside South Carolina's longstanding and facially neutral absentee voting statutes. In other words, COVID-19 should not be the instrument for an attempt in this lawsuit to address this State's social ills.

Even in a pandemic, neither the United States Constitution, nor the Voting Rights Act (VRA), are violated by enforcement of an even-handed absentee statute which has remained on the books for decades, and has gone virtually unchallenged during that time. Indeed, from the

1970s onward, the statutes were amended on numerous occasions. The absentee statutes presumably passed muster each time by being precleared by the Attorney General of the United States pursuant to his § 5 VRA responsibilities.

Plaintiffs note that while there have been numerous § 5 objections to various South Carolina provisions, Complaint at 43-44, they point to no statute which they attack in this lawsuit. Nor could they, inasmuch as the provisions they complain of have gone into effect under the Voting Rights Act over the years. *NAACP v. Hampton County Electric Comm.*, 470 U.S. 166 (1985) [statutory provision objected to by the Attorney General pursuant to § 5 of the VRA cannot be put into effect]. In other words, South Carolina's absentee ballot law is designed to expand voting, not deny or abridge it.

In this case, Plaintiffs throw in the proverbial "kitchen sink" in an effort to enjoin enforcement of an absentee ballot statute which has long existed. *See* S.C. Code Ann. § 7-15-310 et seq. Plaintiffs contend that the so-called "Excuse Requirement" [§ 7-15-320] and "Witness Requirement" [§ 7-15-220 and -420] are, in the context of the pandemic, an infringement upon the fundamental right to vote under the 1st and 14th Amendments; that the "Excuse Requirement" and "Witness Requirement" violate § 2 of the VRA, by burdening the right to vote, and by inflicting an adverse and disparate impact upon the right of African-Americans to vote; and that the "Witness Requirement" – requiring a witness before an absentee ballot may be mailed  - constitutes an illegal "test or device" under § 201 of the VRA. None of these constitutional or statutory claims are valid and should be rejected.

Attorney General Wilson is, of course, not a party to this action, but an amicus only. The parties will address the various elements to impose a preliminary injunction. *See Real Truth*

*About Obama, Inc. v. Fed. Elect. Comm.*, 575 F.3d 342, 346 (4th Cir. 2009), *cert. granted and vacated on other grounds*, 559 U.S. 1089 (2010) [plaintiff must show a likelihood of success on the merits; that plaintiff is likely to suffer irreparable harm in the absence of preliminary injunctive relief; that the balance of equities tips in plaintiffs' favor; and that an injunction is in the public interest.]. However, failure to show a likelihood of success on the merits is dispositive in denying the injunction. Because we believe Plaintiffs here cannot show the likelihood of success on the merits, a preliminary injunction should be denied. *S.C. Elec. and Gas Co. v. Randall*, 333 F.Supp3d 552, 576 (D.S.C. 2018) ["Therefore, because SCE&G cannot show a likelihood of success on the merits, this Court need not address the other necessary elements for preliminary injunctive relief."].

We also note here that the primaries are less than a month away, a matter of weeks before voters are scheduled to vote. The United States Supreme Court only recently addressed such a situation where a federal court is asked to interfere in an election which is imminent. In *Repub. Nat. Comm. V. Dem. Nat. Comm.*, - U.S. - , 140 S.Ct. 1205, 1207 (2020), the Court stated that "[t]his Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of the election." (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006); *Frank v. Walker*, 574 U.S. 929 (2014) and *Veasey v. Perry*, 574 U.S. ___, 135 S.Ct. 9 (2014)).

In *Purcell*, the Supreme Court vacated the injunction barring use of the Arizona voter identification statute. The Arizona statute had been precleared by the Attorney General under § 5 of the VRA. At the time the Court of Appeals issued its order, there were "just weeks before an election . . . " 549 U.S. at 4. The Supreme Court observed that

> "A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489

> U.S. 214, 231, 109 S.Ct. 1013, 1031 L.Ed.2d 271 (1989). Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Countering the State's compelling interest in preventing voter fraud is the plaintiffs' strong interest in exercising the "fundamental political right" to vote. *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (internal quotation marks omitted). Although the likely effects of Proposition 200 (voter ID) are much debated, the possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration to the plaintiffs' challenges.

*Id.* However, as *Purcell* states, "[g]iven the imminence of the election and the inadequate time to resolve the factual disputes, our action today shall of necessity allow the election to proceed <u>without an injunction</u> suspending the voter identification rules." *Id.* at 5-6 (emphasis added).

*Purcell* involved in-person voting while *Repub. Natl. Comm.* concerned absentee ballots as a result of the coronavirus. As demonstrated below, there is far less a reason to attach a "fundamental right to vote" with respect to absentee voting because absentee voting is a privilege bestowed by the Legislature, not a right protected by the Federal Constitution. Regardless, there is no reason to enjoin operation of South Carolina's absentee voting provisions so near to the upcoming election. *Purcell* and *Repub. Natl. Comm.* should control.

We turn now to Plaintiffs' contentions in this case. With respect to the constitutional arguments, the courts have been quite clear that an absentee ballot statute employed by the State generally does not contravene the Federal Constitution or impair or infringe upon the right to vote. In *McDonald v. Bd. of Elec. Comm'rs*, 394 U.S. 802 (1969), the Supreme Court upheld Illinois' absentee ballot statute against an attack grounded in the Fourteenth Amendment. There,

unsentenced inmates, awaiting trial, challenged the statute, contending that the absentee law did not allow them to vote by absentee ballot, depriving them of the fundamental right to vote. Chief Justice Warren, writing for the Court, concluded that, while the right to vote is indeed "fundamental," such "an exacting approach is not necessary here . . . ." This was because

> [f]irst, the distinctions made by Illinois' absentee provisions are not drawn on the basis of wealth or race. Secondly, there is nothing in the record to indicate that the Illinois statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote. It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots. Despite appellants' claim to the contrary, the absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, <u>do not themselves deny appellants the exercise of the franchise</u>; nor, indeed, does Illinois' Election Code so operate as a whole, for the State's statutes specifically disenfranchise only those who have been convicted and sentenced, and not those similarly situated to appellants. Ill.Rev.Stat., c. 46, s 3—5 (1967). Faced as we are with a constitutional question, we cannot lightly assume, with nothing in the record to support such an assumption, that <u>Illinois has in fact precluded appellants from voting</u>. We are then left with the more traditional standards for evaluating appellants' equal protection claims [rational basis].

394 U.S. at 807-08 (footnotes omitted). The Court went on to conclude as follows:

> [s]ince there is nothing to show that a judicially incapacitated, pretrial detainee is absolutely prohibited from exercising the franchise, it seems quite reasonable for Illinois' Legislature to treat differently the physically handicapped, who must, after all, present affidavits from their physicians attesting to an absolute inability to appear personally at the polls in order to qualify for an absentee ballot. Illinois could, of course, make voting easier for all concerned by extending <u>absentee voting privileges</u> to those in appellants' class. Its failure to do so, however, <u>hardly seems arbitrary, particularly in view of the many other classes of Illinois citizens not covered by the absentee provisions, for whom voting may be extremely difficult, if not practically impossible</u>.

*Id.* at 809-10 (emphasis added). Thus, the Supreme Court concluded that the Illinois absentee statute did not deprive persons who could not vote absentee of the right to vote. This was so despite the fact that like the prisoners in *McDonald* or here, like the voters in the pandemic, those ineligible to vote absentee found voting to be "extremely difficult, if not practically impossible."

Thus, in this case, Plaintiffs' attack upon South Carolina's absentee voting statute is entirely misplaced. COVID-19 cannot render an otherwise perfectly constitutional statute unconstitutional. There is a clear distinction between the fundamental right to vote and the statutory privilege to vote absentee.

Other courts, relying upon *McDonald*, are in accord. For example, in *Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2019), the Seventh Circuit, per Judge Posner, held that the federal Constitution does not confer a blanket right upon all registered voters to vote by absentee ballot. According to Judge Posner,

> at bottom the plaintiffs are arguing that the Constitution requires all states to allow unlimited absentee voting, and the argument ignores a host of serious objections to judicially legislating so radical a reform in the name of the Constitution. Voting fraud is a serious problem in U.S. elections generally and one with a particularly gamey history in Illinois . . . and it is facilitated by absentee voting. [Citing authorities] . . . .
>
> These and other problems created by absentee voting . . . may be outweighed by the harm to voters who being unable to vote in person will lose their vote if they can't vote by absentee ballot. But the striking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry.

385 F.3d at 1130-1131.

The Supreme Court decision in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) is particularly instructive here. There, the Court upheld Indiana's photo-ID law. The concurring opinion in *Crawford* of Justices Scalia, Thomas and Alito sets forth the appropriate analysis of the Court in *post-McDonald* line of cases:  Here, the South Carolina statutes, designed to allow easier voting, but while at the same time, guarding against vote fraud, have

withstood the test of time.  A pandemic cannot rewrite those statutes. As was stated in *Crawford v. Marion Co. Election Bd.*, 533 U.S. 185, 209 (2008),

> [t]o evaluate a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). This calls for application of a deferential "important regulatory interests" standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote. *Id.*, at 433–434, 112 S.Ct. 2059 (internal quotation marks omitted). The lead opinion resists the import of *Burdick* by characterizing it as simply adopting "the balancing approach" of *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (majority opinion of STEVENS, J.). See *ante*, at 1617; see also *ante*, at 1617, n. 8. Although *Burdick* liberally quoted *Anderson*, *Burdick* forged *Anderson's* amorphous "flexible standard" into something resembling an administrable rule. See *Burdick, supra*, at 434, 112 S.Ct. 2059. Since *Burdick*, we have repeatedly reaffirmed the primacy of its two-track approach. See *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997); *Clingman v. Beaver*, 544 U.S. 581, 586–587, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005). "[S]trict scrutiny is appropriate only if the burden is severe." *Id.*, at 592, 125 S.Ct. 2029. Thus, the first step is to decide whether a challenged law severely burdens the right to vote. Ordinary and widespread burdens, such as those requiring "nominal effort" of everyone, are not severe. See *id.* at 591, 593–597, 125 S.Ct. 2029. Burdens are severe if they go beyond the merely inconvenient. See *Storer v. Brown*, 415 U.S. 724, 728–729, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (characterizing the law in *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), as "severe" because it was "so burdensome" as to be "'virtually impossible'" to satisfy).
>
> Of course, we have to identify a burden before we can weigh it. The Indiana law affects different voters differently, ante, at 1642 – 1643, but what petitioners view as the law's several light and heavy burdens are no more than the different impacts of the single burden that the law uniformly imposes on all voters. To vote in person in Indiana, everyone must have and present a photo identification that can be obtained for free. The State draws no classifications, let alone discriminatory ones, except to establish optional absentee and provisional balloting for certain poor, elderly, and institutionalized voters and for religious objectors. Nor are voters who already have photo identifications exempted from the burden, since those voters must maintain the accuracy of the information displayed on the identifications, renew them before they expire, and replace them if they are lost.

7

The Indiana photo-identification law is a generally applicable, nondiscriminatory voting regulation, and our precedents refute the view that individual impacts are relevant to determining the severity of the burden it imposes. In the course of concluding that the Hawaii laws at issue in *Burdick* "impose[d] only a limited burden on voters' rights to make free choices and to associate politically through the vote," 504 U.S., at 439, 112 S.Ct. 2059, we considered the laws and their reasonably foreseeable effect on voters generally. See *id.*, at 436–437, 112 S.Ct. 2059. We did not discuss whether the laws had a severe effect on Mr. Burdick's own right to vote, given his particular circumstances. That was essentially the approach of the Burdick dissenters, who would have applied strict scrutiny to the laws because of their effect on "some voters." See *id.*, at 446, 112 S.Ct. 2059 (opinion of KENNEDY, J.,); see also *id.*, at 448, 112 S.Ct. 2059 ("The majority's analysis ignores the inevitable and significant burden a write-in ban imposes upon some individual voters ..." (emphasis added)). Subsequent cases have followed *Burdick's* generalized review of nondiscriminatory election laws. See, e.g., *Timmons, supra*, at 361–362, 117 S.Ct. 1364; *Clingman*, 544 U.S., at 590–591 (plurality opinion; id. at 592–593, 125 S.Ct. 2029 (opinion of the Court). Indeed, *Clingman's* holding that burdens are not severe if they are ordinary and widespread would be rendered meaningless if a single plaintiff could claim a severe burden.

Not all of our decisions predating *Burdick* addressed whether a challenged voting regulation severely burdened the right to vote, but when we began to grapple with the magnitude of burdens, we did so categorically and did not consider the peculiar circumstances of individual voters or candidates. See, e.g., *Jenness v. Fortson*, 403 U.S. 431, 438–441, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). Thus, in *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), we did not link the State's interest in inhibiting party raiding with the petitioners' own circumstances. See *id.*, at 760–762, 93 S.Ct. 1245. And in *Storer v. Brown, supra*, we observed that the severity of the burden of a regulation should be measured according to its "nature, extent, and likely impact." *Id.*, at 738, 94 S.Ct. 1274 (emphasis added). We therefore instructed the District Court to decide on remand whether "a reasonably diligent independent candidate [could] be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" *Id.*, at 742, 94 S.Ct. 1274 (emphasis added). Notably, we did not suggest that the District Court should consider whether one of the petitioners would actually find it more difficult than a reasonably diligent candidate to obtain the required signatures. What mattered was the general assessment of the burden.

Insofar as our election-regulation cases rest upon the requirements of the Fourteenth Amendment, see *Anderson*, 460 U.S., at 786, n. 7, 103 S.Ct. 1564, weighing the burden of a nondiscriminatory voting law upon each voter and concomitantly requiring exceptions for vulnerable voters would effectively turn

back decades of equal-protection jurisprudence. A voter complaining about such a law's effect on him has no valid equal-protection claim because, without proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional. See, e.g., *Washington v. Davis*, 426 U.S. 229, 248, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Fourteenth Amendment does not regard neutral laws as invidious ones, even when their burdens purportedly fall disproportionately on a protected class. A fortiori it does not do so when, as here, the classes complaining of disparate impact are not even protected. See *Harris v. McRae*, 448 U.S. 297, 323, and n. 26, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (poverty); *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 442, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (disability); *Gregory v. Ashcroft*, 501 U.S. 452, 473, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (age); cf. *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 878–879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (First Amendment does not require exceptions for religious objectors to neutral rules of general applicability).

Even if I thought that stare decisis did not foreclose adopting an individual-focused approach, I would reject it as an original matter. This is an area where the dos and don'ts need to be known in advance of the election, and voter-by-voter examination of the burdens of voting regulations would prove especially disruptive. A case-by-case approach naturally encourages constant litigation. Very few new election regulations improve everyone's lot, so the potential allegations of severe burden are endless. A State reducing the number of polling places would be open to the complaint it has violated the rights of disabled voters who live near the closed stations. Indeed, it may even be the case that some laws already on the books are especially burdensome for some voters, and one can predict lawsuits demanding that a State adopt voting over the Internet or expand absentee balloting.

That sort of detailed judicial supervision of the election process would flout the Constitution's express commitment of the task to the States. See Art. I, § 4. It is for state legislatures to weigh the costs and benefits of possible changes to their election codes, and their judgment must prevail unless it imposes a severe and unjustified overall burden upon the right to \*\*1627 vote, or is intended to disadvantage a particular class. Judicial review of their handiwork must apply an objective, uniform standard that will enable them to determine, ex ante, whether the burden they impose is too severe.

. . .

The universally applicable requirements of Indiana's voter-identification law are eminently reasonable. The burden of acquiring, possessing, and showing a free photo identification is simply not severe, because it does not "even represent a significant increase over the usual burdens of voting." *Ante*, at 1621. And the State's interests, ante, at 1613 – 1620, are sufficient to sustain that minimal burden. That should end the matter. That the State accommodates some voters by

> permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required.

553 U.S. at 207-209 (Scalia, Thomas and Alito, JJ, concurring).

Thus, the burden imposed by South Carolina's absentee law – particularly the "Excuse Requirement" and the "Witness Requirement" provisions, is neither severe nor significant. Accordingly, these provisions do not violate the fundamental right to vote.

For these same reasons, Plaintiffs' Voting Rights Act's claims are likewise without merit. The Fourth Circuit has concluded that Virginia's Voter ID statute does not violate the Voting Rights Act. In *Lee v. Va. State Bd. of Elections*, 843 F.3d 592 (4th Cir. 2016), the Court rejected a § 2 VRA claim against Virginia's Voter ID law. The plaintiff contended that the ID statute "unduly burdens the right to vote, imposes a discriminatory burden on African Americans and Latinos, and was enacted with the intent to discriminate against minorities, young voters and Democrats." 843 F.3d at 594. Judge Niemeyer, writing for the Court, noted that

> the statutory requirements for proving a § 2 violation are: (1) the identification of a qualification, prerequisite, standard, practice, or procedure ("a structure or practice"), (2) which results in a denial or abridgement of the right to vote (3) on account of race or color or because the person is a member of a language minority group ("the protected class") (4) such that, in the totality of circumstances, the political process is not equally open to the protected class (5) in that its members have less opportunity than others to participate in the process and elect representatives of their choice.

*Id.* at 599. In rejecting plaintiffs' arguments, the Fourth Circuit explained:

> The plaintiffs argue that, for some groups of minority voters, this opportunity is disproportionately burdened because a lower percentage of minorities have qualifying photo IDs and the process of obtaining photo IDs requires those voters to spend time traveling to and from a registrar's office. The Supreme Court has held, however, that this minor inconvenience of going to the registrar's office to obtain an ID does not impose a substantial burden. As recognized in Crawford, 553 U.S. at 198, 128 S.Ct. 1610, "the inconvenience of making a trip to [a government office], gathering the required documents, and posing for a

> photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 553 U.S. at 198, 128 S.Ct. 1610 (Stevens, J., announcing the judgment of the Court); see also id. at 209, 128 S.Ct. 1610 (Scalia, J., concurring in the judgment) ("The burden of acquiring, possessing, and showing a free photo identification is simply not severe," and "the State's interests are sufficient to sustain that minimal burden").
>
> Nonetheless, the plaintiffs press their argument further, asserting categorically that as long as there is disparity in the rates at which different groups possess acceptable identification, § 2 is violated. To make this assertion, however, the plaintiffs have to make an unjustified leap from *601 the disparate inconveniences that voters face when voting to the denial or abridgement of the right to vote. Every decision that a State makes in regulating its elections will, inevitably, result in somewhat more inconvenience for some voters than for others. For example, every polling place will, by necessity, be located closer to some voters than to others. To interpret § 2 as prohibiting any regulation that imposes a disparate inconvenience would mean that every polling place would need to be precisely located such that no group had to spend more time traveling to vote than did any other. Similarly, motor-voter registration would be found to be invalid as members of the protected class were less likely to possess a driver's license. Yet, courts have also correctly rejected that hypothetical. See Frank v. Walker, 768 F.3d 744, 754 (7th Cir. 2014), cert. denied, ––– U.S. ––––, 135 S.Ct. 1551, 191 L.Ed.2d 638 (2015).

843 F.3d at 600-01. Such is the case here with respect to South Carolina's "Excuse Requirement" and "Witness Requirement." As *McDonald* held, the fact that some voters may be able to take advantage of the absentee ballot privilege, and others may not, does not infringe upon the right to vote so long as the classifications are themselves not based upon race or wealth. Section 7-15-320 makes no such classification.

Likewise, the "Witness Requirement" is valid. As the Fourth Circuit pointed out in *Lee*, and Justice Scalia emphasized in *Crawford,* certain requirements in any election process – particularly absentee voting – will impose certain insubstantial burdens, thereby requiring a reasonable effort to meet those requirements. Judge Neimeyer emphasized that "disparate inconveniences" do not translate into an abridgement or denial of the right to vote. And as Judge

11

Posner stated in *Roupas*, preventing voter fraud, particularly in absentee ballots, is an important state interest, as voter fraud is "facilitated by absentee voting." 385 F.3d at 1130-31. The "Witness Requirement" is designed to guard against voter fraud. *Crawford*, 533 U.S. at 191 (importance of protection of election integrity). Following the Court's reasoning in *Lee*, we do not think either the "Excuse Requirement" or the "Witness Requirement" infringes upon the right to vote under the Federal Constitution or § 2 of the Voting Rights Act.

Most certainly, the "Witness Requirement" is not a prohibited "test or device" or a "litmus test" under § 301 of the VRA. In *Howlette v. City of Richmond*, 485 F.Supp.17 (E.D. Va. 1978), *affd.* 580 F.2d 704 (4th Cir. 1978), the Court concluded that the requirement of the Richmond city charter that each signature on a petition for obtaining a referendum on issuance of general obligation bonds must be individually notarized was not a "test or device" of the kind proscribed by the Voting Rights Act. Citing *South Carolina v. Katzenbach*, 383 U.S. 301, 312-13 (1966), as well as Congressional proceedings relating to passage of the VRA, the Court concluded:

> Thus, both the Congress and the Supreme Court have viewed the prohibition against vouchers as an attack on a specific, racially discriminatory voting registration requirement. The individual notarization requirement at issue in the instant case in no way resembles the voucher requirements prohibited by s 1973b(c)(4). The Court therefore is satisfied that the individual notarization requirement of the Richmond City Charter is not a "test or device" prohibited under the Voting Rights Act of 1965.

485 F.Supp at 24.

Lastly, we note that the Attorney General of the United States did not preclude Act No. 301 of 1975 [original act creating the present absentee statute] or any of its many subsequent amendments from going into effect by objecting under § 5 of the Voting Rights Act. While

Plaintiffs base their claims here upon § 2, as opposed to § 5, the differences between the two sections of the VRA is negligible. As was stated in *Armstrong v. Allain*, 893 F.Supp. 1320, 1323 n.2 (S.D. Miss. 1994), in *Chisom v. Roemer*, 501 U.S. 380, 387 (1991), the Supreme Court recognized that

> . . . "section 5 and section 2, virtually companion sections, operate in tandem to prohibit discriminatory practices in voting, whether those practices originate in the past, present, or future") (quoting *Chisom v. Edwards*, 839 F.2d 1056, 1064 (1988)). In *Chisom*, the Court, further noting that "Section 5 uses language similar to that of § 2 in defining prohibited practices," id., 501 U.S. at 401–02, 111 S.Ct. at 2367, implied that the coverage of the two sections is coextensive since there could otherwise be the "anomalous result" of coverage of a voting practice under § 5 without coverage of that same practice under § 2, *id*.

Clearly, these absentee ballot statutes were submitted to the Attorney General for preclearance. *See e.g. Op. S.C. Atty. Gen.*, 1975 WL 29339 (December 29, 1975) (in a letter to the Civil Rights Division of the Department of Justice, South Carolina Attorney General demonstrated that Act No. 301 of 1975 did not require a "literacy test."). Clearly also these absentee enactments were precleared because they became effective. *NAACP v. Hampton Co., supra*. We would suggest that the United States Attorney General's construction of the Act is entitled to considerable deference in this matter. Moreover, "an unbroken [and unchallenged] practice . . . is not something to be lightly cast aside." *Walz v. Tax Comm'n*, 397 U.S. 664, 678 (1970). These statutes have long been on the books without evidence of challenge.

## CONCLUSION

Accordingly, based upon all of these factors, Plaintiffs have not demonstrated a likelihood of success on the merits.  Thus, the preliminary injunction should be denied and the case dismissed.

                Respectfully submitted,

                ALAN WILSON
                Attorney General
                Federal ID No.10457

                ROBERT D. COOK
                Solicitor General
                Federal ID No. 285
                Email: bcook@scag.gov

                /s/ J. Emory Smith, Jr.
                J. EMORY SMITH, JR.
                Deputy Solicitor General
                Federal ID No. 3908
                Email: esmith@scag.gov

                HARLEY KIRKLAND
                Assistant Attorney General
                Federal ID No. 12397

                Office of the Attorney General
                Post Office Box 11549
                Columbia, South Carolina 29211
                Phone:  (803) 734-3680
                Fax:  (803) 734-3677

May 12, 2020               Counsel for the Attorney General