# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| MARY T. THOMAS, *et al.*, <br><br> Plaintiffs, <br> v. <br><br> MARCI ANDINO, *et al.*, <br><br> Defendants. | Case No.: 3:20-cv-01552-JMC |

**REPLY BRIEF IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Last night, the General Assembly approved a bill that would permit all eligible voters in South Carolina to vote absentee in the June primary.  *See* S.C. General Assembly, 123rd Session, 2019-2020, R138, S635.  Today, Governor McMaster signed it into law.[1]  Implicitly accepting the thrust of Plaintiffs' argument that the COVID-19 presents an unprecedented danger to voters, the Governor underscored that the law will allow "[e]very eligible SC voter . . . to stay safe while exercising the precious right of voting."[2]

Still, the Witness Requirement remains in full effect.  And Defendants' and Intervenor South Carolina Republican Party's ("SCRP") arguments do not undercut the core premise of Plaintiffs' claim challenging it: in the ongoing pandemic, while public health officials have warned South Carolinians to protect themselves and prevent the spread of a deadly illness, the Witness Requirement severely burdens voters' rights.  They simply assert that if the Witness Requirement can withstand challenge in normal times, it is forever immune from challenge under any circumstances.  That premise has no basis in law: the relevant constitutional standard is "flexible," and demands a context-specific approach that weighs specific circumstances and voters' current burdens.  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  The Witness Requirement cannot withstand that test.  Indeed, last week, a court ruled against the objections of defendant-intervenors and entered a consent order enjoining Virginia's near-identical statute.  *See League of Women Voters of Va. v. Va. State Bd. of Elec.*, No. 20-cv-00024, 2020 WL 2158249 (W.D. Va. May 5, 2020) ("*LWVV*").

---

[1] *See* @HenryMcMaster, Twitter (May 13, 2020, 3:14 PM), https://twitter.com/henrymcmaster/status/1260649728447885315.  Given this development, Plaintiffs conditionally withdraw their motion with respect to the excuse requirement for voting absentee.  Because the Excuse Requirement remains in place for subsequent elections, Plaintiffs reserve the right to renew their request for relief for subsequent elections consistent with their Complaint.  *See* ECF No. 1 at 47–48.

[2] @HenryMcMaster, Twitter ((May 13, 2020, 3:14 PM), https://twitter.com/henrymcmaster/status/1260649728447885315.

1

Defendants and Intervenors also leave critical expert testimony and facts undisputed. They do not dispute that COVID-19 will continue to afflict South Carolina through June,[3] Reingold Decl. ¶¶ 12, 13; that the illness can cause severe harm to or be transmitted by anyone, *id.* ¶¶ 7, 8; or that "[r]equiring individuals to have someone they are not otherwise being exposed to come into close enough proximity to witness their ballot would place them at increased risk of infection," *id.* ¶ 18. At bottom, they do not come close to showing why Plaintiffs ought to suffer the irreparable harm of risking illness or disenfranchisement to advance an abstract interest in election integrity—particularly, when they admit the Witness Requirement "offers no benefit to election officials." ECF 7-4 at 3. The Court should grant Plaintiffs' motion.

**I.    Defendants mischaracterize current and continuing guidance on mitigating the harm of COVID-19.**

Defendants minimize what public officials—including the Governor—urge all South Carolinians to do to mitigate harm to themselves and others. Specifically, they claim that "Plaintiffs have lost the[ir] lead argument" in light of the Governor's superseding order lifting his previous "home or work" Order. ECF No. 46 ("Defs.' Opp.") at 2. But that mischaracterizes the nature of the continuing public health emergency. While the Governor's "home or work" directive has been relaxed in that it is not mandatory—that is, residents no longer break the law by being outside—the Governor issued a renewed statewide disaster declaration just yesterday. *See* S.C. Exec. Order No. 2020-35, at 9–10. And the Governor's May 3 order cited by Defendants, continues to "urge[] any and all residents . . . to limit social interaction, practice "social distancing" in accordance with CDC guidance, and take every possible precaution to

---

[3] *See* Chase Laudenslager, *DHEC releases graphics showing new trends, updated projections for COVID-19 in SC*, CountOnNews2 (May 4, 2020) (showing DHEC graphics describing "containment strategy" of "[a]fter June 16, 2020 [possibly] relaxing social distancing . . . with containment strategies that include testing, contact tracing, isolation, and limiting gathering size").

avoid potential exposure to, and slow the spread of, COVID-19." S.C. Exec Order. No. 2020-31, at 4 (emphasis added). Most recently, on May 11, Governor McMaster noted that the State has "'an opportunity to set an example [but] only . . . if South Carolinians continue to follow the advice and recommendations of our public health experts.'"[4]

Those "recommendations of [] public health experts" speak loudly and clearly: the DHEC urges people to continue to follow "social distancing" guidance, including "staying at home as much as possible," and "staying at least 6 feet away from other people."[5] The CDC warns that households with one or more individuals at "high risk" of severe illness from COVID-19 should follow serious measures like "limiting errands" so that *any* family member leaves home "only when absolutely necessary."[6] And it continues to "encourage[] voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations."[7] Plaintiffs' expert agrees with this medical consensus. *See* Reingold Decl. ¶¶ 10, 17, 18.

In this context, the State cannot force residents to decide between protecting their health or risking infection by coming in close contact with someone outside their household. "The Constitution does not permit a state to force such a choice on its electorate." *LWVV*, 2020 WL 2158249, at *8. Indeed, the inherent conflict between in-person voting and social distancing rules is plainly the reason that the General Assembly acted on the Excuse Requirement.

---

[4] Joseph Bustos & Bristow Merchant, *SC salons, gyms, pools can reopen, McMaster says. Here's when*, The State (May 11, 2020) (quoting Governor McMaster), https://www.thestate.com/news/coronavirus/article242651811.html.

[5] DHEC, FAQs (COVID-19) (emphasis added), https://www.scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/frequently-asked-questions-covid-19.

[6] CDC, Households Living in Close Quarters, https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/living-in-close-quarters.html.

[7] CDC, Recommendations for Election Polling Locations, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.

## II.    Defendants and Intervenor are wrong on the relevant standard and do not rebut Plaintiffs' demonstration of significant harm.

### A.   Courts evaluate the burden on voters in light of present circumstances.

Defendants and Intervenors erroneously assume that the Court's analysis is the same in a "COVID-less world" as now.  Not so.  The *Anderson-Burdick* approach is necessarily context-specific, "[t]he results of th[e] evaluation" are never "automatic."  *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  Here, strict or at least heightened scrutiny is warranted.

In reviewing right to vote claims, courts assess burdens imposed by a challenged voter restriction within the context of current circumstances—regardless of whether those are unusual, abnormal, or exigent.  Defendants and Intervenor do not engage with this principle.  Nor do they address the decisions of several courts that have already struck down various election administration laws and procedures in the current pandemic.  *See, e.g.*, *Esshaki v. Whitmer*, No. 20-1336, 2020 WL 2185553, at *1 (6th Cir. May 5, 2020) (enforcement of ballot access provisions during the COVID-19 pandemic without some reasonable accommodation for candidates violates Constitution); *Garbett v. Herbert*, No. 20-cv-00245, 2020 WL 2064101, at *12 (D. Utah Apr. 29, 2020) ("On balance, considering the current pandemic and the totality of the State's emergency measures to combat it, Utah's ballot access framework as applied this year imposed a severe burden on [Republican candidate] Garbett's First Amendment rights."); *Libertarian Party of Ill. v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687, at *4 (N.D. Ill. Apr. 23, 2020) (finding that the "combined effect of . . . Illinois' stay-at-home order and the usual in person signature requirements [posed] a nearly insurmountable hurdle").[8]

---

[8] Ballot-access laws implicate "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."  *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).

4

*League of Women Voters of Virginia*, decided last week, is the most instructive case, because it involved a constitutional challenge to Virginia's analogue "witness signature requirement." 2020 WL 2158249, at *1. There, the court entered its judgment on posture of a motion to approve a consent decree between the parties, over the opposition of the intervenor the Republican Party of Virginia. In determining that the agreement was "fair, adequate, and reasonable," the court found that plaintiffs demonstrated that a "probable violation of federal law." *Id.* at *6. Applying *Anderson-Burdick* and Fourth Circuit law, the court concluded that, because: "*these are not ordinary times*. . . . all Americans, have been instructed to maintain a minimum of six feet from those outside their household—the burden [posed] is substantial for a substantial and discrete class of [the] electorate." *Id.* at *8 (emphasis added). So here. The burdens that the Witness Requirement forces on Plaintiffs "in our current era of social distancing" are nothing less than "substantial" or severe. *Id.* at *3. And, under *Anderson-Burdick*, it also "matters" that these burdens bear more heavily on certain groups, like African Americans and low-income people. *See Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1263 (N.D. Ga. 2018); *see also Jones v. Governor of Fla.*, 950 F.3d 795, 821 (11th Cir. 2020); *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 664 (6th Cir. 2016); *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018). The Witness Requirement must therefore be "narrowly drawn to advance a[n] interest of compelling importance." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

These are not novel principles. When confronted with natural disasters or emergencies in the past, courts have not hesitated to enjoin elections laws that, in the emergency, would unconstitutionally burden individuals' right to vote. For example, a district court enjoined Florida's voter registration deadline because Hurricane Matthew "foreclosed the only methods of

5

registering to vote" during the final week of Florida's voter registration window, such that maintaining Florida's statutory registration deadline would "completely disenfranchise[] thousands of voters," amounting "to a severe burden on the right to vote." *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1257 (N.D. Fla. 2016); *see also Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345–46 (S.D. Ga. 2016) (granting preliminary injunction to extend county's statutory voter registration deadline after a hurricane). Another court extended Virginia's statutory voter registration deadline after state voter registration website crashed on the final day of registration. Order, *New Va. Majority Educ. Fund v. Va. Dep't of Elections*, No. 16-cv-01319, Dkt. No. 10 (E.D. Va. Oct. 20, 2016) (granting preliminary injunction extending statutory voter registration deadline after state voter registration website crashed on the final day of registration). And a Pennsylvania appellate court upheld a decision postponing an election entirely in light of significant flooding because, absent relief, "some voters, by reason of the elements, would have incurred the discrimination of disenfranchisement." *In re Gen. Election-1985*, 531 A.2d 836, 839 (Pa. Commw. Ct. 1987).

These cases confirm that *Anderson-Burdick* framework is a "flexible standard," requiring courts to apply a context-specific approach. *Burdick*, 504 U.S. at 434. The scrutiny applied "will wax and wane with the severity of the burden imposed on the right to vote in any given case; heavier burdens will require closer scrutiny, lighter burdens will be approved more easily." *Fish v. Schwab*, No. 18-3133, 2020 WL 2050644, at *12 (10th Cir. Apr. 29, 2020).

Neither Defendants, Intervenor, nor *amici* Attorney General cite a *single* case suggesting that a challenged voting regulation is *always* subject to the same degree of scrutiny regardless of the circumstances. They misplace their reliance on *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), which bears no resemblance to the facts at

6

hand and in any event "predates *Anderson* and *Burdick*," as Defendants acknowledge. Defs.' Opp. 10. Here, Plaintiffs do not challenge the "right to receive (or submit) an absentee ballot." *Id.* Nor do they merely "complain[] about the regulation of a privilege." ECF No. 50 ("SCRP Opp.") at 9. Rather, they have established that, in the context of the pandemic, they will lose the right to vote altogether due to the witness requirement. This is because, as Plaintiffs' expert's unrebutted testimony has established, "individuals without another person able to witness in their household" are at "increased risk of exposure to and/or transmission of COVID-19" by having someone witness their ballot. ECF No. 7-11 ¶ 18. Moreover, given the COVID-19 crisis, Plaintiffs are "disabled from voting" because they cannot safely "go to the polls" or obtain a witness due to the need to follow social distancing rules. *See O'Brien v. Skinner*, 414 U.S. 524, 525 (1974) (distinguishing *MacDonald* and requiring absentee ballots for voters in jail).

For that reason, Defendants' "general observation," Defs.' Opp. 21–22, that the Witness Requirement has become less burdensome over the years misses the mark. Plaintiffs do not challenge the Witness Requirement in the 1950s or the 1980s. *See id.* at 23. They reasonably do not feel safe voting in person in *this* primary.[9] This concern carries particular weight for older voters and those who have preexisting conditions that put them at higher risk for serious COVID-19 complications like Plaintiffs Thomas and Walker and many of the Family Unit's members. *See* ECF No. 7-18 ¶¶ 6–9; ECF No. 7-21 ¶¶ 2, 11; ECF No. 7-22 ¶ 3. As Dr. Reingold explains, "geriatric patients" and "those with immunologic conditions and with other preexisting conditions," like Plaintiffs, "are at the greatest risk of severe cases, long-term impairment, and death." ECF No. 7-11 ¶ 7.

---

[9] Nor is it assured that in-person voting will be accessible—let alone safe—in upcoming elections as in past years, as even Defendant Andino expected a "deficit in the number of managers needed to staff polling places" and "a number of facilities [to] decline to continue being used as a polling place." ECF No. 7-4, at 2.

7

### B. Defendants and Intervenor fail to rebut Plaintiffs' showing of irreparable harm to Plaintiffs and South Carolina voters.

Ignoring Plaintiffs' unrebutted testimony that they face real health risks from complying with the witness requirement, and statistical evidence showing that many other South Carolinians similarly live alone, *see generally* ECF No. 7-12; ECF No. 7-1, at 29–32, Defendants simply assert that Plaintiffs have the "ability" to quickly "find a witness" outside their home—because, after all, "they have to eat." SCRP Opp. 11. And further, that only a "limited number of voters," *id*. at 23, will be burdened by the witness requirement. Neither contention is availing.

First, Defendants propose that "a neighbor, friend, or delivery driver . . . could witness an absentee ballot through a door." Defs.' Opp. 23. They ignore scientific testimony from Dr. Reingold, that any such in-person contact with someone outside one's household—no matter how limited—carries grave risks. Second, even if a voter can find a witness who will assist them in this way, "transmission of the virus can occur via environmental surfaces, [so] there is also risk of spread of the virus at any location where multiple individuals touch surfaces," like the witness affidavit. ECF No. 7-11 ¶ 11. Defendants argument also ignores that many voters do not live near another neighbor or know someone willing to come close enough be a witness or may have other accessibility issues. Ultimately, "[n]otwithstanding the proffered steps which could be taken to mitigate the risks to health in having somebody witness one's absentee ballot, many would be dissuaded from exercising their vote both on account of the remaining health risks and required steps to mitigate them . . . ." 2020 WL 2158249, at *8.

### C. Defendants and Intervenor ignore evidence that the Witness Requirement does not advance an interest in election integrity.

Whatever level of scrutiny the Court applies on a voting restriction, when weighing attendant burdens against the government's interests courts must consider "the *precise* interests put forward by the State," and consider "the extent to which those interests make it necessary to

8

burden the plaintiff's rights." *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 108–09 (2d Cir. 2008) (internal citations and quotation marks omitted); *see also Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 632 (6th Cir. 2016) ("none of the precise interests put forward by Ohio," including a general interest in "[c]ombating voter fraud perpetrated by mail," was sufficient to overcome burden of ballot rejection due to technical errors). Defendants fail to explain how lifting the Requirement in this crisis would harm voter integrity.

Instead, the evidence in the record shows the opposite. Defendant Andino admitted that because of the unverifiable witness signature and address, "the witness signature offers no benefit" to Defendants. ECF No. 7-4, at 3. Her declaration asserts that her letter sought to provide "useful, relevant information." ECF No. 46-2 ¶ 10. It does. Here, it makes it clear that during the pandemic the Witness Requirement is "'both too restrictive'" by denying thousands of voters the opportunity to vote safely, and "'not restrictive enough to effectively prevent voter fraud.'" *LWVV*, 2020 WL 2158249, at *8 (quoting *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 235 (4th Cir. 2016).

The Witness Requirement's failure to protect against fraud becomes even clearer after Defendants' admission that "*anyone* can be a witness for an absentee ballot—the statute imposes no limitations." Defs.' Opp. 21 (emphasis added). While Defendants suggest that homebound voters obtain a signature from a "delivery driver," *id.* at 23, they do not explain how any anti-fraud interest is served by forcing voters to obtain a signature from a person they do not know, and who cannot even attest to the voter's identity. Indeed, Defendants even assert that someone like Plaintiff Walker could have legally incompetent young children witness their absentee ballot. *Id.* at 22; *see* S.C. Code Ann. § 63-7-20(3)(d)(5) ("'Child' means a person under the age of eighteen."). Such a broad rule hardly promotes election integrity.

9

Nor do Defendants or Intervenor identify any instances of absentee ballot fraud in South Carolina (or any that would have been prevented by the Witness Requirement specifically), let alone anything that could outweigh the overwhelming likelihood that the Requirement will disenfranchise thousands of voters. This is significant, because while a state's "interest in counting only the voters of eligible voters is legitimate in the abstract," the interest will not suffice absent "evidence that such an interest made it necessary to burden voters' rights." *Fish*, 2020 WL 2050644, at *18 (affirming injunction against Kansas's documentary proof of citizenship requirement for voter registration). In any event, the fact that South Carolina is in the clear minority of states with a similar witness requirement certainly belies Defendants' abstract fraud concerns.[10] *See LWVV.*, 2020 WL 2158249, at *9 n.13 (noting fact that "a significant majority of the states have chosen other means to combat voter fraud").

**D. The Voting Rights Act does not—as Defendants and DOJ suggest—permit literacy tests so long as they are only applied to absentee voters.**

Defendants and the Department of Justice ("DOJ") assert that (1) Section 201 requires a three-judge court and (2) the Section 201 claim fails on the merits. That is inconsistent with the Voting Rights Act's ("VRA") text and would subvert the intent of Congress.

Three-judge courts are required only for actions brought by the "Attorney General" under Section 201, 202 or 203. 52 U.S.C. § 10504 (entitled "civil actions by the Attorney General"). The VRA says nothing about private plaintiff suits. Because the VRA "does not 'expressly require' a three-judge court when private parties bring claims," courts have denied requests from private plaintiffs to convene a three-judge court. *Nick v. Bethel*, No. 3:07-cv-00098, 2007 WL

---

[10] *See, e.g.*, Nat'l Conf. of State Legis., Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options (Apr. 24, 2020) ("More than two-thirds of the states have 'no-excuse absentee' voting, which means any voter can request a mail ballot without providing an excuse . . . ."), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.

10

9718147, at *5 (D. Alaska July 31, 2007); *cf. Thomas v. Bryant*, 919 F.3d 298, 304 (5th Cir. 2019) (rejecting similar attempts to place VRA claims before a three-judge court); *Chestnut v. Merrill*, 356 F.Supp.3d 1351 (N.D. Ala. 2019) (same). Single judge courts regularly entertain private claims under these sections. *See, e.g.*, *Greater Birmingham Ministries v. Merrill*, 250 F. Supp. 3d 1238, 1244 (N.D. Ala. 2017) (Section 201); *In re Cty. of Monterey Initiative Matter*, 427 F. Supp. 2d 958, 959 (N.D. Cal. 2006) (addressing a Section 203 claim, which protects language minorities from English-only elections, a form of literacy test).

On the merits, Defendants and DOJ dispute that the Witness Requirement is a voucher test and assert that it is not a "requirement" for voting within the meaning of Section 201, because it does not apply to every person who votes either in-person or absentee. First, per Defendants, the purpose of the Witness Requirement is for the witness to "assur[e] . . . the authenticity of the voter," that is, to vouch for the identity of the voter. ECF No. 46, at 24. Proof of identity is a voting qualification in this state. *See, e.g.*, S.C. Code Ann. § 7-13-710.

Second, under Defendants' and DOJ's reasoning, South Carolina could require absentee voters to pass a literacy test so long as they have the "choice" of voting in person (without a literacy test). That is not, and cannot be, the law. Section 201, like all of the VRA, must "be interpreted in a manner that provides the broadest possible scope in combating racial discrimination." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (citation omitted). Section 201 bars "*any* requirement that a person . . . [satisfy a] voucher" test. 52 U.S.C. § 10501(b)(4) (emphasis added). Here, the Witness Requirement is a "requirement" under any ordinary understanding of the word: absentee voters who fail to comply will have their ballots rejected. S.C. Code Ann. § 7-15-420. Indeed, despite its position here, DOJ previously found that a

literacy test was invalid even though it applied only to certain absentee voters. *See* Letter from U.S. Assist. Atty. Gen. Jerris Leonard to Ala. Atty. Gen. MacDonald Gallion (Mar. 13, 1970).[11]

  Defendants' and DOJ's new interpretation is also inconsistent with controlling case law and congressional intent. The U.S. Supreme Court has applied the ban on tests or devices to enjoin a law that gave voters a choice between complying with a literacy test or a then-valid property qualification.[12] *South Carolina v. Katzenbach*, 383 U.S. 301, 319 (1966). *Katzenbach* therefore makes clear that a "test or device" cannot be required for any voter, even if the voter has a "choice" to use a different way of voting that lacked such a requirement. Indeed, Congress knew that tests or devices often were used as "failsafe" alternatives to other requirements. S. Rep. 89-162, 1965 U.S.C.C.A.N. 2508, 2542–43.[13] Far from making those tests more palatable, Congress clearly intended to ban any test or device. *Id.*; *see also Katzenbach*, 383 U.S. at 310–11. Similarly, in *United States v. Clement*, the Fifth Circuit reversed and held that "requiring any applicant" to "comply with any . . . test or device" violates the VRA. 358 F.2d 89, 92–93 (5th Cir. 1966); *see also* S. Rep. 89-162, 1965 U.S.C.C.A.N. 2508, 2549 (citing *Clement* as an example of a prohibited test). Regardless, here, some voters cannot vote in person in the pandemic and have no choice but to vote absentee subject to the Witness Requirement.

  The amicus S.C. Attorney General cites *Howlette v. City of Richmond*, 485 F.Supp. 17, 22 (E.D.Va.) *aff'd* 580 F.2d 704 (4th Cir.1978). But, *Howlette*, unlike this case, addressed the requirements for referendum petitions. *Id.* at 26–27. The court there simply recognized that Section 201 only applies to "prerequisites to voting," not referendum petitions. And, Defendants

---

[11] https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1100.pdf.

[12] Property requirements are not per se unconstitutional. *Ball v. James*, 451 U.S. 355, 371 (1981). The first property requirements were not enjoined until after the VRA. *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621 (1969).

[13] The Supreme Court has long looked to congressional reports as the "authoritative source" for interpreting the VRA. *See Thornburg v. Gingles*, 478 US 30, 43 n.7 (1987).

fail to recognize that literacy tests, like the Witness Requirement here, were also justified as necessary to prevent fraud. *See Veasey v. Abbott*, 830 F.3d 216, 237 (5th Cir. 2016) (en banc).

Finally, Defendants and the DOJ argue that because the South Carolina absentee voting laws were previously precleared under Section 5 of the VRA, they could not contain a barred test. But preclearance had "limited meaning" and did "not represent approval of the voting change." *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 335 (2000) ("*Bossier II*"). The DOJ had to preclear any voting law that was not retrogressive, even if it violated VRA another provision. *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 474 (1997) ("*Bossier I*"). And even a precleared law could still be "attacked through the normal means." *Bossier II*, 528 U.S. at 335; *see* 52 U.S.C. § 10304(a). Further, the Witness Requirement predates the VRA. ECF No. 46 at 22. The DOJ would never have had the chance to object to it. *See Bossier I*, 520 U.S. at 478, 484 (pre-1965 laws not subject to Section 5 and had to be attacked via other sections of the VRA).

### III. Plaintiffs' claims are timely and *Purcell* Does Not Pose an Obstacle to Relief.

While Defendants do not long dwell on *Purcell v. Gonzalez*, 549 U.S. 1 (2006), the Attorney General, as *amicus*, leans on *Purcell* to oppose the relief sought. ECF No. 53 at 3–4.

The crux of the Supreme Court's determination in *Purcell* was that the Ninth Circuit had failed "to give deference to the discretion of the District Court" in the lower court's denial of the injunction sought. 549 U.S. at 5. The Supreme Court upheld the district court's denial or relief based upon the need to avoid "voter confusion and consequent incentive to remain away from the polls." *Id*. at 4–5. That is not a concern here. Plaintiffs do not seek to impose additional requirements on voters, or changes to the mechanics of the election that could push voters away; the requested relief simply requires the state to count certain ballots that would otherwise be discarded (*i.e.*, those lacking a witness signature). It is difficult to see how such an order would incentivize voters "to remain away from the polls." *Id.*

13

Defendants' suggestion that it is too close to Election Day to make changes to absentee vote-counting procedures without significant disruptions is belied by its actions. Just yesterday, the General Assembly appropriately responded to the unprecedented COVID-19 emergency, by passing legislation that would expand absentee voting for the June primary to every eligible voter. *See* S.C. Gen. Assembly, 123rd Session, 2019-2020, S635. This is a welcome change that will affect virtually every voter and elections administrator throughout the State. Thus, while Defendants assert that "logistical" considerations counsel against relief given that "[a]bsentee voting is underway," Defs.' Opp. 29, the State remains quite capable of making significant changes to its absentee voting process at this time. It is difficult to see how a much more modest change requiring the State to count absentee ballots lacking a witness would be disruptive.

Indeed, the Supreme Court's granting an injunction extending the receipt deadline for absentee ballots, issued with absentee voting already underway and just five days before Wisconsin's presidential primary last month, belies the notion that *Purcell* is an inexorable command against relief. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207–08 (2020). There, the Supreme Court did not stay at least some of the relief ordered by the district court, which extended the deadline for mailed absentee ballots to be received by election officials. *Id.* That relief was granted just five days prior to Election Day. The Court suggested that this relief was permissible because "[t]hat extension was designed to ensure that the voters of Wisconsin can cast their ballots and have their votes count." *Id*. The relief Plaintiffs seek here is not meaningfully different: just as the COVID-19 pandemic prevented many absentee voters in Wisconsin from complying with the Election Day deadline for receipt of their absentee ballots and needed relief from that requirement to ensure that their ballots would be counted,

here, it will prevent many voters in South Carolina from complying with the witness requirement, necessitating relief lest their ballots go uncounted.[14]

As Defendants note, "voters can request an absentee ballot any time in the calendar year of an election." Defs.' Opp. 29. If the fact that voters may already request absentee ballots were a bar to relief in election law cases, Plaintiffs would essentially be foreclosed from seeking relief unless they did so in the calendar year preceding an election. There is no authority for such a broad proposition. And because Plaintiffs' chief claim is based largely on the COVID-19 pandemic, they cannot be faulted for not filing the case in 2019, before the COVID-19 had even reached the United States. While the Governor's first disaster order was issued in March, the full magnitude of the emergency—including its effects on voting and elections—took some time to recognize, and the disaster itself has caused significant disruptions for everyone. Plaintiffs moved as quickly as possible under the circumstances, and initially proposed a schedule (which Defendants opposed), that would have facilitated more timely resolution of the pending motion.[15]

It simply is no great burden on the state to count absentee ballots that do not have a witness signature and address. Defendant Andino has admitted such a change would not burden election officials. *See* ECF No. 7-4 at 3. And doing so would not confuse voters in a manner that would create an "incentive to remain away from the polls," which is the sine qua non for *Purcell* to preclude relief. 549 U.S. at 4–5.

---

[14] While the Supreme Court in *RNC* disapproved of other relief (extending the postmark deadline for absentee ballots), it did so based on the "narrow, technical question" of whether the district court could, in essence, extend voting for six additional days beyond Election Day. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206–07 (2020). And a "critical point" in the Supreme Court's decision was that the Plaintiffs had never requested such relief in their motion for a preliminary injunction. *Id.* at 1206. Also, the Supreme Court made clear that it "cannot be stressed enough" that it expressed no opinion as to "whether *other* reforms or modifications in election procedures in light of COVID–19 are appropriate." *Id.* at 1208 (emphasis added).

[15] The above-stated facts, the fact that Defendants discussed lifting the Challenged Requirements as recently as April 13—*i.e.*, little more than a week before Plaintiffs filed the Complaint, *see* ECF No. 46-8—and Plaintiffs' substantial private interests all weigh heavily against Defendants' laches argument. Defs.' Opp. 29–30.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' preliminary injunction motion.

Dated: May 13, 2020

Respectfully submitted,

Adriel I. Cepeda Derieux\*
Dale E. Ho\*
Sophia Lin Lakin\*
Theresa J. Lee\*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
acepedaderieux@aclu.org
dho@aclu.org

Deuel Ross\*
NAACP Legal Defense &
    Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel.: (212) 965-2200
dross@naacpldf.org

\* *Pro Hac Vice*

*/s/ Susan K. Dunn*
Susan K. Dunn (Fed. Bar #647)
American Civil Liberties Union
of South Carolina
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
sdunn@aclusc.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on May 13, 2020, I served a copy of the foregoing Reply Brief in Support of Plaintiffs' Motion for a Preliminary Injunction via filing with the Court's CM/ECF system, which sent copies of this document to Counsel of Record.


*/s/ Susan K. Dunn*
Susan K. Dunn (Fed. Bar #647)
American Civil Liberties Union
of South Carolina
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
sdunn@aclusc.org

17