**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| Mary T. Thomas, Nea Richard, Jeremy Rutledge, Trena Walker, Dr. Brenda Williams, and The Family Unit, Inc., | ) ) ) ) | Civil Action No.: 3:20-cv-01552-JMC |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Marci Andino, as Executive Director of the State Election Commission, John Wells in his official capacity as Chair of SC State Election Commission, Clifford J. Edler and Scott Moseley in their official capacities as Members of the South Carolina State Election Commission, and Henry D. McMaster in his official capacity as Governor of South Carolina, | ) ) ) ) ) ) ) ) ) ) ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER AND OPINION GRANTING IN PART MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | ) ) ) | |

| | | |
|---|---|---|
| Kylon Middleton; Deon Tedder; Amos Wells; Carylye Dixon; Tonya Winbush; Ernestine Moore; South Carolina Democratic Party; DNC Services Corporation/Democratic National Committee and DCCC, | ) ) ) ) ) ) ) | Civil Action No.: 3:20-cv-01730-JMC |
| Plaintiffs, | ) ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER AND OPINION GRANTING IN PART MOTION FOR PRELIMINARY INJUNCTION** |
| v. | ) ) ) | |
| Marci Andino, in her official capacity as Executive Director of the South Carolina State Election Commission, John Wells in his official capacity as Chair of South Carolina State Election Commission, and Clifford J. Edler and Scott Moseley, in their official capacities as members of the South Carolina State Election Commission, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

1

## I.    INTRODUCTION

In the first of two related actions, Plaintiffs Mary T. Thomas, Nea Richard, Jeremy Rutledge, Trena Walker, Dr. Brenda Williams, and The Family Unit, Inc. (collectively "Thomas Plaintiffs") filed a Complaint for Injunctive and Declaratory Relief against Defendants Marci Andino, John Wells, Clifford J. Edler, and Scott Moseley, in their official capacities as Commissioners of the South Carolina State Election Commission ("SCEC"), and Governor Henry D. McMaster of South Carolina (collectively "Defendants"), seeking to enjoin specified laws promulgated by the State of South Carolina regarding voting by absentee ballot. *Thomas v. Andino*, C/A No.: 3:20-cv-01552-JMC, ECF No. 1 (D.S.C. Apr. 22, 2020) (hereinafter "*Thomas*"). Specifically, due to alleged vulnerabilities to COVID-19, Thomas Plaintiffs challenge (1) "the requirement setting forth exclusive categories of '[p]ersons qualified to vote by absentee ballot,' in South Carolina (the 'Excuse Requirement')[,] S.C. Code Ann. § 7-15-320" (West 2020), and (2) South Carolina's requirement that a witness be present when a voter signs their ballot pursuant to S.C. Code Ann. § 7-15-380 (West 2020) (the "Witness Requirement"). (ECF No. 1 at 2 ¶ 3, 3 ¶ 4, 40 ¶ 104, 41 ¶ 107.)

In the second action, Plaintiffs Kylon Middleton, Deon Tedder, Amos Wells, Carylye Dixon, Tonya Winbush, Ernestine Moore, the South Carolina Democratic Party ("SCDP"), DNC Services Corporation/Democratic National Committee ("DNC"), and DCCC (collectively "Middleton Plaintiffs") filed a Complaint against Defendants Andino, Wells, Edler, and Moseley (grouped together as the "SCEC Defendants") also seeking to enjoin specified laws promulgated by the State of South Carolina regarding voting by absentee ballot. *Middleton v. Andino*, C/A No.: 3:20-cv-01730-JMC, ECF No. 29 at 4 (refencing ECF No. 1) (D.S.C. May 13, 2020) (hereinafter "*Middleton*"). Middleton Plaintiffs challenge the following: (1) the Witness Requirement; (2) that

"South Carolina does not provide pre-paid postage on its mail-in absentee ballots, requiring voters to independently secure postage for their ballot to be counted (the 'Postage Tax')"; (3) that "South Carolina rejects all mail-in absentee ballots not received by the county by 7:00 p.m. on Election Day (the 'Election Day Cutoff')[,]" S.C. Code Ann. § 7-15-230 (West 2020); and (4) that "South Carolina makes it a felony for a candidate or paid campaign staff to assist voters with returning their voted absentee ballots to elections officials (the 'Absentee Assistance Ban')[,]" S.C. Code Ann. § 7-15-385 (West 2020). (ECF No. 1 at 3–4 ¶¶ 5–8 (*Middleton*).)

This matter is before the court on separate Motions for Preliminary Injunction filed by Thomas Plaintiffs and Middleton Plaintiffs.[1]  (ECF No. 7 (*Thomas*); ECF No. 13 (*Middleton*).) Thomas Plaintiffs' Motion for Preliminary Injunction is centered on enjoining (1) the Excuse Requirement and (2) the Witness Requirement before the June 2020[2] primaries in South Carolina.[3] (ECF No. 7 at 1 (*Thomas*).) In their Motion for Preliminary Injunction, Middleton Plaintiffs focus on (1) "the categorical prohibition on all ages under 65 from casting a mail-in absentee ballot

---

[1] Rule 52 of the Federal Rules of Civil Procedure requires the court to "state the findings and conclusions that support" the "granting or refusing [of] an interlocutory injunction." Fed. R. Civ. P. 52(a)(2). In further adherence to Rule 52(a)(1), this Order "finds [] facts specially and state[s] its conclusions of law separately" in numbered paragraphs. The court observes that Rule 52 does not require a discussion of every issue argued and/or presented. *E.g.*, *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) ("But Rule 52(a) exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness. It simply require[s] findings that are explicit and detailed enough to enable us to review them under the applicable standard." (internal and external citations and quotation marks omitted)). *See also Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. DE C.V.*, 188 F. Supp. 3d 22, 34–35 (D.D.C. 2016), *aff'd*, 743 F. App'x 457 (D.C. Cir. 2018)("[t]he Court is neither "require[d]" nor "encourage[d]" "to assert the negative of each rejected contention as well as the affirmative of [all] those which they find to be correct.").
[2] South Carolina is scheduled to hold statewide Democratic and Republic primaries on June 9, 2020, and primary runoffs on June 23, 2020.  *E.g.*, *SCIWAY*, https://www.sciway.net/sc-elections/ (last visited May 24, 2020).
[3] The court observes that while the relevant Witness Requirement statute, S.C. Code Ann. § 7-15-380, has been in existence for many years, Thomas/Middleton Plaintiffs challenge the Witness Requirement only as a result of the ongoing COVID-19 pandemic having immediate and severe effects on the June 2020 primary elections.

unless they fall into narrow and limited categories such as disabled or confined in jail ('Absentee Ballot Age Restriction'), S.C. Code Ann. § 7-15-320(B)(8)"; (2) the Witness Requirement; and (3) the Election Day Cutoff. (ECF No. 13 at 7 (*Middleton*).) For the reasons set forth below, the court **GRANTS IN PART AND DENIES IN PART** Thomas Plaintiffs' Motion for Preliminary Injunction (ECF No. 7) and **GRANTS IN PART AND DENIES IN PART** Middleton Plaintiffs' Motion for Preliminary Injunction (ECF No. 13).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

A.    The Coronavirus Pandemic and Highly Contagious Nature of COVID-19

   i.    *The COVID-19 Virus Generally*

   1.    "The COVID-19 pandemic, also known as the coronavirus pandemic, is an ongoing pandemic of coronavirus disease 2019 ('COVID-19') caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)." *COVID-19 pandemic*, https://en.wikipedia.org/wiki/COVID-19_ pandemic #cite_note-auto-5 (last visited May 24, 2020).[4]

   2.    "COVID-19 is caused by a new coronavirus." *CDC Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html?CDCA A_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fsummary.html (last visited May 24, 2020). "Coronaviruses are a large family of viruses that are common in people and many different species of animals, . . . ." *Id.* The new coronavirus causes illness ranging "from very mild (including some people with no reported symptoms) to severe, including illness resulting in death." *CDC Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-

---

[4] The court observes that for purposes of document formatting, the links to internet websites cited throughout the Order may have space(s) in the website URL where there should not be a space(s). To this point, if the link is copied and pasted in a website browser, an error may result from the space in the website URL.

ncov/cases-updates/summary.html#severity (last visited May 24, 2020).[5]

3.      Persons with COVID-19 may exhibit the following symptoms: cough; shortness of breath or difficulty breathing; fever; chills; muscle pain; sore throat; new loss of taste or smell; nausea; vomiting; or diarrhea. *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fabout%2Fsymptoms.html (last visited May 24, 2020).

4.      The COVID-19 virus is primarily spread "from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks." *WHO*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited May 24, 2020).

5.      People may also become infected by touching a contaminated surface and then touching their eyes, nose, or mouth. *Id.*

6.      The COVID-19 virus is most contagious "within the first 3 days from the onset of symptoms," although spread may be possible before symptoms appear[6] and in later stages of the

---

[5] Under the Federal Rules of Evidence, the court is permitted to "take judicial notice on its own." Fed. R. Evid. 201(c). Moreover, the court may take judicial notice of a fact "that is not subject to reasonable dispute" because it is either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)–(2). The court has taken judicial notice of several facts and statistics throughout the order from the Center for Disease Control's ("CDC") website, the South Carolina Department of Health and Environmental Control's ("DHEC") website, the South Carolina Election Commission's website, and other websites that the court deems pertinent to the matters before the court.

[6] The CDC has explained the asymptomatic spread of COVID-19 as follows:

> Two models attempted to estimate the number of infections caused by asymptomatic, presymptomatic, or mildly symptomatic infected persons. These models varied widely; 1 model suggested that up to half of infections were transmitted from infected persons who were pre symptomatic, and another suggested that up to four fifths of infections were transmitted by persons with no symptoms or mild symptoms. Both models suggested that a large number of

disease. *Id.* at https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_4 (last visited May 24, 2020).

7.      Research suggests that COVID-19 transmission "cannot be accounted for solely by transmission from symptomatic persons." *CDC Emerging Infectious Diseases*, https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article (last visited May 24, 2020).

8.      The Centers for Disease Control and Prevention ("CDC") has opined that "[b]ased on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19." *CDC Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 24, 2020). The CDC further believes that the following persons are "at high-risk for severe illness from COVID-19":

> People 65 years and older; People who live in a nursing home or long-term care facility; People of all ages with underlying medical conditions, particularly if not well controlled, including: People with chronic lung disease or moderate to severe asthma; People who have serious heart conditions; People who are immunocompromised; . . . People with severe obesity (body mass index [BMI] of 40] or higher); People with diabetes; People with chronic kidney disease undergoing dialysis; and People with liver disease.

*Id.*

9.      The CDC has also determined that pregnant women, persons with disabilities, people experiencing homelessness, and racial and ethnic minority groups may be at a higher risk

---

persons with asymptomatic or mildly symptomatic infections were not detected by the health system and that these persons meaningfully contributed to ongoing community transmission. Although models are highly dependent on the assumptions built into them, these models suggest that the speed and extent of SARS-CoV-2 [COVID-19] transmission cannot be accounted for solely by transmission from symptomatic persons.

*CDC Emerging Infectious Diseases*, https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article#r30 (last visited May 24, 2020).

of infection or severe illness because of their underlying health condition, have an increased ability to develop respiratory conditions, may live in congregate settings, or are more affected by health disparities as a result of economic or social conditions. *See id.* at https://www.cdc.gov/ coronavirus/2019-ncov/need-extra-precautions/other-at-risk-populations.html (last visited May 24, 2020).

10.    "The effects of COVID-19 on the health of racial and ethnic minority groups is still emerging; however, current data suggests a disproportionate burden of illness and death among racial and ethnic minority groups." *CDC Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.htm l (last visited May 24, 2020). "Compared to whites, black Americans experience higher death rates, and higher prevalence rates of chronic conditions." *Id.*

11.    As to voting, the CDC has issued recommendations for voters in advance of election day, to include: encouraging voters "to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations"; using mail-in methods, early voting, drive-up voting, voting at off-peak times, social distancing measures to protect individuals as they vote, etc. *CDC Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus /2019-ncov/community/election-polling-locations.html (last visited May 24, 2020).

12.    In its suggestions for slowing the spread of COVID-19, the CDC advocates that persons practice the following tips:

> Follow guidance from authorities where you live; [i]f you need to shop for food or medicine at the grocery store or pharmacy, stay at least 6 feet away from others, [a]lso consider other options: [u]se mail-order for medications, if possible, [c]onsider a grocery delivery service; [c]over your mouth and nose with a cloth face covering when around others, including when you have to go out in public, for example to the grocery store; [c]loth face coverings should NOT be placed on children under age 2, anyone who has trouble breathing, or is unconscious, incapacitated, or otherwise unable to remove the mask without assistance; [k]eep

at least 6 feet between yourself and others, even when you wear a face covering; [a]void gatherings of any size outside your household, such as a friend's house, parks, restaurants, shops, or any other place, [t]his advice applies to people of any age, including teens and younger adults, [c]hildren should not have in-person playdates while school is out, [t]o help maintain social connections while social distancing, learn tips to keep children healthy while school's out; [w]ork from home when possible; . . . [a]void using any kind of public transportation, ridesharing, or taxis, if possible; [and] [i]f you are a student or parent, talk to your school about options for digital/distance learning.

*Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited May 24, 2020).

    ii.   *National and International Response*

13.    On January 30, 2020, the World Health Organization ("WHO") declared that an outbreak of COVID-19 was a Public Health Emergency of International Concern and further declared it was a pandemic on March 11, 2020. *WHO*, https://www.who.int/news-room/detail/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov) (last visited May 24, 2020); *id.* at https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited May 24, 2020).

14.    On March 13, 2020, the President of the United States declared "the ongoing Coronavirus Disease 2019 (COVID-19) pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia, pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121–5207." *FEMA COVID-19 Emergency Declaration*, https://www.fema.gov/news-release/2020/03/13/covid-19-emergency-declaration (last visited May 24, 2020). The President further declared the pandemic a national emergency, pursuant to Sections 201 and 301 of the National Emergencies Act, 50 U.S.C. §§ 1601 *et seq.*, and consistent with Section 1135 of the Social Security Act, 42 U.S.C. § 1320b-5, as amended, retroactive to March 1, 2020. *White House*

*Proclamations*,   https://www.whitehouse.gov/presidential-actions/proclamation-declaring-nation al-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/  (last visited May 24, 2020).

15.    On March 27, 2020, the President approved a major disaster declaration for the State of South Carolina. *White House Statements and Releases*, https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-approves-south-carolina-disaster-declaration-5/  (last visited May 24, 2020).

16.    As of May 24, 2020, there are more than 1.6 million reported cases in the United States and more than 5.38 million reported cases of COVID-19 worldwide, resulting in more than 344,000 deaths in over 215 countries.  *COVID-19 Dashboard by the Ctr. for Syss. Sci. & Eng'g at Johns Hopkins Univ.*,  https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda75 94740fd40299423467b48e9ecf6 (last visited May 24, 2020).

17.    As the fall approaches, COVID-19 cases are expected to continue to rise nationwide. *E.g.*, *CDC Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/forecasting-us.html (last visited May 22, 2020).

*iii.    Local Response*

18.    As early as January 29, 2020, the South Carolina Department of Health and Environmental Control ("DHEC") announced that it began monitoring "developments concerning cases of the 2019 novel coronavirus."[7] *DHEC News Releases*, https://www.scdhec.gov/news-releases/dhec-statement-2019-novel-coronavirus-preparations-activities-south-carolina (last visited May 24, 2020).

---

[7] DHEC's priority was "to prevent[] the spread of the disease and to protect[] public health." *DHEC News Release*, https://www.scdhec.gov/news-releases/dhec-announces-seventh-possible-case-2019-novel-coronavirus-south-carolina (last visited May 21, 2020).

19.    On or about March 6, 2020, DHEC learned of its first 2 possible cases of coronavirus, which were later confirmed as positive, and thereafter, the cases in South Carolina began to climb as a result of community spread. *Id.* at https://www.scdhec.gov/news-releases /dhec-investigating-two-possible-cases-2019-novel-coronavirus-south-carolina (last visited May 24, 2020).

20.    On March 13, 2020, Thomas Defendant Governor McMaster issued Executive Order No. 2020-08, declaring a state of emergency for South Carolina based on a determination that COVID-19 posed an imminent public health emergency. *Executive Order No. 2020-08 State of Emergency,* https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-13% 20FINAL%20Executive%20Order%20No.%202020-08%20%20State%20of%Emergency%20D ue%20to%20Coronavirus.pdf (last visited May 24, 2020).

21.    The State of South Carolina reported its first COVID-19 related death on March 16, 2020. *DHEC News Release*, https://www.scdhec.gov/news-releases/state-south-carolina-repo rts-first-covid-19-related-death (last visited May 24, 2020).

22.    On March 30, 2020, Defendant Andino, in her capacity as the Executive Director of the SCEC, wrote to several elected officials, including Defendant Governor McMaster, to relay the SCEC's "concern[ ] about the safe conduct of the June Primaries, November General Election and all other elections scheduled for 2020." (ECF No. 1-2 at 1 (*Thomas*)).) As a result, the SCEC urged consideration of "emergency changes to [the] election process" to protect the "more than three million voters and election workers during or following a pandemic." (*Id.* at 2.) Andino suggested certain options that represent "proven methods used in other states to conduct elections", including removing the witness requirement on ballot return envelopes. (*Id*.)   In her letter, Defendant Andino also recommended "no excuse absentee voting." (*Id.*)

23.    On April 6, 2020, Defendant Governor McMaster issued Executive Order No.

2020-21, a mandatory statewide "Home or Work" order requiring "[a]ll South Carolinians [to] remain at home or work unless visiting family, exercising, or obtaining goods or services." *Executive Order No. 2020-21*, https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-06%20FILED%20Executive%20Order%20No.%202020-21%20-%20Stay%20 at%20Home%20or%20Work%20Order%20Due%20to%20COVID-19.pdf (last visited May 24, 2020).  Executive Order No. 2020-21 further instructs residents of the State to "limit social interaction, practice 'social distancing' . . . and take every possible precaution to avoid potential exposure to" viral infection, and all individuals to "take reasonable steps to maintain six (6) feet of separation from any other person." *See id.*

24.    In further response to the COVID-19 public health crisis, Defendant Governor McMaster issued several more Executive Orders regarding restrictions on personal and business interests to mitigate this crisis.[8]

25.    On May 12, 2020, to protect the health, safety, and welfare of the people of South Carolina, Defendant Governor McMaster issued Executive Order No. 2020-35 requiring the closure of all public schools for the remainder of the 2019-20 school year, the completion of

---

[8] *See Executive Order No. 2020-09* (Mar. 15, 2020) (closing public schools, postponing certain elections, and urging rescheduling and cancellation of public events with over 100 persons); *Executive Order No. 2020-10* (Mar. 17, 2020) (prohibiting restaurants from providing certain on-premises consumption); *Executive Order No. 2020-12* (Mar. 20, 2020) (facilitating "social distancing" measures); *Executive Order No. 2020-13* (Mar. 23, 2020) (prohibiting or dispersing gatherings of three or more unless authorized or in the home); *Executive Order No. 2020-15* (Mar. 28, 2020) (declaring a new state of emergency based on COVID-19); *Executive Order No. 2020-17*, (Mar. 31, 2020) (closure of non-essential businesses, venues, facilities, services and activities for public use directing that non-essential businesses be closed); *Executive Order No. 2020-18* (Apr. 3, 2020) (closure of additional non-essential businesses); *Executive Order No. 2020-23* (Apr. 12, 2020) (declaring an additional state of emergency based on accelerated spread of COVID-19); *Executive Order No. 2020-29* (Apr. 27, 2020) (declaring new state of emergency for 15 days). These Executive Orders can be found at https://governor.sc.gov/executive-branch/executive-orders.

education at the collegiate level through distance and virtual learning, and the promotion of effective social distancing practices in accordance with CDC guidance. *Executive Order 2020-35 Official (PDF)*, https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-05-12%20eFILED%20Executive%20Order%20No.%202020-35%20-%20State%20of%20Emergency%20to%20Facilitate%20COVID-19%20Pandemic%20Response%2C%20Testing%2C%20%26%20Other%20Measures.pdf (last visited May 24, 2020). Executive Order No. 2020-35 shall remain in effect until May 27, 2020, unless otherwise noted. *Id.*

26.    On May 12, 2020, the South Carolina General Assembly passed legislation allowing all qualified voters to vote absentee ballot for the June 9, 2020 primary and the June 23, 2020 runoff election due to the current state of emergency. S.J. Res. 635, 123rd Gen. Assemb. (S.C. 2020). The pertinent portion of the bill states, as follows, in Section 2(A):

> **Elections, absentee ballots, during the state of emergency, expiring on July 1, 2020**. Section 2. A. A qualified elector must be permitted to vote by absentee ballot if the qualified elector's place of residence or polling place is located in an area subject to a state of emergency and there are fewer than forty-six days remaining until the date of the election.

 *S.J. Res. 635, 123rd Gen. Assemb.* (emphasis in original).

27.    On May 13, 2020, Governor McMaster signed S.635 into law.  (*E.g.*, ECF No. 56 (*Thomas*).)

28.    Executive Order No. 2020-36, filed on May 15, 2020, is one of Thomas Defendant Governor McMaster's latest declarations regarding the state of emergency for South Carolina. Executive Order No. 2020-36 authorizes businesses "previously deemed 'non-essential'" to re-open. *Executive Order 2020-36 Official (PDF)*, https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-05-15%20FILED%20Executive%20Order%20No.%202020-36%20-%20Additional%20Incremental%20Modification%20of%20Non-Essential%20Business%20Closures.pdf (last visited May 24, 2020). And on May 21, 2020, Executive Order No. 2020-37 was

12

filed and allows additional "non-essential" businesses to re-open, but did not lift the recommended social distancing practices. *Executive Order 2020-37 Official (PDF)*, https://governor.sc.gov/site s/default/files/Documents/2020-05-21%20eFILED%20Executive%20Order%20No.%202020-37 %20-%20Additional%20Modification%20of%20Non-Essential%20Business%20Closures.pdf (last visited May 24, 2020).

29.    As of May 22, 2020, at least 46% of reported COVID-19 cases are in South Carolina's racial minority groups. *DHEC SC Demographic Data (COVID-19)*, https://scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/sc-demographi c-data-covid-19 (last visited May 24, 2020.) Nineteen percent of South Carolinians were hospitalized at the time of illness. *Id.* Approximately, 87.8% of reported deaths in South Carolina are aged 61 or older. *Id.* Racial minority groups represent at least 54% of COVID-19 deaths statewide. *Id.*

30.    South Carolina's COVID-19 statistics track with national statistics showing that "45% of individuals for whom race or ethnicity data was available were white, compared to 55% of individuals in the surrounding community." *CDC Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.htm l (last visited May 24, 2020).  "However, 33% of hospitalized patients were black compared to 18% in the community . . . [t]hese data suggest an overrepresentation of blacks among hospitalized patients." *Id.*

31.    On May 20, 2020, DHEC announced 125 new cases of the novel coronavirus COVID-19 and 8 additional deaths, all of which "occurred in elderly individuals." *DHEC News Releases*,  https://scdhec.gov/news-releases/south-carolina-announces-latest-covid-19-update-ma y-20-2020 (last visited May 24, 2020).

32.     On May 21, 2020, DHEC announced 199 new cases of the novel coronavirus COVID-19 and 9 additional deaths, 6 of which "occurred in elderly individuals." *DHEC News Releases*,  https://www.scdhec.gov/news-releases/south-carolina-announces-latest-covid-19-upda te-may-21-2020 (last visited May 24, 2020).

33.     On May 22, 2020, DHEC announced 245 new cases of the novel coronavirus COVID-19 and 3 additional deaths, all of which "occurred in elderly individuals."  *DHEC News Releases*,  https://www.scdhec.gov/news-releases/south-carolina-announces-latest-covid-19-upda te-may-22-2020 (last visited May 24, 2020).

34.     On May 23, 2020, DHEC announced 248 new cases of the novel coronavirus COVID-19 and 6 additional deaths, 5 of which "occurred in elderly individuals."  *DHEC News Releases*,  https://www.scdhec.gov/news-releases/south-carolina-announces-latest-covid-19-upda te-may-23-2020 (last visited May 24, 2020).

35.     On May 24, 2020, DHEC announced 209 new cases of the novel coronavirus COVID-19 and 10 additional deaths, 9 of which "occurred in elderly individuals."  *DHEC News Releases*,  https://www.scdhec.gov/news-releases/south-carolina-announces-latest-covid-19-upda te-may-24-2020 (last visited May 24, 2020).

36.     As of May 24, 2020, there are 10,096 reported cases of COVID-19 in the State of South Carolina, resulting in 435 deaths. *Id.*

B.    Absentee Ballot Voting in  South Carolina Generally

37.     Absentee ballot voting has already begun in South Carolina. (ECF No. 46-2 at 4 ¶ 5 (*Thomas*).) County election officials have already received significantly more absentee ballot applications than in previous years for statewide primaries.  (*Id.*)

38.     "Upon receiving an application for an absentee ballot by mail, and verifying the

voter's eligibility to vote absentee, county boards are required to mail" such ballots to the voter as soon as possible. (*Id.* at 4–5 ¶ 7 (*Thomas*).) The ballot includes printed instructions as to the proper return of the ballot, to include signing the oath, having a witness' signature and address, and timely return of the ballot. (*Id.*)

39.     All records and papers relating to absentee ballot applications are retained for 22 months, pursuant to federal law, and 24 months for state law. (*Id.* at 5 ¶ 8 (*Thomas*).)

40.     Absentee ballots are not counted if there is no voter or witness signature or witness address, or is returned late, but still must be accounted for and retained. (*Id.* at 5–6 ¶ 9 (*Thomas*).)

41.     Until the recent passage of S.635 to allow absentee voting for all South Carolina registered voters, the vast majority of South Carolina voters would have appeared in person at the poll on election day in order to exercise their right to vote.

42.     At the May 15, 2020 hearing SCEC Defendants' Counsel informed the court that the South Carolina Election Commission would be awarded $ 7.6 million from federal and state authorities to assist with additional voting precautions during this pandemic.

C.     The Thomas Lawsuit Generally

43.     Plaintiffs Thomas, Richard, Rutledge, Walker, and Williams are all persons registered to vote in the State of South Carolina. (ECF Nos. 7-18 at 2 ¶ 2, 7-19 at 2 ¶ 2, 7-20 at 2 ¶ 2, 7-21 at 2 ¶ 1, 7-22 at 2 ¶ 2 (*Thomas*).)

44.     Plaintiff The Family Unit, Inc. is a non-profit entity incorporated in the State of South Carolina since August 29, 2008. *Bus. Entities Online*, https://business filings.sc.gov/BusinessFiling/Entity/Search (last visited May 24, 2020).

45.     Defendants are Andino, Wells, Edler, and Moseley, in their official capacities as Commissioners of the SCEC, and Governor Henry D. McMaster. (*See* ECF No. 44 at 8 ¶ 18–10

¶ 20; ECF No. 51 at 7 ¶ 20 (*Thomas*).) During the COVID-19 pandemic, the SCEC has taken "precautions and preventative measures for the health and safety of voters, county election officials and poll workers during the June primaries." (ECF No. 46-2 at 3 ¶ 4 (*Thomas*).) Such measures include special training for county election officials, staff, and poll workers, related to COVID-19 issues, providing personal protective equipment and other preventative supplies for polling locations and county election offices, adhering to social distancing recommendations for workers and voters, cleaning and disinfecting at county election offices. (*Id.*)

46.     On April 22, 2020, Thomas Plaintiffs filed their Complaint for Injunctive and Declaratory Relief. (ECF No. 1 (*Thomas*).) In their Complaint, Thomas Plaintiffs plead claims for violation of the fundamental right to vote, 42 U.S.C. § 1983, First and Fourteenth Amendments to the United States Constitution; violations of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301; and violations of Sections 3 and 201 of the Voting Rights Act, 52 U.S.C. §§ 10302, 10501. (ECF No. 1 (*Thomas*).)

47.     On April 28, 2020, Thomas Plaintiffs filed a Motion for Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure seeking to enjoin "Defendants . . . and all persons acting in concert with each or any of them, from enforcing" the Witness Requirement and/or the Excuse Requirement. (ECF No. 7 at 1 (*Thomas*).) Thomas Plaintiffs assert that "[i]f the Challenged Requirements are not enjoined, they will pose significant risks to voters seeking to exercise their right to vote in the June 9, 2020 primary election amid the current COVID-19 crisis."[9] (*Id.* at 2 (*Thomas*).)

48.     Thomas Plaintiffs seek a preliminary injunction that: (1) prohibits Defendants from

---

[9] In light of this assertion and Thomas Plaintiffs' subsequently filed Motion for Expedited Briefing Schedule on their Motion for Preliminary Injunction (ECF No. 8 (*Thomas*)), the court entered an Order setting forth an expedited schedule for this case. (ECF No. 27 (*Thomas*).)

enforcing the Excuse Requirement[10] to prevent any eligible voter, regardless of age or physical condition, to request, receive, and have counted an absentee ballot for the June 9 primary; (2) prohibits Defendants from enforcing the Witness Requirement for all voters for the June 9 primary election; and (3) orders Defendants to conduct a public information campaign informing South Carolina voters about the elimination of the Challenged Requirements, in coordination with city and county election officials. (ECF No. 7 at 3 (*Thomas*).)

49.     In support of their Motion for Preliminary Injunction, Thomas Plaintiffs primarily rely on their Memorandum of Law (ECF No. 7-1 (*Thomas*)), as well as supporting attachments (ECF Nos. 7-2 through 7-23, 35 (*Thomas*)), and their Reply Memorandum (ECF No. 55 (*Thomas*).)

50.     On May 1, 2020, the South Carolina Republican Party ("SCRP") filed a Motion to Intervene. (ECF No. 11 (*Thomas*).) On May 5, 2020, Thomas Plaintiffs filed a Response in Opposition to the Motion to Intervene (ECF No. 22 (*Thomas*)), to which the SCRP filed a Reply on May 6, 2020 (ECF No. 28 (*Thomas*)). On May 8, 2020, the court granted the SCRP's Motion to Intervene.  (ECF No. 39 (*Thomas*).)

---

[10] Thomas Plaintiffs' initial Motion sought to "prohibit Defendants from enforcing the 'Excuse Requirement,' S.C. Code Ann. § 7-15-320 and § 7-15-310 (West 2020), to prevent any eligible voter, regardless of age or physical condition, to request, receive, and have counted an absentee ballot for the June 9 primary." (ECF No. 7 at 47.) However, on May 12, 2020, the South Carolina General Assembly unanimously passed Senate Bill 635, which permits all "qualified elector[s] to vote by absentee ballot in an election if the qualified elector's place of residence or polling place is located in an area subject to a state of emergency declared by the Governor and there are fewer than forty-six days remaining until the date of the election." S.J. Res. 635, 123rd Gen. Assemb. (S.C. 2020). On May 13, 2020, the Governor of South Carolina signed Senate Bill 635 into law. S.C. Act 133 (S.C. 2020). In response, the court found that, as-applied to the June 2020 Primaries, Plaintiffs' challenges to the "Excuse Requirement" and "Age Ballot Requirements" are no longer rooted in a live case or controversy as it relates to the instant Motion and determined that those claims were moot. (ECF No. 56.) *See, e.g.*, *Calderon v. Moore*, 518 U.S. 149, 150 (1996) ("mootness can arise at any stage of litigation."). However, Thomas Plaintiffs reserve the right to challenge these requirements on the merits as to future elections. Due to this determination, the court will focus this Order on the remaining challenges to the "Witness Requirement" and the "Deadline Challenge" for the June 2020 primaries.

51.    On May 6, 2020, the court entered Orders (ECF Nos. 31, 32 (*Thomas*)) granting Motions for Leave to File Amicus Brief filed by South Carolina Attorney General Alan Wilson (ECF No. 29 (*Thomas*)) and Protection and Advocacy for the People with Disabilities, Inc. ("P&A") (ECF No. 19 (*Thomas*)). P&A filed its amicus brief on May 6, 2020 (ECF No. 34 (*Thomas*)). Attorney General Wilson filed his amicus brief on May 12, 2020 (ECF No. 53 (*Thomas*)).

52.    On May 11, 2020, Defendants and the SCRP filed their respective Answers to Thomas Plaintiffs' Complaint (ECF Nos. 44, 49, 51 (*Thomas*)), and their Responses in Opposition to Thomas Plaintiffs' Motion for Preliminary Injunction (ECF Nos. 46, 50, 52 (*Thomas*)).

53.    In opposition to Thomas Plaintiffs' Motion for Preliminary Injunction, SCEC Defendants rely on their Memorandum of Law (ECF No. 46 (*Thomas*)), as well as supporting attachments (ECF Nos. 46-1 through 46-8 (*Thomas*)).

54.    In opposition to Thomas Plaintiffs' Motion for Preliminary Injunction, Defendant Governor McMaster relies on his Memorandum of Law (ECF No. 52 (*Thomas*)).

55.    In opposition to Thomas Plaintiffs' Motion for Preliminary Injunction, the SCRP relies on its Memorandum of Law (ECF No. 50 (*Thomas*)).

56.    In support of Thomas Plaintiffs' Motion for Preliminary Injunction, P&A relies on its Amicus Brief (ECF No. 34 (*Thomas*)).

57.    In opposition to the Motion for Preliminary Injunction, Attorney General Wilson relies on his Amicus Brief (ECF No. 53 (*Thomas*)).

58.    Additionally, on May 11, 2020, the United States Government filed a Statement of Interest of the United States Concerning Section 201 of the Voting Rights Act. (ECF No. 47 (*Thomas*).)

59.     In response to the absentee ballot bill passed by the South Carolina General Assembly on May 12, 2020, and signed into law by Defendant Governor McMaster on May 13, 2020, the court requested that the parties submit in writing the issues that they still intended to present at a hearing on the Motions for Preliminary Injunction. (ECF No. 56 (*Thomas*).)

60.     Thomas Plaintiffs filed their Reply Brief in Support of Plaintiffs' Motion for Preliminary Injunction on May 13, 2020. (ECF No. 55 (*Thomas*).)

61.     On May 14, 2020, Thomas Plaintiffs conveyed that they desired to only address at the motions hearing their claims for preliminary relief with respect to the Witness Requirement for absentee voting under the United States Constitution and the Voting Rights Act. (ECF No. 57 (*Thomas*).)

D.     The Middleton Lawsuit Generally

62.     Plaintiffs Wells, Dixon, Winbush, and Moore are all persons allegedly registered to vote in the State of South Carolina.  (*See* ECF No. 1 at 7 ¶ 15–8 ¶ 18 (*Middleton*).) Plaintiffs Tedder and Middleton are registered to vote in the State of South Carolina.  (ECF Nos. 13-1 at 2 ¶ 1, 13-2 at 2 ¶ 1.)

63.     Middleton Plaintiffs allege that Wells is African-American and over 65 years of age, thereby in the category of persons at a high risk for contracting COVID-19.  (*Id.* at 7 ¶ 15.)

64.     Middleton Plaintiffs allege that Dixon is African-American, over 65 years of age, and has underlying medical conditions, thereby in the category of persons at a high risk for contracting COVID-19. (*Id.* ¶ 16.)

65.     Middleton Plaintiffs allege that Winbush is African-American and has expressed concern about herself and other voters being able to practice social distancing in the upcoming elections. (*Id.* at 8 ¶ 17.)

66.    Middleton Plaintiffs allege that Moore is African-American, over 65 years of age, and lives alone, thereby in the category of persons at a high risk for contracting COVID-19. (*Id.* ¶ 18.)

67.    Plaintiff SCDP is allegedly a political party within the meaning of S.C. Code Ann. § 7-1-20 (West 2020) and is the South Carolina state party committee of the national Democratic Party.  (ECF No. 1 at 8–10 ¶ 19 (*Middleton*).) The SCDP allegedly acts on behalf of itself and its members, is a political party that actively supports candidates, and mobilizes and assists voters during election cycles. (*Id.*)

68.    Plaintiff DNC is allegedly the national committee of the Democratic Party, as defined by 52 U.S.C. § 30101(14). (ECF No. 1 at 10–11 ¶ 20 (*Middleton*).) The DNC allegedly assists with the election of candidates of its party to public office, including South Carolina, and mobilizes voters to vote for its candidates and causes. (*Id.*)

69.    Plaintiff DCCC is allegedly the national congressional committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). (ECF No. 1 at 11–12 ¶ 21.) The DCCC allegedly assists with the election of candidates of its party to the U.S. House of Representatives, including South Carolina, and mobilizes and registers voters to support their candidates. (*Id.*)

70.    Defendants in *Middleton* are the above-referenced SCEC Defendants.  (*See* ECF No. 32 (*Middleton*).)

71.    On May 1, 2020, Middleton Plaintiffs filed their Complaint for Injunctive and Declaratory Relief.  (ECF No. 1.)  In their Complaint, Middleton Plaintiffs plead claims for Denial or Abridgement of the Right to Vote on Account of Age under the Twenty-Sixth Amendment of the United States Constitution and 42 U.S.C. § 1983 *(Absentee Ballot Age Restriction)*; Undue Burden on the Right to Vote under the First Amendment and Equal Protection Clause of the United

States Constitution and 42 U.S.C. § 1983 *(Absentee Ballot Age Restriction, Postage Tax, Witness Requirement, Absentee Assistance Ban);* the Imposition of a Poll Tax under the Fourteenth Amendment and Twenty-Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983; Vote Denial under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301*(Postage Tax, Witness Requirement, Election Day Cutoff, Absentee Ballot Age Restriction, and Absentee Assistance Ban);* Freedom of Speech and Infringement of Speech under the First Amendment and Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983 *(Absentee Assistance Ban)*; and Violation of Section 208 of the Voting Rights Act of 1965, 52 U.S.C. § 10508 Preemption *(Absentee Assistance Ban)*.  (ECF No. 1 (*Middleton*).)

72.     On May 7, 2020, Middleton Plaintiffs filed their Motion and Incorporated Brief in Support of Motion for Preliminary Injunction, (ECF No. 13 (*Middleton*)), pursuant to Federal Rule of Civil Procedure 65 to address, *inter alia*, the immediate and severe effects the coronavirus pandemic is having on the primary election scheduled for June 9, 2020, and the run-off election following thereafter. Middleton Plaintiffs focus their Motion on 3 requirements that threaten South Carolinians' right to vote during the COVID-19 pandemic: (1) Absentee Ballot Age Restriction; (2) the Witness Requirement; and (3) the Election Day Cutoff (collectively, the "Challenged Provisions").

73.     Middleton Plaintiffs seek a preliminary injunction that: (1)  prohibits SCEC Defendants from enforcing the Absentee Ballot Age Restriction,[11] to prevent any eligible voter, regardless of age, to request, receive, and have counted an absentee ballot for the June 9 primary; (2)  prohibits SCEC Defendants from enforcing the Witness Requirement for all voters for South Carolina's June 9 primary; (3) prohibits SCEC Defendants from enforcing the requirement that

---

[11] *See* Footnote 7.

absentee ballots must be received by 7:00 p.m. on Election Day to be counted and extending the deadline to June 19, provided that the ballots were postmarked or mailed on or before June 9; (4) orders the counting of ballots to begin on June 19, 2020, and giving county election officials until June 23, 2020, to complete the canvass and certify the results to the State Board of Canvassers; (5) prohibits election officials from releasing results until after 7:00 p.m. on June 19, *see* Fed. R. Civ. P. 65[12]; and (6) orders SCEC Defendants to publicly inform all South Carolina voters about the elimination of these requirements in coordination with city and county election officials. (ECF No. 13 at 32 (*Middleton*).)

74.     In support of their Motion for Preliminary Injunction, Middleton Plaintiffs primarily rely on their Memorandum of Law (ECF No. 13 at 7–33 (*Middleton*)), as well as supporting attachments (ECF Nos. 13-1, 13-2 (*Middleton*)).

75.     On May 7, 2020, the court entered an Order (ECF No. 12 (*Middleton*)) granting Attorney General Wilson's Motion for Leave to File Amicus Brief (ECF No. 11 (*Middleton*)), which he filed on May 13, 2020. (*See* ECF No. 29 (*Middleton*)).

76.     On May 12, 2020, the court entered an Order (ECF No. 27 (*Middleton*)) granting the SCRP's Motion to Intervene. (ECF No. 22 (*Middleton*).)

77.     Given the passage of S.635, Middleton Plaintiffs agreed the Excuse Requirement and Absentee Ballot Age Requirement are moot but only for the purposes of the June primaries. (ECF No. 31 (*Middleton*).)    Despite this assertion, the court determined that the Middleton Plaintiffs had only sought relief related to the June primaries and therefore limited the hearing to

---

[12] During the May 15, 2020 hearing, Middleton Plaintiffs withdrew their request of "giving county election officials until June 23 to complete the canvass and certify the results to the State Board of Canvassers" and also withdrew their request (5) prohibiting election officials from releasing results until after 7:00 p.m. on June 19."

the remaining issues related to those primaries.  (ECF No. 35 (*Middleton*).)

78.    On May 14, 2020, SCEC Defendants and the intervenor-Defendant SCRP respectively filed Opposition to the Motion for Preliminary Injunction. (ECF Nos. 32, 33 (*Middleton*).)

79.    In opposing Middleton Plaintiffs' Motion for Preliminary Injunction, SCEC Defendants rely on their Memorandum of Law (ECF No. 32 (*Middleton*)) and supporting attachments (ECF Nos. 32-1 through 32-3 (*Middleton*)).

80.    In opposing Middleton Plaintiffs' Motion for Preliminary Injunction, the SCRP relies on its Memorandum of Law (ECF No. 33 (*Middleton*)) and supporting attachment (ECF No. 33-1 (*Middleton*)).

E.    Motion Hearing on Pending Preliminary Injunction Motions

81.    The instant matters before the court for review are a Motion for a Preliminary Injunction (ECF No. 7 (*Thomas*)) by Thomas Plaintiffs, filed on April 28, 2020, and a Motion for Preliminary Injunction (ECF No. 13 (*Middleton*)) by the Middleton Plaintiffs, filed on May 7, 2020.[13]

82.    On May 15, 2020, the court held a consolidated hearing on the pending Motions for

---

[13] The parties do not offer argument as to whether Thomas/Middleton Plaintiffs are seeking prohibitory or mandatory injunctive relief and, as such, which standard is to be applied. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235–36 (4th Cir. 2014) ("A preliminary injunction may be characterized as being either prohibitory or mandatory.  . . . [w]hereas mandatory injunctions alter the status quo, prohibitory injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." (internal and external citations omitted)); *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) ("Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." (citations omitted)). Upon its review, the court observes that it cannot clearly resolve this issue because the resolution depends on subjective presumptions specific to the parties, *i.e.*, Thomas/Middleton Plaintiffs allege they are trying to prevent irreparable harm while Defendants presumably would contend that Thomas/Middleton Plaintiffs are seeking to alter the status quo as to absentee ballots.

Preliminary Injunction. (*See* ECF No. 64 (*Thomas*); ECF No. 36 (*Middleton*).) In addition to reviewing the parties' submissions, amici briefs, and statement of interest, the court heard oral argument from the parties' counsel. (*Id.*)

### III.    FINDINGS OF FACT[14]

A.    The *Thomas* Lawsuit

1.    The individual Thomas Plaintiffs are lawfully registered voters and have individual characteristics or conditions that are regarded by the CDC as placing them at a higher risk for contracting COVID-19, including being over 65 years of age, having underlying medical conditions (including scleroderma, interstitial lung disease, hypertension, gout, history of breast cancer, emphysema, infection), being disabled, and/or being African-American. (ECF Nos. 7-17 at 2 ¶ 2; 7-18 at 2 ¶ 2, 2–3 ¶ 7; 7-19 at 2 ¶ 2; 7-20 at 2 ¶ 6–3 ¶ 8; 7-21 at 3 ¶¶ 7, 8 (*Thomas*).) In addition to being at a higher risk for contracting COVID-19, (*E.g.*, ECF No. 7-21 at 3 ¶ 8), one of the individual Thomas Plaintiffs allegedly already has COVID-19. (*See* ECF No. 7-22 at 4 ¶ 8.)

2.    As a result of these characteristics or conditions, many have self-quarantined at home and/or live alone. (*Id.* at 7-18 at 3 ¶ 8; 7-20 at 3 ¶ 8; 7-21 at 3 ¶ 6 (*Thomas*).)

3.    Some of the individual Thomas Plaintiffs also serve in positions that serve the disenfranchised or economically disadvantaged voters that have been substantially impacted by the COVID-19 pandemic and the Witness Requirement further burdens them from exercising their right to vote by absentee ballot by requiring them to expose themselves to other people in contravention of maintaining safe social distancing practices. (*See* ECF Nos. 7-17 at 2 ¶ 5–4 ¶ 12;

---

[14] To the extent any findings of fact constitute conclusions of law, they are adopted as such; to the extent any conclusions of law constitute findings of fact, they are so adopted. Moreover, as this is a preliminary injunction, any facts identified "are not final determinations of disputed matters." *EZ Gard Indus., Inc. v. XO Athletic Co.*, No. 07-CV-4769 (JMR/FLN), 2008 WL 1827490, at *1 n.1 (D. Minn. Apr. 23, 2008).

7-19 at 3 ¶ 7–4 ¶ 10 (*Thomas*).)

4.    Plaintiff The Family Unit, which serves mostly African-Americans and/or economically disadvantaged persons, has assisted voters in navigating the absentee voting process. (*See* ECF No. 7-22 at 2–3 ¶ 3 (*Thomas*).) Because of the COVID-19 pandemic, its members and constituents have had difficulty meeting the Witness Requirement. (*Id.* at 3 ¶¶ 4–6 (*Thomas*).) Such challenges include the necessity of having close, personal meetings with senior citizens, the marginally educated, and pretrial inmates to explain the absentee ballot process and thus does not afford the opportunity to assist with either in-person voting or absentee ballot voting. (*Id.* at 3 ¶ 11 –4 ¶ 12 (*Thomas*).)

5.    The mission of the SCEC is "to ensure every eligible citizen has the opportunity to register to vote and participate in fair and impartial elections with the assurance that every vote will count." *SCEC About Us*, https://www.scvotes.org/about-sec (last visited May 22, 2020).

6.    In her Declaration (ECF No. 7-15) submitted in support of Thomas Plaintiffs' Motion for Preliminary Injunction, Dr. Courtney D. Cogburn ("Dr. Cogburn") discussed the impact of COVID-19 on minority communities in South Carolina and made specific assertions regarding the health consequences of voting laws that require a person to break social distancing guidelines.[15]

---

[15]According to Dr. Cogburn:

> [Minorities'] risk [of] COVID-19 infection is tied to pre-existing and evolving inequities in structural systems and social conditions. As a result, any voting requirement requiring them to break social distancing protocols would place them at higher risk for infection and also threatens public health of the Black community more broadly. We will not be able to immediately address the deeply entrenched social and structural factors contributing to the significantly elevated risk to COVID-19 related infection and mortality among [minorities]. We can, however, acknowledge the significance of these factors and take immediate steps to minimize exposure for groups most gravely threatened by exposure to COVID-19…

7.      As the Executive Director of the South Carolina Election Commission, Defendant Andino is the chief administrative officer for the State Election Commission. S.C. Code Ann. § 7-3-20 (A) (West 2020). She is required to supervise the conduct of elections and the voter registration process by all persons involved in the election process, S.C. Code Ann. § 7-3-20 (C)(1) (West 2020), and conduct post-election analysis of such activities. S.C. Code Ann. § 7-3-20 (C)(2) (West 2020).

8.      As the Governor of South Carolina, Defendant McMaster is vested with the "supreme executive authority" of the State. *See* S.C. Const. Art. IV, § 1.  He has the authority to declare a public health emergency, as defined in S.C. Code Ann. § 44-4-130 (West 2020).  S.C. Code Ann. §1-3-420 (West 2020).  Upon such declaration, he may issue such proclamations to "order and direct any person or group of persons to refrain from doing any act or thing which would, in his opinion, endanger life, limb or property . . .by use of all appropriate available means to enforce such order or proclamation" S.C. Code Ann. § 1-3-430 (West 2020).

---

(ECF No. 7-15 at 8.)

In support of the aforementioned conclusion, Dr. Cogburn relies on:

Early data for COVID-19 infection and mortality in South Carolina [which is] consistent with national patterns and are highly concerning. The rate of infection and death for Black residents far exceeds their representation in the general population as well as overall levels for White citizens. Specifically, Black people living in South Carolina comprise 27% of the population but 57% of COVID-19 related deaths, making them 5 times more likely than Whites to die from the infection. The racial disparities in COVID-19 infection rates and deaths in South Carolina are among the most startling in the country…

(ECF No. 7-15 at 6.) (internal citations omitted).

B.    The *Middleton* Lawsuit

9.    Plaintiffs Middleton and Tedder are registered voters in South Carolina. (ECF Nos. 13-1 at 2 ¶ 1, 13-2 at 2 ¶ 1 (*Middleton*).) They are both African-American and candidates in the June 9, 2020 primary. (ECF No. 13-1 at 2 ¶ 2 (*Middleton*).) They both present concerns about potential voters fearing to vote in person as a result of COVID-19. (*See* ECF Nos. 13-1 at 3 ¶¶ 4–6, 13-2 at 2 ¶ 2–4 ¶ 8 (*Middleton*).)

## IV.    CONCLUSIONS OF LAW

1.    The parties make a plethora of arguments regarding the meritorious value of Thomas/Middleton Plaintiffs' claims. This court finds that Thomas/Middleton Plaintiffs have met their burden under the standard the Supreme Court set out in *Winter*[16] for preliminary injunctions as to the Witness Requirement. The court addresses below the vitality of Thomas/Middleton Plaintiffs' assertions under the requirements set forth in *Winter* and reiterated by the Fourth Circuit in *Real Truth*.[17]

A.    The Court's Jurisdiction

2.    The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 based on Thomas/Middleton Plaintiffs' claims against Defendants under 42 U.S.C. § 1983, which permits an injured party to bring a civil action against a person who, acting under color of state law, ordinance, regulation, or custom, causes the injured party to be deprived of "any rights, privileges, or immunities secured by the Constitution and laws."    *Id.*    Specifically, Thomas/Middleton Plaintiffs allege violations of their rights protected by the First and Fourteenth Amendments to the United States Constitution and the Voting Rights Act of 1965, 52 U.S.C. §§ 10301–10314, 10501–

---

[16] *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).
[17] *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).

27

10508, 10701–10702 (formerly 42 U.S.C. §§ 1973–1973bb).

B.      Standing of Thomas/Middleton Plaintiffs to Bring Their Actions

3.      Standing implicates the court's subject matter jurisdiction and is governed by Rule 12(b)(1). *Crumbling v. Miyabi Murrells Inlet, LLC*, C/A No. 2:15-cv-4902-PMD, 2016 WL 3351351, at *1 (D.S.C. June 16, 2016). "It is well established that standing is a threshold jurisdictional issue that must be determined first because '[w]ithout jurisdiction the court cannot proceed at all in any cause.'" *Covenant Media of N.C., LLC v. City of Monroe, N.C.*, 285 F. App'x 30, 34 (4th Cir. 2008) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). "To possess the constitutional component of standing, a party must meet three requirements: (1) [the party] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *McBurney v. Cuccinelli*, 616 F.3d 393, 410 (4th Cir. 2010) (citing, *e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

4.      "The party attempting to invoke federal jurisdiction bears the burden of establishing standing." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (citation omitted).

5.      "To establish Article III standing, an injury must be 'concrete, particularized and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). To be particularized, an injury "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). "There must be some

connection between the plaintiff and the defendant that '[]differentiate[s]' the plaintiff so that his injury is not 'common to all members of the public." *Griffin v. Dep't of Labor Fed. Credit Union*, 812 F.3d 649, 655 (4th Cir. 2019) (quoting *United States v. Richardson*, 418 U.S. 166, 177 (1974)). "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance," as long as "each individual suffers a particularized harm." *Spokeo, Inc.*, 136 S. Ct. at 1548 n.7.

6.    "[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue." *Baker v. Carr*, 369 U.S. 186, 206 (1962).

7.    Accepting as true the allegations in Thomas Plaintiffs' and Middleton Plaintiffs' Complaint, all Plaintiffs have shown that they are registered voters in the State of South Carolina and/or integrally connected to the electoral process and have alleged concrete injuries. (*See* ECF No. 1 at 5 ¶ 11–10 ¶ 16 (*Thomas*); ECF No. 1 at 5 ¶ 12 – 12 ¶ 23 (*Middleton*).)

8.    Therefore, the court finds that Thomas/Middleton Plaintiffs have standing to bring their lawsuits.

C.    Voting

9.    The right to vote and have that vote counted is "a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964).  In this regard, "[i]t has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote and to have their votes counted."  *See id.* at 554.

D.    Preliminary Injunctions Generally

10.    A preliminary injunction arises from Rule 65, but "it is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must establish all four of the following elements: (1) he is likely

to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.*; *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).

11.     The Fourth Circuit no longer recognizes a "flexible interplay among the four criteria for a preliminary injunction." *Real Truth*, 575 F.3d at 347. Each of these requirements "must be fulfilled as articulated." *De la Fuente v. S.C. Dem. Party*, C/A No. 3:16-cv-00322-CMC, 2016 WL 741317, at *2 (D.S.C. Feb. 25, 2016).

12.     "The traditional purpose of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of the lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *De La Fuenta*, 2016 WL 741317, at *2.

13.     Thomas/Middleton Plaintiffs' claims can be divided into two main categories. First, they assert that the statutes referred to herein infringe upon special rights secured to voters under the United States Constitution. Thomas/Middleton Plaintiffs challenge these claims as-applied to the June 2020 primaries and only during the COVID-19 pandemic. For the sake of convenience, this category of claims will be referred to as the "Constitutional claims." Thomas/Middleton Plaintiffs have two remaining Constitutional claims, which challenge: (1) the "Witness Requirement" and (2) the "the Election Day Cutoff."

14.     Second, Thomas/Middleton Plaintiffs contend that the "Witness Requirement" *per se* violates Section 201 of the Voting Rights Act of 1965 and Thomas/Middleton Plaintiffs, therefore, facially attack any application of the Witness Requirement under this theory. This claim will be referred to as the "VRA claims."

E.    <u>Clear Showing of Likely Success on the Merits</u>

15.    "[P]laintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (citing *Winter*, 555 U.S. at 20). "Although this inquiry requires plaintiffs seeking injunctions to make a 'clear showing' that they are likely to succeed at trial, *Real Truth*, 575 F.3d at 345, plaintiffs need not show a certainty of success." *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.3 (2d ed. 1995); *Pashby*, 709 F.3d at 321.

i.    *Thomas/Middleton Plaintiffs can Establish a Clear Showing of Likely Success as to the Merits of Their Constitutional Challenge to the Witness Requirement.*[18]

16.    Thomas/Middleton Plaintiffs contend that they are substantially likely to succeed on the merits of their claim that Defendants' enforcement of the Witness Requirement, combined with the unique risks presented by the COVID-19 pandemic, violates the First and Fourteenth Amendment as-applied to Plaintiffs during this state of emergency.[19]

17.    The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I.

18.    The United States Constitution also provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the Supreme Court has therefore, "recogniz[ed][ that States retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citing *Sugarman v. Dougall*,

---

[18] Of course, this determination, "like any ruling on a preliminary injunction, does not preclude a different resolution of [][Thomas/Middleton Plaintiffs'] claims on a more fully developed record." *Newsom v. Albemarle Cnty. School Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).
[19] Thomas/Middleton Plaintiffs do not lodge a facial attack on the statute, but instead pursue an as-applied challenge to the statute during the COVID-19 pandemic.

413 U.S. 634, 647 (1973); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)).

19.    The Supreme Court has articulated a "flexible standard" to address "a [First and Fourteenth Amendment] challenge to a state election law." *See Burdick*, 504 U.S. at 434. As the Supreme Court first explained in *Anderson v. Celebrezze*, the practical need for "substantial regulation of elections" means that "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test.'" *See* 460 U.S. 780, 788–89 (1983) (quoting *Storer*, 415 U.S. at 730).

20.    Instead, to properly accommodate the "state's important regulatory interests" while vindicating individual constitutional rights, *Anderson* instructed the courts to carefully balance those interests:

> [A Court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson*, 460 U.S. at 789.

21.    The Supreme Court refined that test in *Burdick v. Takushi*, explaining that "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *See* 504 U.S. at 434. Thus, a "severe" restriction on those rights triggers strict scrutiny. *Id*. But if the challenged election law "imposes only 'reasonable, non-discriminatory restrictions'" on First and Fourteenth Amendment rights, then "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id*. (quoting *Anderson*, 460 U.S. at 788).

22.    The Fourth Circuit has summarized the combined *Anderson-Burdick* inquiry as follows:

> In short, election laws are usually, but not always, subject to ad hoc balancing. When facing any constitutional challenge to a state's election laws, **a court must first determine whether protected rights** are severely burdened. If so, strict scrutiny applies. If not, the court must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that "order, rather than chaos, is to accompany the democratic processes."

*Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019) (quoting *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995)) (emphasis added).

23.    Inherent in the rule is that the challenge only applies to protected rights. Thomas/Middleton Plaintiffs and Defendants vigorously debate whether absentee voting is a right or a privilege.[20]

---

[20] Relying on *McDonald v. Board of Election Commissioners*, SCEC Defendants imply that absentee voting is not constitutionally protected here because the Witness Requirement, like "the state's absentee rules in *McDonald*" do not "impact [the inmate [voters']] ability to exercise the fundamental right to vote," but rather only their "right to receive absentee ballots." 394 U.S. 802, 808 (1969). SCEC Defendants also assert that "these same things are true of the…Witness Requirement because, in SCEC Defendants' view, like the record in *McDonald*, "[t]here [is] nothing in the record to show that [Plaintiffs] are in fact absolutely prohibited from voting by the State." (ECF No. 46 at 11.) While the court agrees with SCEC's conclusion that Defendants here have not, in the very literal sense, "absolutely prohibited" Plaintiffs from voting, the court disagrees with the way in which SCEC Defendants have framed the issue. To be clear, the standard does not require this court to find that the state has "absolutely prohibited voting" in order to find that absentee voting impacts Plaintiffs' ability to exercise their fundamental right to vote." Indeed, as the Supreme Court pointed out in *O'Brien v. Skinner*, the *McDonald* Court's ultimate determination that "the right to vote [was not] at stake" was premised on the fact that the burden to absentee voting was a "relatively trivial inconvenience encountered by a voter . . . when other means of exercising the right to vote [were easily] available." *O'Brien*, 414 U.S. 524, 532 (1974) (discussing *McDonald*). But here, "other means of exercising the right" to vote are not easily available. In-person voting, while still technically an available option, forces voters to make the untenable and illusory choice between exercising their right to vote and placing themselves at risk of contracting a potentially terminal disease. As the court observes, every aspect of the "normal" way of life, including the realm of voting, has necessarily changed due to something that was not present in 1969 when *McDonald* was decided: an on-going pandemic. If faced with burdensome restrictions to absentee voting, as Thomas/Middleton Plaintiffs allege, those burdens are certainly more than a "trivial inconvenience" that could easily be remedied by voting in person. In fact, it is

24.    Defendants are correct that under South Carolina law, absentee voting is a "privilege," not a right to vote itself. (ECF No. 50 at 9 (citing *State ex rel. McLeod v. Ellisor*, 192 S.E.2d 188, 190 (S.C. 1972); *O'Brien v. Skinner*, 414 U.S. 524, 530 (1974) (referring to it as "absentee voting privileges"); *Am. Party of Tex. v. White*, 415 U.S. 767, 795 (1974); *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 809 (1969)).) However, while this court agrees that the right to an absentee ballot is not guaranteed by the First Amendment, that does not mean that absentee voting is *per se* unprotected under the First Amendment. For example, much like absentee voting, there is "no fundamental right to run for elective office," and yet the Supreme Court has recognized laws restricting candidates' access to the ballot implicate the First Amendment because they "'place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'" *Esshaki v. Whitmer*, No. 20-1336, 2020 WL 2185553 (6th Cir. May 5, 2020) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968)) (Sixth Circuit upholding the core of the district court's preliminary injunction enjoining Michigan from enforcing the statutory ballot-access provisions for political candidates in advance of Michigan's upcoming primary election under the framework established in *Anderson-Burdick*.).

25.    Additionally, akin to the court in *Price v. N.Y. State Bd. of Elections*, this court is faced with an unusual fact pattern, which is a function of unusual times:

---

relatively difficult to vote in person without risking the possibility of infection, especially for those who are more susceptible to the ravaging harms of COVID-19. In other words, during this pandemic, absentee voting is the safest tool through which voters can use *to effectuate* their fundamental right to vote. To the extent that access to that tool is unduly burdened, then no matter the label, "denial of the absentee ballot is effectively an absolute denial of the franchise [and fundamental right to vote]."*O'Brien*, 414 U.S. at 533 (Justice Marshall concurring). As such, in these circumstances, absentee voting impacts voters' fundamental right to vote.

> [t]he fact pattern here is unusual, and our holding in this case is necessarily narrow. We do not hold that there is a general constitutional right to obtain absentee ballots. Nor do we hold that there is a constitutional right to obtain absentee ballots in all county committee races in New York State. Instead, after applying a deferential standard of review, and after examining the record in this as[-]applied challenge, we conclude that the arguments proffered by the State are so extraordinarily weak that they cannot justify the burdens imposed by [the restriction].

540 F.3d 101, 112 (2d Cir. 2008).

26.    Accordingly, and in the context of the as-applied challenge before the court concerning a privilege that so intimately effects the fundamental right to vote, the court must determine that Thomas/Middleton Plaintiffs' Witness Requirement challenge is to be examined under a normative constitutional rights framework—an as-applied challenge.

27.    Thomas/Middleton Plaintiffs and Defendants also vigorously debate whether the court is to apply a strict scrutiny standard or a lesser level of scrutiny under the *Anderson*/*Burdick* balancing test. However, at this juncture, the court need not reach that decision. District courts may grant temporary relief without deciding federal constitutional questions prematurely, without forecasting what the exact final decision will be on the ultimate claim, without creating an unseemly conflict between sovereigns and without impairing any state function. *See, e.g.*, *Pocahontas Fuel Co. v. Early*, 13 F. Supp. 605, 608 (W.D. Va. 1935) ("The purpose of this suit is to restrain the enforcement of an act of Congress alleged to be unconstitutional. Whether the act be unconstitutional and, if so, whether the plaintiff is entitled to a permanent injunction restraining its enforcement, must await the maturity of the cause . . . at the present the sole question is whether or not there should be awarded an . . . injunction preserving the rights of the plaintiff until a hearing upon the merits can be had, an injunction which, upon a complete and final hearing, may be dissolved or may be succeeded by a permanent injunction.")

28.    "While no court should lightly or carelessly enjoin enforcement of a statute, even

temporarily, it is equally true that it is right and proper to do so when it appears that there is no other available method by which the rights of a citizen may be protected. One of such rights is the opportunity to litigate his rights in the courts." *Pocahontas Fuel Co. v. Early*, 13 F. Supp. 605, 608 (W.D. Va. 1935).

29.    Assuming, without deciding, that the *Anderson/Burdick* balancing test applies as opposed to strict scrutiny, the court determines that, at this juncture, Plaintiffs have identified burdens inflicted by the Witness Requirement, which are at least of sufficient magnitude to warrant the injunction. *Anderson*, 460 U.S. at 789 (instructing that courts must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate").

30.    Thomas Plaintiffs assert that the Witness Requirement "impose[s] particularly severe burdens given the loss of life, toll of sickness from COVID-19, and the risk that violating social distancing protocols pose to Plaintiffs and their communities." (ECF No. 7 at 21 (*Thomas*).)

31.    In terms of other burdens, the individual Thomas Plaintiffs, have individual characteristics or conditions that are regarded by the CDC as placing them, at a higher risk for contracting COVID-19, including being over 65 years of age, having underlying medical conditions (including scleroderma, interstitial lung disease, hypertension, gout, history of breast cancer, emphysema, infection), being disabled, and/or being African-American. (ECF Nos. 7-17 at 2 ¶ 2; 7-18 at 2 ¶ 2, 2–3 ¶ 7; 7-19 at 2 ¶ 2; 7-20 at 2 ¶ 6–3 ¶ 8; 7-21 at 3 ¶¶ 7, 8 (*Thomas*).)  As a result of these characteristics or conditions,  many have or plan to self-quarantine. (*Id.* at 7-18 at 3 ¶ 8; 7-20 at 3 ¶ 8; 7-21 at 3 ¶ 6 (*Thomas*).)

32.    Some of the individual Thomas Plaintiffs also serve in positions that serve the disenfranchised or economically disadvantaged voters that have been substantially impacted by

the COVID-19 pandemic and the Witness Requirement further burdens them from exercising their right to vote by absentee ballot by requiring them to expose themselves to other people in contravention of maintaining safe social distancing practices. (*See* ECF Nos. 7-17 at 2 ¶ 5–4 ¶ 12; 7-19 at 3 ¶ 7–4 ¶ 10 (*Thomas*).)

33.    Once burdens are identified, a court evaluating a constitutional challenge to an election regulation must weigh the asserted burdens to the right to vote against the "precise interest put forward by the State as justifications for the burden imposed by its rule." *Burdick*, 504 U.S. at 424 (quoting *Anderson*, 460 U.S. at 789).

34.    The Supreme Court has made clear that it has not identified any "litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters." *Crawford v. Marion Cty. Election Bd*., 553, U.S. 181, 191 (2008). Rather, "**however slight that burden may appear**" the reviewing court must find that it is "**justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation**.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)) (emphasis added).

35.    Here, SCEC Defendants assert that the Witness Requirement is justified because it is intended "to (1) preserve the integrity of elections by developing a scheme that ensure[s] the reliability of our voting system and (2) protect[] it from fraud." (ECF No. 50 at 5.)

36.    However, courts are not to blindly accept a state's assertion that its interests are enough to outweigh a burden, instead  a court must find that it is "**justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation**.'" *Crawford*, 553 U.S. at 191 (emphasis added).

37.    In applying this standard, the court observes that Defendants' assertion that the Witness Requirement is necessary to combat voter fraud is undermined by SCEC Defendants

Andino, Elder, Wells, and Moseley. Specifically, Defendant Andino, the Executive Director of the SCEC, sent a letter to Defendant Governor McMaster and other elected officials on March 30, 2020, whereby Executive Director Andino stated:

> Absentee voting also requires voters to have another person witness their signature when returning their ballot. **While election officials check the voter's signature, the witness signature offers no benefit to election officials as they have no ability to verify the witness signature.** Removing the requirement for a witness signature would remove a barrier many voters would likely encounter while in self-isolation.

(ECF No. 1-2 at 3 (*Thomas*) (emphasis added).)

      38.    SCEC Defendants attempt to clarify this statement through Executive Director Andino's Declaration (ECF No. 46-2 (*Thomas*)), which states her "letter was not intended as . . . an endorsement or recommendation of any particular voting method or requirements not permitted in this state, nor of any legal position regarding the current state law requirements." Nonetheless, in the same Declaration, Executive Director Andino affirms that the purpose of the letter was to provide "useful, relevant information for policymakers to consider when determining what action to take, if any, with regards to the safe conduct of elections in light of concerns regarding COVID-19" (*id*. at 6 ¶ 10), in her role as a "liaison between the S[]C[EC] and public officials . . . , other government entities and the voting public." (*Id*.) Because Andino is the Chief Administrative Officer of the SCEC, the court places emphasis on both her prior letter and her Declaration.

      39.    While states certainly have an interest in protecting against voter fraud and ensuring voter integrity, the interest will not suffice absent "evidence that such an interest made it necessary to burden voters' rights." *Fish v. Schwab*, No. 18-3133, 2020 WL 2050644, at *18 (10th Cir. Apr. 29, 2020) (affirming injunction against Kansas's documentary proof of citizenship requirement for voter registration).

      40.    "In passing judgment, the court must . . . determine the legitimacy and strength of

each of those interests [and] it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789.

41.    Here, Defendants have not offered any evidence of voter fraud in South Carolina[21] other than SCEC's fleeting mention, during the May 15, 2020 hearing, of a voter-buying scandal from the 1980s. *Cf. United States v. Carmichael*, 685 F.2d 903, 907 (4th Cir. 1982).

42.    While the court also considers SCEC Defendants' asserted interest of voter integrity, Director Andino's letter stating that the Witness Requirement "offers no benefit" also undermines, but does not completely dissolve, the "legitimacy" of this interest as well. (*See* ECF No. 1-2 at 3 (*Thomas*).)

43.    Thomas/Middleton Plaintiffs have shown strong likelihood that the burdens placed upon them by the Witness Requirement far outweigh the imprecise, and (as admitted by SCEC Defendants) ineffective, state interests of combating voter fraud and protecting voting integrity.[22] *See e.g. Paher v. Cegavske*, No. 320CV00243, 2020 WL 2089813, at *2 (D. Nev. Apr. 30, 2020) (interest in maintaining "a high level of access to the ballot, while protecting the safety of voters

---

[21] According to the Brennan Center for Justice, which is a nonpartisan law and policy institute, more than 31 million Americans cast ballots by mail in 2018. *Brennan Center for Justice*, https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud    (last visited May 20, 2020). Despite this dramatic increase in mail voting over time, fraud rates "remained infinitesimally small." *Id.* Additionally, "none of the five states that hold their elections primarily by mail has had any voter fraud scandals since making that change." *Id.* For example, Oregon sent out more than 100 million mail-in ballots since 2000, and has documented only about a dozen cases of proven fraud." *Id.* "Rounded to the seventh decimal point, that's 0.0000001 percent of all votes cast." *Id.* Moreover, according to a sampling research conducted by the Heritage Foundation—an organization invested in "[p]reventing, deterring, and prosecuting election fraud", there have only been 1,285 proven instances of voter fraud nationwide. *A Sampling of Recent Election Fraud Cases from Across the United States*, https://www.heritage.org/voterfraud (last visited May 22, 2020).

[22] The court agrees that these are legitimate state interests, but they are still served by other means (i.e. requiring absentee ballot applications to include identifying information, etc.).

and poll workers—who belong to groups who are at high risks for severe illness from COVID-19" outweighed concern for voter fraud).

44.     Therefore, Thomas/Middleton Plaintiffs are likely to prevail on their constitutional challenge to the Witness Requirement under the *Anderson-Burdick* balancing test because the character and magnitude of the burdens imposed on Thomas/Middleton Plaintiffs in having to place their health at risk during the COVID-19 pandemic likely outweigh the extent to which the Witness Requirement advances the state's interests of voter fraud and integrity. *See e.g. Libertarian Party of Ill. v. Pritzker*, No. 20-CV-2112, 2020 WL 1951687, at *4 (N.D. Ill. Apr. 23, 2020) (court determining that a signature requirement for potential candidate eligibility on ballot presented "insurmountable hurdle" during COVID-19 pandemic and enjoining enforcement of portions of said requirement).

F.    Likelihood of Suffering Irreparable Harm Absent an Injunction

45.     *Winter* requires that the party requesting injunctive relief demonstrates that it is likely it will suffer irreparable harm absent the preliminary injunction. 555 U.S. at 22–23. The harm to be prevented must be of an immediate nature and not simply a remote possibility. *Am. Whitewater v. Tidwell*, No. 8:09-cv-02665-JMC, 2010 WL 5019879, at *11 (D.S.C. Dec. 2, 2010) (citing *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)).

        i.    *Thomas/Middleton Plaintiffs Have Established Irreparable Harm.*

46.     The threatened "loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002); *see also Preston v. Thompson*, 589 F.2d 300, 303 n.4 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm."); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (where plaintiff had proven a probability of success on the

merits, the threatened loss of First Amendment freedoms "unquestionably constitutes irreparable injury").

47.    To demonstrate a need for injunctive relief, a plaintiff must show how the harm suffered is such that other forms of damages available in the normal course of litigation are not enough.  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough," because "the possibility that adequate compensatory or other corrective relief will be available at a later date." *Hughes Network Sys. v. Interdigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).  This "weighs heavily against a claim of irreparable harm." *Id*.

48.    "A preliminary injunction is not normally available where the harm at issue can be remedied by money damages." *Bethesda Softworks, LLC v. Interplay Entm't Corp.*, 452 F. App'x 351, 353 (4th Cir. 2011).[23]

49.    Claims of infringement of a citizen's constitutional right to vote cannot be redressed by money damages, and therefore traditional legal remedies would be inadequate in this case. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress.")

---

[23] The presumption against issuing preliminary injunctions where a harm suffered can be remedied by money damages at judgment stems from real concerns the issuance of a preliminary injunction remedy raises. These concerns include, for example, the fact that in issuing a preliminary injunction order, a district court is required, based on an incomplete record, to order a party to act in a certain way.  *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994). Issuing an injunction further risks repetitive litigation, that which carries significant costs for both parties. *Id*. Thus, there are only "extraordinary circumstances" that are "quite narrow" in application, where preliminary injunction is appropriate notwithstanding monetary damages.  *Id*. (discussing a plaintiff's business not being able to survive as an example of such circumstances.) The COVID-19 pandemic is one such extraordinary circumstance.

50.     Accordingly, to the extent that Thomas/Middleton Plaintiffs have a likely constitutional violation, Thomas/Middleton Plaintiffs have satisfied their initial showing of irreparable harm.

G.     The Balance of Equities and the Public Interest Factors

51.     The third and fourth elements of the preliminary injunction test require Thomas/Middleton Plaintiffs to establish clearly that the balance of equities tips in their favor and that an injunction also is in the public interest. *Winter*, 555 U.S. at 20.

52.     In cases involving significant public interest, courts may "consider the balance of the equities and the public interest factors together." As the Fourth Circuit has explained:

> Even if Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction, we still must determine that the balance of the equities tips in their favor, "pay[ing] particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982). This is because "courts of equity may go to greater lengths to give 'relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 826 (4th Cir. 2004) (quoting *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552, 57 S. Ct. 592, 81 L. Ed. 789 (1937)).

*Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 602 (4th Cir. 2017).

53.     A court considering whether to grant a preliminary injunction must therefore "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

54.     "The court must also consider the balance of hardships between the litigants **and the impact on the public at large prior to issuing an injunction.**" *Uhlig, LLC v. Shirley*, C/A No. 6:08-cv-01208-JMC, 2012 WL 2458062, at *4 (D.S.C. June 27, 2012) (emphasis added).

i.     *Thomas/Middleton Plaintiffs Have Established that a Preliminary Injunction of the "Witness Requirement" Tips Towards Their Favor and is in the Public Interest.*

55.    Regarding the final two factors—balance of the equities and the consideration of the public interest—the Fourth Circuit has also found these factors established when there is a likely First Amendment violation.  *Giovani Carandola,* 303 F.3d at 521 ("upholding constitutional rights surely serves the public interest").

56.    Above, the court found that Thomas/Middleton Plaintiffs will suffer irreparable harm without an injunction of the Witness Requirement.  Alternatively, there is no evidence that Defendants will suffer any harm if Thomas/Middleton Plaintiffs' Motions are granted. Indeed, a government is "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola,* 303 F.3d at 521; *accord Newsom v. Albemarle Cnty. School Bd.,* 354 F.3d at 261 (4th Cir. 2003).

57.    Temporarily enjoining the Witness Requirement promotes "the public interest in . . . safeguarding public health." *Pashby*, 709 F.3d at 331. "The public interest is clearly in remedying dangerous or unhealthy situations and preventing the further spread of disease." *Diretto v. Country Inn & Suites by Carlson*, No. 16-cv-1037, 2016 WL 4400498, at *4 (E.D. Va. Aug. 18, 2016).

58.    This is particularly true in the context of the "worst pandemic this state, country, and planet has seen in over a century." *League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 6:20-CV-00024, 2020 WL 2158249, at *10 (W.D. Va. May 5, 2020). To conclude otherwise would be non-sensical during a time where social distancing and isolation has been encouraged by the CDC.[24]

---

[24] In its suggestions for slowing the spread of COVID-19, the CDC advocates for "limiting face-to-face contact with others" by "[s]tay[ing] at least 6 feet (about 2 arms' length) from other

59.    Were it not for the current pandemic, then this element *may* have cut the other way. But the court's decision is to be guided by "the ramifications of granting or denying the preliminary injunction on nonparties to the litigation." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc*, 549 F.3d 1079, 1100 (7th Cir. 2008) (citing *Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986); *Ty, Inc.*, 237 F.3d at 895). Considering the ramifications of the injunction during a pandemic, the public interest is served. *See, e.g.*, *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 924–25 (6th Cir. 2020) ("Were there no public health crisis, then, the analysis would be relatively straightforward . . . but, of course, we are not living in normal times; we are living in pandemic times.").

60.    The evidence in the record points to the conclusion that adherence to the Witness Requirement in June would only increase the risk for contracting COVID-19 for members of the public with underlying medical conditions, the disabled, and racial and ethnic minorities.

61.    Strikingly, the Witness Requirement would still apply to voters who have already contracted COVID-19, therefore affirmatively mandating that an infected individual go "find" someone to witness their absentee ballot and risk exposing the witness (and whoever comes in contact with the witness) to the virus. The asymptomatic COVID-19 voter would unknowingly place potential witnesses at risk and the symptomatic COVID-19 voter would be hard-pressed to find a willing witness. Defendants are also hard-pressed to convince this court, at least, that this predicament created by strict enforcement of the Witness Requirement is in the best interests of the public during a pandemic of this nature.

62.    Finally, the public interest "favors permitting as many qualified voters to vote as

---

people." *Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html(last visited May 20, 2020).

possible." *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012).

63.     Accordingly, the court finds that granting Thomas/Middleton Plaintiffs injunctive relief is in the public interest.

H.     Required Posting of Bond

65.     Rule 65 provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

66.     The district court "retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby*, 709 F.3d at 332 (citing *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)).

67.     After considering the circumstances alleged in the instant Motions, and given the significance of this matter of local, national, and international public concern resulting from this unprecedented pandemic, which has garnered a response from all levels of government, the court deems it appropriate to waive bond for Thomas/Middleton Plaintiffs. *See Hoechst Diafoil Co.*, 174 F.3d at 421 (acknowledging the requirement that a district court set an injunction bond and also acknowledging that the court can set the bond "in such sum as the court deems proper").

I.     Extension of Deadline for Receipt of Absentee Ballots

   i.     *Middleton Plaintiffs Cannot Establish a Clear Showing of Likely Success as to the Merits of Their Constitutional Claim for an Extended Deadline.*

68.     Middleton Plaintiffs request that this court enjoin Defendants "from enforcing the requirement under S.C. Code Ann. § 7-15-230 that absentee ballots must be received by 7:00 p.m. on Election Day [June 9] to be counted" and wants the court to effectively "extend the deadline

[of absentee ballot receipt by an additional ten (10) days] to June 19, provided that the ballots were postmarked or mailed on or before June 9." (ECF No. 13 at 32.)

69.    S.C. Code Ann. § 7-15-230 provides, in pertinent part:

No ballot shall be counted unless the oath is properly signed and enclosed therewith **nor shall any ballot be counted which is received by the board of voter   registration and elections or other officials charged with the conduct of the election after time for closing of the polls** . . .

*Id*. (emphasis added).

70.    Middleton Plaintiffs contend that "South Carolina's Election Day Cutoff law . . . threatens to disenfranchise thousands of voters whose ballots do not arrive by the election day deadline—a threat that is substantially exacerbated by an influx of requests to vote by absentee ballot and delays in mail service" and "is "unconstitutional under the current circumstances." (ECF No. 13 at 25, 29 (*Middleton*).)

71.    Middleton Plaintiffs also contend that they are "likely to succeed on their claim that South Carolina's rejection of mailed absentee ballots not received by the Election Day Cutoff is unconstitutional under the current circumstances" because . . . (1) "[f]irst-time absentee voters are more likely to mail their ballots later since they are also likely to be less familiar with voting by mail, including the Election Day Cutoff; (2) the "influx of requests is likely to create scenarios where voters who lawfully request absentee ballots by 5:00 p.m. on June 5 do not even receive them by June 9, the election day deadline"; and (3) "extending the Election Day Cutoff does not impede the State's interest in orderly elections." (ECF No. 13 at 29, 28 (*Middleton*).)

72.    While the reasons undergirding Middleton Plaintiffs' request for an extended deadline may be true and are, at best, significant debate-worthy policy considerations, the court arrives at a different conclusion as to whether these reasons support a finding that Middleton Plaintiffs have a strong likelihood of success on the merits of their, constitutionally-based,

Deadline challenge.[25] To the contrary, the court finds that Middleton Plaintiffs are unlikely to succeed on their constitutional challenge to the June 9, 2020 deadline.

73.     Unlike the Witness Requirement, the most significant obstacles to Middleton Plaintiffs' ability to meet the June 9, 2020 deadline are principally unrelated to the COVID-19 pandemic's *health risks* and the burdens, if any, imposed by the deadline are minimal.[26]

74.     South Carolina's generally applicable deadline for receipt of absentee ballots is constitutional because it imposes only a minimal burden, if any, on Middleton Plaintiffs' right to vote.

75.     "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*,

---

[25] Addressing Middleton Plaintiff's first two reasons for an extended deadline: as Defendants accurately point out,"[e]very citizen is presumed to know the law." *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1507 (2020); *see also State v. Adams*, 763 S.E.2d 341, 348 (S.C. 2014) ("ignorance of the law is no excuse"). It is reasonable to expect a voter, who is voting by absentee ballot, no matter the reason, to familiarize themselves with the rules governing that procedure—especially when those procedures are provided. Information regarding expanded absentee voting in South Carolina has been available to every South Carolina voter since May 13, 2020. *See* https://www.scvotes.org/all-voters-can-now-vote-absentee-june-primaries-runoffs *All Voters Can Now Vote Absentee in June Primaries Release May 13, 2020* (Last visited May 22, 2020) ("every voter in South Carolina is now qualified to vote absentee in the June Primaries and runoffs. Governor McMaster today signed into law legislation passed yesterday by the General Assembly that authorizes any voter to vote absentee in any election in June 2020.") Similarly, while the court understands Middleton Plaintiffs' concerns that "the Postal Service faces unprecedented challenges from the pandemic and budgetary constraints", (ECF No. 13 at 26), this concern does not impact the constitutional inquiry before the court.
[26] Additionally, Middleton Plaintiffs state that "those who do not receive their ballots on time to mail them back will be faced with the same untenable choice: risk serious illness/death or not vote." (ECF No. 29 at 13.) While this may be true for some people who wait until near the June 9 deadline to request an absentee ballot, the opportunity to request a ballot has been open to all South Carolina voters since May 13, 2020, nearly a whole three weeks before the June 5, 2020 absentee ballot application deadline. The court finds this to be ample time to request an absentee ballot and timely submit it to the SCEC well before Election Day.

504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).

76.     Any voter may request and submit an absentee ballot, so long as that ballot is received by the Election Commission by the time the polls close on Election Day. S.C. Code § 7-15-230 (West 2020).

77.     Standing alone, South Carolina's deadline of 7:00 p.m. on Election Day is nondiscriminatory. "A state's generally applicable registration cutoff imposes only a minimal burden on the right to vote. *Rosario v. Rockefeller*, 410 U.S. at 758. While the specific challenge here is to the ballot receipt date and not to the registration deadline, the principle still applies.

78.     Of course, voters who fail to get their vote in early cannot blame South Carolina law for their inability to vote; they must blame "their own failure to take timely steps to effect their enrollment." *Rosario*, 410 U.S. at 758; *see also Burdick*, 504 U.S. at 436–37 ("[A]ny burden on voters' freedom of choice and association is borne only by those who fail to identify their candidate of choice until days before the primary."). This notion was recently underscored by the Supreme Court in *Republican Nat'l Comm. v. Democratic Nat'l Comm.* when the high Court commented, "even in ordinary elections, voters who request an absentee ballot at the deadline for requesting ballots, will usually receive their ballots on the day before the election or day of the election…voters here would [not] be in a substantially different position from late-requesting voters in other [] elections with respect to the timing of their receipt of absentee ballots."). 140 S. Ct. 1205, 1207 (2020).

79.     In terms of the state's interests: setting specific election deadlines is part and parcel of a state's generalized interest in the orderly administration of elections. *Mays v. LaRose*, 951 F.3d 775, 787 (6th Cir. 2020).

80.     SCEC Defendants assert that the state's interest is "ensuring  a  smooth  process

48

for [voters] to cast ballots and officials to count those ballots." (ECF No. 10.)

81.    During the May 2020 hearing, SCEC Defendants represented that the state has an additional interest in maintaining the June 9, 2020 deadline because it ensures that the Secretary of State and his staff have sufficient time to canvass votes in a timely fashion and meet the ballot certification deadline, which triggers final preparations for ballot preparation for the June 23, 2020 run-off elections. As a result, SCEC Defendants contend that an extension until June 19, 2020 would hinder and frustrate the state's goal of certifying the results to the State Board by the June 13, 2020 deadline in time for the June 23, 2020 run-off elections.

82.    The court determines that the state's enforcement of the Election Day cutoff to absentee ballot receipt does not severely burden or disenfranchise Middleton Plaintiffs.

83.    Accordingly, the court denies Middleton Plaintiffs' request to extend the absentee deadline by an additional 10 days, or even an additional 6 days.[27]

J.    Likelihood of Suffering Irreparable Harm Absent an Injunction, The Balance of Equities and the Public Interest Factors

84.    Generally, in determining whether to grant a motion for injunctive relief, "[t]he court must also consider the balance of hardships between the litigants and the impact on the public

---

[27] During the May 15, 2020 hearing, Middleton Plaintiffs suggested that the court should consider a six-day extension of the deadline consistent with a Wisconsin district court's order which "was affirmed by the Supreme Court" and "extended the deadline by six days." *See Democratic Nat'l Comm. v. Bostelmann*, Civ. No. 20-cv-249-wmc, 2020 WL 1638374, at *22 (W.D. Wis. Apr. 2, 2020), *clarified*, ECF No. 122 (W.D. Wis. Apr. 3, 2020), *stayed in part sub nom. Democratic Nat'l Comm. v. Republican Nat'l Comm.*, Nos. 20- 1538 & 20-1546 (7th Cir. Apr. 3, 2020), *stayed in part*, 140 S. Ct. 1205 (2020). The court determines that the specific facts of the Wisconsin case as it related to an absentee ballot deadline do not apply to the facts of this case. Additionally, the Supreme Court's decision was "narrow" and "should not be viewed as expressing an opinion on the broader question of whether modifications to election procedures in light of COVID-19 are appropriate." *Republican Nat'l Comm.*, S.Ct. 1205 at 1207. As the most significant contrast, the Wisconsin Commissioners "no longer object[ed]" to the Wisconsin Plaintiffs' six-day extension request and consented to the deadline extension. 2020 WL 1638374, at *16. Here, SCEC Defendants vehemently object to an extension of any kind.

at large prior to issuing an injunction." *Uhlig, LLC v. Shirley*, C/A No. 6:08-cv-01208-JMC, 2012 WL 2458062, at *4 (D.S.C. June 27, 2012).

85.    However, Middleton Plaintiffs have not made a clear showing that they will likely succeed on the merits of their deadline challenge because the law on the questions at the heart of the dispute does not favor their position. Therefore, because Middleton Plaintiffs cannot show a likelihood of success on the merits, this court need not address the other necessary elements for preliminary injunctive relief. *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 225 (5th Cir. 2010) ("Because we have determined that Plaintiffs cannot show a substantial likelihood of success on the merits, we need not address FEMA's additional arguments regarding the other necessary elements for preliminary injunctive relief. The holding on the initial element is sufficient to vacate the injunction."); *Coleman v. Chase Bank*, C/A No. 3:14-cv-101, 2014 WL 2533400, at *3 (E.D. Va. June 5, 2014) ("Because Plaintiffs cannot show a likelihood of success on the merits, the Court need not address the remaining factors.").

K.    Section 201 Voting Rights Act Challenge

    i.    *Thomas Plaintiffs Cannot Establish a Clear Showing of Likely Success as to the Merits of Their Section 201 Voting Rights Act Claim.*

86.    Section 201 of the Voting Rights Act of 1965 prohibits the use of "any test or device" including "any requirement that a person as a prerequisite for voting . . . prove his qualifications by the voucher of registered voters or members of any other class." 52 U.S.C. § 10501(a).

87.    S.C. Code Ann. § 7-15-420 (West 2020) states that an absentee "ballot may not be counted unless the oath is properly signed and witnessed . . . ."

88.    Thomas Plaintiffs assert that, based on the aforementioned language in § 7-15-420, the Witness Requirement is "*per se* illegal" and violative of Section 201 "insofar as [the Witness

Requirement] is a 'prerequisite for voting' that asks a voter to 'prove his qualifications by the voucher of registered voters or members of any other class.'" (ECF No. 7-1 at 43 (*Thomas*).)

89.    As they have brought a *per se* challenge, Thomas Plaintiffs are facially attacking the validity of the Witness Requirement as opposed to attacking the Witness Requirement on an as-applied basis.[28]

90.    As a threshold issue, the court takes notice of the United States Government's Statement of Interest Concerning Section 201 of the Voting Rights Act (ECF No. 47) (*Thomas*), wherein the Government claims that "this [c]ourt as constituted cannot address Plaintiffs' Section 201 claim, which the Voting Rights Act provides may only be heard by a three-judge court." (ECF No. 47 at 2 (*Thomas*).)

91.    While SCEC Defendants did not raise or brief this issue, SCEC Defendants represented to the court during the May 15, 2020 hearing that it adopts the Government's position

---

[28] Unlike the Thomas/Middleton Plaintiffs' "as-applied" challenge to the Witness Requirement under the First and Fourteenth Amendments, Thomas Plaintiffs' challenge to the Witness Requirement under § 201 of the Voting Rights Act is a facial attack on the South Carolina statutes mandating the Witness Requirement. The distinction is quite significant here. "A facial challenge is an attack on a statute itself as opposed to a particular application." *Doe v. City of San Diego*, 313 F. Supp. 3d 1212, 1217 (S.D. Cal. 2018) (citing *City of Los Angeles v. Patel,* 576 U.S. 409 (2015)). Accordingly, "a facial attack does not raise questions of fact related to the enforcement of the statute in a particular instance." *Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 133 n.10 (1992) ("Facial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision").  As this court has recognized before, "facial challenges are generally disfavored because they 'threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.'" *Greenville Cty. Republican Party Exec. Comm. v. South Carolina*, 824 F. Supp. 2d 655, 662 (D.S.C. 2011) (quoting *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 451 (2008). This "Witness Requirement" challenge based on the VRA, then, does not depend on the COVID-19 pandemic or the specific obstacles faced by Thomas Plaintiffs related to the specific burdens caused by the coronavirus. As such, the court analyzes the § 201 "Witness Requirement" challenge independently of the facts surrounding the current pandemic.

that this court cannot address the Section 201 claim absent a three-Judge panel.[29]

92.    Defendants are correct that Section 1973aa–2 provides that any "action under this subsection shall be heard and determined by a court of three judges." However, Section 1973aa–2, **by its express terms**, only applies this requirement **to suits by the Attorney General**. *Id.* (stating, in relevant part, that "[w]henever the Attorney General has reason to believe" that Sections 1973aa, 1973aa–1, or 1973aa–1a are being violated, "he may institute for the United States, or in the name of the United States, an action in a district court of the United States") (emphasis added).

93.    As is clear from Thomas Plaintiffs' Complaint, this case is not brought by the Attorney General. Rather, it is brought by private parties under Section 201. Therefore, this provision is inapplicable to the present case and this court has authority, as presently constituted, to address Thomas Plaintiffs' Section 201 claim. *See e.g. Navajo Nation Human Rights Comm'n v. San Juan Cty.*, 215 F. Supp. 3d 1201, 1217 (D. Utah 2016).

94.    Addressing Thomas Plaintiffs' Section 201 claim, the court finds that Plaintiffs are unlikely to succeed on the merits of this claim because the Witness Requirement is not a "test or device" as defined under the plain language of the statute.

95.    52 U.S.C. § 10501 states:

(a) No citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State.

*Id.* at § 10501(a).

96.    More pertinently, section (b) states, "[a]s used in this section, the term 'test or

---

[29] The court also acknowledges that intervenor-Defendant SCRP also briefed this argument in its Response in Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF No. 50) (*Thomas*). Specifically, intervenor-Defendant SCRP states that the claim "fails right out the gate because [Thomas Plaintiffs] failed to affirmatively request a three-judge court . . . ." (ECF No. 50 at 13.)

device' means any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or **(4) prove his qualifications by the voucher of registered voters or members of any other class.**" 52 U.S.C. § 10501(b) (emphasis added).

97.    The Witness Requirement is not a "test or device" as defined under Section 201 because the requirement does not mandate the witness to "vouch" or "prove" that the voter is qualified to vote, but instead is simply required to witness the oath taken by the voter. *Gregory v. S.C. Democratic Exec. Comm.*, 247 S.E.2d 439, 444 (S.C. 1978) ("as its purpose of the assurance of the authenticity of the absentee vote . . . "). This is further confirmed after a review of a similar signature scheme, which came under a facial attack in *Howlette v. City of Richmond, Va.*; in that case, "the sole question for decision [was] whether enforcement of the City Charter requirement that each signature on a petition seeking a referendum be individually notarized is violative of the VRA and the constitution." 485 F. Supp. at 22 (E.D. Va.), aff'd, 580 F.2d 704 (4th Cir. 1978).

98.    The court noted that, "the notary merely administers an oath; he or she in no way vouches that the signer is a registered voter or requires the [voter] to produce proof [to the witness] that he is a registered voter." *Howlette,* 485 F. Supp. 17 at 22.

99.    Further, the court also examined the Congressional purpose of Section 201 of the Voting Rights Act and determined that:

> Thus, both the Congress and the Supreme Court have viewed the prohibition against vouchers as an attack on a specific, racially discriminatory voting registration requirement. The individual notarization requirement at issue in the instant case in no way resembles the voucher requirements prohibited by s 1973b(c)(4). The Court therefore is satisfied that the individual notarization requirement of the Richmond City Charter is not a "test or device" prohibited under the Voting Rights Act of 1965.

*Howlette*, 485 F. Supp. at 24

100.    Here, as in *Howlette*, a witness is not required to confirm that the voter is registered to vote or "qualified" in any way. Instead, the witness is only standing in to confirm that the voter completes the voter's oath and signs the document. Indeed, a voter's eligibility has already been verified by the SCEC according to the absentee procedure. (ECF No. 46-2 at 5 ¶ 7 (*Thomas*)) ("upon receiving an application for an absentee ballot by mail, and verifying the voter's eligibility to vote absentee, county boards are required to mail…such ballots to the voter as soon as possible."). There would be no need to, and the Witness Requirement does not, require the *witness*, who may or may not know the voter, to sign upon the witness line for the purpose of verifying that the voter is registered or "qualified" to vote.

101.    As further indication of the failing nature of this claim, the court focuses on the second portion of Section 201 prohibition, which emphasizes the *who*. To constitute a "test or device," the voucher must be a "registered voter or members of any other class," which is not the case here.

102.    The Witness Requirement does not specify who must witness the oath and certainly does not limit a witness to another qualified voter. The Witness Requirement allows for a myriad of competent individuals to witness the oath whether the witness themselves are registered to vote or not.

103.    Similarly, the Witness Requirement does not require the witness to be a part of a particular "member of any class" or subset of society.  *Compare Libertarian Party v. Judd*, 718 F.3d 308, 310–12, 316–19 (4th Cir. 2013); *Lerman v. Bd. of Elections*, 232 F.3d 135, 150 & n.14 (2d Cir. 2000); *Nader v. Brewer*, 531 F.3d 1028, 1031–32, 1035–38 (9th Cir. 2008) (cases either striking down or seriously calling into question the validity of ballot-access laws that restricted

*who* may qualify as signatory—*i.e.*, specific members of a geographic or residential area).

104.    For the aforementioned reasons, the court finds that the Witness Requirement is not a "test or device" prohibited under Section 201 of the Voting Rights Act of 1965.

105.    Thomas Plaintiffs have not made a clear showing that they will likely succeed on the merits of their Section 201 challenge because the law on the questions at the heart of the dispute does not favor their position. Therefore, because Thomas Plaintiffs cannot show a likelihood of success on the merits, this court need not address the other necessary elements for preliminary injunctive relief. *La Union Del Pueblo Entero*, 608 F.3d at 225.

## V.    CONCLUSION

For the foregoing reasons and after careful consideration of the entire record, the court **GRANTS IN PART AND DENIES IN PART** Thomas Plaintiffs' Motion for Preliminary Injunction (ECF No. 7 (*Thomas*)) and **GRANTS IN PART AND DENIES IN PART** Middleton Plaintiffs' Motion for Preliminary Injunction (ECF No. 13 (*Middleton*)). More specifically, the court **GRANTS** the pending Motions for Preliminary Injunction as to the Witness Requirement and **ENJOINS** Defendants, their respective agents, officers, employees, successors, and all persons acting in concert with each or any of them, from enforcing the Witness Requirement set forth in S.C. Code Ann. § 7-15-380, and from enforcing the Witness Requirement set forth in any other South Carolina statutes, on registered absentee voters *only* during the June 2020 primaries and resulting runoff elections occurring in the State of South Carolina. The court further **ORDERS** Defendants to **immediately and publicly** inform South Carolina voters about the elimination of the Witness Requirement for absentee voting, in coordination with city and county election officials, and county boards.  Such public campaign shall include providing updated information regarding the instant injunction on all relevant websites and social media outlets (*i.e.*, Facebook,

Instagram, Twitter, etc.) as appropriate. The court hereby **DENIES** all remaining claims made by Thomas/Middleton Plaintiffs in their Motions for Preliminary Injunction.[30]

      **IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

May 25, 2020
Columbia, South Carolina

---

[30] **The court denies or moots the following requested relief**:

  1) prohibiting Defendants from enforcing S.C. Code Ann. § 7-15-320 and § 7-15-310, the Absentee Ballot Age Restriction, to prevent any eligible voter, regardless of age, to request, receive, and have counted an absentee ballot for the June 9 primary (MOOTED)

2) prohibiting Defendants from enforcing the Excuse Requirement, S.C. Code Ann. § 7-15-320 and § 7-15-310, to prevent any eligible voter, regardless of age or physical condition, to request, receive, and have counted an absentee ballot for the June 9 primary (MOOTED)

3) prohibiting Defendants from enforcing the requirement under S.C. Code Ann. § 7-15-230 that absentee ballots must be received by 7:00 p.m. on Election Day to be counted and extending the deadline to June 19, provided that the ballots were postmarked or mailed on or before June 9 (DENIED)

4) ordering the counting of ballots to begin on June 19, *see* S.C. Code Ann. § 7-13-1110, and giving county election officials until June 23 to complete the canvass and certify the results to the State Board of Canvassers, *id*. § 7-17-20 (MOOTED AS WITHDRAWN)

5) prohibiting election officials from releasing results until after 7:00 p.m. on June 19, *see* Fed. R. Civ. P. 65 (MOOTED AS WITHDRAWN)