# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

|  |  |
|---|---|
| MARY T. THOMAS, NEA RICHARD, JEREMY RUTLEDGE, TRENA WALKER, THE FAMILY UNIT, INC., and the SOUTH CAROLINA STATE CONFERENCE OF THE NAACP,<br><br>                  Plaintiffs,<br><br>              v.<br><br> MARCI ANDINO, in her official capacity as Executive Director of the South Carolina State Election Commission; JOHN WELLS, in his official capacity as Chair of the South Carolina State Election Commission; JOANNE DAY, CLIFFORD J. EDLER, LINDA McCALL, and SCOTT MOSELEY, in their official capacities as members of the South Carolina Election Commission; and HENRY D. McMASTER, in his official capacity as Governor of South Carolina,<br><br>                  Defendants. | Case No.: 3:20-cv-01552-JMC<br><br>FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

## INTRODUCTION

1.    On March 15, 2020, when State health officials reported just 28 confirmed cases of COVID-19 in South Carolina,[1] the Election Commission affirmed its mission "to ensure every eligible citizen has the opportunity to . . . participate in fair and impartial elections, and have the assurance that their votes will count."[2]  These are laudable goals, crucial to safeguarding the

---

[1] *See* Press Release, DHEC Announces Additional Nine Cases of 2019 Novel Coronavirus in South Carolina, scdhec.gov (Mar. 15, 2020), https://www.scdhec.gov/news-releases/dhec-announces-additional-nine-cases-2019-novel-coronavirus-south-carolina.

[2] *See* Coronavirus (COVID-19) Updates, Securing South Carolina Elections, SCvotes.org (Mar. 15, 2020), https://www.scvotes.org/securing-south-carolina-elections.

fundamental right to vote of all South Carolina electors.  But months into a deadly pandemic that

now afflicts thousands of South Carolinians, which prompted Governor McMaster to first order

all residents to remain at "home or work" and then to order observance of rigorous social

distancing measures and school closures under a continued series of State of Emergency orders,

it is now clear that two requirements of the election laws will deprive thousands of the chance to

participate in scheduled South Carolina elections by forcing upon voters like the individual

Plaintiffs the dilemma of risking their community's and their own health to vote or not voting at

all.

2.      Plaintiffs bring this action to prevent the needless deprivation of their fundamental

right to vote.

3.      First, Plaintiffs challenge the requirement setting forth exclusive categories of

"[p]ersons qualified to vote by absentee ballot," in South Carolina (the "Excuse Requirement").

S.C. Code Ann. § 7-15-320.  A voter who does not qualify under any of the listed categories has

to vote in person on Election Day, or not at all.  On May 12, 2020, the South Carolina General

Assembly passed, and on May 13, 2020, Governor McMaster signed into law, S.C. Act 133,

permitting all qualified voters to vote by absentee ballot for the June 9 and June 23, 2020

primaries.  The new law expired on July 1, 2020, and as such it will not be in effect for

remaining 2020 election dates.

4.      Since the start of this action, Defendants have represented to this Court that the

Excuse Requirement affords an excuse to vote absentee to eligible voters who "live in a nursing

home or long-term facility, are immunocompromised, or who have conditions like asthma,

severe obesity, chronic lung disease, diabetes, serious heart conditions, kidney diseases requiring

dialysis, and liver disease."  Dkt. No. 46, at 12.  That is a welcome clarification, which will offer

2

helpful guidance to thousands of South Carolinians.  But none of the listed absentee "excuses" apply to thousands of voters, including members of organizational Plaintiffs the Family Unit and the South Carolina State Conference of the NAACP, who do not have one of these conditions and would surely vote in person at their polling site but for the ongoing COVID-19 pandemic. The Excuse Requirement will therefore force South Carolina voters to make an untenable decision between risking their health and the health of their families or giving up their right to vote.  Plaintiffs seek relief enjoining the Excuse Requirement insofar as it unreasonably burdens their fundamental right to vote while following South Carolina's directive to practice recommended physical distancing to protect their and their community's health from community transmission of the novel coronavirus.  Additionally, the Excuse Requirement violates Title II of the Americans with Disabilities Act.

5.    Second, Plaintiffs challenge the constitutionality of South Carolina's witness signature requirement on absentee ballots, codified at S.C. Code Ann. § 7-15-220 (the "Witness Requirement," and collectively with the Excuse Requirement, the "Challenged Requirements"). State law requires all mail-in ballots be signed by a third-party witness in addition to the voter, otherwise an absentee ballot goes uncounted.  In the current environment, this poses an unreasonable obstacle to many South Carolina voters, like Plaintiff Mary Thomas, who lives alone and cannot risk contact with third parties while the threat of contagion continues—whether to vote in person or to obtain a witness signature.  The Witness Requirement also violates Title II of the Americans with Disabilities Act and Section 2 of the Voting Rights Act.

6.    The Witness Requirement threatens to disenfranchise thousands of voters like Ms. Thomas: almost 30% of the State's residents (about 560,000) live by themselves, and well over 200,000 South Carolinians over 65 years of age—one of the groups most vulnerable to

3

COVID-19—live alone.[3]

7.      As a result, on May 25, 2020, the Court granted the Plaintiffs' Motion for Preliminary Injunction as to the Witness Requirement and enjoined Defendants, their respective agents, officers, employees, successors, and all persons acting in concert with each or any of them from enforcing the Witness Requirement on registered absentee voters in the June 2020 primaries and any resulting runoff elections only.  The Court further ordered the Defendants to inform South Carolina voters about the elimination of the Witness Requirement for absentee voting during the June 2020 primaries by informing the public on all relevant websites and social media outlets.  The Defendants complied with and implemented this order.

8.      The Challenged Requirements' impact will also fall more heavily on Black voters in South Carolina, who both live alone in larger percentages than the population as a whole and who are being afflicted by COVID-19 at stunningly disproportionate rates and currently comprise over 44% of the State's virus-related deaths despite making up just 27% of its total population.[4]  South Carolina's history of voting-related discrimination against Black people, as well as continued discrimination in areas such as education, employment, and healthcare, interacts with the Challenged Requirements to hinder their ability to participate effectively in the political process in violation of Section 2 of the Voting Rights Act.

9.      COVID-19 is an unprecedented public health emergency.  The current crisis

---

[3] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: Selected Social Characteristics of the United States: South Carolina (2018), https://data.census.gov/cedsci/table?q=south%20carolina%20single%20person%20households&g=0400000US45&hidePreview=false&tid=ACSDP1Y2018.DP02&vintage=2018&layer=VT_2018_040_00_PY_D1&cid=DP02_0001E (last visited June 23, 2020).

[4] DHEC S.C. Demographic Data (COVID-19), https://scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/sc-demographic-data-covid-19 (last updated July 7, 2020).

remains acute and will continue to pose a significant public health risk in the fall.[5]  Indeed, models project that infections will rebound in the fall, even if the current outbreak subsides before then.[6]  In this context, the two challenged requirements will each, separately and jointly, unduly burden the right to vote of South Carolina voters voting in the remaining elections in the 2020 calendar year.

10.    Neither of the requirements' undeniable burdens on voters are justified.  South Carolina already allows voters to vote absentee if they cannot vote in person "because of injury or illness."  S.C. Code Ann. § 7-15-310.  But Defendants' current interpretation of state law does not recognize that voters who choose to stay home to mitigate the spread of COVID-19 are *all* unable to vote in person because of an illness, whether or not they have knowingly contracted the disease.  The State could remedy the unconstitutional disenfranchisement that the qualification requirement will cause by allowing voters to vote absentee for that reason in all remaining 2020 elections, as public officials in numerous states have already done during the current crisis.  The State has acknowledged it can do so by removing restrictions to absentee ballot eligibility for the June 2020 primaries, but the public health concerns and safety risk posed by COVID-19 that prompted South Carolina to take this action require absentee voting restrictions be removed for all remaining 2020 elections.

11.    And while election integrity is a critical interest, the witness signature rule does

---

[5] *See* Inst. for Health Metrics & Evaluation, COVID-19 Projections: South Carolina, https://covid19.healthdata.org/united-states-of-america/south-carolina (last updated July 7, 2020).

[6] *See Dr. Fauci Anticipates Coronavirus Outbreak in the Fall*, COUNTON2 NEWS (Mar. 31, 2020) ("Fauci said he anticipates coronavirus will be cyclical and return in the fall because of its degree of transmissibility."), https://www.counton2.com/news/national-news/dr-fauci-anticipates-coronavirus-outbreak-in-the-fall/.

very little if anything—nor is it properly tailored—to serve this interest in light of the many other provisions of South Carolina law that safeguard absentee voting and penalize those who abuse the process. Indeed, the fact that South Carolina is one of only 11 states that require an individual submitting an absentee ballot to have another adult witness and sign their ballot envelope further underscores the requirement's lack of necessity. Regardless, whatever additional marginal benefit the witness rule may offer, such benefit is greatly outweighed by the risk of disenfranchisement.

12.     Plaintiffs therefore ask that the Court enjoin South Carolina's limitations on qualifications to vote by means of an absentee ballot and its absentee witness rule and declare them unconstitutional for the duration of the 2020 election calendar.

## **PARTIES**

13.     Plaintiff Mary Thomas is an 86-year-old retiree who lives alone at her residence in Charleston, South Carolina. She is a U.S. citizen, has never lost her right to vote by reason of a felony conviction or court order, and is a registered South Carolina voter. She is Black. Before retiring, Ms. Thomas worked as a licensed public nurse (LPN) and as a clinical pastoral chaplain. Ms. Thomas is at risk of severe complications from the novel coronavirus and COVID-19 because of her age and preexisting medical conditions, including hypertension and gout. She is partially blind. She has voted absentee in South Carolina for over twenty years, either by reason of being physically disabled or because she is over 65 years of age. Ms. Thomas has been quarantining herself since approximately mid-March and has cut off all in-person contact with others unless absolutely necessary—*e.g.*, because of a health emergency. She intends to vote absentee again in this year's elections, including the June primary and November general elections, in part, to avoid the documented risk that COVID-19 poses to her health and life. Ms.

Thomas understands that a witness signature is needed to vote absentee in South Carolina in the November general election. However, because she lives alone and is currently adhering to a strict self-quarantine, she has no way to obtain a witness's signature on her absentee ballot without gravely endangering her health.

14.     Plaintiff Nea Richard is a 22-year-old Black student at Claflin University, a historically Black university in Orangeburg, South Carolina. She is a U.S. citizen, and is a lawfully registered voter in her hometown of Cross Hill, South Carolina. Though her school has transitioned to online instruction, Ms. Richard continues to reside in Orangeburg. While in school, Ms. Richard has travelled two hours to Cross Hill for each election so that she can vote in person and serve as a poll worker. She intends to vote in person and serve as a poll worker again in Cross Hill for the remaining 2020 elections. From Ms. Richard's experience as a poll worker, she is familiar with the many forms of close contact that poll workers and voters are forced to make at polling sites, like sharing pens and touching voting machine screens. If the Challenged Requirements are not eliminated, Ms. Richard reasonably fears that the Challenged Requirements will significantly increase congestion at her precinct, make it nearly impossible to properly clean the precinct, and will needlessly contribute to the spread of COVID-19 and potentially her own infection. The elimination of the Challenged Requirements will protect Ms. Richard and other people in the precinct by meaningfully reducing the number of in-person voters and lowering the concomitant increased risk of transmission caused by excessive congestion due to the lack of alternatives to in-person voting for most voters.

15.     Plaintiff Reverend Jeremy Rutledge is a 49-year-old senior pastor of the Circular Congregational Church, located in Charleston. He is white. He resides in Mt. Pleasant, South Carolina. He is a U.S. citizen, has never lost his right to vote by reason of a felony conviction or

court order, and is a registered voter in South Carolina. Rutledge is at risk of severe

complications from the novel coronavirus and COVID-19 because he lives with systemic

scleroderma, a chronic, autoimmune disorder that affects the skin and internal organs.

Rutledge's condition has caused him to suffer from interstitial lung disease, which in the past has

caused severe scarring (fibrosis) of his lungs. For years, Rutledge has treated his medical

conditions with immunosuppressant medication. These drugs help Rutledge maintain a

relatively healthy, active life by preventing his immune system from dangerously causing his

lung tissue to thicken, but also make Rutledge particularly vulnerable to respiratory ailments like

COVID-19 and pneumonia. As a result, Rutledge has strictly self-quarantined himself at home

with his wife and son since at least mid-March and does not anticipate that he will feel safe

outside his home until a vaccine or cure for the novel coronavirus and COVID-19 have been

developed or found. As public officials ease social distancing restrictions before a vaccine or

cure are available, Rutledge has arranged for his family to live elsewhere so that his wife and son

return to work and school while he remains self-quarantined in their family home. Rutledge has

routinely voted in person on Election Day until the COVID-19 pandemic and does not consider

himself physically disabled. Under Defendants' interpretation of the Excuse Requirement, he

thus does not qualify to vote absentee. He must therefore either vote in person or forego his right

to vote in South Carolina elections. In the event that his wife and son return to work and school

and he remains self-quarantined by himself in their family home, Rutledge will have no way to

obtain a witness's signature on an absentee ballot without putting himself in grave danger of

severe illness.

     16.    Plaintiff Trena Walker is a 53-year-old, single caregiver to three children under 12

who lives in the Mixson development in North Charleston, South Carolina. She is Black and a

U.S. citizen. She is a lawfully registered South Carolina voter. She is presently unemployed; in the past, she has worked as a nursery teacher for preschoolers and as a teacher's assistant for the Charleston County School District. Ms. Walker is legally blind. She does not live with any person considered legally competent to sign legal documents in South Carolina. Ms. Walker intends to vote in the June primary and November general elections. She usually votes in person, but she is fearful of doing so again in forthcoming elections because her medical history of breast cancer and emphysema put her at high risk of grave complications from COVID-19. For that reason, Ms. Walker has followed social distancing and quarantine recommendations to the best of her ability and does not leave her home except when necessary to purchase food for herself and her children. Ms. Walker also closely follows public health officials' specific recommendations to Black people and is particularly reluctant to leave her home because of the disproportionately harmful effects that COVID-19 has already had on Black people. Ms. Walker expects she will not feel safe leaving her home until a vaccine against the virus is developed or a cure is identified. She is fearful that leaving her home will only become more dangerous as public officials ease social distancing restrictions before a vaccine or cure are available. Ms. Walker does not qualify to vote absentee under any of the state law "excuses" as interpreted by Andino and the SEC. If the Challenged Requirements were eliminated for the remainder of the 2020 elections, Ms. Walker would vote by absentee ballot to reduce the chances of contracting COVID-19.

17.    Plaintiff the Family Unit, Inc. is a 501(c)(3) nonpartisan, charitable nonprofit organization with the mission of empowering and serving the needs of the low-income community of Sumter County, South Carolina. The Family Unit is led by Dr. Brenda C. Williams. The Family Unit's constituents and members are mostly Black and/or low-income

people with a high school education or less.  As part of its mission, the Family Unit educates and registers voters, including people who are pretrial detainees; helps eligible voters to understand and perform absentee voting; restores abandoned homes and donates them to working-poor families to live in; helps people find employment; volunteers with elderly people; and advocates for improved school facilities for children in the Sumter County area. In recent years, the Family Unit's members and constituents have had their absentee ballots rejected because of the Witness Requirement.  The Family Unit's members and constituents include people with disabilities, including, but not limited to people with medical conditions that make them more susceptible to death or serious illness from COVID-19 and people who have or have had COVID-19.  The difficulties experienced by the Family Unit's members and constituents in attempting to vote absentee under the Challenged Requirements have been magnified substantially by the State's response to the COVID-19 pandemic.

18.    As a direct result of the Challenged Requirements, the Family Unit has been forced to divert its extremely limited resources and time away from its core activities to new activities, like investigating, responding to, mitigating, and addressing the concerns of its members and constituents impacted or disenfranchised by the Challenged Requirements as interpreted by Andino and the SEC and Defendants' inadequate efforts to protect voters from COVID-19 ahead of the 2020 elections.  For example, after learning about the impact of the Challenged Requirements on its members and constituents, Dr. Williams began an investigation that included requesting information from county election officials, interviewing affected voters, and reviewing information about the impact of the Challenged Requirements.  Based on data provided by election officials, every year, the ballots of hundreds of voters in each county are

rejected because of the Witness Requirement.  In absence of the Challenged Requirements, the Family Unit would not have had to engage in these activities.

19.    Plaintiff South Carolina State Conference of the NAACP ("South Carolina NAACP") is a nonpartisan, nonprofit organization composed of 35 branches and several thousand individual members throughout South Carolina.  It has members who are citizens and registered voters, and who will be directly impacted by the Challenged Requirements that effectively require voters to expose themselves and others to the grave effects of COVID-19 or else forego their right to vote.  For example, one member who has been practicing strict social distancing is over 80 years of age and has limited mobility.  She lives only with her husband, who has been diagnosed with dementia and is therefore unable to witness an absentee ballot. Like many others in the state, the only way that she would be able to vote is by violating social distancing rules and breaking self-quarantine at grave risk to her health and safety.  The South Carolina NAACP includes members who are unable to cast an absentee ballot because of the Excuse Requirement, but who have disabilities, including medical conditions that make them more susceptible to death or serious illness from contracting COVID-19, or who reasonably fear contracting COVID-19.  Many other members of the South Carolina NAACP will also be impacted by the documented disproportionate harm that COVID-19 is causing Black people.

20.    The fundamental mission of the South Carolina NAACP is the advancement and improvement of the political, educational, social, and economic status of minority groups; the elimination of racial prejudice; the publicizing of adverse effects of racial discrimination; and the initiation of lawful action to secure the elimination of racial bias.  To further this mission, the South Carolina NAACP advocates to ensure that the interests of the Black community are represented in local, state, and national legislative bodies by representatives who share the

community's interests, and who will be accountable to the community. The South Carolina

NAACP encourages and facilitates nonpartisan voter registration drives by its chapters to

promote civic participation. The current health crisis has largely disrupted the organization's

efforts to meet and organize members and voters in person. Because of state and federal social

distancing guidelines and the Challenged Requirements, the South Carolina NAACP has been

forced to divert its resources from its usual get-out-the-vote efforts to instead engage in new

activities, like press strategies and host virtual meetings to direct its members to demand that

their elected officials take urgent action to address the Challenged Requirements, to protect the

health and voting rights of their communities during the pandemic. If the Challenged

Requirements remain in effect, the South Carolina NAACP will be required to provide additional

rides to the polls or assistance to voters in obtaining a witness signature, and be required to

answer additional questions regarding how to vote at all from members and constituents who

desire to vote while attempting to comply with social distancing guidance.

21.    Defendant Marci Andino is the Executive Director of the South Carolina Election

Commission and is sued in her official capacity. The Executive Director is the Chief

Administrative Officer for the State Election Commission and is required by law to supervise the

County Boards of Voter Registration and Elections. S.C. Code Ann. § 7-3-20. In this role, she is

tasked with ensuring that the County Boards comply with state and federal law in conducting

elections and voter registration. *Id.* § 7-3-20(C).

22.    Defendant John Wells is the Chair of the South Carolina Election Commission

and is sued in his official capacity. Defendants JoAnne Day, Clifford J. Edler, Linda McCall,

and Scott Moseley are members of the South Carolina Election Commission and are sued in their

official capacities. The Executive Director serves at the pleasure of the South Carolina Election

Commission. S.C. Code Ann. § 7-3-20(A). The mission of the South Carolina Election Commission is "to ensure every eligible citizen has the opportunity to register to vote and participate in fair and impartial elections with the assurance that every vote will count."[7]

23. Defendant Henry D. McMaster is the Governor of South Carolina. As Governor, the South Carolina Constitution vests in him the "supreme executive authority" of the State. S.C. Const. Art. IV, § 1. He has statutory power to proclaim an emergency in the State and may "cope with such threats and danger" as it presents pursuant to his authority to "order and direct any person or group of persons to do any act which in his opinion, endanger life, limb or property." S.C. Code Ann. § 1-3-430. He has "full power by use of all appropriate available means to enforce such order or proclamation." *Id.*

## JURISDICTION AND VENUE

24. This action arises under the First and Fourteenth Amendments to the U.S. Constitution, the Americans with Disabilities Act, and the Voting Rights Act and is brought under 42 U.S.C. §§ 1983 and 1988 and 52 U.S.C. § 10301 to seek injunctive and declaratory relief for violations of constitutional rights under color of state law. This Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

25. This Court has personal jurisdiction over Defendants, who are sued in their official capacities as state officials. The violations complained of concern their conduct in such capacities.

26. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

27. Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants reside in this

---

[7] *See* S.C. Election Comm'n, *About the SEC, Mission Statement*, https://www.scvotes.org/about-sec (last visited July 8, 2020).

judicial district, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claims occurred there.

## STATEMENT OF FACTS

**I.    Transmission of COVID-19 and Public Health Guidelines**

28.    Our nation faces a public health emergency caused by the exponential spread of COVID-19, the respiratory disease caused by the novel coronavirus SARS-CoV-2.  According to the CDC, the coronavirus spreads aggressively and asymptomatic people can spread it.[8]  All age groups have contracted the disease.[9]

29.    The United States is the current epicenter of the global COVID-19 pandemic.  As of early July, the United States led the world in the total number of COVID-19 cases, surpassing previous leaders China and Italy.  The Centers for Disease Control and Prevention (CDC) presently estimates that between 140,000 and 160,000 people will have died from COVID-19 by August 1.[10]

30.    The CDC estimates that approximately 20% of those who are infected by SARS-CoV-2 require hospitalization.[11]  COVID-19 can severely damage lung tissue, cause a permanent loss of respiratory capacity, and also damage tissues in the kidney, heart, and liver.  The surge of

---

[8] Ctrs. for Disease Control & Prevention, *How Coronavirus Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last updated June 16, 2020).

[9] Robert Verity, PhD. et al., Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis, Lancet Infec Dis (March 30, 2020), 6.

[10] Ctrs. for Disease Control & Prevention, *Forecasts of Total Deaths*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/forecasting-us.html (last updated July 6, 2020).

[11] Ctrs. for Disease Control & Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last updated June 30, 2020).

COVID-19 cases causes mounting strains on healthcare systems, including critical shortages of doctors, nurses, hospital beds, medical equipment, and personal protective equipment (PPE).

31.    People of all ages have contracted COVID-19 and died from it, but the illness poses special risks for the elderly and those with certain preexisting medical conditions. Preliminary reports based on WHO data show a 3.6% mortality rate for individuals between 60-69 years old, an 8.0% mortality rate for those 70-79 years old, and a 14.8% mortality rate for those who are 80 years old or older.[12]  COVID-19 also poses greater risks for people with preexisting heart and respiratory conditions, individuals with compromised immune systems, and those with many other conditions.[13]

32.    The effects of the pandemic on social life will last well into the fall of 2020, if not much longer.  Even into the summer months, experts have indicated that COVID-19 "will face less immunity and thus transmit more readily even outside of the winter season," and that season changes are "unlikely to stop transmission."[14]  Further, even those who develop an immune response to the virus after an infection are not necessarily safe from reinfection, as we still do not yet have sufficient data about how long immunity to the virus will last.[15]  Dr. Anthony Fauci,

---

[12] *Id.*

[13] Ctrs. for Disease Control & Prevention, *People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last updated June 25, 2020).

[14] Marc Lipsitch, DPhil, Professor of Epidemiology and Director, Center for Communicable Disease Dynamics, Harvard T.H. Chan School of Public Health, *Seasonality of SARS-CoV-2: Will COVID-19 go away on its own in warmer weather?,* https://ccdd.hsph.harvard.edu/will-covid-19-go-away-on-its-own-in-warmer-weather/.

[15] Apoorva Mandavilli and Katie Thomas, *Will an Antibody Test Allow Us to Go Back to School or Work?*, N.Y. TIMES (Apr. 10, 2020), https://www.nytimes.com/2020/04/10/health/coronavirus-antibody-test.html.

head of the National Institute of Allergy and Infectious Diseases, has said that he "can't guarantee" in-person voting will be safe in November, because of a potential resurgence of COVID-19 in the fall.[16]

33.    With no known effective treatment, and vaccines still months (or more) away, public health officials have been left to urge the public to practice 'social distancing,' frequent (and thorough) hand washing, and avoidance of close contact with others.[17]

34.    The majority of American voters still vote in person, at a polling place, on Election Day.[18]  To some—such as homeless, visually impaired, limited English proficient or illiterate voters who need accessible voting machines and personal assistance—meaningful opportunities to physically vote in person early or on Election Day are critical.  For this reason, the CDC has issued specific guidelines concerning voting during the COVID-19 pandemic.[19] Among other things, these guidelines stress that "[t]he more an individual interacts with others, and the longer that interaction, the higher the risk of COVID-19 spread."[20]  Accordingly, the CDC warns that "[e]lections with only in-person voting on a single day are higher risk for

---

[16] Jason Silverstein, *Fauci says he "can't guarantee" in-person voting in November will be safe,* CBS NEWS (Apr. 13, 2020), https://www.cbsnews.com/news/coronavirus-fauci-says-he-cant-guarantee-in-person-voting-in-november-will-be-safe/?ftag=CNM-00-10aac3a.

[17] Johns Hopkins University, *Coronavirus, Social Distancing and Self-Quarantine*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine (last visited June 23, 2020); Declaration of Dr. Jonathan Louis Golob at ¶ 8, ECF No. 5, *Dawson v. Asher*, 2:20-cv-00409-JLRMAT (W.D. Wash. Mar. 16, 2020).

[18] *See, e.g.*, Jordan Misra, *Behind the 2018 U.S. Midterm Election Turnout*, Census.gov (Apr. 23, 2019) (showing 60% of voters who cast ballot in 2018 did so "in person on Election Day"), https://www.census.gov/library/stories/2019/04/behind-2018-united-states-midterm-election-turnout.html.

[19] Ctrs. for Disease Control & Prevention, *Considerations for Election Polling Locations and Voters: Interim Guidance to Prevent Spread of Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated June 22, 2020).

[20] *Ctrs. for Disease Control &* Prevention, *supra note 22.*

16

COVID-19 spread because there will be larger crowds and longer wait times."[21]

35.    The CDC election guidelines emphasize that "[l]ower risk election polling settings" include those with: (i) "a wide variety of voting options;" (ii) "longer voting periods (more days and/or more hours);" and "any other feasible options for reducing the number of voters who congregate indoors in polling locations at the same time."[22]

36.    The CDC guidelines for conducting safe elections during the COVID-19 pandemic encourage election officials and poll workers to "promot[e] behaviors that reduce spread."[23]  Among these, it recommends that voters should be reminded "upon arrival to leave space between themselves and others" and "to stay at least 6 feet apart."[24]

37.    These are essential recommendations given the relatively minimal risks of voting by mail during the pandemic versus voting in person.  There is no evidence that SARS-CoV-2 can be spread through the mail, and the U.S. Postal Service has further changed their policies to "eliminate the requirement that customers sign our Mobile Delivery Devices for delivery" and now require the customer "to step back a safe distance or close the screen door/door so that they may leave the item in the mail receptacle or appropriate location by the customer door."[25]

38.    In contrast, the risks of interpersonal interaction while voting are already evident. During Florida's April primary, two Broward County poll workers tested positive for COVID-

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] United States Postal Service. *USPS Statement on Coronavirus* (April 30, 2020), https://about.usps.com/newsroom/statements/usps-statement-on-coronavirus.htm (citing guidance from the CDC).

19, one of whom was handling driver's license as part of the identification verification process.[26] And on April 13, Chicago officials reported that a poll worker for the city's March 17 election died of COVID-19, prompting officials to send letters notifying voters, poll workers, field investigators, and cartage companies who were present at the same polling site.[27]

39.    Elections held on April 7 in Wisconsin saw multi-hour waits and lines stretching blocks upon blocks in places like Milwaukee and Green Bay, in part, because officials faced a huge backlog of requests for absentee ballots and questions about voting absentee, including how to properly request an absentee ballot and how to return it in time to be considered. Election officials also dealt with a reduced number of poll workers due to age, fears of illness, or actual illness. Cities were forced to close polling locations, and these closures impacted voters unequally. The city of Madison had over 60 open polling sites, while in Milwaukee—a city more than twice Madison's size, with a population of roughly 600,000—only 18,803 voters cast ballots in person, because all but five of the city's 180 polling locations had closed.[28]

40.    Under these circumstances, "the extent of the risk of holding [the] election ha[d] become increasingly clear" well before the day of the primary.[29]  Indeed, the likely consequences

---

[26] Anthony Man, *Two Broward poll workers, including one who handled voters' driver licenses, test positive for coronavirus*, S. FLA. SUN SENTINEL (Mar. 26, 2020), https://www.sun-sentinel.com/coronavirus/fl-ne-browardelections-poll-workers-coronavirus-20200326-wmgy775dvjc5jis2oagxlpmule-story.html.

[27] *See* Mary Ann Ahern, *Poll Worker at Chi. Voting Site Dies of Coronavirus, Election Officials Say*, NBC CHICAGO (Apr. 13, 2020), https://www.nbcchicago.com/news/local/chicago-politics/poll-worker-at-chicago-voting-site-dies-of-coronavirus-election-officials-say/2255072/.

[28] Jason Calvi, *'2 Different Cities:' Milwaukee Had 5 Polling Sites During COVID-19 Election, Madison Had 60+*, Fox 6 Now (last updated Apr. 9, 2020), https://fox6now.com/2020/04/08/2-different-cities-milwaukee-had-5-polling-sites-during-covid-19-election-madison-had-60/.

[29] *Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-00249, 2020 WL 16383374, at *1 (W.D. Wis. Apr. 2, 2020).

were readily apparent, including "a dramatic shortfall in the number of voters on election day as compared to recent primaries" and "a dramatic increase in the risk of cross-contamination of the coronavirus among in-person voters, poll workers, and, ultimately, the general population in the State."[30]

41.    By April 29, health officials in Wisconsin had identified at least 52 individuals who either voted in-person or worked at a polling location on election day and since tested positive for COVID-19.[31]  And an Economists' study of the Wisconsin primary has found a "statistically and economically significant association between in-person voting and the spread of COVID-19 two to three weeks after the election."[32]

## II.    COVID-19 in South Carolina

42.    The COVID-19 pandemic has deeply affected the Palmetto State.  As of July 9, 2020, the State had confirmed 50,548 cases.[33]  Over 890 South Carolinians have died from the disease.[34]

43.    Models used by health officials predict that the State will continue to see growing

---

[30] *Id.*

[31] Scott Bauer, *52 Who Worked or Voted in Wisconsin Election Have COVID-19*, ABC NEWS (Apr. 29, 2020), https://abcnews.go.com/Health/wireStory/52-worked-voted-wisconsin-election-covid-19-70406317 (explaining that "[a]fter May 7, the state will stop asking people who test positive for the virus whether they were at the polls a month earlier").

[32] Chad D. Cotti et al., *The Relationship Between In-Person Voting and COVID-19: Evidence from the Wisconsin Primary*, at 1, National Bureau of Econ. Research (last revised June 2020), https://www.nber.org/papers/w27187.pdf; *see also* Alex Seitz-Wald, *7 Wisconsin Coronavirus Infections Linked to Election Day, Health Official Says*, NBC NEWS (Apr. 21, 2020), https://www.nbcnews.com/politics/2020-election/7-wisconsin-virus-cases-linked-person-voting-n1188606.

[33] DHEC News Releases, *S.C. Announces Latest COVID-19 Update* (July 9, 2020), https://www.scdhec.gov/news-releases/south-carolina-announces-latest-covid-19-update-july-9-2020.

[34] *Id.*

numbers of infections and deaths through early October.[35]  These models project a sustained

outbreak in South Carolina will continue well into the fall, if not longer.[36]

44.    In response, the South Carolina Department of Health and Environmental Control

("DHEC") has urged social distancing by "staying home as much as possible, staying at least

6 feet away from other people while in public, and avoiding gatherings with many people

present."[37]  According to DHEC, "[t]hese are the best ways to protect yourself and our

communities from the spread of COVID-19."[38]

45.    To combat viral spread, Governor McMaster has also taken a series of

increasingly aggressive steps since early March, including by issuing various executive orders.

Through these orders, most "non-essential" businesses and schools were subject to closure.[39]

46.    On March 13, Governor McMaster issued Executive Order No. 2020-08,

declaring a State of Emergency for South Carolina.[40]  On the same day, President Donald Trump

proclaimed a National Emergency concerning COVID-19.[41]

47.    On March 15, Governor McMaster issued Executive Order No. 2020-09, directing

---

[35] *See* Inst. for Health Metrics & Evaluation, *supra* note 6.

[36] *Id.*

[37] DHEC, *Protect Yourself & Those Around You (COVID-19)*, https://www.scdhec.gov/protect-yourself-those-around-you-covid-19 (last visited July 7, 2020).

[38] *Id.*

[39] S.C. Exec. Order No. 2020-07 (Mar. 11, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-11%20FILED%20Executive%20Order%20No.%202020-07%20-%20Suspending%20Transportation%20Regulations%20Due%20to%20NC%20Emergency%20%20Coronavirus%20(002).pdf.

[40] *Id.*

[41] Proclamation No. 9994, 85 Fed. Reg. 15337 (2020),  https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

the closure of all public schools in South Carolina beginning Monday, March 16 through Tuesday, March 31, 2020.[42]

48.    Executive Order No. 2020-09 also postponed or rescheduled all elections scheduled to be held in the state on or before May 1, 2020.[43]  It delegated responsibility to the SEC to ensure that candidate filing period(s) continued and that individuals could continue to register to vote.  Town, city, and county referendums and elections planned for March 19, March 24, March 31, April 7, April 14, and April 28 were all postponed accordingly.[44]

49.    On March 27, President Trump approved a major disaster declaration for South Carolina, which made federal emergency aid available for recovery efforts due to the COVID-19 pandemic.[45]

50.    On March 28, Governor McMaster issued Executive Order No. 2020-15, declaring a "new, separate, and distinct" state of emergency based on his determination that COVID-19 posed an "actual, ongoing and evolving public health threat" to the State of South

---

[42] S.C. Exec. Order No. 2020-09 §2 (Mar. 15, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-15%20FILED%20Executive%20Order%20No.%202020-09%20-%20Closing%20Schools%20Cancelling%20Elections%20Other%20Provisions%20Due%20to%20COVID-19.pdf.

[43] S.C. Exec. Order No. 2020-09 §3 (Mar. 15, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-15%20FILED%20Executive%20Order%20No.%202020-09%20-%20Closing%20Schools%20Cancelling%20Elections%20Other%20Provisions%20Due%20to%20COVID-19.pdf.

[44] S.C. Election Comm'n, *March & April Elections Postponed Due to Coronavirus* (Mar. 15, 2020), https://www.scvotes.org/march-april-elections-postponed-due-coronavirus.

[45] *See* FEMA, *President Donald J. Trump Approves Major Disaster Declaration for South Carolina* (Mar. 27, 2020), https://www.fema.gov/news-release/2020/03/27/president-donald-j-trump-approves-major-disaster-declaration-south-carolina.

Carolina.[46]

51.    On March 31, Governor McMaster issued Executive Order No. 2020-17, directing "non-essential" businesses to close to non-employees and the public.  That order was followed by Executive Order No. 2020-18 on April 3, which expanded the definition of "non-essential" businesses that should be closed to non-employees and the public to include retail stores.[47]

52.    On Monday, April 6, Governor McMaster issued Executive Order No. 2020-21, a mandatory statewide "Home or Work" order requiring "[a]ll South Carolinians [to] remain at home or work unless visiting family, exercising, or obtaining goods or services."[48]  The order instructed residents of the State to "limit social interaction, practice 'social distancing' . . . and take every possible precaution to avoid potential exposure to" viral infection.  It directed individuals in South Carolina to "take reasonable steps to maintain six (6) feet of separation from any other person."[49]  It ordered residents to limit movement outside the home except for the

---

[46] S.C. Exec. Order No. 2020-15 (Mar. 28, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-28%20eFILED%20Executive%20Order%20No.%202020-15%20-%20State%20of%20Emergency%20Due%20to%20COVID-19%20Pandemic.pdf.

[47] S.C. Exec. Order No. 2020-18 §1(B) (Apr. 3, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-03%20eFILED%20Executive%20Order%20No.%202020-18%20-%20Closure%20of%20Additional%20Non-Essential%20Businesses.pdf.

[48] S.C. Exec. Order No. 2020-21 at 6 (Apr. 6, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-06%20eFILED%20Executive%20Order%20No.%202020-21%20-%20Stay%20at%20Home%20or%20Work%20Order.pdf; see also Off. of Gov. McMaster, Governor McMaster Issues "Home or Work" Order, SC.Gov (Apr. 7, 2020), https://governor.sc.gov/news/2020-04/governor-mcmaster-issues-home-or-work-order.

[49] S.C. Exec. Order No. 2020-21 (Apr. 6, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-06%20eFILED%20Executive%20Order%20No.%202020-21%20-%20Stay%20at%20Home%20or%20Work%20Order.pdf.

purposes of visiting essential businesses, engaging in essential activities, or conducting critical

infrastructure operations.

53.    In issuing the "Home or Work" order, Governor McMaster explained that he took

the steps, in part, because "[t]oo many people are not complying with [our] requests for social

distancing."[50]  Additionally, he clarified that, while not named as such, his April 6 order was a

"stay-at-home order."[51]

54.    The April 6 "Home or Work" order expressly exempted gatherings of government

officials, employees, or personnel needed to perform "essential government functions," but

directed state and local governments to "utilize any available technology or reasonable

procedures" to "accommodate public participation via virtual or other remote or alternate means"

in those functions "to the extent possible."[52]

55.    This Court took similar steps in light of the pandemic, including closing the

Clerk's Office public counters until further notice.[53]  On April 14, this District Court continued

"[a]ll civil and criminal jury selections, jury trials, and roster meetings scheduled to commence

through July 5, 2020."[54]

56.    On April 16, Governor McMaster sent a letter to the leadership of the State's

General Assembly to inform them of his view that the legislature should avoid returning for

---

[50] Joseph Bustos & Maayan Schechter, *Gov. McMaster toughens SC coronavirus stance, ordering state to work or 'stay home'*, THE STATE (Apr. 6, 2020),
https://www.thestate.com/news/coronavirus/article241807571.html.

[51] *Id.* ("Asked on Monday why not call his new executive order a 'stay-at-home' mandate, the governor said: 'This is a stay-at-home order.  You call it what you like, but it says, 'stay at home.'").

[52] *Id.*

[53] *In re: District Clerk's Office Operations*, Misc. No. 20-mc-00122, Doc. No. 1 (D.S.C. Mar. 31, 2020).

[54] *In re: Court Operations Response to COVID-19*, Misc. No. 20-mc-00139, Doc. No. 1 (D.S.C. Apr. 14, 2020).

session any time before May 14, which "could place the health and safety of [its] members at an elevated risk for exposure to the virus." A true and accurate copy of Governor McMaster's letter is attached hereto as Exhibit 1.

57. On April 20, Governor McMaster issued Executive Order No. 2020-28, which, in relevant part, modified and amended his April 6 "Home or Work" order to ease restrictions on public beach use and on certain retail businesses including furniture, clothing, jewelry, and department stores.[55] These and other listed businesses were authorized to re-open for business to the public as of 5:00 p.m. on April 20, provided they strictly follow social distancing measures.[56]

58. On April 27, Governor McMaster issued Executive Order No. 2020-29, which declared a new state of emergency for 15 days.[57] On May 1, 2020 and May 3, 2020, Governor McMaster issued additional executive orders altering restrictions on vacation rentals[58] and outdoor dining,[59] respectively, while "urg[ing] any and all residents . . . [to] take every possible

---

[55] S.C. Exec. Order No. 2020-28 (Apr. 20, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-20%20FILED%20Executive%20Order%20No.%202020-28%20-%20Modification%20of%20Restrictions%20for%20Public%20Beaches%20%26%20Waters%20%26%20Incremental%20Modification%20of%20Non-Essential%20Business%20Closures.pdf.

[56] Gov. Henry McMaster (@henrymcmaster), TWITTER (Apr. 20, 2020, 5:15 PM), https://twitter.com/henrymcmaster/status/1252345270588698627.

[57] S.C. Exec. Order No. 2020-29 (Apr. 27, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Budget/2020-04-27%20eFILED%20Executive%20Order%20No.%202020-29%20-%20State%20of%20Emergency%20Due%20to%20COVID-19%20Pandemic%20Response%20%26%20Other%20Measures.pdf

[58] See S.C. Exec. Order No. 2020-30 (May 1, 2020) https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-05-01%20eFILED%20Executive%20Order%20No.%202020-30%20-%20Rescinding%20Self-Quarantine%2C%20Lodging%2C%20%26%20Travel%20Restrictions%20for%20Individuals%20Entering%20S.C.%20from%20High-Risk%20Areas.pdf

[59] S.C. Exec. Order No. 2020-31 (May 3, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-05-03%20eFILED%20Executive%20Order%20No.%202020-

precaution to avoid potential exposure to, and to slow the spread of, COVID-19, and further encourage residents and visitors . . . to limit their movements outside of their home."[60]

59.    On May 8, 2020, Governor McMaster issued Executive Order No. 2020-33, which set the date for previously postponed elections as July 14, 2020.[61]

60.    On May 12, 2020, Governor McMaster issued Executive Order No. 2020-35, which required the closure of all public schools for the remainder of the 2019–20 school year, completion of collegiate instruction through distance and virtual learning, and continued promotion of social distancing practices based on CDC guidance.[62]

61.    On May 15, Governor McMaster issued Executive Order No. 2020-36, which authorized certain businesses "previously deemed 'non-essential'" to re-open.[63]

62.    On May 21, Governor McMaster issued Executive Order No. 2020-37, which allows additional "non-essential" business to re-open.  This Executive Order keeps in place

---

31%20-%Modification%20of%20Home%20or%20Work%20Order%20%26%20Authorization%20of%20Outdoor%20Dining%20Services.pdf

[60] *Id.*

[61] S.C. Exec. Order No. 2020-33 (May 8, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-05-08%20FILED%20Executive%20Order%20No.%202020-33%20-%20Rescheduling%20Elections%20Postponed%20by%20Executive%20Order%20Nos.%202020-09%20%26%202020-29.pdf

[62] S.C. Exec. Order No. 2020-35 (May 12, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-05-12%20eFILED%20Executive%20Order%20No.%202020-35%20-%20State%20of%20Emergency%20to%20Facilitate%20COVID-19%20Pandemic%20Response%2C%20Testing%2C%20%26%20Other%20Measures.pdf

[63] S.C. Exec. Order No. 2020-36 (May 15, 2020), https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-05-15%20FILED%20Executive%20Order%20No.%202020-36%20-%20Additional%20Incremental%20Modification%20of%20Non-Essential%20Business%20Closures.pdf

recommended social distancing practices.

63.     On May 27, Governor McMaster issued Executive Order No. 2020-38, which declared a State of Emergency in South Carolina for 15 days and outlined emergency measures in accordance with the declaration of a State of Emergency.[64]

64.     On June 11, Governor McMaster issued Executive Order No. 2020-40, which declared another State of Emergency for 15 days.  The Order acknowledges the need for "additional proactive action and implement[ation] [of] further extraordinary measures to prepare for, respond to, and address the ongoing and evolving public health threat posed by the COVID-19 pandemic," due to the "different, additional, and intensifying" circumstances based on the state's sharp uptick in cases.  The Order implores "to the maximum extent possible" the continued use of social distancing practices.[65]

65.     South Carolina is one of the states currently experiencing a rise in COVID-19 cases, as of mid-June.  Following Governor McMaster's termination of the state's "Home or Work" (stay-at-home) order on May 4, South Carolina has seen sharp increases in COVID-19 cases and deaths, which are projected to continue into the fall.

66.     On June 10, 2020, Dr. Linda Bell, the head doctor of the DHEC, indicated she is

---

[64] S.C. Exec. Order No. 2020-38 (May 27, 2020), https://governor.sc.gov/sites/default/files/Documents/2020-05-27%20eFILED%20Executive%20Order%20No.%202020-38%20-%20State%20of%20Emergency%20to%20Facilitate%20Coordinated%20COVID-19%20Pandemic%20Response.pdf

[65]S.C. Exec. Order No. 2020-40 (June 11, 2020), https://governor.sc.gov/sites/default/files/Documents/2020-06-11%20eFILED%20Executive%20Order%20No.%202020-40%20-%20State%20of%20Emergency.pdf.

now "more concerned about COVID-19 in South Carolina than I have ever been before."[66]

67.    On June 10, the day before his announcement of this new Executive Order, Governor McMaster said during a press conference that "[t]his virus is with us. . . . It's not going to disappear . . . the hot weather is not going to kill it . . . and it's going to be here with us until a vaccine is created."[67]  The Governor emphasized the importance of continued social distancing and increased mask wearing.  Governor McMaster stated: "[t]he ultimate price in this lack of care is death."[68]  During the same press conference, Dr. Linda Bell noted that the uptick in cases and the failure of many in the state to wear masks and observe social distancing mean that it "will take us that much longer" to improve conditions in the state.[69]

68.    On June 26, Governor McMaster issued Executive Order No. 2020-42, which declared a new State of Emergency in South Carolina for 15 days.[70]

69.    On June 30, DHEC warned that "[t]he number of new positive cases in a day are a the highest they've ever been, as is the number of people currently hospitalized due to COVID-19 complications, which is currently more than 1,000."[71]  It added: "A lack of social distancing and mask-wearing is contributing to the state's escalating numbers."

---

[66] *I Am More Concerned About COVID-19 in South Carolina than I Have Ever Been Before,' Expert Says*, WLTX (June 10, 2020), https://www.wltx.com/article/news/local/south-carolina-coronavirus-cases-spiking-worrying-experts/101-f6c215d2-67db-4420-a1b0-372132a3156f.

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] S.C.    Exec.    Order    No.    2020-42    (June    26,    2020), https://governor.sc.gov/sites/default/files/Documents/2020-06-26%20eFILED%20Executive%20Order%20No.%202020-42%20-%20State%20of%20Emergency.pdf.

[71] DHEC, News Release*, DHEC Recommends Residents Stay Safer at Home for Fourth of July* (June 30. 2020), https://www.scdhec.gov/news-releases/dhec-recommends-residents-stay-safer-home-fourth-july.

70.    On June 30, Dr. Linda Bell stated: "[i]n addition to the disheartening increases in young people transmitting the virus to their family and friends, new data indicate that asymptomatic people can spread the virus more easily than initially thought."[72]

## III.    COVID-19's Impact on Black South Carolinians in Light of Ongoing and Historical Discrimination

71.    Nationally, the COVID-19 pandemic has had a particularly devastating effect on Black communities.  An analysis by the Associated Press—one of the first attempts to examine the racial disparities of COVID-19 cases and deaths nationwide—found that, in areas where the demographic data has been publicly shared by government officials, African  Americans have made up 42% of people who have died from COVID-19, despite accounting for roughly only 21% of the total population in these areas.[73]  And a CDC report published April 8, 2020, which included data from 1,482 patients hospitalized across 14 states, found that Black patients made up 33% of those for whom race or ethnicity information was available, despite representing only 18% of the states' populations.  This "suggest[ed] that black populations might be disproportionately affected by COVID-19."[74]

---

[72] Daniella DeRobbio, *DHEC: More and more individuals who test positive participated in group gatherings*, ABC4NEWS (June 30, 2020) (quoting Dr. Linda Bell), https://abcnews4.com/news/coronavirus/dhec-more-and-more-individuals-who-test-positive-participated-in-group-gatherings.

[73] Kat Stafford et al., *Outcry over Racial Data Grows as Virus Slams Black Americans*, ASSOCIATED PRESS (Apr. 8, 2020), https://apnews.com/71d952faad4a2a5d14441534f7230c7c?fbclid=IwAR1plunY_qfeA2KrSUPA1TuJobAwQh53a_Qlkf5dw0dWjz-iz85GA1FOt4.

[74] CDC Morbidity and Mortality Weekly Report, *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019—COVID-NET, 14 States, March 1-30, 2020* (Apr. 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6915e3-H.pdf.

72.    Courtney Cogburn, an associate professor at the Columbia University School of Social Work, noted that "[t]here are patterns at this intersection of race and socioeconomic status that make it very clear this is just not a story about poverty."  That is, racial disparities in serious illness and death due to COVID-19 are inextricably linked to a long history and ongoing patterns of racial discrimination against Black people:

> A history of systemic racism and inequity in access to health care and economic opportunity has made many African Americans far more vulnerable to the virus. Black adults suffer from higher rates of obesity, diabetes and asthma, which make them more susceptible, and also are more likely to be uninsured.  They also often report that medical professionals take their ailments less seriously when they seek treatment.[75]

73.    These trends were in view relatively early in South Carolina, which by early April had already "reported a ratio of Black residents to white residents who ha[d] tested positive for the virus that well exceeds the general population ratio."[76]  In South Carolina, there is well-documented and alarming racially disparate patterns of serious illness and mortality due to COVID-19.  As of June 30, Black people in South Carolina represented 33% of reported COVID-19 cases and a staggering 45% of related deaths[77] despite making up just 27% of the State's population.[78]  Based on these numbers, Black South Carolinians have been twice as likely to contract COVID-19 than white South Carolinians, and more than thrice as likely to die from it.

---

[75] Kat Stafford et al., *Outcry over racial data grows as virus slams black Americans*, ASSOCIATED PRESS (Apr. 8, 2020), https://apnews.com/71d952faad4a2a5d14441534f7230c7c?fbclid=IwAR1plunY_qfeA2KrSU-PA1TuJobAwQh53a_Qlkf5dw0dWjz-iz85GA1FOt4.

[76] *See* John Eligon et al., *Black Americans Face Alarming Rates of Coronavirus Infection in Some States*, N.Y. TIMES (Apr. 7, 2020).

[77] DHEC, *SC Demographic Data (COVID-19)*, https://scdhec.gov/sc-demographic-data-covid-19 (last visited June 30, 2020).

[78] U.S. Census Bureau, *QuickFacts South Carolina*, https://www.census.gov/quickfacts/SC (last visited June 23, 2020).

74.     South Carolina has long experienced patterns of racial discrimination in health and socioeconomic life patterns that render Black South Carolinians at greater risk of severe health complications from COVID-19.  For example, because of longstanding racial biases in medical care,[79] Black people with symptoms like cough and fever are less likely than other patients to be given one of the scarce COVID-19 tests.[80] Persistent structural inequalities mean that Black people have less access to healthcare, health insurance, or emergency medical help. DHEC has recognized that Black people are "disproportionately affected by [lack] of access to care,"[81] and that "[u]nderlying medical conditions such as diabetes, heart disease, hypertension, obesity, and asthma might make it more likely that African Americans are admitted to the ICU or die from the disease."[82]  Many of these underlying conditions, like asthma, result from the past and present policies that both relegate Black people to particular neighborhoods and that disproportionately allocate landfills, factories, and other environmental risks to these Black neighborhoods.[83]  Racial discrimination in South Carolina has also resulted in socioeconomic

---

[79] *See, e.g.*, Michael O. Schroeder, *Racial Bias in Medicine Leads to Worse Care for Minorities*, U.S. NEWS (Feb. 11, 2016), https://health.usnews.com/health-news/patient-advice/articles/2016-02-11/racial-bias-in-medicine-leads-to-worse-care-for-minorities

[80] *See* Rubix Life Sciences, Health Data in the COVID-19 Crisis: How Racial Equity is Widening for Patients to Gain Access to Treatment (Mar. 20, 2020), https://rubixls.com/wp-content/uploads/2020/04/COVID-19-Minority-Health-Access-7-1.pdf; *see also* Blake Farmer, *The Coronavirus Doesn't Discriminate, But U.S. Health Care Showing Familiar Biases*, NPR (Apr. 2, 2020), https://www.npr.org/sections/health-shots/2020/04/02/825730141/the-coronavirus-doesnt-discriminate-but-u-s-health-care-showing-familiar-biases.

[81] SouthCarolinaETV, *Governor's Update on Coronavirus (COVID-19) April 16, 2020*, YOUTUBE (Apr. 16, 2020), https://www.youtube.com/watch?v=Vv64tAZI_dY.

[82] Tonya Brown, *More African Americans are dying from COVID-19 than other races in South Carolina*, 15 NEWS (Apr. 9, 2020) (quoting DHEC statement), https://wpde.com/news/coronavirus/more-african-americans-dying-from-covid-19-in-south-carolina.

[83] *See, e.g.*, Ihab Mikati et al., *Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status*, 108 Am J. Pub. Health 480 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5844406/; Diane Alexander & Janet Currie, *Is it who you*

inequalities that disadvantage Black people, like higher rates of unemployment, disability,

poverty, and inadequate health insurance than white people.  These factors also make it more

likely that Black voters in South Carolina are forced to work outside the home even during the

current pandemic and are therefore more exposed to COVID-19.  For example, in South

Carolina, the ACS shows that 24.5% of Black people and just 15.2% of whites over age 16 work

in "blue collar" service occupations.  And 39.9% of white people versus only 23.1% of Black

people in South Carolina hold management or professional occupations—*i.e.*, "white collar" jobs

that are much more likely to allow employees to continue to work safely at home.  Dr. Jason

Cummings, a sociology professor at the University of South Carolina, recently highlighted these

concerns in noting: "[p]oor people, and people of color, are more likely to be exposed to other

people.  The idea of social distancing is really a privilege for those who have money and

resources[.]"[84]

## IV.    The COVID-19 Crisis and 2020 Elections in South Carolina

75.    Dozens of elections are still scheduled to take place in South Carolina before the

end of the calendar year, including major statewide elections on November 3.[85]

76.    On March 30, 2020, Defendant Marci Andino, acting in her capacity as Executive

Director of the South Carolina Election Commission, wrote various elected officials, including

Defendant Governor Henry McMaster.  A true and accurate copy of Director Andino's letter is

---

*are or where you live? Residential segregation and racial gaps in childhood asthma*, 55 J. Health Econ.
186 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6112984/.

[84] Fleming Smith et al., *Long-term inequities put SC minorities at higher risk for coronavirus exposure
and death*, THE POST & COURIER (Apr. 15, 2020) (quoting Dr. Jason Cummings),
https://www.postandcourier.com/health/covid19/long-term-inequities-put-sc-minorities-at-higher-risk-for-
coronavirus-exposure-and-death/article_9d557788-799d-11ea-a89e-a7d97f6247a1.html.

[85] *See* SCvotes, 2020 Election Calendar 1/1/2020 – 12/31/2020,
https://www.scvotes.org/sites/default/files/2020-04-08%20Schedule%20of%20Elections.pdf.

attached hereto as Exhibit 2 (hereinafter "SEC Letter").  The SEC Letter expressed the Commission's "concern[] about the safe conduct of the June Primaries, November General Election and all other elections scheduled for 2020."  Ex. 2 at 1.

77.    The SEC Letter stated the "main issue" in its view: "is that our elections, as currently prescribed by law, require large numbers of people to congregate in one place— something that everyone is currently being asked not to do by public safety and health officials." *Id.*  It added: "a large percentage of the state's poll managers fall into high risk categories, which would likely lead to a deficit in the number of managers needed to staff polling places."  *Id.* at 1-2.

78.    The SEC Letter recommended various "changes to our election process" that the SEC explained it understood were advisable "[i]n order to safely and securely conduct elections during and following the coronavirus pandemic."  *Id.* at 2.  At the top of the SEC Letter's listed options was the suggestion that South Carolina should "[a]llow no excuse absentee voting."  *Id.* The SEC Letter described adopting "no-excuse absentee voting" as a "relatively simple change." *Id.* at 4.  The SEC Letter also recommended "[r]emov[ing] the witness requirement on ballot return envelopes."  *Id.*

79.    On April 13, Defendant Andino also wrote the Hon. Alan M. Wilson, Attorney General of South Carolina, requesting an opinion from his office on how the SEC should interpret the definition of "physically disabled person," contained in S.C. Code Ann. § 7-15-310(4) for purposes of voter qualification to vote absentee.  Dkt. No. 46-8.

80.    Defendant Andino's April 13 letter to the Attorney General emphasized SEC was "looking to current absentee voting laws to see how voters who are staying at home to reduce the spread of the virus may be able to take advantage of by mail absentee voting."  *Id.*  It added that

the provisions of South Carolina law allowing qualified electors who are "physically disabled" or attending to those persons "do not expressly address voters who may not be sick or confirmed as having COVID-19, but must still risk exposure by physically attending a polling place on election day." *Id.* "Consistent with the mandate of [S.C. Code Ann.] § 7-15-20 that the [] laws 'shall be liberally construed in order to effectuate their purposes,'" Defendant Andino asked for clarification on "whether voters staying home due to the pandemic qualify for absentee voting under this reason." *Id.*

81.     On April 6, 2020, the South Carolina Association of Registration and Election Officials, Inc. (SCARE) wrote a letter to Governor McMaster, President of the Senate Harvey Peeler, and Speaker of the House Jay Lucas ("SCARE Letter").  Dkt. No. 46-7.  Defendant Andino received this letter from Katy D. Smith, SCARE President.  Dkt. No. 46-2, at 11.

82.     SCARE is an organization with active members comprised of county election or registration officials, full time clerks, and voting machine custodians.[86]  As Executive Director of SEC, Defendant Andino is the liaison to and works with SCARE.  Dkt. No. 46-2, at 11.

83.     The SCARE Letter shared SCARE's "concerns regarding our upcoming elections."  In particular, it noted the need for "a plan in place that protects our voters, staff, facility owners, communities, and poll managers in the midst and following a pandemic."  Dkt. No. 46-7, at 1.

84.     The SCARE Letter expressed SCARE's support for the "voting by mail method" that Defendant Andino discussed in the SEC Letter of March 30, "understanding that some components of the other proposed options are viable solutions that may be incorporated to help

---

[86] SCARE, *What is Scare?*, https://www.sccounties.org/sites/default/files/uploads/resources/Association-Groups/SCARE/what_is_scare.pdf (last visited July 8, 2020).

compose a complete workable plan and solution when conducting elections in this manner" Dkt. No. 46-7, at 1.

85.    On May 12, the South Carolina General Assembly passed Senate Bill 635, allowing all qualified voters to vote by absentee ballot for the June 9 and June 23, 2020 primary and runoff elections.[87]  On May 13, Governor McMaster signed S.635 into law.  The new law states in pertinent part, in Section 2(A):

> **Elections, absentee ballots, during the state of emergency, expiring on July 1, 2020.** Section 2. A. A qualified elector must be permitted to vote by absentee ballot in an election if the qualified elector's place of residence or polling place is located in an area subject to a state of emergency declared by the Governor and there are fewer than forty-six days remaining until the date of the election.

86.    On May 25, 2020, the Court granted the Plaintiffs' Motion for Preliminary Injunction as to the Witness Requirement and enjoined Defendants, their respective agents, officers, employees, successors, and all persons acting in concert with each or any of them from enforcing the Witness Requirement on registered absentee voters in the June 2020 primaries and any resulting runoff elections only.  The Court further ordered the Defendants to inform South Carolina voters about the elimination of the Witness Requirement for absentee voting during the June 2020 primaries by informing the public on all relevant websites and social media outlets. The Defendants complied with and implemented this order

87.    To date, Defendants have neither adopted nor implemented either recommendation of the SEC as to the November General Election.

88.    With the proposed changes in effect for the June 9 primary, rates of absentee

---

[87] S.J. Res. 635, 123rd Gen. Assemb. (S.C. 2020).

voting for the June 9 primary far outpaced those of both the 2016 and 2018 primaries.[88]

89.    However, even with this increase in absentee voting, shortages of election officials and a decreased number of polling locations resulted in long lines and hours-long wait times at in-person voting locations on June 9.[89]  For example, one elderly voter in Columbia waited for three and a half hours in 90-degree heat in order to vote curbside before leaving without voting, as she had made little progress toward the front of the line.[90]

90.    Officials closed polling locations for the June 9 primary because of staffing shortages related to COVID-19.  For example, during the June 9 primary elections, Richland County cut polling places in half, from 149 down to 70, citing staffing shortages as the reason.[91] For the remaining precincts that were operational, poll worker shortages were widely reported "because of fears of contracting coronavirus."[92]  Indeed, the interim election director of Richland

---

[88] Tim Scott, *South Carolinians Voting-by-mail in Record Numbers Ahead of June Primary*, ABC COLUMBIA (June 2, 2020), https://www.abccolumbia.com/2020/06/02/south-carolinians-voting-by-mail-in-record-numbers-ahead-of-june-primary/ (noting that one week before the June 9 primary, 143,000 absentee ballots had been issued, compared to 60,000 absentee ballots that were issued for the June 2016 and 2018 primaries).

[89] *See* Isabella Cueto, *At 11 p.m., Some Richland Residents Waited to Vote as Confusion Mars Primary*, THE STATE (June 9, 2020), https://www.thestate.com/news/politics-government/election/article243409471.html#storylink=cpy (explaining that many voters who were used to 15 to 20 minute wait times at their polling places in past elections were made to wait more than 3 hours to vote).

[90] Carrie Levine & Pratheek Rebala, *'I Wanted My Vote To Be Counted': In South Carolina, A Peek At Covid-19's Impact On Elections*, THE CENTER FOR PUBLIC INTEGRITY (June 22, 2020), https://publicintegrity.org/politics/elections/in-south-carolina-a-peek-at-covid-19s-impact-on-elections-polling-place/.

[91] Bristow Marchant and Emily Bohatch, *COVID-19 Concerns Lead Richland County to Cut Polling Places in Half for June Primary*, THE STATE (May 26, 2020), https://www.thestate.com/article242997221.html.

[92] Bristow Marchant, *Richland County Is Losing Hundreds of June Primary Poll Workers to Coronavirus Fears*, THE STATE (Apr. 29, 2020), https://www.thestate.com/news/politics-government/election/article242381961.html; *see also* Greg Hadley, *Voters Report Races Missing from*

County was unable to perform his duties for the June 23 runoff elections as he awaited his own COVID-19 test results.[93]

## V.    South Carolina's Absentee Voting Process

91.    South Carolina law sets out specific categories of qualified electors who may vote by mail ballot, known generally as "absentee voting."  S.C. Code Ann. § 7-15-320.  Section 7-15-320 of the South Carolina Code lists 15 such categories.  These include various categories of people absent from the jurisdiction in which they could vote in person on Election Day, including students, service members on active duty, overseas citizens, and people away from their county of residence on vacation.  *Id.* § 7-15-320(A).

92.    The election laws also set out several categories of qualified electors who may vote absentee "whether or not they are absent from their county of residence on election day."  *Id.* § 7-15-320(B).  This list includes "physically disabled persons."  *Id.*  Physically disabled persons are any "who, because of injury or illness, cannot be present in person at his voting place on election day."  *Id.* § 7-15-310.

93.    Senate Bill 635, as signed into law on May 13, qualified all voters to vote by absentee ballot during the June primary and runoff elections.  This provision, however, expires on July 1, 2020 and will not be in place for the remaining 2020 calendar year elections.

94.    Individuals may request an absentee ballot in person, by visiting their county registration office, or by sending in a mail request, among other methods.  S.C. Code Ann. § 7-15-330.  A voter may request the application anytime during the calendar year in which the

---

*Ballots at Richland Polls During S.C. Primary*, THE STATE (June 9. 2020), https://www.thestate.com/news/politics-government/election/article243404346.html.

[93] Noah Feit, *Richland County's Interim Election Director Misses Runoffs After COVID-19 Test*, THE STATE (June 23, 2020), https://www.thestate.com/article243733457.html.

election in which they intend to vote absentee is being held. When applying, individuals must sign the application including a "reason for request" of an absentee ballot, among other information. *Id.* § 7-15-340. Applicants must also affirm an oath stating: "I do swear or affirm that I am a qualified elector, that I am entitled to vote in this election, and that I will not vote again in this election. The information above is true in all respects, and I hereby apply for an absentee ballot for the reason indicated above." *Id.*

95.     Fraudulently applying for an absentee ballot is a misdemeanor subject to "not less than one hundred dollars nor more than five hundred dollars or imprison[ment] not more than one year, or both." *Id.*; *see also* S.C. Code Ann. § 7-25-20.

96.     When a registrar receives an absentee ballot application and verifies that the individual properly competed the application and that they are a registered voter in the jurisdiction, the registrar mails to the individual the following items:

   a.  One of each ballot to be used in the election;

   b.  Printed instructions as to the marking, folding, and return of each ballot;

   c.  An envelope marked "Ballot Herein" in which all completed ballots must be placed;

   d.  A return-addressed envelope for use to return the "Ballot Herein" envelope and all ballots to the board of voter registration and elections, imprinted with an "oath of absentee ballot applicant." The oath informs, among other things, that the applicant is qualified to vote in the election, has not already voted, and that the applicant received no assistance in voting that they would not have been entitled to receive had they voted in person.

97.     Under S.C. Code Ann. § 7-15-220, an individual voting by absentee ballot must

return their ballot in the envelope on which the oath is imprinted, which shall be "signed and witnessed." Spaces for a third-party witness to sign the oath and provide their address are imprinted directly underneath blank lines to be filled in with the voter's signature and date.

98.    Once a voter receives their absentee ballot, the voter "must mark each ballot on which he wishes to vote," place each in the single envelope marked "Ballot Herein," and then place that envelope in the provided return-addressed envelope. S.C. Code Ann. § 7-15-385. The return-addressed envelope must then be sent to the board of voter registration and elections by mail, personal delivery, or by authorizing another person to return it as set forth in the law. *Id.*

99.    The absentee ballot counting process is scheduled, by law, to begin at 9:00 a.m. on Election Day. *See* S.C. Code Ann. § 7-15-420. At that time, election managers must commence examining all return-addressed envelopes that have been received by the county board of voter registration and elections and make sure that each oath has been properly signed and witnessed, and that it includes the witness's address.

100.    A ballot determined not to be properly signed and witnessed by a third party, or one that does not include the witness's signature and address, cannot be counted as a vote in the election. *See* S.C. Code Ann. § 7-15-420.

101.    This Court's Order and Opinion of May 25, 2020 enjoined Defendants from enforcing the Witness Requirement on registered absentee voters during the June 9 primaries. Dkt. No. 65, at 55. The Witness Requirement will be enforced as to all registered voters who vote absentee in other elections held in South Carolina in 2020, including the November 3 general election.

102.    South Carolina law does not afford the voter notice or the opportunity to cure a ballot that is not counted because of a defective witness signature.

**VI.    The Challenged Requirements Unduly and Unreasonably Burdens the Voting Rights of South Carolinians.**

**A.    The Excuse Requirement deprives many South Carolina voters, including Plaintiffs, of their fundamental right to vote.**

103.    Historically, most voters in South Carolina vote in person and on Election Day.[94] For most voters, that means physically appearing at a designated polling place where they must not only be in close contact with other voters, observers, poll workers, but also repeatedly touch equipment and material such as voting machines, paper ballots, and shared writing instruments. At present, public health officials consider all of these activities as risking exposure to and/or transmission of COVID-19.  They are therefore strongly disfavored and/or proscribed by various government orders.

104.    Meaningful opportunities to vote in person are still necessary to many South Carolina voters, including those who lack access to reliable mail service or need the kinds of accommodations for persons with disabilities and personal assistance for people with limited literacy that are only available at in-person sites.  To prevent viral spread at needed in-person sites, the CDC instructs that South Carolina encourage as many voters as possible "to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations."[95]

---

[94] *See, e.g.*, U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2018 Comprehensive Report* 30 (2018) (72,806 absentee ballots of over 1.7 million ballots cast in South Carolina in 2018 midterm elections; 217,857 voted "in-person early"), https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf; U.S. Election Assistance Comm'n, *The Election Admin. and Voting Survey 2016 Comprehensive Report* 24 (2016) (497,436 absentee ballots of over 2 million total ballots cast in South Carolina in 2016 election), https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf.

[95] Ctrs. for Disease Control & Prevention, *supra* note 23.

105.    Even if the ongoing COVID-19 outbreak subsides, members of vulnerable or "high-risk" populations who would otherwise vote in person on Election Day will reasonably opt and/or be required to continue practicing "social distancing" for the foreseeable future.  Some like Plaintiff Rev. Rutledge who risk grave medical complications from COVID-19 will reasonably decide to self-quarantine until a vaccine for the illness is the developed or a cure is identified.

106.    Because South Carolina is an "excuse required" absentee voting state, eligible voters must fall under one of several enumerated categories of persons who are "qualified" to vote by absentee ballot for the remainder of the 2020 calendar year elections.  Relevant here, "physically disabled persons" and "persons sixty-five years of age or older" are qualified, and "must be permitted to vote by absentee ballot in all elections . . . ."  S.C. Code Ann. § 7-15-320. Older South Carolinians at high risk of complications from COVID-19 are thus able to request an absentee ballot only if they are older than 65.

107.    As Defendant Andino explained in the SEC Letter, none of the 18 categories that qualify a voter to vote absentee "include self-isolating due to a pandemic."  Ex. 2, at 2.  Thus, at present, it is Defendants' position that no provision of the South Carolina laws affords *all* eligible voters the opportunity to vote absentee by mail-in ballot.

108.    Defendants have not afforded all eligible voters an opportunity to safely vote absentee in any elections held as of July 1, 2020—including the November 3, 2020 general election—despite the fact that COVID-19 will largely pose the same concerns in the fall as it did in June.  By taking steps to permit all South Carolina voters to use absentee ballots to vote safely in the June primaries and runoffs, the State made clear that the pandemic necessitates such changes while the risk of community transmission of COVID-19 remains.

109.    As currently construed, the Excuse Requirement severely burdens the fundamental right of all eligible voters practicing self-quarantining and social distancing to participate in elections in South Carolina.  In addition, it fails to clearly apprise voters with disabilities whether they are eligible to vote via absentee ballot.

110.    The Excuse Requirement will therefore likely prevent tens of thousands of South Carolinians who might otherwise vote in scheduled elections from participating in those contests, as anyone not covered by an enumerated absentee "excuse" will have to choose between exposing themselves and others to the risk of illness from coronavirus and COVID-19 to vote in person or foregoing their right to vote.

111.    The Excuse Requirement is also particularly burdensome for Black people in South Carolina.  Black South Carolinians continue to bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.  It is precisely because of these patterns that Black people in South Carolina face particularly severe health risks from COVID-19 exposure arising from being forced to vote in-person rather than by mail.  In these circumstances, the Excuse Requirement interacts with these conditions to deny Black people in South Carolina an equal opportunity to participate in the political process.

112.    The Excuse Requirement is plainly unreasonable.  Because South Carolina already affords an excuse to eligible voters who "because of injury or illness, cannot be present in person at [a] voting place on election day[,]" S.C. Code Ann. § 7-15-310, Defendants could reasonably interpret the statute to include people who are self-isolating to be eligible to vote absentee "because of injury or illness" under the Excuse Requirement.

113.    Several of the remaining minority of states that require an excuse to vote by mail

have interpreted their disability or illness basis for absentee eligibility in precisely this fashion during the ongoing crisis.  Furthermore, as described in Dkt. No. 65, at 26, South Carolina amended state law to permit all voters to cast absentee ballots in the June elections.

**B.    South Carolina's Witness Requirement will deny large numbers of eligible voters the right to vote yet provides only marginal benefits to the State.**

114.    As noted, election officials currently have no discretion on whether or not to count an unwitnessed absentee ballot—they must reject the ballot and are not required to give notice to the voter or opportunity to cure.  S.C. Code Ann. § 7-15-420.

115.    Yet in the current pandemic, individuals living alone have no safe means to have an individual witness and sign their ballot envelope while complying with the Governor's repeated executive orders requiring adherence to social distancing measures.  Even if people do leave their homes, the State directs them to maintain at least six feet of distance from others with whom they do not live.  These orders also reflect the consensus of doctors and public health officials.

116.    Older South Carolinians and those with certain preexisting medical conditions face even graver risks by interacting with another individual to obtain a witness signature.  But because COVID-19 can afflict individuals of any age and those without preexisting conditions and can spread aggressively through asymptomatic people, any individual living alone faces a real risk of endangering themselves or others by seeking someone to witness their ballot.

117.    Nor will the impact of enforcing the Witness Requirement in an environment in which COVID-19 is still being transmitted be light.  Instead, it will likely prevent thousands of eligible South Carolinians from casting ballots.

118.    At present, South Carolina has over 3.3 million registered voters.[96]  Over 620,000 South Carolinians voted in the June 2018 Democratic and Republican primaries.  And in the November 2016 general election, over 2.1 million South Carolinians cast ballots.

119.    Yet according to 2018 American Community Survey (ACS) statistics from the Census Bureau, 29% of South Carolinians age 18 and older live alone.[97]  Assuming similar numbers in the 2020 November general election, over 550,000 South Carolinians will face the choice of either risking their health by voting in person or finding a witness for their absentee ballots, or not voting at all.[98]  Like Plaintiffs, many of them will be forced not to vote in order to protect their health and their community.

120.    This burden on the right to vote will fall more heavily upon certain groups—older people, persons with disabilities, and Black people in South Carolina, among others.  For instance, about 39.8% of all South Carolinians living alone are age 65 and older.[99]  24.7% of South Carolinians age 65 and older live alone, compared to approximately 11% of the general population.[100]  33.2% of South Carolinians 18 and older with a disability live alone and 33.8% of South Carolinians 65 and older with a disability live alone.  Of all Black households, 33.2% are

---

[96] *South Carolina Voter Registration Demographics*, https://www.scvotes.org/cgi-bin/scsec/96vr?countykey=ALL&D1=None (last visited June 23, 2020).

[97] U.S. Census Bureau, *supra* note 3, https://data.census.gov/cedsci/table?q=south%20carolina%20single%20person%20households&g=0400000US45&hidePreview=false&tid=ACSDP1Y2018.DP02&vintage=2018&layer=VT_2018_040_00_PY_D1&cid=DP02_0001E.

[98] *Id.*

[99] *Id.*

[100] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: ACS Demographic and Housing Estimates: South Carolina (2018), https://data.census.gov/cedsci/table?q=south%20carolina%20demographics&g=0400000US45&tid=ACSDP1Y2018.DP05 (last visited June 23, 2020).

people who live alone.  Of all white households, 28.2% are people who live alone.  And 14.8% of all Black households in South Carolina are headed by women who live alone with their children under 18 (*i.e.*, people who are not legally competent witnesses) versus just 3.9% of similar white households.

121.    As noted above, older individuals already face higher rates of infection and death from COVID-19, further magnifying its impact.  And the CDC has found that "some people with disabilities might be at a higher risk of infection or severe illness because of their underlying medical conditions."[101]

122.    Evidence has also revealed stark racial disparities in the impact of COVID-19 that will result in disparate burdens on minority voters.  These figures mirror developing trends in other states, such as Maryland and North Carolina, which have both released data showing that Black people face higher rates of both infection and death from COVID-19 than the population as a whole.[102]

123.    The Witness Requirement will therefore likely prevent tens of thousands of South Carolinians who might otherwise cast absentee ballots from doing so this year, with a disproportionate impact falling on older voters, voters with disabilities, and Black voters.

124.    The Witness Requirement is particularly burdensome for Black voters in South Carolina, who are more likely to live alone and thus will be more likely to risk exposure to

---

[101] Ctrs. for Disease Control & Prevention, *People with Disabilities,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last updated Apr. 7, 2020).

[102] N.C. Dep't Health & Human Servs., *COVID-19 North Carolina Dashboard*, https://www.ncdhhs.gov/divisions/public-health/covid19/covid-19-nc-case-count#by-race/ethnicity (last updated Apr. 21, 2020); Fenit Nirappil et al., *Record set for single-day covid-19 deaths in D.C., Maryland and Virginia at 53; black residents hit hardest*, WASH. POST (Apr. 9, 2020), https://www.washingtonpost.com/local/covid-19-deaths-hit-new-high-in-dc-maryland-and-virginia-at-53-Black-residents-hit-hardest/2020/04/09/cc85cd14-77b3-11ea-b6ff-597f170df8f8_story.html.

COVID-19 in the course of obtaining a witness signature.  Black people in South Carolina continue to bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.  It is precisely because of these patterns that Black people in South Carolina face particularly severe health risks from COVID-19 exposure.  In these circumstances, the witness requirement interacts with these conditions to deny Black people in South Carolina an equal opportunity to participate in the political process.

125.    Protecting election integrity and preventing improper use of absentee ballots certainly are valid governmental interests, but maintaining the Witness Requirement during the current pandemic fails to serve or protect those interests.  As Defendant Andino wrote in the SEC Letter urging changes to the elections process in light of the ongoing pandemic: "the witness signature offers no benefit to election officials as they have no ability to verify the witness signature."  Ex. 2, at 3.  In fact, South Carolina already exempts voters in the military or living abroad from the Witness Requirement.  S.C. Code Ann. § 7-15-380(B).

126.    And to the extent the Witness Requirement did serve these or any other governmental interests, it would be substantially outweighed by its massive burden on South Carolina voters, particularly as compared to other procedures that serve the same interests.

127.    The Witness Requirement is not South Carolina's sole method of policing the integrity of absentee ballots—far from it.  Indeed, only 10 other states even contain a similar requirement, yet absentee balloting systems in the remaining 40 are not undermined by fraud.[103]

---

[103] *Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options*, Nat'l Conf. of State Legislatures (Apr. 14, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx (select tab titled "Processing, Verifying, and Counting Absentee Ballots" and scroll down to the chart "Verifying Authenticity of Absentee/Mailed Ballots.")

128.    Meanwhile, South Carolina has several other vehicles to both confirm the legitimacy of the absentee ballot cast and disincentivize fraudulent use of absentee ballots.

129.    For one, the board of voter registration and elections assigns each absentee ballot application a specific serial number, which is then memorialized in a "record book." S.C. Code Ann. § 7-15-330. The record book is updated to reflect:

> a. the applicant's name, home address, and absentee mailing address (if different), the date on which the form is requested, and the date on which it is issued, *id.*;
>
> b. the date on which the ballot(s), printed instructions, envelope marked "Ballot Herein," return-addressed envelope are requested by written application and the date they are issued to the elector, S.C. Code Ann. § 7-15-370;
>
> c. the date on which the return-addressed envelope and enclosed ballot(s) are received by the board, S.C. Code Ann. § 7-15-385.

130.    Only return-addressed envelopes that are received and recorded in the record book by these procedures are securely stored "in a locked box within the office of the board of voter registration and elections." S.C. Code Ann. § 7-15-385. By law, absentee ballots "remain in the custody of the county board of voter registration and elections until" they are transferred "for the purpose of tabulation and reporting . . . ." S.C. Code Ann. § 7-15-410.

131.    Any elector or qualified watcher may challenge the absentee vote of any person whom they suspect is not a qualified voter. S.C. Code Ann. § 7-13-810. *Id.* § 7-13-830, and § 7-15-420.

132.    Most directly, of course, voters themselves must attest under penalty of perjury their identity, residence, and that they will not double vote when they request their absentee

46

ballot. S.C. Code Ann. § 7-15-340. They must so attest again when they sign their ballot envelope. *Id.* § 7-15-380.

133. Any person who fraudulently attests to the absentee ballot application by voting more than once in the same election is guilty of a misdemeanor and subject to a fine of up to $500 or imprisonment for up to a year. S.C. Code Ann. §§ 7-15-340, 7-25-20. They are separately guilty of the offense of "voting more than once at elections" and may be fined at the discretion of the court or imprisoned as long as three years. *Id.* § 7-25-110.

134. Other provisions of law establish similar penalties for "impersonating a voter." *Id.* § 7-25-120. And for "swearing falsely at elections or taking oath in another's name." *Id.* § 7-25-150.

135. In light of these attestation and verification requirements and criminal penalties associated with misusing absentee ballots, the additional step of requiring a witness signature adds no meaningful protection against fraud. Indeed, while instances of fraud are exceedingly rare, an individual determined to break these laws and risk the penalties can just as easily forge the signature of another individual as they can falsely attest when they sign their own name. Indeed, the Witness Requirement has little if any practical utility for election integrity because South Carolina law does not require witnesses to identify themselves by printing their name or providing any other information. Indeed, the Witness Requirement has little if any practical utility for election integrity because South Carolina law does not require witnesses to identify themselves by legibly printing their name or providing any information other than a signature and an address. S.C. Code Ann. § 7-15-380.

136. As Defendant Andino explained: "Removing the requirement for a witness signature would remove a barrier many voters would likely encounter while in self-isolation."

47

Ex. 2, at 3.  The burden on the voting rights of the many thousands of South Carolinians who will be prevented from either casting their ballots safely or having them counted by retaining the Witness Requirement far outweighs any upside of the requirement, if any.

## CLAIMS FOR RELIEF

### COUNT ONE

**Violation of the Fundamental Right to Vote
42 U.S.C. § 1983, First and Fourteenth Amendments to the U.S. Constitution**

137.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

138.    Eligible individuals have a fundamental right to vote under the First and Fourteenth Amendments of the U.S. Constitution.  Under the First and Fourteenth Amendments, a court considering a challenge to a state election law must carefully balance the character and magnitude of the injury to the rights that the plaintiff seeks to vindicate against the justifications put forward for the burdens imposed by the rule.  *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

139.    In light of the COVID-19 pandemic, South Carolina's Excuse Requirement, Witness Requirement, and their enforcement severely and unreasonably burden the fundamental right to vote of South Carolina voters.  These requirements will likely prevent thousands of eligible voters from casting ballots that are then counted, with particularly heavy burdens on older South Carolinians, voters with disabilities, and African American voters.

140.    Therefore, Defendants, acting under color of state law, have and will continue to deprive Plaintiffs of rights secured to them by the First and Fourteenth Amendments to the U.S. Constitution—namely, the fundamental right to vote—and protected by 42 U.S.C. § 1983 by enforcing the Challenged Requirements.

## COUNT TWO

### Violations of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301

141.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the Count below as though fully set forth herein.

142.    Section 2 of the Voting Rights Act provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a).

143.    The "essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *League of Women Voters of N.C. v. North Carolina* ("*LWV*"), 769 F.3d 224, 238–39 (4th Cir. 2014) (internal quotation marks and citation omitted). "[A] Section 2 vote-denial claim consists of two elements:

> First, the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
>
> Second, that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class."

*LWV*, 769 F.3d at 240 (internal quotation marks and citations omitted).

144.    As it has been interpreted by Defendants, the Excuse Requirement, if not enjoined, will materially burden the right to vote, and will have an adverse and disparate impact on Black voters in South Carolina. Black voters in South Carolina are more likely to work in jobs that expose them to COVID-19, less likely to have insurance or financial resources, and

more likely to suffer from severe health complications and/or to die from COVID-19 than white voters.  Black voters are therefore significantly more burdened by the effects of the Excuse Requirement.

145.    Likewise, the Witness Requirement, if not enjoined, will materially burden the right to vote, and will have an adverse and disparate impact on Black voters in South Carolina. Black voters in South Carolina are more likely to work in jobs that expose them to COVID-19, less likely to have insurance or financial resources, more likely to live alone, and more likely to suffer from severe health complications and/or to die from COVID-19 than white voters.  Black voters are therefore significantly more burdened by the effects of the Witness Requirement.

146.    The disparate burden resulting from the Challenged Requirements is directly linked to social and historical conditions.  South Carolina has a long history of voting-related discrimination, including the recent use of witness requirements, property qualifications, and photo ID laws.  From 1965 to 2013, South Carolina was covered by the preclearance provisions of the Voting Rights Act.  Since 2000, the U.S. Department of Justice has objected to eleven proposed voting changes in South Carolina due to those changes' potentially racially discriminatory purpose or effect.

147.    Black people in South Carolina continue to suffer from discrimination in other areas such as education, employment, and health, which hinders their ability to participate effectively in the political process.  According to the ACS, in South Carolina, 11.6% of Black people and 8.3% of white people lack health insurance; 38.6% of Black people and 33.1% of white people over age 65 have a disability; 14.2% of Black people and 11.6% of white people age 18 to 64 have a disability; 16.1% of Black and only 8.7% of white people lack a high school degree; 8% of Black and 4.1% of white people over age 16 are unemployed; 21.1% of Black and

6.4% of white households in general lived below the poverty line; 17% of Black people over 65 versus 7.1% of whites over 65 also live in poverty; 13.6% Black and only 3.5% of white households lack a vehicle; 84.7% of Black and 92% of white households have a computer or "smart phone"; even among those people with computers, 28.3% of Black and just 14.9% of white households lack broadband internet; 24.2% of Black and 6.5% of white households use SNAP/food stamps; and Black median family income ($42,910) is nearly half that of white families ($76,382). In particular, as discussed above at ¶¶ 71–74, these discriminatory patterns render Black voters more vulnerable to COVID-19, such that the Challenged Requirements are particularly burdensome for them as a group relative to other voters. In addition, voting is racially polarized in South Carolina and Black people do not hold elected office in portion to their population, resulting in state elected officials who are less responsive to the health, voting, and other concerns of Black voters amid the COVID-19 crisis.

148.    Under the totality of the circumstances, the Challenged Requirements interact with these social and historical conditions to abridge and deny Black people in South Carolina the right to vote. As a result of the Challenged Requirements, Black people in South Carolina will have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

## COUNT THREE

### Violation of
### Title II of the Americans with Disabilities Act (42 U.S.C. §§ 12131, *et seq.*)

149.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

161.    Title II of the ADA requires that public entities refrain from discriminating against qualified individuals on the basis of disability. 42 U.S.C. § 12132. The regulations

implementing Title II of the ADA require that public entities avoid unnecessary eligibility criteria or methods of administration that have the effect of screening out, excluding, or discriminating against people with disabilities.  28 C.F.R. § 35.130(b)(3),(8).  Further, a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

162.    Plaintiffs Thomas, Rutledge, Walker, members of the Family Unit, and members of the South Carolina NAACP have disabilities within the meaning of the ADA, 42 U.S.C. § 12102, including serious health conditions that make them susceptible to severe complications from COVID-19.  They are "qualified" for the programs, services, and activities being challenged herein in that they meet all essential eligibility requirements to vote in South Carolina.  42 U.S.C. § 12131(2).

163.    Defendants are violating Title II of the ADA by imposing eligibility requirements that will "screen out or tend to screen out an individual with a disability" and cannot be shown to be necessary for the provision of the state's absentee voting program.  28 C.F.R. § 35.130(b)(8). The Excuse Requirement, as construed in the South Carolina Code, will require some individuals with disabilities to expose themselves or others to COVID-19 in order to vote because it precludes some such individuals from casting absentee ballots via mail and generates confusion about eligibility requirements for voting by mail for some voters with disabilities.  *See* S.C. Code Ann. §§ 7-15-320, 7-15-310.  The Witness Requirement will require that many individuals with disabilities, who live alone and for whom COVID-19 poses grave health risks, or who have COVID-19, to engage in in-person interactions outside the home to vote.  The Challenged

Requirements will screen out many individuals with disabilities who are unwilling or unable to risk their life and health (or the life and health of others) in this way.

164.     Defendants are also violating Title II of the ADA by administering an absentee voting system that does not take into consideration the extra burdens and risks created by the Challenged Requirements for people with disabilities.  Because of their health statuses, Plaintiffs and Plaintiffs' members with disabilities must severely limit in-person contact with others during the COVID-19 pandemic.  The Challenged Requirements create additional—and unnecessary—burdens for them to exercise their right to vote.  Such additional burdens risk "defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."  28 C.F.R. § 35.130(b)(3)(ii).  The goal of any election is to allow eligible voters to participate in the democratic process by casting their ballots and having their votes counted.  The Excuse Requirement fails to clearly apprise voters with disabilities of whether they are qualified to vote via absentee ballot; a voter with a disability would have to determine that they are "physically disabled" within the meaning of the South Carolina Code and thus qualified to vote via absentee ballot.  A voter is considered "physically disabled" for purposes of absentee voting if they are "a person who, because of injury or illness, cannot be present in person at his voting place on election day."   S.C. Code Ann. § 7-15-310.  A voter who chooses the "physically disabled persons" excuse to cast an absentee ballot opens themselves up to criminal liability for false statements under oath or fraudulent voting.  S. C. Code Ann. §§ 7-25-150, 7-25-20.  Further, the Witness Requirement is a step in the absentee voting process that would require some voters with disabilities to risk their health in order to participate in the electoral process.  Such risks are likely to deter some individuals with disabilities from voting, thus impairing—indeed defeating—the objectives of allowing all

eligible voters to be able to cast their vote and participate in this democracy.

165.    Defendants are further violating Title II of the ADA by their refusal to provide reasonable modifications to policies, practices and procedures with respect to the Challenged Requirements for individuals with disabilities, such as Plaintiffs Thomas, Rutledge, Walker, the members of Plaintiffs Family Unit, and members of the South Carolina NAACP, whose health statuses severely limit their ability to leave home or have personal contacts with others amid the COVID-19 pandemic.

166.    Suspending the Excuse Requirement—or clarifying through official guidance that *all* voters with disabilities that make them more susceptible to death or serious illness from COVID-19 infection are eligible to vote absentee—is necessary to ensure that all voters can vote safely in the 2020 general election.  Although Defendants have taken the position in this litigation that a subset of voters with disabilities are eligible to cast absentee ballots using the "physically disabled persons" excuse, thus far, Defendants have yet to issue administrative rules, public guidance, or any other statement that formally and officially adopts this interpretation.

167.    Eliminating the Witness Requirement is necessary for all voters whose disabilities put them at greater risk of complications or death from COVID-19 infection.

168.    Unless the requested relief is granted, Plaintiffs and other individuals with disabilities will suffer irreparable harm.  Unlike voters without disabilities, they will be exposing themselves to the increased risk of severe illness or death in order to exercise their right to vote.

169.    The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities.  42 U.S.C. § 12188(a)(1)-(2).

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully requests that this Court:

A.     Declare that South Carolina's enforcement and interpretation of the Excuse Requirement (as stated in S.C. Code Ann. § 7-15-320 and § 7-15-310) while the risk of COVID-19 transmission in South Carolina remains violates the fundamental right to vote under First and Fourteenth Amendments to the U.S. Constitution, the Voting Rights Act, and the ADA;

B.     Declare that South Carolina's enforcement of the Witness Requirement (as stated in S.C. Code Ann. § 7-15-220) while the risk of COVID-19 transmission in South Carolina remains violates the fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution, the Voting Rights Act, and the ADA.

C.     Issue a permanent injunction that orders relief including:

     1.     Prohibiting Defendants from enforcing the Excuse Requirement (as stated in S.C. Code Ann. § 7-15-320 and § 7-15-310) to prevent any eligible voter, regardless of age and physical condition, to request, receive, and have counted, an absentee ballot, at least while emergency orders concerning COVID-19 are in place and/or while public health officials continue to recommend social distancing practices due to risk of community transmission of COVID-19;

     2.     Prohibiting Defendants from enforcing the Witness Requirement (as stated in S.C. Code Ann. § 7-15-220) for all voters, at least while emergency orders concerning COVID-19 are in place and/or while public health officials continue to recommend social distancing practices due to risk of community transmission of COVID-19;

3.      Ordering Defendants to issue guidance instructing city and county election officials to count otherwise validly cast absentee ballots that are missing a witness signature for South Carolina's general elections in 2020; and

4.      Ordering Defendants to modify election materials, including absentee ballots, to reflect the elimination of the Excuse and Witness Requirements, and conduct a public information campaign informing South Carolina voters about the elimination of the Excuse and Witness Requirements, in coordination with city and county officials before and during the absentee balloting period, and ordering Defendants to issue guidance instructing city and county election officials to issue absentee ballots to all eligible voters and to count otherwise validly cast absentee ballots that are missing a witness signature;

D.      Award Plaintiffs attorneys' fees in this action;

E.      Award Plaintiffs their costs of suit; and

F.      Grant such other and further relief as this Court deems just and proper in the circumstances.

Dated: July 10, 2020

Respectfully submitted,

Adriel I. Cepeda Derieux*
Dale E. Ho*
Sophia Lin Lakin*
Theresa J. Lee*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
acepedaderieux@aclu.org
dho@aclu.org

Deuel Ross*
NAACP Legal Defense &
    Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel.: (212) 965-2200
dross@naacpldf.org

*Motion for admission *Pro Hac Vice*
forthcoming

/s/ Susan K. Dunn
Susan K. Dunn (Fed. Bar #647)
American Civil Liberties Union
of South Carolina
Charleston, SC 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
sdunn@aclusc.org

*Attorneys for Plaintiffs*

57