*Mary T. Thomas, et al. v. Marci Andino, et al.*

*C/A No.: 3:20-cv-01552-JMC*

# Exhibit 1
### to Defendants' Memorandum in Support of Motion for Summary Judgment

### Deposition Excerpts of Jeremy Paul Rutledge

1

 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF SOUTH CAROLINA
 2                         COLUMBIA DIVISION

 3
      MARY T. THOMAS, NEA RICHARD,
 4    JEREMY RUTLEDGE, TRENA WALKER,
      THE FAMILY UNIT, INC., and the
 5    SOUTH CAROLINA STATE CONFERENCE
      OF THE NAACP,
 6                              Plaintiffs,

 7         v.                   C/A No.: 3:20-cv-01552-JMC

 8    MARCI ANDINO, in her official capacity as
      Executive Director of the South Carolina
 9    State Election Commission; JOHN WELLS,
      in his official capacity as Chair of the
10    South Carolina State Election Commission;
      JOANNE DAY, CLIFFORD J. ELDER, LINDA McCALL,
11    and SCOTT MOSELEY, in their official capacity
      as Members of the South Carolina State Election
12    Commission; and HENRY D. McMASTER, in his official
      capacity as Governor of South Carolina,
13                              Defendants.

14

15                    D E P O S I T I O N

16    WITNESS:      JEREMY PAUL RUTLEDGE

17    DATE:         Friday, July 24, 2020

18    TIME:         10:06 a.m.

19    LOCATION:     1406 Glencoe Drive
                    Mount Pleasant, South Carolina
20
      TAKEN BY:     Attorneys for the Defendants
21                  SC State Election Commission officials

22    REPORTED BY:  DEBORAH L. DUSSELJEE, RPR, CRC
                    Realtime Systems Administrator
23    - - - - - - - - - - - - - - - - - - - - - - - - - -

24                    COMPUSCRIPTS, INC.
                      www.compuscripts.com
25                     1.888.988.0086

Jeremy Paul Rutledge 7/24/2020

16

1    early.

2            And I went one other time, which I

3    approximate to be about three weeks later, to retrieve

4    a number of books and things from my office because I

5    knew I wouldn't be working from the church office.  I

6    was working from home.  And, again, I went early to

7    avoid any people.

8        Q.    You live with your wife and son; is that

9    correct?

10       A.    Yes.

11       Q.    Does anyone else live in your house?

12       A.    No.

13       Q.    Has anyone else been to your house since

14   March 13th?

15       A.    Yes.

16       Q.    Who's been there?

17       A.    I will do my best to recall this for you,

18   and it's also recorded in the document we provided.

19   My wife and I sat down and were very thorough, so I'm

20   working from memory at this moment.

21           Who has come to my house since March 13th?

22   My mother and her housemate, Barbara Cole, have come

23   to our house.  Our administrative assistant, Kathryn

24   Cullinan, has come to our house.  Actually last

25   evening, our choir director, Michael Laird, and his

Jeremy Paul Rutledge 7/24/2020

17

1   wife Vanessa came to our house to pick up a computer.

2            All of these visits were outside at a

3   minimum of 15 feet with masks.  In Michael and

4   Vanessa's case, we put the computer they were picking

5   up outside, and we did not come out of the house.

6            So in every case, we have kept a very strong

7   physical distance.  There may be a visit that I'm not

8   recalling.  I'm sort of straining to remember what we

9   put on that -- on the --

10   Q.   And I'm not trying to test you right now as

11   compared to written responses, and we'll go through

12   those later, and I'll ask you who some of those people

13   are.

14            Where does your mother live?

15   A.   My mother lives in a -- I mean, she lives in

16   Mount Pleasant.

17   Q.   That's what I was asking, is she -- she

18   lives nearby.

19   A.   Yes.

20   Q.   How often have you seen her since

21   March 13th?

22   A.   Oh, less than --

23   Q.   Do you see her --

24   A.   Go ahead.

25   Q.   Do you see her once a week?  Do you see her

Jeremy Paul Rutledge 7/24/2020

18

1    once a month?  Have you seen her once in the last four

2    months?

3         A.   I'm approximating.  About three times a

4    month.  Much less than we would like.  Maybe --

5         Q.   How often did you see her before March 13th?

6         A.   Oh, several times a week, so...

7              I would -- let's just approximate twice a

8    week, and now it is more like twice a month.

9         Q.   Got it.  Speaking of people, there's a list

10   you gave us.  This is, again, a response, the one you

11   were just talking about.  One is a list of people who

12   may know something about this case, and the other one,

13   there is a list of people who you've seen.

14              And I just want to ask you who these people

15   are and when you saw them and just find out a little

16   bit about it.  So obviously I know that Sara is your

17   wife.  So that's easy on the first one.

18              Kathryn Cullinan, who is that?

19        A.   She is the church administrator.

20        Q.   Approximately how many times have you seen

21   her since March 13?

22        A.   Only one that I can remember, so I would say

23   approximately two.  I mean, it's possible.  I work

24   with Kathryn very closely, but I only remember

25   physically seeing her once.  Again, it was outside

Jeremy Paul Rutledge 7/24/2020

19

1    with face masks on at a distance.

2         Q.    Barbara Cole is your mother, correct?

3         A.    No.  My mother is --

4         Q.    No, I'm sorry.  That's obviously not your

5    mother.  Who is Barbara Cole again?

6         A.    Barbara Cole is my mother's housemate.  They

7    share a house together.

8         Q.    Okay.  Do you see her every time you see

9    your mother or just sometimes?

10        A.    Just sometimes.

11        Q.    Who is Dr. Brad Keith?

12        A.    Dr. Brad Keith is one of -- I have three

13   doctors at MUSC, and he's one of my doctors.

14        Q.    What is his specialty?

15        A.    Internal medicine.

16        Q.    Dr. Richard Silver, what is his specialty?

17        A.    His specialty is rheumatology, and he is my

18   primary doctor.  He's a specialist in my disease.

19        Q.    Which -- since you mentioned it, what

20   condition do you have?

21        A.    My disease is systemic scleroderma with

22   interstitial lung disease.  And if Debbie needs me to

23   spell any of that, I would be happy to.  It's

24   important, you know, that diagnosis.

25        Q.    It is.

Jeremy Paul Rutledge 7/24/2020

24

1    Houston.

2        Q.    What would they know about the case?

3        A.    The same as our families, I think.  They may

4    have even been included in that same e-mail, kind of a

5    newsy e-mail, what is happening with us, so...

6        Q.    Now I am looking at the other list.  This is

7    the people you've had some interaction with since

8    March.  And some of this you mentioned, your mother

9    and her housemate.

10             And then there's Stephanie and Noel Hunt.

11   Who is that?

12       A.    They are church members, and they are

13   neighbors.

14       Q.    Approximately how close do they live to you?

15       A.    Approximately one mile.

16       Q.    Have you seen them more than just that one

17   time in April?

18       A.    No.

19       Q.    What do you remember about when you saw them

20   in April?  Where was it?  How long did it last?

21       A.    It was at their house outside.  We kept a

22   large physical distance.  I would say 15 feet, and it

23   probably lasted 30 minutes at the longest.  Perhaps it

24   was shorter than that.

25             I remember feeling a little nervous, you

Jeremy Paul Rutledge 7/24/2020

25

1    know, to be visiting, so maybe 20 to 30 minutes is my

2    estimate.  Again, at a good social distance outdoors.

3        Q.   Got it.

4          Lara D'Eugenio?

5        A.   Yeah.  Lara D'Eugenio, she's also a church

6    member and a friend.  And we --

7        Q.   Appro --

8        A.   Go ahead.

9        Q.   I was going to say, approximately where was

10   that and how long did it last?

11       A.   That was at her house.  I would approximate

12   that visit to be about 30 minutes.  It was outside,

13   and I believe we wore masks as well.  And that was

14   just one visit, so...

15        We kept --

16       Q.   I don't want to cut you off.  I'm sorry.

17        Who are Annie and Peter Steele?

18       A.   They are also friends and church members.

19   We saw them once.  It was here.  It was outside at --

20   I would say, again, 15 feet.  I'm pretty careful about

21   that distance and like to maintain that distance.

22   They had -- Annie had sewn us some new face masks, and

23   they were bringing them by to drop them off.

24       Q.   Mike Fischer, who is he?

25       A.   Mike -- Mike -- I'm sorry.  I didn't mean to

Jeremy Paul Rutledge 7/24/2020

26

1   speak too soon.

2      Q.   That's all right.

3      A.   Mike Fisher is our neighbor.  He lives

4   across the street and over one house.

5      Q.   When you see him, is it just the comings and

6   goings of in and out of your house and his house?

7      A.   Yes.  He walks his dogs, and so we wave to

8   him probably once a day.  They have concerns about

9   being high risk, so none of us get close to each

10   other.  Often, we will wave to Mike from 50 feet or

11   more.  So we keep a good distance from Mike, but we

12   see him -- see him every day.

13      Q.   Treva Williams, Rose Stump, and is it

14   Raynique Syas?

15      A.   Yes.  Yes.  They -- they came by once.  And

16   I -- I'm sorry to say I can't estimate this very well.

17   I think it was probably two months ago.

18      Q.   That's almost spot on to what you had

19   written down, so well done.

20      A.   Okay.  Days are a little fuzzy right now.

21   Time is better with time of day than how many days

22   have passed.

23      They came by once.  I think they knew I was

24   feeling a little dejected by having stayed home so

25   long.  And I work with them closely in the community,

Jeremy Paul Rutledge 7/24/2020

27

1    so they came by and brought like posters that said, We

2    love you Jeremy or whatever, and they were at the end

3    of my driveway.

4              So we were probably 15 feet away.  Also, our

5    family had masks.  And it was just that one visit.

6         Q.    Who is Adam Parker?

7         A.    Adam Parker is also a friend.  He works for

8    "The Post and Courier" as well.

9         Q.    Did you discuss this lawsuit with

10   Mr. Parker?

11        A.    No.

12        Q.    I see Barbara and Barry Sanders.  I'm

13   guessing that's not the football player Barry Sanders.

14        A.    No, no.  They are church members, and we

15   visited them after a surgery one of them had.  It was

16   a pastoral visit.  We were going to visit them outside

17   their house, you know, 15 feet, face masks.  That's

18   also how I visited with Adam, 15 feet and face masks.

19             When we went to see Barbara and Barry, it

20   was raining that day, so we actually were in our car,

21   and they were still in their house.  So we called each

22   other and waved, so that was our way of keeping our

23   distance.

24        Q.    Marcia and Tim West, who are they?

25        A.    Marcia and Tim West are also friends from

Jeremy Paul Rutledge 7/24/2020

28

1    church.  And we went to their house on their

2    anniversary to wish them happy anniversary and met

3    them outside at a distance, again, I would say, of 15

4    feet, maybe a little more.  They have a big yard.  We

5    wore face masks and -- yeah.

6            Actually, to be honest, now I cannot

7    remember if it was an anniversary or a birthday

8    because I have a vague memory of my son singing Happy

9    Birthday, so...

10           But it was a happy occasion we went to.

11    Q.    It was something exciting.

12           And then finally Ivy Wadsworth.

13    A.    Ivy Wadsworth is a friend and a neighbor,

14    and they live two blocks away.  And we saw her once on

15    a walk.  She was outside of her house, and we spoke

16    with her briefly.  Again, at about 15 feet.

17           We are always wearing face masks when we go

18    for a walk.  And I believe that was just one time.

19    That was relatively recently.  It was in the last two

20    weeks.

21    Q.    Your thing says July 13th, so, again, spot

22    on.

23           A couple of -- you have a list of places

24    you've been, some -- like forests and the beach.  You

25    have Marion Square on your list.  When did you go to

Jeremy Paul Rutledge 7/24/2020

35

1      A.    Yes, generally.

2      Q.    I want to talk a little bit about the

3  witness requirement first.

4            Could your wife be the witness for your

5  absentee ballot?

6      A.    Could my wife be the witness for my absentee

7  ballot?  The answer this morning is yes.  If we were

8  voting this morning, she could be.

9      Q.    You don't wear a face mask in your house, do

10  you?

11      A.    No.

12      Q.    Your wife lives there and doesn't wear a

13  face mask at home either.

14      A.    That's correct.

15      Q.    Right.  You see your wife basically more

16  times a day than you can count, correct?

17      A.    Yes.

18      Q.    Good answer.

19            All right.  So I want to talk about the

20  qualification requirement now.  It's what your lawyers

21  have called the excuse requirement.  I don't want to

22  get in a spitting contest over what we call it, but it

23  is the requirement that you must have a reason to vote

24  absentee because it's not open to just everyone.

25            I have the declaration that was filed with

Jeremy Paul Rutledge 7/24/2020

40

1        A.     Yeah, that's the only --

2        Q.     Okay.

3        A.     You have all that.

4        Q.     We do.  I just wanted to make sure you

5    weren't going to tell me what you told your lawyers

6    because that's privileged, and I don't want to ask

7    about that.

8        A.     Yeah.

9        Q.     And if you had started to, I don't know who

10   was going to stop you first, your lawyer or me.

11              All right.  Do you know anyone who

12   contracted COVID-19 because they voted in the

13   June 9th, 2020 primary?

14       A.     I do not know anyone that has told me that.

15   I'm not sure how I would know who contracted COVID and

16   how they got it.  Or let me rephrase that.  I'm not

17   sure I would know from someone with COVID where

18   exactly they contracted it, so I can't say -- can't

19   say with any certainty.

20              MR. LAMBERT:  Those are the only questions I

21   have at this time.

22              As you probably realized, there are a lot of

23   other lawyers on this videoconference now.  So

24   unfortunately, I have got to hand you off to them, and

25   you are not off the hot seat just yet.  But

Jeremy Paul Rutledge 7/24/2020

41

1    Mr. Rutledge, I appreciate you taking time this

2    morning to answer my questions and talk to me.

3              THE WITNESS:  Could I clarify one answer as

4    well?

5              MR. LAMBERT:  Sure.

6              THE WITNESS:  When you asked if Sara could

7    be a witness for me and I said today she could be,

8    that is because she has stayed at home with me since

9    the schools closed in March.  So we've been in a

10   bubble, and that allows us to safely be together.

11             If that bubble is broken, then the answer

12   would be no.  And as we approach the start to school,

13   that's why I said today the answer is yes.  But I just

14   wanted to clarify that's only for today.

15   BY MR. LAMBERT:

16       Q.   So what would happen if the bubble were

17   broken?  Would you or she have to go live somewhere

18   else?

19       A.   Yes, and, in fact, that is our plan.  When

20   the bubble is broken, Sara and Ian will go to live in

21   another house, and we will live separately until

22   there's a vaccine because the risk, again, is just too

23   great.  Nobody wants me to die, right?  And so --

24       Q.   No, certainly not.

25       A.   I didn't mean to be flip.  I just meant --

Jeremy Paul Rutledge 7/24/2020

42

1    yeah, so our plan is, once the bubble is broken, we

2    will have to live separately.

3        Q.    If you have to do that, do you have any

4    thoughts about how you will see them, whether it's

5    socially distanced outside with a mask on?  Have you

6    thought about what that might look like?

7        A.    Yes.  The only thing we have discussed is

8    the possibility of, you know, trying to meet at the

9    end of a school week, perhaps in a park or someplace

10   we can identify outdoors with masks at a distance,

11   again, in order to -- at least to keep me in a kind of

12   bubble or to keep me safe from infection.

13       Q.    You would assume you're going to try to do

14   something, whenever this bubble breaks, so that you

15   can actually see your wife and son in person and not

16   go necessarily 8, 10, 12 months without laying eyes on

17   them; is that fair?

18       A.    Yes.  We would like to find a way to lay

19   eyes on each other.

20       Q.    As if I were in your shoes, I would too.  I

21   couldn't imagine it being otherwise.

22            If you were to figure out a way to be able

23   to see them in a park or some sort of public space

24   outdoors with masks, would it be possible there for

25   you to bring an absentee ballot and an envelope and

Jeremy Paul Rutledge 7/24/2020

43

1   sign it and put it on a bench and then walk back and

2   your wife walk over and sign it and then leave it

3   there for you?

4         A.    I think that is in the realm of possibility.

5   There's a little bit -- I've thought about this

6   question because I've wondered it myself.

7              It's a little speculative to me, speculative

8   because it would -- it would really require that we

9   find a park that works for us, that nobody is sick at

10  the time, that the weather is good, you know, from my

11  point of view that nobody else is around because I

12  would want my vote to be private.  And so it requires

13  a lot of things to go right.

14        Q.    It does.  I think just today as you think

15  about it, your -- the ballot goes in the envelope, and

16  the envelope gets sealed, and the outside of the

17  envelope is what's signed.

18             So I think at least you don't have to worry

19  about the vote being private in the sense of someone

20  seeing your ballot.  Your wife wouldn't even

21  necessarily see it and know who you voted for unless

22  you told her.  So at least that's one piece of it you

23  could not have to worry about.

24             Unless you have anything else to clarify,

25  I'm going to pass you off now to -- I don't know who's

Jeremy Paul Rutledge 7/24/2020

44

1    coming after me, but they can fight over who gets you

2    next.

3            MR. BURNS:  Before we conclude, there wasn't

4    a pause before the end of your statement.  I wanted to

5    object to the form of the last statement Mr. Lambert

6    made.

7    BY MR. LAMBERT:

8        Q.   In that case, if I can do one thing, let me

9    ask a question then to follow up on that with the

10   objection to form.

11           Mr. Rutledge, are you aware that the ballot

12   goes in an envelope, which is sealed, and then that

13   envelope is which has the signatures on it for you and

14   for the witness?

15       A.   Yes.  I'm aware that the signatures can be

16   added to the sealed envelope.

17           MR. LAMBERT:  Thank you very much.  In that

18   case, I will now actually pass you off for real this

19   time.

20           THE WITNESS:  Thank you.

21           MR. BURNS:  If we could, I think now is a

22   good time for a brief five-minute break to give

23   Reverend Rutledge a chance to catch his breath.  If

24   that's okay with everyone, we'll take a brief

25   five-minute break.

1    because she was still, you know, living in the bubble

2    with me, and we didn't want there to be any reason for

3    that ballot to get thrown out.

4              So since we were all still living in the

5    same house, it was an easy thing to do.  We went ahead

6    and did that to ensure that the vote was counted.

7         Q.   And Mr. Lambert asked you a couple of

8    questions or commented about your declaration.  And I

9    think it said something about under your

10   interpretation of the excuse requirement, you don't

11   qualify to vote absentee.

12             Is that an accurate statement?

13        A.   Yes, and that's still my interpretation.  I

14   do not consider myself to be a disabled person, and I

15   think that there's some medical definitions about

16   being disabled that I don't believe I meet.

17        Q.   Have you called anybody, like your -- I

18   guess you're in Charleston County, right, or are you

19   in Berkeley County?

20        A.   I'm in Charleston County.

21        Q.   Have you called your Charleston County

22   election commission to see if your interpretation is

23   accurate?

24        A.   No.  To see if my interpretation of my

25   medical condition is accurate?

Jeremy Paul Rutledge 7/24/2020

55

1   share with them.

2          But does that answer your question?  I'm not

3   sure I followed exactly what you were asking.

4      Q.    Sure.  And could you give me the names of

5   those folks that you referenced?

6      A.    Yeah.  Senator Kimpson, I see from time to

7   time.  And then I'm trying to think of some of my

8   friends from the Furman program.  Tom Davis, I believe

9   I have spoken with about different things.  It's been

10  a while.  Beth, and I'm blanking on her last name.  I

11  can provide these for you.

12         Just friends that I've called about

13  different things or reached out to, especially

14  relating to the pandemic in our state and the spread

15  of the virus.  But not about --

16     Q.    But you don't recall -- just to be clear,

17  you don't recall ever contacting any house member or

18  senator requesting that they change the law related to

19  absentee ballots for the upcoming election.

20     A.    No.  I think my focus has not been on trying

21  to get the legislature to change the law this quickly.

22  It had been more about going to the Election

23  Commission, which seems like the way that something

24  could happen quickly during an election year.  That's

25  been my understanding as a citizen.