THE STATE OF SOUTH CAROLINA
In the Supreme Court

———————————————

In the Original Jurisdiction

———————————————

Regina Duggins and Chaunta R. Hamilton …..…………………………………….….Petitioners,

v.

Jay Lucas, in his capacity as Speaker of the House of Representatives and
Harvey Peeler, in his capacity as President of the Senate………...……………..…….Respondents,

and

South Carolina Election Commission…..…………………..……….Respondent/Nominal Defendant.

———————————————

**PETITION FOR ORIGINAL JURISDICTION,
EXPEDITED DISPOSITION, AND EMERGENCY RELIEF**

———————————————

Christopher P. Kenney (SC Bar No. 100147)
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, South Carolina 29202
(803) 252-4848
(803) 252-4810 (facsimile)
cpk@harpootlianlaw.com

Shaundra Young Scott (SC Bar No. 75374)
SOUTH CAROLINA
DEMOCRATIC PARTY
1929 Gadsden Street
Columbia, SC 29201
(803) 799-7798
shaundra@scdp.org

ATTORNEY FOR PETITIONERS
REGINA DUGGINS AND
CHAUNTA R. HAMILTON

July 31, 2020
Columbia, South Carolina.

South Carolina election workers and voters are headed for calamity. The COVID-19 pandemic threatens the orderly conduct of the November general election by diminishing the number of election workers willing to expose themselves to certain harm and the number of available polling locations willing to welcome the public. According to the State's elections chief, poll manager shortages, inexperienced poll managers, and a lack of polling places will lead to precinct consolidation, crowding, long lines, confusion, and errors such that "immediate action" is needed to ensure election officials are able to plan for and meet "the greatest challenge to our election system our state has ever seen." Without action now, the rapidly approaching general election promises to be tumultuous and to place voters in certain high-risk cohorts—voters like Petitioners Regina Duggins and Chaunta R. Hamilton—in harm's way when casting the only ballot they are presently allowed to under South Carolina law: an in-person ballot on election day.

The first principle of South Carolina government is that *all* political power is vested in and derived from the people and the people have the right to change their government at all times. See S.C. CONST. art. I, § 1. To that end, elections must be free and open such that every inhabitant of this State who is qualified to vote under the Constitution "*shall have* an equal right to elect officers and be elected to fill public office." S.C. CONST. art. I, § 5 (emphasis added). "The right of suffrage, as regulated in this Constitution, *shall be* protected by laws regulating elections and prohibiting, under adequate penalties, all undue influence from power, bribery, tumult, or improper conduct." S.C. CONST. art. II, § 1 (emphasis added). Accordingly, the General Assembly is tasked with regulating the time, place, and manner of elections and enacting other provisions necessary to the fulfillment and integrity of the election. S.C. CONST. art. II, § 10. But the simple, uncontradicted fact is that the current method of regulating elections during the COVID-19 pandemic violates individual rights, particularly those of sick and vulnerable voters. Voters with compromised health

2

conditions, and those simply unsure whether they would suffer a severe case of the coronavirus, will be forced to choose between safeguarding their life and health and exercising the franchise. Placing Petitioners and those with compromised conditions, whether known or unknown, in such an untenable position violates the Constitution. This action seeks to remedy that profound injustice.

This original jurisdiction petition is submitted pursuant to article V, § 5 of the Constitution, South Carolina Code § 14-3-310, and Rule 245 of the South Carolina Appellate Court Rules. It respectfully seeks (1) leave to file Petitioner's proposed complaint; (2) (if necessary) expedited discovery; (3) an expedited hearing and decision declaring a clear and present danger to free and open elections fulfilled with provisions sufficient to guarantee their integrity and secure them from tumult; and (4) an injunction instructing Nominal Defendant South Carolina Election Commission to implement the procedures it has already identified as necessary to protect election workers and voters and conduct a successful election. Respectfully, time is of the essence.

## FACTUAL BACKGROUND

The relevant factual background is detailed in **Exhibit A**, Petitioners' proposed complaint.

## STANDARD OF REVIEW

When appropriate, the Court will consider matters in its original jurisdiction when they cannot be considered by a lower court first without material prejudice to the rights of the parties. Rule 245(a), SCACR. "Only when there is an extraordinary reason such as a question of significant public interest or an emergency will this Court exercise its original jurisdiction." Key v. Currie, 305 S.C. 115, 116, 406 S.E.2d 356, 357 (1991).

## GROUNDS FOR GRANTING THE PETITION

This Court is the only venue where voters can obtain redress for the profound constitutional injury complained of here. This case turns on two obviously true propositions.

3

First, the unprecedented public health crisis caused by the COVID-19 coronavirus will disenfranchise a significant number of voters unless election procedures change. As Petitioners' epidemiologist explains, a significant cohort of South Carolina voters are at high risk for severe complications or death from COVID-19 and in-person voting is a "high-risk" activity for all people. See Ex. A at Ex. 3. Moreover, the risk associated with in-person voting—a risk particularly acute to those with compromised conditions—is guaranteed to be far greater than it need be due to too few election workers assisting too many voters at too few polling locations, resulting in longer lines. This is not a matter of conjecture: it is precisely what happened during the June statewide primary and the reason the State's elections chief has *twice* pled with lawmakers to act while there is still time. See Ex. A at Exs. 4 & 6.

Second, "the right to vote is a cornerstone of our constitutional republic." Bailey v. S.C. State Election Comm'n, No. 2020-000642, 2020 WL 2745565, at *1 (S.C. May 27, 2020). Because all legitimate power of this government flows from the people's exercise of the franchise, the Court cannot abstain when the legislature fails to meet its constitutional responsibilities. Yes, the General Assembly is tasked by the Constitution with providing free and open procedures that secure the election from tumult. But, for whatever reason, current law fails to meet the moment with procedures that make voting safe to all eligible voters. That shortcoming undermines the rights of individuals and the people's very power to call the political branches to account. Accordingly, it is not a legitimate or lawful exercise of government power to sit idly on ones' hands and watch an election meltdown. It threatens constitutional republicanism itself.

The petition should be granted to address this once-in-a-generation emergency. Discovery (if necessary), briefing, and disposition should all be expedited to give election administrators what they need: time to prepare. Petitioners respectfully offer two further suggestions in support.

4

**I.    Ensuring free and open elections secure from tumult is a matter of public interest that can only be resolved by the Court.**

The Court should conclude this matter warrants original jurisdiction for three reasons.

First, there is no reasonable debate about the threat posed by the coronavirus or that election procedures must be implemented now to allow officials sufficient time to prepare and avoid failed elections. This State remains in the midst of a crisis. The Governor has declared repeated states of emergency. See Ex. A ¶¶ 16–31. The Court has used emergency powers to prevent large gatherings of people both indoors and out. See id. ¶¶ 32–36. Two weeks ago, a member of the U.S. District Court aptly summarized the precarious nature of South Carolina's situation in an order denying a federal inmate compassionate release:

> COVID-19's virulence to date has not only taken the lives of over 130,000 Americas and infected over 3 million more, but it has also wreaked havoc on all of society. Six months ago, the thought that an American citizen's well-being would be threatened with such regularity was unfathomable. Three months ago, the notion that a person would be at a greater risk for exposure to COVID-19 in South Carolina than in a prison in New Jersey was preposterous. Yet, here we are.

United States v. Morgan, No. 2:17-cr-00727-DCN, Dkt. No. 62 at 10–11 (D.S.C. July 17, 2020) (denying motion with leave to refile "[i]f conditions at FCI Fort Dix worsen or if the circumstances in South Carolina improves"). Here we are indeed. Notably, when the Court heard argument in Bailey, it was not disputed that the coronavirus pandemic was a sufficiently serious threat to warrant original jurisdiction and consider whether persons attempting to maintain physical distance were "physically disabled" within the meaning of South Carolina Code § 7-15-320. Since that case was decided, the threat to South Carolina voters has only grown (see Ex. A ¶¶ 9–15) while current election procedures afford *fewer* opportunities to vote in-person or mail absentee.

The highly communicable nature of the coronavirus and its capacity for symptomless spread threatens a substantial portion of the State's 3.3 million registered voters who are ineligible

to cast an absentee ballot. Whether an activity is high or low risk for COVID-19 transmission turns on four factors: people, place, time, and space. Ex. A at Ex. 3 ¶ 21. Petitioner's epidemiologist explains, "[i]n-person voting is a high-risk activity for all people because it necessarily gathers strangers together, indoors, and for potentially long stretches of time." Id. ¶ 22. Thus, current election procedures "will increase the risk that poll workers and voters will contract COVID-19" (see id. ¶ 18), and that threatens the State's very ability to conduct a successful election without substantial changes in existing law. Because many election workers also fall into high-risk categories (Ex. A at Ex. 6 p. 1), there will be a severe shortage of election workers that will force election administrators to consolidate precincts, which in turn will result in more voters in longer lines at fewer polling locations, making physical distancing impossible. On this point, State and local election officials and an independent watchdog all agree. See Ex. A at ¶¶ 57–79.

But there is no reason to accept this foreseeably horrible outcome as a fait accompli. The South Carolina Election Commission has offered nine specific procedures which, if ordered now to allow election officials time to implement them, would alleviate many of the risks associated with a high-turnout, in-person election. Specifically, this State's top election official has proposed a plan that includes no-excuse absenteeism, online absentee applications, no witness requirement for absentee return envelopes, drop boxes for absentee returns, additional time for election officials to count absentee ballots, designated curbside voting locations, expanding electronic ballot delivery (already used for military voters) to disabled voters and first responders, early voting, and vote-by-mail. See Ex. A at Ex. 6 p. 3. Generally, these procedures all facilitate safe, free, and open access to the franchise by spreading voter participation across a greater number of days and balloting procedures to dilute the concentration of persons casting an in-person ballot on election day. These efforts—procedures that facilitate physical distance between voters and election

workers alike—comport with guidance from public health experts as the only sure way to stop the spread of this highly infectious disease. An association of local South Carolina election officials and an independent election watchdog group agree remedial procedures are necessary to make voting safe and that time is of the essence. See Ex. A at Exs. 7 & 8. For these reasons, the extraordinary and (quite literally) unprecedented circumstances here should weigh heavily in favor of granting original jurisdiction.

Second, waiting for this case to further ripen forecloses the prospect of granting any relief. As explained by the executive director of the State election commission, election officials need clarity *now* to ensure sufficient time to implement any changes to election law. The director has repeatedly pled with Defendants to act quickly (Ex. A at Exs. 4 & 6), but those pleas have fallen on deaf ears. While precedent allows the Court to cure a constitutional violation by ordering a new election, e.g., George v. Mun. Election Comm'n of City of Charleston, 335 S.C. 182, 516 S.E.2d 206 (1999) (nullifying election where procedure violated constitutional guarantee of secret ballot), that is not a workable remedy under these circumstances. For starters, there is no precedent for invalidating statewide elections. The few instances where it could not be avoided concerned county or municipal elections. Further, no one knows when the current pandemic will end, so any do-over would necessarily place voters right back in their present circumstance. Or, actually, far worse circumstances since a post-election dispute could delay timely certification of presidential contest results necessary to select electors to represent the State's voters in the Electoral College. Post-election review also invites a parade of horribles that all good-faith actors should be eager to avoid. As one election law commentator explains:

> Allowing post-election review when pre-election review would have been relatively easy to request essentially gives a campaign the "option" whether to sue: The campaign identifying a potential election problem can sit on its hands until it sees the election results, and if it does not like the election results it can use the

> problem as an excuse to get a more favorable outcome. It is far better to have a
> legal system that discourages such speculation and encourages preventing harm in
> elections that would prove difficult to undo after the fact.

Richard L. Hasan, "Beyond the Margin of Litigation: Reforming U.S. Election Administration to

Avoid Electoral Meltdown," 62 WASH. & LEE L. REV. 937, 994 (2005). Such a result is anathema

to the notion that election integrity should be held "foundational", see Anderson v. S.C. Election

Comm'n, 397 S.C. 551, 556, 725 S.E.2d 704, 705 (2012), and the Court has power to prevent this

self-inflicted catastrophe. Respectfully, it should.

Third, this is a matter of intense public interest arising from an unprecedented national

emergency that implicates questions of constitutional power. It fits squarely within original

jurisdiction jurisprudence. For example, original jurisdiction has been held to exist when necessary

to clarify the effective date of a new constitutional amendment. See Davis v. Leatherman, 419 S.C.

44, 46, 796 S.E.2d 137, 138 (2017). It is often held to exist when necessary to resolve questions

of government power, like whether a governor had power to make recess appointments, Senate v.

McMaster, 425 S.C. 315, 821 S.E.2d 908 (2018), or remove a board member from a public utility.

Hodges v. Rainey, 341 S.C. 79, 533 S.E.2d 578 (2000). Likewise, with matters disputing whether

legislative power was constitutionality exercised. S.C. Pub. Interest Found. v. Lucas, 416 S.C. 269,

271, 786 S.E.2d 124, 125 (2016) (challenging proviso under the one subject rule). The Court has

frequently granted original jurisdiction to settle election disputes, like whether a procedure for the

nomination of candidates in municipal election was lawful, Mitchell v. City of Greenville, 411

S.C. 632, 770 S.E.2d 391 (2015), whether state election officials were obligated to conduct a party

primary election, S.C. Libertarian Party v. S.C. State Election Comm'n, 407 S.C. 612, 757 S.E.2d

707 (2014), and whether candidates were eligible for certification to appear on the ballot. Florence

Cty. Democratic Party v. Florence Cty. Republican Party, 398 S.C. 124, 727 S.E.2d 418 (2012);

Anderson, supra. This petition implicates all the weighty concerns engendered in these precedents: constitutional duty, separation of powers, and lawful election procedures. However, unlike an intradepartmental squabble, this dispute implicates free exercise of the franchise—the right on which all legitimate government action must be founded.

Accordingly, this is a grave matter of public interest that only this Court can resolve.

## II.    The Court should not abstain or show further comity to the legislature.

The obvious impediment to relief here is the decision in Bailey v. South Carolina State Election Commission, No. 2020-000642, 2020 WL 2745565 (S.C. May 27, 2020), where the Court was asked whether South Carolina Code § 7-15-320(B)'s inclusion of "physically disabled person[s]" as a category of voters eligible to cast an absentee ballot was broad enough to include voters attempting to maintain physical distance during the pandemic. The Court (correctly) held the claim concerning the June statewide primary was mooted by legislative action, but then cited the political question doctrine in declining to rule on claims concerning the November general election. See Bailey, 2020 WL at *2–3. Bailey poses no obstacle here for at least four reasons.

First, this case is just different from the statutory construction question presented in Bailey. Resolving statutory construction questions turns on discerning legislative intent. Fullbright v. Spinnaker Resorts, Inc., 420 S.C. 265, 272, 802 S.E.2d 794, 797 (2017) (collecting cases). If a statute is clear and constitutional, the Court will decline to wade into a policy dispute over its efficacy. See id. at 271–72, 281, 802 S.E.2d at 797, 802 (collecting cases, leaving policy concerns "for the legislature."). The claim here sounds in the Constitution as Petitioners seek redress for an injury founded on the express guarantee of free and open elections secure from tumult. See S.C. CONST. art. I, § 5 & art. II, § 1. Construing the Constitution is a different task altogether. "When this Court is called to interpret our Constitution, it is guided by the principle that both the citizenry

9

and the General Assembly have worked to create the governing law." State v. Long, 406 S.C. 511, 514, 753 S.E.2d 425, 426 (2014). So, while the Court applies rules of construction similar to those used to construe statutes (id.), legislative power is not plenary, and the Court has the responsibility to construe the Constitution and laws of the State "without concern for political or popular opinion." Mims Amusement Co. v. S.C. Law Enf't Div., 366 S.C. 141, 149, 621 S.E.2d 344, 348 (2005). For example, "[t]he Legislature may not abrogate the right to a jury trial simply by designating a proceeding as a civil action without a jury" (id.) because, unlike the code of laws, the Constitution provides a hard, non-negotiable floor for government action.

> The provisions of the state constitution are not a grant but a limitation of legislative power, so that the Legislature may enact any law not expressly, or by clear implication, prohibited by the state or federal constitution.

Segars-Andrews v. Judicial Merit Selection Comm'n, 387 S.C. 109, 118, 691 S.E.2d 453, 458 (2010). So, while the Court was correctly concerned with legislative intent when it considered the statutory construction claim in Bailey, legislative intent only gets you so far here where the Court must consider the prerogative of a far greater power: the people's exercise of the franchise. Here, current election procedures violate the Constitution during the COVID-19 pandemic.

Second, when the Court dismissed Bailey there was a reasonable expectation the pandemic might recede, or that the General Assembly would act to safeguard the November general election. *Neither* assumption has proven true. As Petitioners' proposed complaint explains, the State remains in a state of emergency and the coronavirus continues to rage unimpeded across this State and much of the Nation. See Ex. A ¶¶ 9–38. Likewise, the window for meaningful legislative action has closed. On June 24, 2020, the House tabled two amendments that would have extended the same protections voters in the June statewide primary received to voters in November. Ex. A ¶¶ 84. House and Senate leadership claim they will not return until September (id. ¶¶ 85–87),

which will be too late. See id. at Ex. 6 p. 4 (urging "immediate action"). So, while the Court might have reasonably assumed when it decided Bailey on May 27, 2020 that judicial intervention was unnecessary because legislative action would soon follow, that did not and will not happen.

Third, because elections are the vehicle through which the people call the political branches to account, the Court cannot ignore an existential threat to elections or free and open participation by individual voters in them. This distinction sets this claim apart from Bailey, where, for example, the Court could have simply (and reasonably) dispensed with the statutory construction claim by answering "no"—the disability exception does not include persons attempting to maintain physical distance during the pandemic—and left it to the legislature to decide what to do with that construction. But here the individual, constitutional right to free, open, and safe elections is what is at stake and current election procedures are at odds with that right. In Callison v. Peeples, 102 S.C. 256, 86 S.E. 635 (1915), the Court said requirements during elections must be "strictly followed" and rejected the contention that the General Assembly's failure to make provisions for the disenfranchised electors relieved the Court from hearing the case:

> The contention that the act of the General Assembly made no provision for electors situate as these were is not sufficient to warrant the court in dismissing their application for protection; for the General Assembly can no more deprive them of their constitutional rights than the proponents of the new county. It makes no difference how or why they were deprived of the right, unless, of course, they themselves were responsible for it. The fact that they were deprived of the right to vote goes to the legality of the election, and its validity depends upon the determination of what part of the electorate so deprived of the right would be necessary to render the election void.

Id. at 256, 86 S.E. at 637. Likewise, current law disenfranchises voters like Petitioners; whether the General Assembly intended that be the case is immaterial to the Court's obligation to vindicate this most important individual right. Indeed, because the right to vote is so fundamental it cannot be left abridged without disrupting our system of ordered liberty. Recently, the Court dismissed

11

an original jurisdiction matter on standing grounds and encouraged the plaintiffs to seek relief through legislative and executive action and, if relief was not forthcoming, to seek it "at the ballot box." Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n, 407 S.C. 67, 81, 753 S.E.2d 846, 853 (2014). But the distinction drawn here, where the risk to sick and vulnerable voters refuses them the ballot itself, threatens voters' ability to obtain redress and call the political branches to account. These barriers to the franchise frustrate the practice of ordinary politics as an available means to settle disagreements and place this action outside the scope of many others, like Carnival Corp., where the Court might otherwise reasonably defer. Thus, the better view is that this action is simply different in kind from the statutory construction claim in Bailey.

Fourth, if necessary, the Court should conclude Bailey was wrongly decided when it said that "[a]s for elections after July 1, 2020, we hold that whether any change should be made to the law is a political question for the Legislature likewise to answer." Bailey, 2020 WL at *3. This conclusion misapprehends the political question doctrine. "[T]he action or inaction of the General Assembly does not determine whether a question is political, and therefore, nonjusticiable." Bailey, 2020 WL at *5 (Hearn, J, dissenting). A true "political question" is not one that touches on some aspect of politics or elections, but a dispute where the resolution is left to another branch of government. For example, whether to punish or expel a member of the legislature is a political question. See S.C. CONST. art. III, § 12 ("Each house shall choose…"). Whether the Judicial Merit Selection Commission properly evaluated a judicial candidate is a political question. S.C. Pub. Interest Found. v. Judicial Merit Selection Comm'n, 369 S.C. 139, 632 S.E.2d 277 (2006). Thus, properly understood, "[t]he nonjusticiability of a political question is primarily a function of the separation of powers." S.C. Pub. Interest Found. v. Judicial Merit Selection Comm'n, 369 S.C. 139, 142, 632 S.E.2d 277, 278 (2006) (citing Baker v. Carr, 369 U.S. 186, 210–11 (1962)); Segars-

Andrews, 387 S.C. at 121, 691 S.E.2d at 460 (same). Applying this framework, the mere fact that legislative action has or could occur has no bearing on whether the Court should hear a case, nor does the fact that the underlying matter concerns politics or elections.

But that is precisely what the Court concluded in Bailey, which cannot be followed without causing irreparable harm to the Court's power to declare the law. The novel doctrine announced in that case will be an endless source of mischief and confusion leading to repeated claims that the pendency of this bill or that bill in the legislature is suddenly cause for the Court to cede its obligation to declare what the law presently requires. This is not to say the General Assembly cannot abrogate a decision of the Court with legislation (provided doing so does not offend the Constitution); certainly, it can. But a rule that requires abstention based solely on the possibility of legislative action is not only an unworkable standard to apply but one that diminishes the Court's power as a co-equal branch. Indeed, a better frame to explain the Court's decision in Bailey is not the political question doctrine, but the simple exercise of comity to a co-equal branch. The Court explained its decision not to construe the absentee statute by stating:

> Statutory interpretation is certainly a judicial question, but when the Legislature considers the very same question—knowing it is doing so at the very same time the Court considers the question—and answers the question with clarity, we cannot give a different answer through the judicial act of statutory interpretation. We may do so only by the political act of simply disagreeing. This Court will not do it.

Bailey, 2020 WL at *3. This reasoning is correct to the extent it sought to afford the legislature the first opportunity to act. But comity is a matter of discretion, not jurisdiction. This claim seeks free and open elections secure from tumult as guaranteed under the Constitution. The Court is the ultimate guardian of that individual constitutional right. The political question doctrine is intended to preserve the separation of powers, not disrupt them. If the Court finds Bailey unavoidable here, it should not be followed as precedent.

13

## CONCLUSION

Current election procedures will disenfranchise Petitioners alongside tens of thousands of other sick and vulnerable voters who are only eligible to cast an in-person ballot on election day in November. This will put tremendous, possibly insurmountable strain on an election system with too few workers and polls and inadequate procedures. No voter—sick or otherwise—should be forced to weigh their personal health and safety against exercise of the franchise. Nor should we accept the chaos that will ensue from the tragic maladministration caused by an overwhelmed election system unable to perform under the stresses and strains of the COVID-19 pandemic. Fortunately, there is still time to act and a clear roadmap for solving this problem that relies on the expertise of election officials.

This petition for original jurisdiction should be granted along with leave to Petitioners to file their proposed complaint. The Court should shorten Defendants' time to respond and expedite discovery (if necessary), briefing, and a decision. Declaratory and injunctive relief is warranted. The Court should hold current election procedures violate article I, § 5 and article II, § 1 of the South Carolina Constitution and then order the South Carolina Election Commission to pursue the nine remedial actions outlined in the executive director's correspondence to Defendants (Ex. A at Ex. 6) along with any such further election procedures as are feasible, necessary, just, and proper to conduct a free, and open election secure from tumult.

[signature page follows]

14

Respectfully submitted by,

*[signature]* P. K

Christopher P. Kenney (SC Bar No. 100147)
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, SC 29202
(803) 252-4848
(803) 252-4810 (facsimile)
cpk@harpootlianlaw.com

Shaundra Young Scott (SC Bar No. 75374)
SOUTH CAROLINA DEMOCRATIC PARTY
1929 Gadsden Street
Columbia, SC 29201
(803) 799-7798
shaundra@scdp.org

ATTORNEYS FOR PETITIONERS
REGINA DUGGINS AND
CHAUNTA R. HAMILTON

July 31, 2020
Columbia, South Carolina.

15

Duggins v. Lucas, No. 20-____ (S.C.)
Petitioners' proposed complaint

# Exhibit A

## (Petitioners' proposed complaint)

## IN THE ORIGINAL JURISDICTION
## OF THE SOUTH CAROLINA SUPREME COURT

Regina Duggins and Chaunta R. Hamilton,

                Plaintiffs,

      v.

Jay Lucas, in his capacity as Speaker of the
House of Representatives and Harvey Peeler,
in his capacity as President of the Senate,

                Defendants,

                And

South Carolina Election Commission,

                Nominal Defendant.

No. _____

**[PROPOSED]
COMPLAINT**

Plaintiffs Regina Duggins and Chaunta R. Hamilton are citizens and voters of this State with underlying health conditions that cause them to suffer a higher risk of catching a severe case of COVID-19. They are afraid to vote during the rapidly approaching general election based on existing election procedures. They bring this action under the South Carolina Constitution for a declaration that election procedures for the general election set for Tuesday, November 3, 2020, will disenfranchise them and deny them participation in a free and open election with provisions sufficient to ensure its integrity and to secure it from the tumult caused by the raging coronavirus pandemic that threatens both the conduct of the election and individual voters forced to choose between their personal health and safety and exercise of the franchise.

Repeated warnings from election officials like Nominal Defendant South Carolina Election Commission have gone unheeded and any further delay in resolving this matter will all but ensure elections fail come November. Time is of the essence.

The first principle of this government is that *all* political power is vested in and derived from the people and the people have the right to change their government at all times. See S.C. CONST. art. I, § 1. As set forth more fully below, current election procedures threaten the very integrity of the November general election and promises that those procedures *might* change as a result of legislative action in September will be too little too late. Without intervention by the Court now there will be shortages of election workers unwilling to expose themselves to the coronavirus. Those shortages will cause election officials to consolidate precincts, thus forcing more voters into fewer polling locations, resulting in longer lines, and placing Plaintiffs and a large number of other South Carolina voters at even greater personal risk. Simply put, current law will not provide for a free and open election secure from tumult as guaranteed article I, § 5 and article II, § 1 of the South Carolina Constitution and the Court should enjoin current procedures and order a remedy to protect Petitioners' rights. Plaintiffs would respectfully show this Honorable Court as follows:

## JURISDICTION

1.     The Court has subject matter jurisdiction under article V, § 5 of the South Carolina Constitution and personal jurisdiction over all Defendants.

## PARTIES

2.     Plaintiff Regina Duggins is a citizen of the State of South Carolina, a resident of Charleston County, and a registered voter. See Duggins Aff. ¶¶ 2, 5 (**Exhibit 1**). Duggins was diagnosed with asthma as a child. Id. ¶ 6. In 2018, she was hospitalized for Aspirin Exacerbated Respiratory Disease (AERD), which she treats with three different inhalers to aid her breathing. Id. Her weight also puts her at a higher risk to suffer from severe complications were she to contract COVID-19. Id. ¶ 6. She is just 43 years old and takes extraordinary daily measures to ensure she

2

does not contract the virus. See id. ¶¶ 3, 7. She is fearful about participating in the November general election. Id. ¶ 9.

3.     Plaintiff Chaunta R. Hamilton is a citizen of the State of South Carolina, a resident of Berkeley County, and a registered voter. See Hamilton Aff. ¶¶ 2, 5 (**Exhibit 2**). Hamilton has been diagnosed with End-Stage Renal Disease, which requires her to undergo dialysis treatment three times per week until she receives a kidney transplant. Id. ¶ 6. Accordingly, she has taken extraordinary precautions to avoid contracting COVID-19. See id. ¶ 7. Without expanded ballot access for the November general election, she will be unable to vote for fear of contracting COVID-19. See id. ¶ 9.

4.     Defendant Jay Lucas is the Speaker of the House of Representatives.

5.     Defendant Harvey Peeler is the President of the Senate.

6.     Nominal Defendant South Carolina Election Commission (Election Commission) is an agency of the State of South Carolina responsible for planning and executing elections and assisting local election commissions in doing the same. The Election Commission has consistently and repeatedly warned of the need to act to protect election workers and voters and ensure the successful conduct of the general election during the COVID-19 pandemic. It is joined here as a party necessary to grant complete relief.

## FACTS

7.     Generally speaking, South Carolina voters are required to cast a ballot at the polls on election day unless they are absent from their county of residence or present but meet the criteria in an enumerated list of categories. See S.C. Code Ann. § 7-15-320. Absentee voting procedures permit either an early in-person ballot or a mail ballot. See id. § 7-15-330.

8.    South Carolina remains in a state of emergency because of the COVID-19 pandemic. Without relief here, it is certain to have a deleterious effect on the free, open, and safe conduct of the November general election free of tumult by disrupting the State's ability to conduct a successful election and discouraging participation by voters concerned about lines and crowds.

## The State of South Carolina and her citizens are
## in an escalating state of emergency due to the COVID-19 pandemic

9.    COVID-19 is a highly communicable respiratory disease caused by a novel coronavirus called SARS-CoV-2 that has spread across the world, including in the United States and South Carolina.



New reported cases by day in the United States

10.    With few notable exceptions, the virus has spread unimpeded across the United States. For example, on July 17, 2020, the United States recorded a daily record of more than 75,000 new cases.



New reported deaths by day in the United States

*Figure 1 - "Coronavirus Live Updates: U.S. Shatters Single-Day Caseload,"*
*N.Y. TIMES website (July 17, 2020).*

11.    South Carolina is likewise posting record numbers of new cases.

12.    According to the South Carolina Department of Health and Environmental Control (DHEC), 82,071 South Carolinians have been infected with the virus and 1,452 have died as of July 28, 2020. See "SC Testing Data and Projections" SCDHEC website (July 28, 2020).[1]

---

[1] Available at: https://scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/sc-testing-data-projections-covid-19

    13.    South Carolina's daily and cumulative case load is growing largely unimpeded.



"SC Testing Data & Projections (COVID-19)," DHEC website (last accessed July 28, 2020).[2]

    14.    South Carolina deaths from COVID-19 have also sharply risen in recent weeks:



"COVID-19 Deaths in South Carolina by Date," DHEC website (last accessed July 28, 2020).[3]

---

[2] Available at: https://scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/sc-testing-data-projections-covid-19

[3] Available at: https://scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/sc-testing-data-projections-covid-19

15. Also concerning is the occupancy of South Carolina hospitals which, once overrun by coronavirus cases, will be unable to provide life-saving care to all patients in need, leading to increased death among citizens that might otherwise be saved through medical intervention. While DHEC's current hospital occupancy report suggests an improved landscape, disclaimers on the recent July 25, 2020 report indicate the agency's reporting capacity is still "transitioning" to a new federal system. The last available public report not subject to these accuracy disclaimers indicates highly populated counties with caseloads already exceeding 75% of available capacity:



"Total Hospital Bed Occupancy (COVID-19)," DHEC website (accessed July 17, 2020).[4]

### The Executive and Judicial branches of State government have exercised emergency powers to marshal a response to the COVID-19 pandemic

16. Beginning on March 13, 2020 and continuing uninterrupted through the present, Governor Henry McMaster has issued 31 executive orders, including nine emergency declarations

---

[4] Available at: https://scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/hospital-bed-capacity-covid-19

6

citing an "imminent" threat to public health or other risks posted by COVID-19 and marshaling a response using the State's Public Health Plan Emergency Committee and South Carolina Emergency Operations Plan.

17. For example, the March 13, 2020 executive order (Ex. Order 2020-08):

   a. Ordered DHEC to restrict visitation to nursing homes and assisted living facilities;

   b. Closed all public schools in Kershaw and Lancaster counties;

   c. Authorized jails and prisons to suspend visitation;

   d. Activated the South Carolina National Guard;

   e. Prohibited price gouging; and

   f. And suspended certain regulations for security contractors and commercial vehicle operators.

See Ex. Order 2020-08 (citing S.C. Code Ann. §§ 1-3-420; 25-1-440; 44-4-130 & -500).

18. On March 15, 2020, the Governor issued an executive order closing all public schools for 14 days and postponing all March and April municipal elections. Ex. Order 2020-09.

19. On March 17, 2020, the Governor issued an executive order directing DHEC to use its powers under the Emergency Health Powers Act—a law that grants the department power to (1) close and decontaminate any facility deemed to pose a risk to public health; (2) ration and manage services by any health care facility; (3) test, treat, vaccinate, isolate, or quarantine individuals or groups; and (4) commander the assistance of in-state health care workers, among other emergency powers—to prevent transmission of the COVID-19 virus. Ex. Order 2020-10, § 2. The executive order also suspended on-premises restaurant service and prohibited public gatherings of more than 50 persons. Id. §§ 4–5.