IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Mary T. Thomas, Nea Richard, Jeremy Rutledge, Trena Walker, The Family Unit, Inc., and the South Carolina State Conference of the NAACP<br><br>        Plaintiffs,<br><br>vs.<br><br>Marci Andino, as Executive Director of the State Election Commission, John Wells in his official capacity as Chair of SC State Election Commission, Clifford J. Edler and Scott Moseley in their official capacities as Members of the South Carolina State Election Commission, and Henry D. McMaster in his official capacity as Governor of South Carolina,<br><br>        Defendants. | Civil Action No. 3:20-cv-01552-JMC<br><br><br><br><br><br>PRESIDENT PEELER'S RESPONSE IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT |

## INTRODUCTION

COVID-19 is a serious matter, and the South Carolina General Assembly is treating it as such. But the existence of a global pandemic does not suddenly render long-established laws governing the absentee-voting process constitutionally infirm. It does not make neutral laws discriminatory. It does not re-assign legislative authority for the content of the South Carolina Election Code to unspecified "public health officials." And, with the greatest respect for the Court and its role in the constitutional structure, it does not convert an Article III court into a state-level legislature or policymaker.

But that is precisely what the Plaintiffs have asked this Court to do: step into the shoes of the South Carolina General Assembly and rewrite the South Carolina Election Code to address an

incredibly fluid, changes-by-the-minute situation. The federal judiciary should not be coopted to do work that is committed by the South Carolina Constitution to the General Assembly to address and resolve. S.C. Const. art. II, § 10.

This fundamental point of federalism and separation of powers is perfectly illustrated by the Plaintiffs' requested declaratory relief. They ask the Court to take the extreme step of declaring the "Excuse Requirement" and the "Witness Requirement" (in the Plaintiffs' pejorative phrasing) of South Carolina's absentee-voting laws to be unconstitutional "while the risk of COVID-19 transmission in South Carolina remains." (First Am. Compl. ¶ "Wherefore"(A)–(B) (Dkt. No. 76).)

Of course, in order to give the Plaintiffs the relief that they seek, the Court would first have to decide what level of "risk" is unacceptable for voters to vote in person. Is it a "risk" of illness? A "risk" of death? A "risk" of becoming an asymptomatic transmitter? What if the number of positive cases continues on its downward trajectory, as it is currently trending? If the number of cases is dropping, is there no longer a "risk" that would, under the Plaintiffs' over-reaching theory, impair in-person voting? What metric could an Article III court possibly use to assess this "risk"?

The Court would also have to decide when this undefined "risk" still "remains" in the state. If even one person in the state returns a positive test for the virus, does that mean the risk "remains"? Should it be a county-by-county assessment, or city-by-city, or voting precinct-by-precinct assessment? What if someone from a neighboring state tests positive? What metric could an Article III court possibly use to assess when this undefined risk "remains" in South Carolina?

The federalism and separation-of-powers problems further reveal themselves in the Plaintiffs' requested injunctive relief, which is to enjoin the "Excuse Requirement" and the "Witness Requirement" "while emergency orders concerning COVID-19 are in place and/or while

public health officials continue to recommend social distancing practices due to risk of community transmission of COVID-19." (First Am. Compl. ¶ "Wherefore"(C) (Dkt. No. 76).)

The Court would have to determine what "emergency orders" could control this supposedly constitutional analysis. An emergency order from Governor McMaster? What about from a county, or a municipality? What if the trajectory of COVID-19 continues sufficiently downward for Governor McMaster to modify or lift his existing emergency order, but Richland County or the City of Columbia disagrees and keeps one in place? Is the constitutional analysis of a statewide election law really dependent on how the state's chief executive or a town council exercises political judgment when deciding to issue an emergency order?

And which of the often-competing recommendations from federal, state, or local "public health officials" should control such an analysis? Suppose Governor McMaster, relying on DHEC scientists, determines that it is safe for restaurants, parks, churches, arenas, and other places of public gatherings to reopen without restriction, but a dissenting scientist at DHEC suggests to continue wearing masks and staying six feet apart from others when visiting these facilities. Which of these amounts to a "recommendation" from a "public health official" sufficient to keep the Plaintiffs' proposed injunction in place? Or what if there are no longer any emergency orders in place in South Carolina, such that everything returns to its pre-virus status, but the CDC continues to urge Americans to continue wearing masks? Is the constitutional analysis of a statewide election law really dependent on undefined "recommendations" of unidentified "public health officials"?

These are not questions that an Article III court can or should even attempt answer. These questions all require judgments by the elected officials who are constitutionally designated to address these issues: the South Carolina General Assembly. Put simply, though respectfully, it is not the job of a federal court to substitute its judgment for that of elected representatives.

Accordingly, President Peeler respectfully urges the Court to dismiss this non-justiciable matter and abstain from considering it, just as the South Carolina Supreme Court did when presented with similar issues in June. Alternatively, the Court should grant the pending motions for summary judgment filed by the Election Commission and the State Republican Party, as the Plaintiffs lack standing to bring this case, and the two challenged provisions of the South Carolina Election Code easily pass muster.

## ARGUMENT

**I. The Court should dismiss this case because determining how to conduct South Carolina's elections is a legislative function, not a judicial one.**

**A. This case presents non-justiciable political questions because of how the Plaintiffs have framed their requested relief.**

As noted above and in President Peeler's intervention motion, the legal authority for altering (or choosing not to alter) South Carolina's Election Code belongs exclusively to the General Assembly:

> The General Assembly shall provide for the nomination of candidates, regulate the time, place and manner of elections, provide for the administration of elections and for absentee voting, insure secrecy of voting, establish procedures for contested elections, and enact other provisions necessary to the fulfillment and integrity of the election process.

S.C. Const. art. II, § 10. The South Carolina Supreme Court recognized this authority when it dismissed a challenge to the state's absentee voting laws as presenting a non-justiciable issue:

> If conditions in the Fall warrant another change in our election law, and if the will of the people as expressed through their legislative representatives is that such a change be made, the Legislature may change the law. This Court, however, will not.

*Bailey v. S.C. State Election Comm'n*, 844 S.E.2d 390, ___, 2020 S.C. LEXIS 77, at *5–11 (S.C. May 27, 2020).

This Court should follow the South Carolina Supreme Court's lead and dismiss this matter to the extent it presents non-justiciable political questions. While it is certainly true that the Court generally has authority and even an obligation to resolve constitutional challenges, it should not be misled by the Plaintiffs' attempt to frame their disagreement with the laws passed by the General Assembly as rising to constitutional proportions.

As detailed in the opening pages of this memorandum, the Plaintiffs have not identified a measurable or manageable standard for the Court to employ here. Instead, they ask the Court to rewrite state election law to reflect their subjective policy desires as long as any undefined "risk" of contracting COVID-19 "remains" in South Carolina, "and/or" when an "emergency order" is in place, "and/or" when "public health officials" have any "recommendation" regarding COVID-19. (First Am. Compl. ¶ "Wherefore" (Dkt. No. 76).)

At its core, this is a policy judgment that this Court is neither equipped nor authorized to make. Just last year, the United States Supreme Court explained that an issue—even when packaged as a constitutional claim—amounts to a non-justiciable political question when the case presents "a lack of judicially discoverable and manageable standards for resolving it." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2496 (2019) (quoting *Baker v. Carr*, 369 U.S. 186, 226 (1962)); *see id.* at 2498–2508 (vacating pursuant to the political question doctrine decisions of district courts in North Carolina and Maryland that evaluated those states' congressional districting plans against numerous constitutional challenges).

This is just such a case. The Plaintiffs' entire case is based on the idea that voting in person will allegedly increase the potential for transmission of COVID-19. But such a speculative evidentiary presentation begs the question: How much of an increase? And that begs an obvious follow-up: How much of an increase is too much for the Election Code to remain enforceable?

The Plaintiffs cannot answer these questions. Neither can this Court. That's because they are unanswerable as a ***legal*** matter. These are all ***policy*** questions that are, by law, committed to the South Carolina General Assembly to resolve. The way the Plaintiffs have framed their own case unavoidably triggers the political-question doctrine. Accordingly, the Court should dismiss at least the Plaintiffs' constitutional claims as non-justiciable political questions. *See, e.g.*, *Coalition for Good Governance v. Raffensperger*, Case No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996, at *6–10 (N.D. Ga. May 14, 2020) (dismissing claims regarding Georgia's absentee-voter laws in light of COVID-19 because "they present a nonjusticiable political question" and "there are no judicially discoverable and manageable standards for resolving it").

A handful of courts have ostensibly declined to apply the political-question doctrine to claims like those presented by the Plaintiffs here. But a closer examination of those cases reveals that those courts have, in fact, relied on the very same principles underlying the political-question doctrine when analyzing constitutional claims against various state-level absentee voting laws.

This is true of federal appellate courts. *See, e.g.*, *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 394, 403–08 (5th Cir. 2020) (applying the *McDonald* standard for evaluating a challenge to Texas's absentee-voting laws, explaining that the Texas legislature's decisions regarding the boundaries of absentee voting are entitled to the highest deference, and reiterating that "the spread of the Virus has not given 'unelected federal jud[ges]' a roving commission to rewrite state election codes" (quoting *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, (2020) (Roberts, C.J., concurring))).

It is true of federal district courts. *See, e.g.*, *Tully v. Okeson*, Case No. 1:20-cv-01271-JPH-DLP, 2020 U.S. Dist. LEXIS 151508, at *14–15 (S.D. Ind. Aug. 21, 2020) (rejecting a challenge to Indiana's absentee voting procedures under the *McDonald* standard and summarizing that "[f]or

6

the federal courts to step in and decide what measures are necessary would 'allow[] a political question—whether a rule is beneficial, on balance—to be treated as a constitutional question and resolved by the courts rather than by legislators'" (quoting *Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020))); *Democracy N.C. v. N.C. State Bd. of Elections*, Case No. 1:20cv457, 2020 U.S. Dist. LEXIS 138492, at *72–129 (M.D.N.C. Aug. 4, 2020) (rejecting a challenge to North Carolina's absentee voting laws in light of COVID-19 as not presenting "an unconstitutional burden created by the COVID-19 pandemic," and concluding that "even if the court did share Plaintiffs' concern, it is not for this court to undertake a wholesale revision of North Carolina's election laws").

And it is true of state courts. *See, e.g.*, *Fisher v. Hargett*, Case No. M2020-00831-SC-RDM-CV, 2020 Tenn. LEXIS 283, at *43–51 (Tenn. Aug. 5, 2020) (rejecting a challenge to Tennessee's absentee voting laws in light of COVID-19, and concluding that the laws were constitutional—despite thinking the state's justifications for them were not "persuasive"—because those were "policy choices" made by the Tennessee legislature, to which the Tennessee Constitution delegated authority to establish the state's election laws).

In fact, as the Tennessee Supreme Court acknowledged three weeks ago:

> We, however, properly may not and will not judge the relative merits of them [*i.e.*, the state's rationale underlying its statutory protections concerning absentee voting], regardless of our own views. ***To do so would be to exceed the proper scope of our role as jurists***.

*Fisher*, 2020 Tenn. LEXIS 283, at *51 (emphasis added).

The General Assembly is scheduled to reconvene in September to address whether South Carolina's absentee voting laws require any modification to account for COVID-19 with respect to the upcoming election in November. It used the same authority and policy judgments to implement temporary measures for the June election, but nearly 80% of voters still voted in

7

person—and there is not a single documented instance of the virus being transmitted by in-person voting during that election.

The importance of this undisputed fact cannot be overstated. The entirety of this lawsuit is premised on the notion that going to vote in person inevitably results in one contracting COVID-19. It is a false premise in theory—with respect to transmitting COVID-19, going to vote is no different than any other outing that one has to make, and no one would plausibly suggest that going to the grocery store or gas station necessarily results in contracting the virus—and the only actual evidence in the record demonstrates that nearly ***600,000 South Carolinians*** have voted in person during the pandemic with a ***0.0% transmission rate***.

Thus, the Court's assumption in Footnote 20 of its preliminary injunction order that "it is relatively difficult to vote in person without risking the possibility of infection" is now directly contradicted by unrebutted, indisputable evidence. So, too, is the theoretical basis for the Plaintiffs' entire case. Accordingly, the Court should defer to the judgment of the General Assembly with respect to the purported constitutional claims in this case and dismiss them as non-justiciable political questions.

> **B.     The Court should abstain from considering this matter because there are parallel proceedings pending before the South Carolina Supreme Court that can resolve the issues presented here.**

Even if the Court does not believe that this case presents a non-justiciable political question, it should still abstain from exercising jurisdiction in this matter as a matter of federal–state comity. All abstention doctrines stem from the same fundamental point: some matters are best left to the states for resolution, even if federal jurisdictional and justiciability criteria are met.[1]

---

[1] For the reasons argued by the Election Commission and the State Republican Party in their respective motions for summary judgment, President Peeler also believes that the Court lacks

A state interest will justify federal abstention when it speaks to "[f]unctions which make our states self-governing sovereigns, rather than 'mere political subdivisions' or 'regional offices'" of the United States government. *Harper v. PSC of W. Va.*, 396 F3d 348, 352 (4th Cir. 205) (quoting *New York v. United States*, 505 U.S. 144, 148 (1992)). Voting procedures are undoubtedly at the top of that list, as the United States Constitution leaves to each state the authority to establish how elections should be run within its jurisdiction. *Clingman v. Beaver*, 544 U.S. 581, 586 (2005).

As the Fourth Circuit forcefully explained when vacating a ruling from this Court that resisted abstention:

> Although that doctrine [of abstention] has many different forks and prongs, its central idea has always been one of simple comity. Notwithstanding the overlapping obligations of state and federal courts with regard to both state and federal law, the federal judiciary has always maintained some modicum of respect for state public policies in areas of paramount state concern.
>
> Federal courts should thus "exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." And the federal judiciary should accordingly abstain from deciding cases (1) that present "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar" or (2) whose adjudication in a federal forum "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*Johnson v. Collins Entm't Co.*, 199 F.3d 710, 719 (4th Cir. 1999) (quoting *Burford v. Sun Oil*, 319 U.S. 315, 318 (1943), and *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989)).

The Fourth Circuit further reinforced the purposes of abstention in terms that are particularly applicable to this case and others like it nationally, where plaintiffs are attempting to use the federal judiciary to rewrite state election laws on the eve of an upcoming election:

---

jurisdiction here because the plaintiffs all lack standing to present these claims, and he incorporates by reference and adopts those arguments and supporting evidence as if fully set forth herein.

> The Supreme Court has admonished the federal courts to respect the efforts of state governments to ensure uniform treatment of essentially local problems. Principles of federalism and comity require no less. Basic abstention doctrine requires federal courts to avoid interference with a state's administration of its own affairs. Though "abstention from the exercise of federal jurisdiction is the exception, not the rule," its importance in our system of dual sovereignty cannot be underestimated. It safeguards our federal system from the "delay, misunderstanding of local law, and needless conflict with a state policy" that inevitably result from federal judicial intrusions into areas of core state prerogative.

*Id.* (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976), and *Burford*, 319 U.S. at 327).

These federal–state comity concerns manifest themselves in all strains of abstention. *Pullman* abstention, for instance, is proper when a federal court can avoid making a federal constitutional ruling regarding a state law when other avenues for relief are available—such as the *Duggins* case that is pending before the South Carolina Supreme Court, which also challenges the state's absentee voting procedures as a matter of state constitutional law. *See, e.g.*, *Smith v. Husted*, Case No. 2:16-cv-212, 2016 U.S. Dist. LEXIS 194805, at *12–16 (S.D. Ohio Mar. 11, 2016) (abstaining pursuant to *Pullman* from resolving challenges under the Fourteenth and Twenty-Sixth Amendments and Section 2 of the Voting Rights Act to an Ohio election law because a case involving similar issues, though different parties, was also pending before an Ohio trial court).[2]

*Younger* abstention is designed to avoid federal interference with pending state-level proceedings—again, such as the *Duggins* matter before the South Carolina Supreme Court. *See, e.g.*, *Family Found., Inc. v. Brown*, 9 F.3d 1075, 1076–78 (4th Cir. 1993) (affirming a district

---

[2] This is consistent with the Supreme Court's directive that federal courts should render a constitutional ruling only as a last resort. *See, e.g.*, *Slack v. McDaniel*, 529 U.S. 473, 485 (2000) (explaining that federal courts "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of" (quoting *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring))).

court's dismissal pursuant to *Younger* abstention when plaintiffs challenged Virginia election laws as being in violation of the First and Fourteenth Amendments, but the issue could be addressed by the Virginia Supreme Court, and explaining that it was critical for the district court not to "interfere[] unnecessarily in the Commonwealth's administration of its own election process, the integrity of which the state 'indisputably has a compelling interest in preserving' through the enforcement of its own election laws" (quoting *Burson v. Freeman*, 504 U.S. 191, 199 (1992))).

And *Colorado River* abstention, like *Younger*, directs federal courts to abstain as an exercise of "wise judicial administration" when parallel proceedings exist at the state level—once again, such as the *Duggins* matter. *See, e.g.*, *Thompson v. Moorman*, 709 F.2d 1509 (Table Form), 1983 U.S. App. LEXIS 13152, at *6–8 (6th Cir. 1983) (affirming application of *Colorado River* abstention to federal suit brought to challenge Kentucky's election procedures under the Fourteenth Amendment when another suit was also pending in the Kentucky state court).

Each of the above-listed doctrines supports abstention here. And the federal appellate courts have unmistakably sent that message to the district courts with respect to rulings concerning a state's absentee-voting procedures. While perhaps not phrased through reference to the traditional abstention categories, the appellate system has repeatedly frozen district court orders that have attempted to rewrite state absentee-voting procedures in response to purported COVID-19 concerns with a common theme: Stay out of these disputes. For instance:

**Alabama:** A district court issued a preliminary injunction that enjoined the state from enforcing its requirement that an absentee ballot be witnessed, as well as other aspects of the state's voting law, due to COVID-19. *People First of Ala. v. Merrill*, Case No. 2:20-cv-619-AKK, 2020 U.S. Dist. LEXIS 104444, at *87 (N.D. Ala. June 15, 2020). The Eleventh Circuit refused to stay that injunction pending appeal. *People First of Ala. v. Sec'y of State for Ala.*, Case No. 20-12184,

11

2020 U.S. App. LEXIS 19850, at *2 (11th Cir. June 25, 2020). But the United States Supreme Court granted a stay one week later. *Merrill v. People First of Ala.*, Case No. 19A1063, 2020 U.S. LEXIS 3541 (July 2, 2020).

**Wisconsin:** A district court issued a preliminary injunction that enjoined the state from enforcing certain absentee-voting laws because of COVID-19. *Democratic Nat'l Comm. v. Bostelmann*, Case No. 20-cv-249-wmc, 2020 U.S. Dist. LEXIS 57918, at *10 (W.D. Wis. Apr. 2, 2020). The very next day, the Seventh Circuit stayed a portion of that injunction. *Democratic Nat'l Comm. v. Bostelmann*, Case No. 20-1538, 2020 U.S. App. LEXIS 25831, at *8–10 (7th Cir. Apr. 3, 2020). The United States Supreme Court stayed the remainder of that injunction shortly thereafter and criticized the trial court for "judicially created confusion" by "alter[ing] the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206–07 (2020).

**Texas:** A district court issued a preliminary injunction that eliminated virtually all of the state's safeguards with respect to absentee voting because of COVID-19. *Tex. Democratic Party v. Abbott*, Case No. SA-20-CA-438-FB, 2020 WL 2541971, at *5–7 (W.D. Tex. May 19, 2020). The Fifth Circuit temporarily stayed that injunction the very next day. *Hinojosa v. Abbott*, Case No. 20-50407, 2020 U.S. App. LEXIS 16713, at *2 (5th Cir. May 20, 2020). It issued a more fulsome opinion two weeks later that scolded the district court for "intervene[ing] just weeks before an election," explained that federal judges are not at liberty to "rewrite state election codes," and stayed the injunction pending the appeal. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 394 (5th Cir. 2020).

The Supreme Court has further extended this practice to other types of election disputes that have arisen during the pandemic. *See Clarno v. People Not Politicians Or.*, Case No. 20A21,

12

2020 U.S. LEXIS 3631, at *1 (Aug. 11, 2020) (staying a district court's preliminary injunction regarding Oregon's laws governing how state constitutional amendments are placed on a ballot); *Little v. Reclaim Idaho*, Case No. 20A18, 2020 U.S. LEXIS 3585, at *1 (July 30, 2020) (staying a district court's preliminary injunction regarding Idaho's laws governing collecting signatures for a ballot initiative).

The pattern revealed by these cases is unmistakable. When federal district courts have supplanted state-level decisions with respect to absentee-voting procedures during the pandemic, federal appellate courts have immediately suspended the district courts' decisions and allowed the state's procedures to remain in place.[3] This clear deference to letting states take the lead in establishing the law governing absentee voting during COVID-19 is fully consistent with the principles underlying abstention: for purposes of federal–state comity, some matters are best left resolved by the states, even if a federal court otherwise has jurisdiction.

Accordingly, President Peeler respectfully requests that the Court abstain from considering this matter so that South Carolina may set its own absentee voting procedures without unwarranted federal interference.

## II.     The challenged provisions of the South Carolina Election Code are lawful.

Assuming *arguendo* that jurisdiction is proper in this Court and the Court does not abstain, the Plaintiffs' claims readily fail. President Peeler incorporates by reference and adopts the arguments and supporting evidence cited by the State Election Commission and the State

---

[3]   The only instance of which President Peeler is aware where this was not the case involved a challenge to Rhode Island's absentee voting laws, where the ***state agreed*** with the suspension of those laws and entered a ***consent decree*** confirming the same. The Supreme Court refused a political party's request to stay that injunction because, unlike "cases where a State defends its own law, here the state election officials support the challenged decree, and no state official has expressed opposition." *Republican Nat'l Comm. v. Common Cause R.I.*, Case No. 20A28, 2020 U.S. LEXIS 3632, at *1 (2020).

Republican Party in their respective summary judgment motions on the merits of the Plaintiffs' claims as a matter of constitutional law, the Voting Rights Act, and the Americans with Disabilities Act. Because President Peeler has a particular interest in upholding the constitutionality of the challenged laws, he respectfully supplements the arguments of the existing Defendants as follows.[4]

There is no national constitutional provision that creates a right to vote in whatever manner the voter chooses—in-person, absentee, curbside, online, or some other imaginable way. Instead, states are given considerable latitude when drawing up their own procedures for absentee voting. *See, e.g.*, *Griffin v. Roupas*, 385 F.3d 1128, 1130–32 (7th Cir. 2004) (rejecting constitutional challenge to limitations on who is qualified to vote absentee in Illinois, explaining that voting fraud "is a serious problem" that is "facilitated by absentee voting," surveying the various states' procedures for absentee voting, and concluding that "the striking of the balance between discouraging fraud and other abuses and encouraging turnout is quint-essentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry").

In South Carolina, in-person voting is the preferred method for casting a ballot, and absentee voting is a privilege extended by the General Assembly to help facilitate voting in limited circumstances. *State ex rel. McLeod v. Ellisor*, 259 S.C. 364, 369–70, 192 S.E.2d 188, 189–90 (1972).[5] The statutory procedures and boundaries that govern absentee voting are, therefore,

---

[4] President Peeler also incorporates by reference and adopts arguments that Speaker Lucas presents on the issues of this case to the extent they are not inconsistent with the arguments presented herein.

[5] *Ellisor* involved construction of South Carolina's absentee voting statutes in October with a general election looming the next month. The South Carolina Supreme Court specifically noted that it was considering the case with the expectation that the federal district court would abstain from considering a competing lawsuit pursuant to *Pullman* abstention. *See* 259 S.C. at 368, 192 S.E.2d at 189 ("The federal courts normally abstain from deciding federal questions which depend

14

subject to rational-basis review. *See McDonald v. Bd. of Elec. Comm'rs*, 394 U.S. 802, 809 (1969) (explaining that a challenge to Illinois's absentee voting limitations "must bear some rational relationship to a legitimate state end"); *Texas Democratic Party*, 961 F.3d at 403 & n.28 (holding that *McDonald*'s rational-basis test governed a challenge to Texas's absentee voting procedures and commenting that the district court's failure to apply *McDonald* was "[a]mazing[]"); *Tully*, 2020 U.S. Dist. LEXIS 151508, at *8–16 (applying *McDonald*'s rational-basis test to a challenge to Indiana's absentee voting procedures in light of COVID-19, but concluding that the challenge would fail even under the *Anderson-Burdick* framework).[6]

There cannot be any legitimate dispute that there is a rational—even compelling, though that is not the standard—basis for the limitations that South Carolina has placed on absentee voting in this state. Ballot security is one such basis, as the state has previously experienced voting fraud through absentee ballots, and the General Assembly is entitled, just as it has done, to stem such fraud by limiting the availability of absentee voting in a nondiscriminatory fashion.[7] *See Griffin*, 385 F.3d at 1131 ("In this respect, absentee voting is to voting in person as a take-home exam is

---

upon the interpretation of a state statue reasonably open to differing constructions until the state court has construed it." (citing *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941))).

[6] Even courts that have used the *Anderson-Burdick* framework have rejected claims similar to those presented by the Plaintiffs here. *See, e.g.*, *Democracy North Carolina*, 2020 U.S. Dist. LEXIS 138492, at *72–129 (citing this Court's preliminary injunction order as authority for applying the *Anderson-Burdick* framework to a challenge to North Carolina's absentee voting laws in light of COVID-19, but rejecting those challenges as not presenting "an unconstitutional burden created by the COVID-19 pandemic"); *Fisher*, 2020 Tenn. LEXIS 283, at *43–51 (citing this Court's preliminary injunction order as authority for applying the *Anderson-Burdick* framework to a challenge to Tennessee's absentee voting laws in light of COVID-19, but concluding that the laws were constitutional because those were "policy choices" made by the Tennessee legislature).

[7] The State Election Commission identifies prior criminal matters that have involved voting fraud using absentee ballots in South Carolina on Pages 15 and 16 of its motion for summary judgment (Dkt. No. 108-1). President Peeler is pleased that there are not more such examples and would point to this low number as proof that the General Assembly has exercised sound judgment in tailoring the availability of absentee voting.

to a proctored one."). The statutory requirement that a witness confirm an absentee ballot is a key to preserving this interest as well. (*See* Declaration of Lt. Pete Logan ¶¶ 3–7 (Dkt. No. 109-8) (explaining how law enforcement relies on witness requirement for absentee ballots when it investigates alleged voting fraud).)

Efficiency in election administration is also well-served by having nondiscriminatory limitations on absentee voting. The effort and resources that go into distributing, collecting, opening, counting, and (if necessary) recounting absentee ballots can be overwhelming, and also invites variables into the election process that in-person voting simply does not. The *Middleton* version of this case is proof positive of this concern, as those plaintiffs have asked the Court to wildly expand the absentee voting procedures in a manner that would throw the entire election process into chaos. Their requested relief includes permitting candidates and their staffs to bundle absentee ballots, to have absentee ballots be counted without any witness requirement, to make assumptions regarding the United States Post Office's efficiency, and to hold elections open for ten days after Election Day itself. (Dkt. No. 69, at 41–42 in *Middleton*.) The General Assembly has a rational—even compelling—interest for wanting to maintain order with the state's elections, and limiting the role of absentee voting clearly furthers that interest.

Moreover, in-person voting allows election officials to contemporaneously assist voters if they experience a problem with their ballot or confusion with some step in the voting process. This, too, is a rational, compelling basis for limiting availability of the state's absentee-voting program. *See Griffin*, 385 F.3d at 1131 ("Absentee voters also are more prone to cast invalid ballots than voters who, being present at the polling place, may be able to get assistance from the election judges if they have a problem with the ballot.").

These significant state interests vastly overshadow the Plaintiffs' purported harm. As discussed in the preceding sections, their claims in this case are fully dependent on the Court adopting their speculation that a voter who goes to a polling location on Election Day will contract COVID-19. The only actual evidence on the point—nearly 600,000 South Carolinians voted in-person in June without a single documented case of COVID-19 arising from that exercise—confirms that the opposite is true. The burdens on voting allegedly presented here are illusory; to the extent they are not illusory, they are significantly outweighed by the state's interests, which the General Assembly is rationally furthering through nondiscriminatory limitations and procedures for absentee voting in South Carolina. The Court should enter summary judgment against the Plaintiffs accordingly.

## **CONCLUSION**

COVID-19 does not alter the balance of authority between the federal government and state government, nor does it tear down the barriers separating the various branches of government. The issues presented in this case do not lend themselves to judicial resolution, nor do they lend themselves to federal intervention in a matter that is constitutionally committed to the states. Accordingly, President Peeler respectfully requests that the Court dismiss this matter or, alternatively, abstain from considering it.

To the extent the Court disagrees and believes that this case can properly be considered by an Article III court, President Peeler respectfully requests that the Court grant the motions for summary judgment filed by the State Election Commission and the State Republican Party.

Respectfully submitted,

          WOMBLE BOND DICKINSON (US) LLP

          By: /s/ M. Todd Carroll
          Federal Bar No. 9742
          todd.carroll@wbd-us.com
          Kevin A. Hall
          Federal Bar No. 5375
          kevin.hall@wbd-us.com
          1221 Main Street, Suite 1600
          Columbia, South Carolina 29201
          803-454-6504

Attorneys for Senator Harvey Peeler, in his capacity as President of the South Carolina Senate

August 26, 2020
Columbia, South Carolina